No. 25-2205

_____

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

### KANGOL LLC,

*Appellee-Plaintiff,*

v.

### HANGZHOU CHUANYUE SILK IMPORT & EXPORT CO., LTD.,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
District Judge Sharon Johnson Coleman
No. 1:24-cv-01636

### BRIEF OF DEFENDANT-APPELLANT HANGZHOU CHUANYUE SILK
### IMPORT & EXPORT CO., LTD.

**Wesley E. Johnson**
**Cross-Border Counselor LLP**
**105 W. Madison St, Suite 2300**
**Chicago, IL 60602**
**Phone: (312) 752-4828**
**Email: Wjohnson@cbcounselor.com**
**Attorney for Defendant-Appellant**

### ORAL ARGUMENT REQUESTED

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Counsel for Defendant-Appellant submits the following disclosure statement pursuant to Circuit Rule 26.1 and Federal Rule of Appellate Procedure 26.1:

Parties Represented: Hangzhou Chuanyue Silk Import & Export Co., Ltd.

Law Firms Appearing for the Party: Cross-Border Counsel LLP

Corporate Disclosure (Fed. R. App. P. 26.1(a)):
a. The party has no parent corporation.
b. No publicly held corporation owns 10% or more of its stock.

Organizational Victim Disclosure (Fed. R. App. P. 26.1(b)): Not applicable.

Debtor Disclosure (Fed. R. App. P. 26.1(c)): Not applicable.

/s/ Wesley E. Johnson
Wesley E. Johnson
Cross-Border Counsel LLP
105 W. Madison Street, Suite 2300
Chicago, Illinois 60602
(312) 752-4828
wjohnson@cbcounselor.com

Counsel for Defendant-Appellant

Dated: October 22, 2025

**TABLE OF CONTENTS**

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT** .............................................ii

Counsel for Defendant-Appellant submits the following disclosure statement pursuant to Circuit Rule 26.1 and Federal Rule of Appellate Procedure 26.1: ..........ii

**TABLE OF AUTHORITIES** ..........................................................................iii

**JURISDICTIONAL STATEMENT** ........................................................... 1

**STATEMENT OF THE ISSUES** ................................................................ 2

**STATEMENT OF THE CASE** ..................................................................... 3

**SUMMARY OF ARGUMENT** ...................................................................... 8

**ARGUMENT** .......................................................................................... 11

   I.   INTRODUCTION ................................................................. 11

   II.  STANDARD OF REVIEW .................................................... 17

   III. THE HAGUE SERVICE CONVENTION'S THRESHOLD ISSUES.............. 18

   IV. THE HAGUE SERVICE CONVENTION IS EXCLUSIVE AND THEREFORE PROHIBITS OTHER MEANS OF SERVICE ........................................................ 20

      a.   The Supreme Court's Methods for Interpretation of Treaties..................... 20

      b.   Interpretation of the Hague Service Convention: the Text and Context.... 23

      c.   Interpretation of the Hague Service Convention: the Text and Context as Viewed by the Supreme Court.......................................................... 31

      d.   Interpretation of the Hague Service Convention: Drafting History and Negotiations....................................................................... 38

      e.   Interpretation of the Hague Service Convention: The Current Views of the United States and Other Signatories to the Treaty ........................................... 40

      f.   The Third Circuit Court of Appeals Found the Hague Service Convention to be Exclusive and Prohibited Service by Email. .................................................. 44

V.   DESPITE THE EXCLUSIVITY OF THE HAGUE SERVICE CONVENTION, IT MAY ALLOW SERVICE BY EMAIL (BUT NOT IN CHINA)............................ 46

VI.  THE HAGUE SERVICE CONVENTION PROHIBITS JUDGMENT UNLESS THE DEFENDANT IS SERVED BY A METHOD PROVIDED FOR BY THE CONVENTION. ............................................................................................... 50

VII.   THE DEFAULT JUDGMENT IS VOID *AB INITIO* ................................. 51

VIII.  FEDERAL RULE OF CIVIL PROCEDURE 69 .......................................... 51

IX.  RESTITUTION ........................................................................................ 52

X.   CONCLUSION.......................................................................................... 52

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(b), FED. R. APP. P. 32(g), and CIR. R. 32(c)** .......................................................................... i

**CERTIFICATE OF SERVICE** .................................................................................. ii

**CIRCUIT RULE 30(d) STATEMENT**.................................................................... iii

**SHORT APPENDIX OF DEFENDANT-APPELLANT HANGZHOU CHUANYUE SILK IMPORT & EXPORT CO., LTD** ............................................... i

I.   Memorandum Opinion and Order of June 13, 2025, Short Appendix 001-07 .. ii

II.  Amended Final Judgment Order of October 2, 2024, Short Appendix 008-13 iii

III. Sealed Temporary Restraining Order of March 26, 2024, Short Appendix 014-22   iv

# TABLE OF AUTHORITIES

## Cases

*Air France v. Saks*, 470 U.S. 392 (1985) .............................................................. 26, 27

*Bestway Inflatables & Material Corp. v. Individuals*, No. 24 C 11696, 2025 LX 108727 (N.D. Ill. June 17, 2025)......................................................... 20, 21, 38, 39

*Choctaw Nation of Indians v. United States*, 318 U.S. 423 (1943) .......................... 26

*Corley v. United States*, 556 U.S. 303, 314 (2009) .................................................... 37

*Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 563 (7th Cir. 1984)............. 23

*Dorsey v. Varga*, 55 F.4th 1094, 1103 (7th Cir. 2022) ............................................... 23

*Garcia v. Pinelo*, 808 F.3d 1158, 1162 (7th Cir. 2015) .............................................. 54

*Golan v. Saada,* 596 U.S. 666, 681, n10 (2022) ......................................................... 53

*Griffin v. Oceanic Contractors*, 458 U.S. 564, 575 (1982) ......................................... 40

*Hangzhou Chic Intelligent Technology Co. v. P'ships & Unincorporated Ass'n Identified on Schedule A*, No. 20 C 4806, 2021 U.S. Dist. LEXIS 64064 (N.D. Ill. Apr. 1, 2021). ............................................................................................................ 15

*Lozano v. Alvarez*, 572 U.S. 1, 12 (2014) *quoting Olympic Airways v. Husain*, 540 U.S. 644 (2004) ....................................................................................................... 27

*Luxottica Group S.p.A. v. P'ships & Unincorporated Ass'n Identified on Schedule "A"*, 391 F. Supp. 3d 816 (N.D. Ill. 2019).................................................................. 16

*Manning v. Caldwell for City of Roanoke*, 930 F.3d 264 (4th Cir. 2019)................... 44

*Menon v. Water Splash, Inc.*, 472 S.W.3d 28 (Tex. App. 2015) ................................. 48

*Monasky v. Taglieri,* 589 U.S. 68, 71 (2020) .............................................................. 53

*Nw. Fuel Co. v. Brock*, 139 U.S. 216, 219 (1891) ....................................................... 66

*Oakley, Inc. v. Partnerships and Unincorporated Associations Identified in Schedule "A",* No. 20-cv-05049, 2021 WL 2894166, at *4 (N.D. Ill. July 9, 2021) ..... 24, 29, 41

*Patrick's Restaurant, LLC v. Singh*, 2019 U.S. Dist. LEXIS 2535 (D. Minn. Jan. 7, 2019) ....................................................................................................... 42, 43

*Peanuts Worldwide LLC v. P'ships & Unincorporated Associations Identified on Schedule "A"*, 347 F.R.D. 316 (N.D. Ill. 2024) ......................... 18, 19, 25, 26, 29, 41

*Redmond v. Redmond*, 724 F.3d 729, 739 (7th Cir. 2013) ......................................... 54

*Reich v. Continental Casualty Co.*, 33 F.3d 754 (7th Cir. 1994) ............................... 45

*Relational, LLC v. Hodges*, 627 F.3d 668, 671 (7th Cir. 2010). ................................ 23

*Sask. Mutual Insurance Co. v. CE Design, Ltd.*, 865 F.3d 537, 541 (7th Cir. 2017). 54

*SEC v. Lahr*, No. 22-2497, 2024 U.S. App. LEXIS 18170 (3d Cir. July 24, 2024 ... 57, 58

*Smart Study Co. v. Acuteye-US*, 620 F. Supp. 3d 1382 (S.D.N.Y. 2022) ....... 17, 26, 36

*Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern District*, 482 U.S. 522, 534, n. 15 (1987).......................... 11, 32, 34, 44, 45

*United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) .................................... 46

*VLM Food Trading Int'l, Inc. v. Illinois Trading Co.*, 811 F.3d 247, 251 (7th Cir. 2016) ................................................................................................................. 23

*Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699 (1988) .. 11, 17, 20, 27, 28, 29, 31, 34, 35, 37, 38, 41, 43, 45, 46, 47, 49, 50, 58

*Water Splash, Inc. v. Menon*, 581 U.S. 271, 273 (2017) .. 11, 17, 27, 28, 29, 35, 37, 41, 44, 45, 46, 47, 49, 59, 61

## Statutes

15 U.S.C. § 1114 .......................................................................................................... 3

15 U.S.C. § 1121 .......................................................................................................... 1

15 U.S.C. § 1125(a) ..................................................................................................... 3

15 U.S.C. § 1125(c) ..................................................................................................... 3

28 U.S.C. § 1291 .......................................................................................................... 1

28 U.S.C. § 1331 .......................................................................................................... 1

735 ILCS 5/2-1402 ..................................................................................................... 52

## Rules

Federal Rule of Civil Procedure 1 ............................................................................ 30

Federal Rule of Civil Procedure 60(b)(4) ............................................................. 6, 12

Federal Rules of Appellate Procedure 4(a)(1)(A) ..................................................... 1

Federal Rules of Civil Procedure 4(f)(3) ........................... 3, 5, 8, 16, 18, 19, 24, 29, 31

Federal Rules of Civil Procedure 69(a)(1) ...................... 2, 7, 10, 12, 17, 18, 51, 52, 53

Ill. Sup. Ct., R 277 ..................................................................................................... 52

## Other Authorities

1964 *Conference de la Haye de Droit International Prive, Actes et Documents de la Dixieme Session (Notification) TOME III* (1965) (3 Actes et Documents) 38, 39, 40, 46

1965 Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, 20 U.S.T. 361 ........................ passim

*Conclusions and Recommendations Adopted by the Special Commission on the Practical Operation of the Hague Apostille, Evidence and Service Conventions* ¶55, p. 11 (Oct. 28-Nov. 4, 2003) .................................................................................... 42

*Decisions of the 2004 Bucharest Congress* ................................................. 48

Department of Justice website ................................................................. 41

Department of State website ................................................................... 41

Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, 23 U. S. T. 2555, T. I. A. S. No. 7444 ................................. 24, 25

*HCCH 2024 Special Commission Conclusions & Recommendations* ...................... 47

Office of Private International Law, Office of the Legal Adviser, Department of State, Response to Questionaire .............................................................. 49

*Outline - HCCH 1965 Service Convention* ................................................... 44

Practical Handbook on the Operation of the 1965 Service Convention, 5th Edition 48

*Practical Handbook on the Operation of the Hague Service Convention.* Kindle Edition (Third Edition, 2006) ................................................................ 44

*Practical Handbook on the Operation of the Service Convention* ¶279, p. 91 (4th ed. 2016) ................................................................................................ 42

*U.S. Supreme Court Docket No, 16-254*, Brief for the United States as Amicus Curiae Supporting Petitioner ................................................................. 41

United States Department of State *Treaties in Force* (2025) .......................... 11

*Universal Postal Convention (Seoul, 1994)* ................................................. 48

## Constitutional Provisions

*USCS Const. Art. VI, Cl 2* ...................................................................... 21, 26

# JURISDICTIONAL STATEMENT

District Court Jurisdiction: The United States District Court for the Northern District of Illinois had subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 15 U.S.C. § 1121 (trademark jurisdiction), specifically  pursuant to 15 U.S.C. § 1114(1) and 15 U.S.C. § 1125(a). Defendant-Appellant Hangzhou Chuanyue Silk Import & Export Co., Ltd. is a limited company organized under the People's Republic of China, with a principal place of business in Hangzhou, China.

Appellate Court Jurisdiction: This Court has jurisdiction under 28 U.S.C. § 1291. The final order appealed from is the Memorandum Opinion and Order entered on June 13, 2025 (Dkt. # 66), denying Defendant-Appellant's Motion to Vacate Default Judgment. The Notice of Appeal was timely filed on July 14, 2025, within 30 days of the entry of judgment as required by Federal Rules of Appellate Procedure 4(a)(1)(A). There are no prior or related appeals in this case.

This appeal is from a final order or judgment that disposes of all parties' claims. This case is not a direct appeal from the decision of a magistrate judge.

# STATEMENT OF THE ISSUES

1) Whether the District Court erred in denying Defendant-Appellant's motion to void the default judgment issued in Plaintiff-Appellee's favor for failure to properly serve Defendant-Appellant pursuant to Federal Rules of Civil Procedure 4(f)(3), specifically:

   a. whether the methods of service of process found in the 1965 Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, 20 U.S.T. 361 (the "***Hague Service Convention***")[1], apply and are exclusive, and thus prohibit inconsistent methods of service and

   b. whether, within the meaning of Article 10 of the Hague Service Convention, email is a "postal channel."

2) Whether the District Court erred in denying Defendant-Appellant's motion to vacate the default judgment issued in Plaintiff-Appellee's favor for failure to properly serve Defendant-Appellant pursuant to Article 15 of the Hague Service Convention.

3) Whether the District Court erred in denying Defendant-Appellant's motion to modify the default judgment pursuant to Federal Rules of Civil Procedure 69(a)(1) for failure to follow Illinois post-judgment proceedings.

---

[1] Appendix 004

## STATEMENT OF THE CASE

Plaintiff-Appellee Kangol LLC ("***Kangol***") filed this action in the Northern District of Illinois on February 27, 2024, alleging trademark infringement and counterfeiting under 15 U.S.C. § 1114 (Count I), False Designation of Origin under 15 U.S.C. § 1125(a) (Count II), and Trademark Dilution under 15 U.S.C. § 1125(c), against multiple defendants identified on "Schedule A." (Complaint, Dkt. 1).

Simultaneously with the Complaint, Kangol filed a motion to seal and submitted several filings under seal, the list of Defendants, Schedule A (Dkt. 5), a declaration regarding the screenshot evidence it intended to submit (Dkt. 6), and its motion for a temporary restraining order ("***TRO***") (Dkt. 10), accompanying Memorandum (Dkt. 11) and multiple exhibits to the Memorandum (Dkt. 12, 12-1 through 12-6).

That Memorandum also requested service of process by email pursuant to Federal Rules of Civil Procedure 4(f)(3), Dkt. 11 at 15, supported by the Declaration of Todd R. Tucker, Kangol's lead counsel (Dkt. 12).

Relying for factual support on that declaration, Kangol sought a court order authorizing service of process under Fed. R. Civ. P. 4(f)(3) via email on the defendants located in China because "1) it is very difficult to know the true identities and locations of the Defendants given that the Defendants are primarily Chinese entities that sell counterfeit goods on online sales platforms and typically do not disclose reliable information about their identities and locations in connection with their online storefronts and (2) email service will be reliable given that the Defendants rely on email to operate their online businesses." Kangol's

Amended Memorandum in Support of Kangol's *Ex Parte* Motion for Entry of Temporary Restraining Order and Other Relief. Dkt. 19 at 14-15.

Mr. Tucker's declaration stated that "[b]ased on my experience, it is also my understanding that email service will be reliable given that e-commerce sellers like Defendants rely on email, often exclusively, to operate their online businesses." Declaration of Todd R. Tucker, Dkt. 12. The declaration did not otherwise discuss the location or address of any defendant, including Defendant-Appellant Hangzhou Chuanyue.

Schedule A listed 25 defendants. Defendant-Appellant Hangzhou Chuanyue Silk Import & Export Co., Ltd. ("**Hangzhou Chuanyue**"), a Chinese company, was listed as Defendant No. 14.

On February 29, 2024, Kangol filed an amended memorandum of law to replace Dkt. 11, and an amended motion to seal, Dkt. 19.

On March 1, 2024, the District Court granted the two motions to seal (Dkt. 22). On March 4, 2024, the District Court ordered Kangol to either "file a supplemental memorandum addressing the propriety of joinder by 3/18/2024" or "file an amended complaint with smaller subset of defendants along with its memorandum." Dkt. 23.

In response to the March 1, 2024 order, Kangol filed an Amended Complaint on March 18, 2024 (Dkt. 24) along with a renewed motion to seal (Dkt. 25). A new version of Schedule A containing 5 defendants was filed (Dkt. 26), and then a

corrected version of Schedule A was filed on March 25, 2024 (Dkt. 30). Hangzhou Chuanyue was listed on the corrected Schedule A, still listed as Defendant 14.

On March 26, 2024, the District Court conducted a hearing regarding Kangol's motion for a TRO. Dkt. 31. The Court issued a Sealed Temporary Restraining Order on that date (Dkt. 32, Short Appendix ("*S. App.*") 014, the "***TRO Order***"), stating that "Kangol may provide notice of the proceedings in this case to Defendants, including notice of the preliminary injunction hearing, service of process pursuant to Fed. R. Civ. P. 4(f)(3), and any future motions, by electronically publishing a link to the Complaint, this Order, and other relevant documents on a website and by sending an e-mail with a link to said website to the e-mail addresses provided for Defendants by third parties." TRO Order, pp 6-7, S. App. 019-20.

The TRO was to be in effect until April 9, 2024 (Dkt. 32, p.7, Short Appendix 20). On April 9, 2024, the District Court extended the TRO to April 23, 2024 (Dkt. 38).

On April 18, 2024, the summons was issued. On the same day, Kangol, filed its motion for preliminary injunction ("***PI***," Dkt. 39), its Memorandum in support of the PI (Dkt. 40), the Summons returned as "Executed" (Dkt. 41), and a Notice of Motion, setting the hearing date for the PI motion for April 23, 2024 (Dkt. 42). The District Court reset the hearing for April 24, 2024 (Dkt. 43). On April 24, 2024, the District Court granted the PI motion (Dkt. 45, 46).

On May 17, 2024, Kangol filed a motion for default and default judgment (Dkt. 49) with an accompanying memorandum of law (Dkt. 50), and a notice of motion setting the motion for May 22, 2024 (Dkt. 51).

The District Court entered its Amended Final Judgment Order on October 2, 2024,[2] Dkt. 58, Short Appendix 008, (the "***Default Order***") finding that Kangol had "properly completed service of process on the Defaulting Defendants," including Hangzhou Chuanyue. The Default Order further ordered third parties to "permanently restrain and enjoin any financial accounts connected to the Defaulting Defendants" and to "release to Plaintiff the amounts from the Defaulting Defendants' financial accounts within seven (7) calendar days of receipt of this Order." Default Order, p. 5 Short Appendix p. 5

Kangol did not, in any of those submissions to the District Court, discuss any Defendant's postal address, nor any efforts it made to ascertain any of those addresses.

On February 25, 2025, Hangzhou Chuanyue moved to vacate the default judgment under Federal Rule of Civil Procedure 60(b)(4), arguing that Hague Service Convention applied, since Hangzhou Chuanyue had a known address within the meaning of Article 1 of the Hague Service Convention, the judgment was void *ab initio* for lack of proper service under the Hague Service Convention, in the alternative that the default was invalid under the Hague Service Convention and,

_____

[2] The differences between the Final Judgment Order and the Amended Final Judgment Order are not relevant to this Appeal.

also in the alternative, that the turnover order was inconsistent with Federal Rule of Civil Procedure 69(a)(1) in that it did not comply with Illinois state procedures for post-judgment collections. Hangzhou Chuanyue further contended that, if the default order was vacated, it was entitled to restitution for any money collected by Kangol. (Dkt. 60)

Plaintiff filed its Response on March 3, 2025. (Dkt. 63). On March 13, 2025, Defendant filed its reply memorandum (Dkt. 65).

On June 13, 2025, the District Court denied Defendant's motion to vacate. (Memorandum Opinion and Order of June 13, 2025, Dkt. 66, Short Appendix 001, the "***Memorandum Opinion***"). The court held that email service was permissible under Rule 4(f)(3) notwithstanding the Hague Service Convention, that default judgment was entered properly despite Article 15 of the Convention, and that Plaintiff's turnover procedures were sufficient. *Id.*

Although it was extensively briefed, the District Court did not determine if Hangzhou Chuanyue's address was known, or if Kangol made any effort to determine the address. *Id.* at p. 4, 004.

On July 11, 2025, Defendant filed a timely notice of appeal. (Dkt. 67). Hangzhou Chuanyue contends that the District Court erred by denying its motion to vacate the Default Order, which was based on authorizing Service of Process by email in its TRO Order (Dkt. 32, S. App 014) and finding 1) that service was proper and 2) Hangzhou Chuanyue was in default and 3) ordering third parties to restrain its funds and release them to Kangol in its Default Order (Dkt. 58, S. App. 008).

## SUMMARY OF ARGUMENT

Hangzhou Chuanyue contends that the District Court first erred by granting the motion for alternate service via email in its TRO Order. TRO Order, S. App. 019.

Fed. R. Civ. P. 4(f)(3) allows service on a foreign individual or entity "by other means not prohibited by international agreement, as the court orders." Although service was to be on foreign defendants outside of the United States, neither Memorandum in support of the TRO nor the TRO Order mentioned any international agreements that might be relevant to service via Fed. R. Civ. P. 4(f)(3), or if Kangol had made any effort to determine whether any of the defendants had a known address.

Service of process via email on Defendants in China who have a known address is in fact prohibited by the Hague Service Convention. The Hague Service Convention is "exclusive" – if there is occasion to serve judicial papers on defendants outside of the United States (and within the territory of another country that is also signatory to the Hague Service Convention, such as China) the methods of service provided for in the Hague Service Convention exclude, and thereby prohibits, other methods of service.

The exclusive nature of the Hague Service Convention has been recognized by the Supreme Court in three separate decisions, *Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern District*, 482 U.S. 522, 534, n. 15 (1987); *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699

(1988); and *Water Splash, Inc. v. Menon*, 581 U.S. 271, 273 (2017) ("[T]he Hague Service Convention specifies certain approved methods of service and 'pre-empts inconsistent methods of service' wherever it applies"). *Id.*

The exclusive character of the Hague Service Convention may further be determined using the "traditional tools of treaty interpretation" used by the Supreme Court in *Schlunk* and *Water Splash*: the text and structure of the treaty, the history and negotiations of the treaty "and the practical construction adopted by the parties." *Schlunk*, at 699. All of those tools show that the Hague Service Convention is exclusive and therefore prohibits other means of service.

That conclusion would be true even if this Court determines that email service is allowed. If it is allowed, it is only because email is considered by the signatory countries to the Hague Service Convention, including the United States, to be a "postal channel" within the meaning of Article 10(a) of the Hague Service Convention. Article 10(a) allows signatories to the Hague Service Convention to object to service via Article 10(a), which China has done. *See Section* V.

Even if the Hague Service Convention does not provide the exclusive means of service of process, Article 15 of the Hague Service Convention prohibits entry of judgment unless the methods of service provided for in the treaty is used. Therefore, even if service was valid, the District Court erred by granting the Default Order.

Finally, the Default Order is inconsistent with Fed. R. Civ. P. 69(a)(1) in that it purports to order third parties, such as Amazon, to immediately restrain and turn over funds to Plaintiff, which is contrary to Illinois post-judgment proceedings.

Based on those errors, Hangzhou Chuanyue's Motion to Vacate the Judgment, Dkt. 60, should have been granted. Hangzhou Chuanyue therefore respectfully requests that this Court reverse the Memorandum Opinion, and remand this case to determine if its address is "known," and if so, find the Default Order void *ab initio*, or in the alternative modifying the Default Order to comply with Fed. R. Civ. P. 69(a)(1).

ARGUMENT

## I.     INTRODUCTION

Federal Rule of Civil Procedure ("***Fed. R. Civ. P.***") 4(f)(3) allows service on a party outside of the United States pursuant to a court order by "other means not prohibited by international agreement." The primary international agreement addressing service of process to which the United States is signatory is the *Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, 20 U. S. T. 361, T. I. A. S. No. 6638, 20 U.S.T. 361 (the "***Hague Service Convention***"). That treaty entered into force in the United States on February 10, 1969, United States Department of State *Treaties in Force* (2025) p. 43,[3] Article 1 of that Convention requires that, when the address of the defendant is known, and service abroad is required in a civil or commercial matter, the treaty "shall apply."

The "shall apply" language, together with the rest of its text and structure, as confirmed three times by the United States Supreme Court, and consistent with the understanding of the original drafters, and the current understanding of the United States and all other signatory nations, demonstrates conclusively that the Hague Service Convention is *exclusive*. The exclusive character of the treaty means that "other means" not provided for in the Convention are excluded and one of the

---

[3] Available at https://www.state.gov/wp-content/uploads/2025/08/Treaties-in-Force-2025-FINAL.pdf. Last accessed October 17, 2025.

methods of transmission under the Convention *must* be used, which is to say that "other means" not specified in the Convention are prohibited.

Unfortunately, in denying Defendant-Appellant Hangzhou Chuanyue Silk Import & Export Co., Ltd. ("***Hangzhou Chuanyue***")'s motion to vacate judgment in whole or in part pursuant to Rule 60(b)(4) or in the alternative, for Plaintiff's failure to comply with Fed. R. Civ. P. 69(a)(1), Dkt. 60 ("***Motion to Vacate***"), the District Court did not treat the Hague Service Convention as exclusive, but adopted the implicit, and sometimes explicit, view of the majority of district courts in the Seventh Circuit, that the Hague Service Convention is "optional." *See, e.g., Hangzhou Chic Intelligent Technology Co. v. P'ships & Unincorporated Ass'n Identified on Schedule A*, No. 20 C 4806, 2021 U.S. Dist. LEXIS 64064, at *5 (N.D. Ill. Apr. 1, 2021). Under that view, the majority view in the Northern District of Illinois, since "[s]ervice by email is not specifically provided for in the Convention, but neither is it forbidden," courts are "authorized to order that service be effected by an alternative means (i.e., email) so long as Plaintiffs 'ma[d]e a showing as to why alternative service should be authorized'." *NBA Properties v. P'ships & Unincorporated Ass'ns*, 549 F. Supp. 3d 790, 797 (N.D. Ill. 2021).

Although that is the majority view in the Northern District of Illinois, it is not the universal view. Under the minority view, represented by *Luxottica Group S.p.A. v. P'ships & Unincorporated Ass'n Identified on Schedule "A,"* 391 F. Supp. 3d 816 (N.D. Ill. 2019) "the absence of express language prohibiting service by email or any other unlisted means in the Hague Service Convention is not dispositive. The

inquiry must be whether email is inconsistent with the service methods the Convention allows" and where the defendant's address is known, "the Hague Service Convention applies." *Id.* at 824.

District Courts in other Circuits have also adopted the *Luxottica* view. "[The Hague Service "Convention is meant to set forth simple and certain methods of service that can be used to serve foreign litigants. To infer that the Convention's silence as to a particular method equates to an implied permission to use virtually any method of service not proscribed by the Convention contravenes that purpose." *Smart Study Co. v. Acuteye-US*, 620 F. Supp. 3d 1382, 1396 (S.D.N.Y. 2022) *appeal dismissed sub nom.* [Smart Study Co. v. HAPPY PARTY-001, No. 22-1810-CV, 2023 U.S. App. LEXIS 10797, 2023 WL 3220461 (2d Cir. May 3, 2023)](#), holding that email service on Chinese residents was invalid[4].

One of the cases relied upon by the District Court, and representing the Northern District of Illinois majority view, *Peanuts Worldwide LLC v. P'ships & Unincorporated Associations Identified on Schedule "A,"* 347 F.R.D. 316 (N.D. Ill. 2024), recognized that "District courts across the country have long wrestled with whether this silence [of the Hague Service Convention regarding service by email

---

[4] Both *Smart Study* and *Luxottica* rely on the two Supreme Court cases that directly addressed the Hague Service Convention, [Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699 (1988)](#); and [Water Splash, Inc. v. Menon, 581 U.S. 271, 273 (2017)](#), both of which indicate that the methods of service listed in the Hague Service Convention are exclusive, as discussed in more detail below.

should be construed as implicit permission or prohibition," 347 F.R.D. at 327-28, and that the issue is "hotly debated and would benefit from clarification on appeal." *Id.* at 320. *Peanuts* further noted that

> "[n]o Circuit Court of Appeals[5] has yet directly addressed these relatively complex questions. A definitive resolution of these issues on appeal would provide some much-needed clarity, particularly in light of the mounting volume of "Schedule A" cases against overseas defendants filed in this district every year. Whatever one's thoughts on the validity of electronic service, or on the Schedule A method of litigation more broadly, it is hardly fair for a Schedule A litigant's chances to rise or fall based on the identity of the judge to which that entity's case is assigned. The Seventh Circuit has already weighed in on the related question of whether foreign e-commerce vendors have sufficient "minimum contacts" with the forum to support personal jurisdiction in Schedule A cases. A similar ruling on electronic service of process—whether in this or another case—would help future litigants avoid substantial confusion."

> *Peanuts* at 330. (internal citations omitted).

---

[5] The *Peanuts* court noted that "[t[he Fifth Circuit has twice endorsed service by email on Chinese defendants, but did not substantively engage with the question of whether the Convention's text "prohibits" service by email in either case. *Peanuts Worldwide* at 330. A Third Circuit opinion, coincidently issued the day prior to the *Peanuts* decision, did directly address the propriety of email service where the Hague Service Convention applies, although the case was designated "Not Precedential." *SEC v. Lahr*, No. 22-2497, 2024 U.S. App. LEXIS 18170 (3d Cir. July 24, 2024). That case is discussed below. *See Section* IV.f.

Beyond the confusion of future litigants, the lack of Circuit Court guidance substantially increases the likelihood of procedures challenges to service of process and default rulings. But even more importantly, if the District Court and the majority of District Courts in the Seventh Circuit have erred in their understanding of the Hague Service Convention's application under FCRP 4(f)(3) there should be grave concern that district courts in the Seventh Circuit and elsewhere are routinely violating the treaty obligations of the United States.

As a party to the Convention, the United States has a vital interest in ensuring that the Convention is construed in accordance with its terms as intended by the United States and the Convention's other contracting states, not only to ensure that foreign litigants haled into court in the United States are treated fairly, but to likewise ensure that residents of the United States are treated fairly when they are haled into a foreign court.

Those treaty obligations are also implicated where default judgments are issued. The District Court denied Hangzhou Chuanyue's motion to vacate the default judgment under Article 15 of the Hague Service Convention. Article 15 prohibits judgment against a defendant unless: a) the document was served by a method prescribed by the internal law of the State addressed for the service of documents in domestic actions upon persons who are within its territory, or b) the document was actually delivered to the defendant or to his residence by another method provided for by the Hague Service Convention. In Default Order, the District Court ignored the requirement in Article 15 that "the document [i.e. a writ

of summons or equivalent document] "was actually delivered to the defendant or to his residence by another method provided for by this Convention", focusing instead on *Schlunk*'s discussion of *notification au parquet* and the court's conclusion that service of process was valid because "the listed methods of service permitted in the Convention are not exclusive."

As the court in *Bestway Inflatables & Material Corp. v. Individuals*, No. 24 C 11696, 2025 LX 108727 (N.D. Ill. June 17, 2025) recently pointed out, "Rule 4(f) is a rule about <u>service</u>; it does not govern <u>default judgments</u>." *Id.* at \*2 (Emphasis in original), and that "[j]ust because alternate service is permitted under Rule 4(f)(3) does not mean that the Hague Convention magically disappears, as plaintiff seems to wish." *Id.* at 4. Article 15 unequivocally prohibits default judgments unless the one of the specific methods outlined in the Hague Service Convention is used to effectuate service.[6]

The divergent approaches of the District Court in the present case and the court in *Bestway* raises the same concerns as the varying approaches to service of

---

[6] Article 15 has one arguable exception, not relevant to this case, where "the document was served by a method prescribed by the internal law of the State addressed for the service of documents in domestic actions upon persons who are within its territory." This, however, is one of the methods listed in the Hague Service Convention. Specifically, Article 19: "To the extent that the internal law of a Contracting State permits methods of transmission, other than those provided for in the preceding Articles, of documents coming from abroad, for service within its territory, the present Convention shall not affect such provisions."

process in the district courts of the Seventh Circuit , confusion of litigants, additional procedural challenges, and the prospect of violation by the district courts of the treaty obligations of the United States[7].

Finally, the District Court erred by not vacating or modifying the Default Order for failure to comply with Fed. R. Civ. P. 69(a)(1), which requires that "A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located." The Default Order was inconsistent with Fed. R. Civ. P. 69(a)(1) in that it purported to order third parties, such as Amazon, to immediately turn over funds to Plaintiff, which is contrary to Illinois post-judgment proceedings.

## II.    STANDARD OF REVIEW

This Court reviews *de novo* the legal questions presented here, including the proper interpretation of the Hague Service Convention and Federal Rule 4.

The entry of default judgment and the denial of relief under Rule 60(b)(4) are reviewed for abuse of discretion. But a default judgment entered without personal jurisdiction is void, and it is a per se abuse of discretion to deny a motion to vacate such a judgment. *See Relational, LLC v. Hodges*, 627 F.3d 668, 671 (7th Cir. 2010).

---

[7] The *Bestway* scenario, where there is service but a court is powerless to enter judgment, is untenable, as discussed below. *See* Section IV.b.

Likewise, a court abuses its discretion when its ruling rests on an erroneous view of the law. *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 563 (7th Cir. 1984).

The underlying legal questions that control here are reviewed *de novo*. Like statutory interpretation, treaty interpretation, including whether and how the Hague Service Convention applies, is reviewed *de novo*. *VLM Food Trading Int'l, Inc. v. Illinois Trading Co.*, 811 F.3d 247, 251 (7th Cir. 2016). The construction and application of the Federal Rules of Civil Procedure, including Fed. R. Civ. P. 4(f) and 69(a), are questions of law, reviewed *de novo*. *Dorsey v. Varga*, 55 F.4th 1094, 1103 (7th Cir. 2022).

## III.    THE HAGUE SERVICE CONVENTION'S THRESHOLD ISSUES

Before the Hague Service Convention applies. Article 1 lists three threshold issues: 1) it must be in a civil or commercial matter, 2) there is occasion to transmit a document for service abroad, and 3) the address of the defendant is known. The first two thresholds are easily determined. Whether Hangzhou Chuanyue's address is known is disputed by Hangzhou Chuanyue and Kangol.

To conclude that a defendant's address is "not known" under the Hague Service Convention, courts in the Northern District of Illinois require that a plaintiff must show "reasonably diligent efforts to ascertain and verify defendant's mailing address." *See, e.g. NBA Properties v. P'ships & Unincorporated Ass'ns,* 549 F. Supp. 3d 790, 796 (N.D. Ill. 2021); *Oakley, Inc. v. Partnerships and Unincorporated Associations Identified in Schedule "A,"* No. 20-cv-05049, 2021 WL 2894166, at *4 (N.D. Ill. July 9, 2021).

Hangzhou Chuanyue contends that its address is known and easily discoverable, and that Kangol made no effort to determine its address. In its Memorandum Opinion, the District Court acknowledged the dispute, but did not decide the issue. Instead, the District Court followed the courts in *NBA* and *Oakley* that, whether or not the address of a defendant is known, and whether or not a plaintiff made any effort to determine that address is immaterial, as service may be had under Fed. R. Civ. P. 4(f)(3) without regard to the Hague Service Convention. That position is based on a view that, even when the three threshold conditions are met, the Hague Service Convention does not provide the exclusive means of service and thus does not prohibit "other means" within the meaning of Fed. R. Civ. P. 4(f)(3). As noted, that position is "hotly debated," *see Peanuts* 347 F.R.D. at 320 and as shown below, contrary to the text of the treaty, Supreme Court precedent, and the history and current understanding of the parties to the treaty, including the United States.

Should this Court see fit to remand this case, whether Hangzhou Chuanyue's address is "known" would remain to be determined. It would be appropriate for this Court to offer guidance as to the standards to be applied in determining whether as address is "known" within the meaning of the Hague Service Convention.

The *Peanuts Worldwide* court offered the following standard: in "determining whether the Convention does in fact apply…the court must assess whether Plaintiff has made 'reasonably diligent efforts to ascertain and verify defendant's mailing address," *citing NBA Properties*, 549 F. Supp. 3d at 796, and that reasonable

diligence "generally requires that the plaintiff 'ha[ve] attempted to obtain [the defendant's] address in a variety of ways,'" *citing Smart Study,* 620 F. Supp. 3d at 1391. *Peanuts Worldwide,* 347 F.R.D.at 327-28.

That variety of ways should include, at a minimum, 1) the listed address on a defendant's ecommerce platforms, such as Amazon, 2) if a business entity, its registered address, and 3) if the defendant claims a trademark application or registration, the address listed there.

## IV.    THE HAGUE SERVICE CONVENTION IS EXCLUSIVE AND THEREFORE PROHIBITS OTHER MEANS OF SERVICE

### a.  The Supreme Court's Methods for Interpretation of Treaties

Treaties "are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Air France v. Saks*, 470 U.S. 392, 396 (1985), *quoting Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431-432 (1943). In addition, it is a court's "responsibility to read the treaty in a manner 'consistent with the shared expectations of the contracting parties.'" *Lozano v. Alvarez*, 572 U.S. 1, 12 (2014) *quoting Olympic Airways v. Husain*, 540 U.S. 644, 650, 124 S. Ct. 1221, 157 L. Ed. 2d 1146 (2004) and *Air France v. Saks*, 470 U.S. 392, 399, 105 S. Ct. 1338, 84 L. Ed. 2d 289 (1985).

Those standards for interpreting treaties were employed and elaborated upon in the two Supreme Court decisions that interpreted the Hague Service Convention: *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 699 *(*1988) and *Water Splash, Inc. v. Menon*, 581 U.S. 271, 276 (2017). Treaties such as the Hague Service Convention are, like Federal Statutes, the "supreme Law of the Land." *USCS Const. Art. VI, Cl 2*. In accordance with *Water Splash*, this Court must construe the treaty liberally, consider both text and context of the treaty, *Water Splash* at 276, consider the Convention's drafting history, the views of the Executive Branch of the United States, and the views of other signatories, *Id.* at 280 and read it "in a manner consistent with the *shared* expectations of the contracting parties." *Id.* at 282.

The District Court failed, as have many other district courts in the Seventh Circuit, including those relied upon by the District Court, to interpret the Hague Service Convention in accordance with the above outlined Supreme Court precedents, particularly *Schlunk* and *Water Splash*.

Instead of following the Supreme Court methods of interpreting treaties, district court decisions, including those relied upon by the District Court in the Memorandum Opinion, have simply looked at the Hague Service Convention to determine if it *explicitly* prohibits email. After concluding that it does not, these courts have found that service via email is allowed on defendants located in China. The courts in *Oakley* and *NBA Properties* 549 F. Supp. 3d at 797, held that "Service by email is not specifically provided for in the Convention, but neither is it forbidden... Thus, despite that Plaintiff had not attempted service under the terms

of the Convention, the Court was authorized to order that service be effected by an alternative means (i.e., email)"[8] (internal quotes and citation omitted). *See Oakley*, 2021WL 2894166, at \*4; *see also NBA Properties*, 549 F.Supp.3d at 797.

*Oakley, NBA Properties* and *Peanuts* have one thing in common: the litigant seeking to invalidate service did not argue that the Hague Service Convention should be interpreted in accordance with the Supreme Court precedent used by the two Supreme Court cases considering the Hague Service Convention: *Schlunk* and *Water Splash*. The lack of analysis of the Hague Service Convention is in glaring contrast to the approach of the *Schlunk* and *Water Splash* cases. For example, in *Peanuts,* 347 F.R.D. at 331 the court does not apply the methods of analysis in *Schlunk* or *Water Splash*. To be fair to those courts, the defendants seeking to quash service did not provide the court with any arguments related to interpretation of the treaty. *See, e.g.*, *Peanuts,* Case No. 23-2965, Dkt. 43, pp. 12-16.

That is not true for the District Court in the present case. In its Motion to Vacate, Hangzhou Chuanyue argued that the District Court was obligated to interpret the Hague Service Convention in accordance with *Schlunk* and *Water Splash* by examining the text of the treaty (beyond simply inquiring as to whether it forbade service by email), the history and drafting of the treaty, and the current understanding of the signatories and the executive branch of the United States in deciding if the Hague Service Convention provides the exclusive means of service of

---

[8] These two decisions were issued by the same judge, Judge Kness, a few days apart.

process abroad, thereby forbidding service via "other means" not provided for in the treaty. Dkt. 60.

### b. Interpretation of the Hague Service Convention: the Text and Context

Both Supreme Court cases that interpreted the Hague Service Convention began their analysis with the text of the treaty itself: the words, in context, including the structure of the treaty. *See Water Splash,* 581 U.S. at 276; *Schlunk*, 486 U.S. at 699.

Article 1 of the Hague Service Convention is the appropriate starting point for an analysis of the exclusivity of the Hague Service Convention. It reads:

> The present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad. This Convention shall not apply where the address of the person to be served with the document is not known.

The second half of the first sentence in Article 1 – "where there is occasion to transmit a judicial or extrajudicial document for service abroad" is the subject of the *Schlunk* case, which resolved the issue of when such an occasion might arise. If a foreign defendant may be served without transmitting a document abroad, such as when a subsidiary foreign corporation may be served by service on its domestic corporate parent, then the Hague Service Convention does not apply. "Where service on a domestic agent is valid and complete under both state law and the Due Process Clause, our inquiry ends and the Convention has no further implications."

*Schlunk*, 486 U.S. at 707. Of course, in the present case, Hangzhou Chuanyue is abroad, in China, and Kangol sought to serve it in China via email. Therefore, in accordance with Article 1 the Hague Service Convention "shall apply."

The "shall apply" language creates an enormous roadblock for interpreting the Hague Service Convention as only providing some optional methods of service and not prohibiting other methods. If a court authorizes service under Fed. R. Civ. P. 4(f)(3) via a method that is not within the methods available in the Hague Service Convention, in what way has the treaty been applied? By its plain language, a method of service[9] that does not fit within one of the specific methods listed in the Hague Service Convention violates that treaty's "shall apply" language and is thus prohibited. Indeed, the Supreme Court has stated, no fewer than three times, that this language makes the Hague Service Convention exclusive.

In *Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern District*, 482 U.S. 522 (1987), the Supreme Court considered a different Hague Conference treaty, the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, 23 U. S. T. 2555, T. I. A. S. No. 7444 (the "**Hague Evidence Convention**").[10] That treaty was proposed by the United States after the Hague Service Convention was favorably received, and pursuant to the interests of American lawyers in obtaining evidence abroad. *Id.* at 530. The Hague Evidence

---

[9] As will be discussed, service by email likely is a method of service allowed by the Hague Service Convention, but prohibited when defendants are in China

[10] Appendix 011.

24

Convention established "a system for obtaining evidence located abroad that would be 'tolerable' to the state executing the request and would produce evidence 'utilizable' in the requesting state." *Id.*( citation omitted).

In sharp contrast to the "shall apply" language of the Hague Service Convention, Article 1 of the Hague Evidence Convention reads, "[i]n civil or commercial matters a judicial authority of a Contracting State *may*, in accordance with the provisions of the law of that State, request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act" (Emphasis supplied).

In rejecting the contention that the Hague Evidence Convention is exclusive, i.e. that it "exclude[ed] all other existing practices…and requir[ed] … contracting states to use the [Hague Evidence] Convention procedures," *Id.* at 534, the Supreme Court drew a sharp distinction between the Hague Evidence Convention and the Hague Service Convention:

> The Hague Conference on Private International Law's omission of mandatory language in the preamble is particularly significant in light of the same body's use of mandatory language in the preamble to the Hague Service Convention, 20 U. S. T. 361, T. I. A. S. No. 6638. Article 1 of the Service Convention provides: "The present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad." *Id.*, at 362, T. I. A. S. No. 6638. As noted, *supra*, at 530, the Service Convention was drafted before the Evidence Convention, and its language provided *a model exclusivity provision* that the drafters of

the Evidence Convention could easily have followed had they been so inclined. Given this background, the drafters' election to use permissive language instead is strong evidence of their intent.

*Id.,* n. 15 (Emphasis supplied).

When, in its next term, the Supreme Court considered the Hague Service Convention, and in particular Article 1's language, it adopted the footnote from *Societe Nationale:* "[Article 1's] language is mandatory, as we acknowledged last Term in *Societe Nationale*. By virtue of the Supremacy Clause, U.S. Const., Art. VI, the Convention pre-empts inconsistent methods of service prescribed by state law in all cases to which it applies" (citation omitted). *Schlunk*, 486 U.S. at 699. The Supreme Court in *Schlunk* also noted that "compliance with the Convention is mandatory in all cases to which it applies" *Id.* at 705, and that "[t]hose who eschew its procedures risk discovering that the forum's internal law required transmittal of documents for service abroad, and that the Convention therefore provided the exclusive means of valid service." *Id.* at 706.

The Supreme Court in *Water Splash* further adopted the *Schlunk* standard: "Hague Service Convention specifies certain approved methods of service and 'pre-empts inconsistent methods of service' wherever it applies." *Water Splash*, 581 U.S. at 273.[11]

---

[11] As discussed below, this language is not merely "anodyne" or dicta. *See* Section IV.c.

Beyond the text of Article 1, the structure and text of the rest of the Hague Service Convention create a second roadblock for interpreting the Hague Service Convention as non-exclusive. Articles 2 through 6 establish the system of Central Authorities through which service may be made. Articles 8, 9, 10, 11 and 19 specify certain methods of service which the signatories are free to utilize or that the treaty does *not* interfere with, implying that States are not free to utilize other methods and that the treaty does interfere with other unlisted methods of service. Moreover, each of those methods is subject to the objection or consent of the country of destination. The Central Authority system is the only form of service that a signatory country must provide.

Articles 11 and 19 of the Convention are entirely inconsistent with any notion that the methods specifically provided for in the Convention are not exclusive. Article 11 provides that any two states can agree to methods of service not otherwise specified in the Convention,[12] and Article 19 clarifies that the Convention does not preempt any internal laws of its signatories that permit service from abroad via methods not otherwise allowed by the Convention[13]. As the court in

---

[12] "The present Convention shall not prevent two or more Contracting States from agreeing to permit, for the purpose of service of judicial documents, channels of transmission other than those provided for in the preceding Articles and, in particular, direct communication between their respective authorities."

[13] "To the extent that the internal law of a Contracting State permits methods of transmission, other than those provided for in the preceding Articles, of

*Smart Study Co. v. Acuteye-US*, 620 F. Supp. 3d 1382 (S.D.N.Y. 2022), *appeal dismissed sub nom. Smart Study Co. v. HAPPY PARTY-001*, No. 22-1810-CV, 2023 U.S. App. LEXIS 10797, 2023 WL 3220461 (2d Cir. May 3, 2023), explained, "[w]hat both these articles have in common is that they leave countries free to consent, either unilaterally or together, to means of service that are not specifically authorized by the Convention… In other words, Articles 11 and 19 provide ready tools to permit countries to expressly permit service by email. And those articles would be largely superfluous if litigants could serve a party in another country merely by selecting a method that is not expressly listed in the Hague Convention— there would be no need for articles that permit countries to agree to other methods of service, or to legislate to affirmatively authorize other methods of service." *620 F. Supp. 3d 1382, 1394 (S.D.N.Y. 2022)*.

The canon against superfluity is one of "most basic interpretive canons," *Corley v. United States*, 556 U.S. 303, 314 (2009), and the Supreme Court in *Water Splash* based its decision in large part on avoiding rendering Article 10(a) of the treaty superfluous. *Water Splash* at 277-79. An interpretation of the Hague Service Convention as non-exclusive, i.e. allowing other forms of service not specified under the Convention, would render Articles 8 through 11 and 19 superfluous, and the treaty "structurally implausible." S*ee Water Splash* at 278.

---

documents coming from abroad, for service within its territory, the present Convention shall not affect such provisions."

Article 15 of the Hague Service Convention prohibits the entry of a default judgment unless the summons was served by the either the internal laws of the receiving state or by "another method provided for by this Convention," or, in the absence of a certificate of service, proof of transmission "by one of the methods provided for in this Convention." As *Schlunk* pointed out, compliance with the Convention is mandatory in all cases to which it applies… and Articles 15 and 16 provide an indirect sanction against those who ignore it." *Schlunk* at 705. A plain reading of such an indirect sanction is that the behavior being sanctioned is prohibited.

In discussing the indirect sanction in Article 15, the court in *Bestway Inflatables & Material Corp. v. Individuals*, No. 24 C 11696, 2025 LX 108727 (N.D. Ill. June 17, 2025) inadvertently provided an additional structural basis for concluding that Hague Service Convention is exclusive in character. The court in that case agreed with the majority of district courts in this circuit that the Hague Service Convention was non-exclusive and did not prohibit service on Chinese defendants via Fed. R. Civ. P. 4(f)(3). However, the court simultaneously recognized that default judgment is not available unless the specific methods of service in the Hague Service Convention are applied. "To summarize: Rule 4(f) says nothing about the applicability of the Hague Convention or default judgments. A court's prior approval of alternative service under Rule 4(f)(3), such as email service, has no bearing on the applicability of the Hague Convention to a future motion for entry of default judgment. If a plaintiff seeks to secure default judgment against a

defendant to which the Hague Convention applies, then they must successfully embark on one of the two 'routes' set out in Article 15 [i.e. a method of service in the Hague Service Convention]." *Bestway* at *7-8.

That result is incongruous. It would bring a defendant within the jurisdiction of the court, but that defendant would be immune from any consequence for failing to appear. Partial jurisdiction of this nature is generally unknown. It would create a situation where courts would have to proceed on an *ex parte* basis but to what end? Article 15 prohibits "judgments," not merely default judgments. With no disposition of the case that could be construed as a judgment available, it is not clear what a court would have the power to do in a *Bestway*[14] procedural limbo. Moreover, it would create a disincentive for defendants who have been served to appear. It is not reasonable to read the Hague Service Convention as creating such an uncertain result.

That level of uncertainty would also be an incongruous reading of Fed. R. Civ. P. 4(f)(3) itself. As Fed. R. Civ. P. 1 requires, the Federal Rules of Civil Procedure

---

[14] That case was ultimately resolved when the court allowed the plaintiff's counsel to cure the lack of diligence by later averring "that that the address of each of the defendants that they seek a default judgment against are unknown after they made reasonable and diligent efforts to determine their the addresses," and thereby avoid the Hague Service Convention and allowing the entry of default judgment. Case No. 1:24-cv-11696, Dkt. 44. Because of the confusion and uncertainty it would create in defendants with known addresses, plaintiffs should not be allowed to cure a lack of diligence.

"should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 4(f)(3) should not be construed as allowing a court to obtain jurisdiction over a party via "other means" while creating an incentive for a defendant to avoid appearing and preventing a court from reaching a final disposition of the case.

That absurd result is entirely unnecessary. As the Supreme Court has noted, albeit in interpreting a statute and not a treaty, "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors*, 458 U.S. 564, 575 (1982). The alternative here is simple: if the Hague Service Convention is construed as exclusive for the reasons outlined in this brief, the *Bestway* partial jurisdiction issue is avoided.

### c. Interpretation of the Hague Service Convention: the Text and Context as Viewed by the Supreme Court

As noted above, neither the District Court nor any of the cases it relied upon address the "shall apply" language in Article 1 of the Hague Service Convention, nor any other textual analysis beyond confirming that email is nowhere specifically or generally prohibited. Those cases also avoid or minimize the Supreme Court's thrice stated view that the Hague Service Convention is "a model of exclusivity," "mandatory," "pre-empts inconsistent methods of service." The District Court did not directly address this language, only stated that "neither *Schlunk* nor *Water Splash* commented on the propriety of service by email under the Convention" and

that "[o]ther courts in this district have come to the same conclusion, finding that "the Convention's silence on unenumerated methods of service is not an outright prohibition." The court further found that the Hague Service Convention "does not prohibit email service nor are the prescribed methods of service exclusive." Appendix 005-6.

The other cases relied upon by the District Court, *NBA Properties, Peanuts* and *Oakley*, minimized but did not seriously address the Supreme Court's statements regarding the exclusivity of the Hague Service Convention.

In *NBA Properties*, the court only addressed the text of the Hague Service Convention to the extent of noting that the treaty does not specifically provide for or prohibit service by email, and the lack of "any provision of the Convention that limits a party to the methods of service enumerated in the Convention….The Supreme Court's statements that the Hague Service Convention prohibits inconsistent methods of service were dismissed as "anodyne." *NBA Properties* at 549 F. Supp 3d at 798.

Quite what "anodyne" means in this context is not clear, but it may be a polite way of calling it dicta, perhaps following a case cited by the *NBA Properties* court: *Patrick's Restaurant, LLC v. Singh*, 2019 U.S. Dist. LEXIS 2535 (D. Minn. Jan. 7, 2019). That court found that the *Water Splash* decision's adoption of the *Schlunk* standard, that "the Hague Service Convention specifies certain approved methods of service and 'pre-empts inconsistent methods of service' wherever it

applies," *Water Splash* at 273, is dicta. The court reasoned that it was dicta because "*Water Splash* recited this excerpt of *Volkswagenwerk* in an effort to provide background information not in any way connected to the Court's substantive analysis. In fact, the Court had not even identified the operative question before it when it made this reference to *Volkswagenwerk*. It is quintessential dicta" *Patrick's Restaurant*, at *6-7.

*Patrick's Restaurant's* dicta claim is not well reasoned. First, the court attempts to explain why the Supreme Court's *Water Splash* decision's characterization of the Hague Service Convention as pre-empting inconsistent methods of service is dicta but does not explain why it was dicta when the Supreme Court said the same thing in *Schlunk*. Moreover, the dicta claim was based on the fact that the statement came prior to the Supreme Court having "identified the operative question before it." While it defined "dicta" as "a judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential" *Id.*, besides implying that the statement is in the wrong order, i.e. coming before the identification of the operative question, the *Patrick's Restaurant* court simply concluded that that statement was " quintessential dicta" *Id.*

However, the characterization of the Hague Service Convention as exclusive, as opposed to the permissive Hague Evidence Convention, was not dicta in *Schlunk*

or *Water Splash*[15]. Indeed, neither case makes much sense if the Hague Service Convention is not exclusive.

As a preliminary matter, Supreme Court dicta should not be lightly brushed aside as "anodyne." Courts must give deference to dicta and separate opinions of the Supreme Court because "[r]espect for the rule of law demands nothing less: lower courts grappling with complex legal questions of first impression must give due weight to guidance from the Supreme Court, so as to ensure the consistent and uniform development and application of the law."). *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 282 (4th Cir. 2019).

Hearkening back to Justice Holmes, the Seventh Circuit has observed that "[F]ederal law is for all practical purposes what the Supreme Court says it is. When the Court's view is embodied in a holding, the Court's reluctance to overrule its precedents enables a confident prediction that that holding is 'the law.' When the view is embodied in a dictum, prediction cannot be made with the same confidence. But where it is a recent[16] dictum that considers all the relevant considerations and adumbrates an unmistakable conclusion, it would be reckless to think the Court likely to adopt a contrary view in the near future. In such a case the dictum

---

[15] It was indeed dicta in *Societe Nationale*, where the characterization of the Hague Service Convention as a model of exclusivity was for purposes of contrast with the permissive Hague Evidence Convention.

[16] In 2025, opinions may vary on whether 2017's *Water Splash* was "recent", but it is undoubtedly the most recent opinion on the Hague Service Convention issued by the Supreme Court.

provides the best, though not an infallible, guide to what the law is, and it will ordinarily be the duty of a lower court to be guided by it. *Reich v. Continental Casualty Co.*, 33 F.3d 754, 757 (7th Cir. 1994) (Posner, J.).

Thus, even if the *Schlunk* and *Water Splash* statements are dicta, they were presumably included not as mere background, but to provide guidance in how the Supreme Court would rule in future cases. The District Court should not have ignored them, nor should courts dismiss them as merely "anodyne."

The Supreme Court's discussion in *Societe Nationale,* 482 U.S. 522 at 534, n. 15, contrasting the Hague Evidence Convention with the earlier Hague Service Convention, was dicta, but carefully reasoned. The Court's explanation, that the Evidence Convention was permissive was illustrated by the Service Convention's use of mandatory language, reflected a considered understanding of the Service Convention's binding character. Which the Supreme Court called "a model of exclusivity." Although *Societe Nationale* did not decide the Service Convention's exclusivity, its reasoning anticipated and informed the Court's holding the following term in *Schlunk,* which adopted the reasoning of *Societe Nationale*. That kind of closely reasoned Supreme Court dicta, especially what it is later adopted by the Supreme Court in a later opinion, deserves substantial deference.

But the *Schlunk* and *Water Splash* statements are neither anodyne nor dicta. Indeed, neither case makes much sense if the Hague Service Convention does not provide the exclusive means of service abroad.

In determining whether a statement is dicta, the Seventh Circuit posed a series of questions in lieu of a strict definition to distinguish holding from dicta, including whether "the passage was not an integral part of the earlier opinion -- it can be sloughed off without damaging the analytical structure of the opinion, and so it was a redundant part of that opinion and, again, may not have been fully considered." *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) (Posner, J.).

In *Schlunk*, the Supreme Court resolved the issue of when the Hague Service Convention applies. Focusing on the plain language of Article 1 of the treaty, the Supreme Court held that "where there is occasion to transmit a judicial or extrajudicial document for service abroad" within the meaning of Article 1. Because Illinois law allowed valid, completed service on the foreign manufacturer by serving its U.S. subsidiary deemed an involuntary agent, no transmission abroad was required, so the Convention did not apply.

*Schlunk's* reasoning turns on a binary question: either (i) service is accomplished domestically under forum law (so there is no occasion for service abroad and the Convention doesn't apply), or (ii) service must go abroad, in which case the Convention "shall apply," displacing inconsistent alternatives. If the Convention were not exclusive when it applies, then determining whether there was an "occasion to transmit" would be unnecessary—parties could simply choose a non-Convention method even when serving abroad.

Similarly, in *Water Splash*, the Supreme Court addressed a narrow but central textual question regarding whether Article 10(a)'s permission to "*send* judicial documents*" via postal channels also authorizes *service* of process by mail. The defendant seeking to quash service in that case claimed that the Hague Service Convention prohibited service by mail, because Article 10(a) used the word "send" instead of "service." The lower court agreed. Texas law would have allowed for the service by mail but for the word "send" in Article 10(a). *Menon v. Water Splash, Inc.*, 472 S.W.3d 28, 33 (Tex. App. 2015). That position would be irrational if the Hague Service Convention's methods of service were not exclusive, as a method of service not listed in the Convention could be freely used. The Supreme Court held that "send" in Article 10(a) includes "serve," so the Convention permits service by mail under Article 10(a), subject to the destination state's objection) *Water Splash* at 284. If the Convention's methods were *not* exclusive, a court could authorize mail service *regardless* of Article 10(a), making the "send vs. serve" question immaterial and rendering the Supreme Court's opinion merely advisory.

Thus, the explicit text and structure of the Hague Service Convention, considered by themselves or by reference to the Supreme Court precedents in *Schlunk* and *Water Splash*, dictate a finding that the treaty is exclusive. Neither the District Court in the decision below, nor the cases it relied upon, *NBA Properties, Oakley, Hangzhou Chic*, and *Peanuts,* address the Article 1's "shall apply" language, or any of implications of the rest of the text and structure of the Hague Service Convention. Those cases rely simplistically on the absence of a

specific prohibition against email service or a general prohibition against service by alternate means in the Hague Service Convention. Had they followed the methods of treaty interpretation outlined by the Supreme Court, they ought to have arrived at the conclusion that the Hague Service Convention does indeed prohibit methods of service it does not specifically allow.

### d. Interpretation of the Hague Service Convention: Drafting History and Negotiations

The Hague Service Convention's exclusive character may be derived from its text and structure, without any lingering ambiguity. However, even if the text and structure of the treaty could be construed as ambiguous that of course would not be the end of the analysis. "[t]reaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Schlunk*, at 699 (internal quotation marks omitted). As discussed below, these traditional tools of treaty interpretation comfortably resolve any lingering ambiguity in Hangzhou Chuanyue's favor.

The Rapport Explicatif de M. V. Taborda Ferreira [Explanatory Report by Mr. V. Taborda Ferreira, the "***Rapporteur***," see *Water Splash* at 281] on the Hague Service Convention[17], clarifies that the drafters and negotiators of the treaty

---

[17] 1964 *Conference de la Haye de Droit International Prive, Actes et Documents de la Dixieme Session (Notification) TOME III 75-77*, 363 (1965) (3 Actes et Documents), *see Schlunk*, 486 U.S. at 698. *3 Actes et Documents* is available at <u>b6304b87-d5ee-4020-</u>

intended for it to be exclusive, even to the point of indirectly sanctioning states who failed to follow the Convention's procedures. *Schlunk* at 705. To that end, they adopted the principle of:

a) Imposer comme obligatoires les dispositions de la convention, par la création d'une «sanction indirecte» (art. 15 de la convention)."

[a) Making the provisions of the convention mandatory through the creation of an "indirect sanction" (Article 15 of the convention).]

3 Actes et Documents 363, Appendix 070.

In a section of the report entitled "CARACTÈRE OBLIGATOIRE DE LA CONVENTION [MANDATORY NATURE OF THE CONVENTION]," the Rapporteur further reported that:

"Il faut souligner que l'opinion de la Troisième commission[18] a été que la convention était «obligatoire», et que les Etats requérants devaient l'appliquer dans tous les cas où i l leur faudrait «transmettre un acte à l'étranger pour y être signifié ou notifié»."

---

8587-c22ae19ec002.pdf (Last accessed October 16, 2025). Relevant excerpts are included in the Appendix at 020.

[18] The Troisième Commission was negotiated the draft convention of 14 February 1964. The United States's delegate, Philip Werner Amram, was a member of the Troisième Commission and served as its vice president. Rapporteur report, 3 *Actes et Documents* 363 (Appendix 070). Mr. Amram participated extensively in the commission's discussions and proposed a version of the Article 1 quite close to the final version. *Id.* at 166 (Appendix 066).

[It should be emphasized that the view of the Third Commission was that the Convention is **mandatory**, and that requesting States must apply it in all cases where they are required **to transmit a document abroad for the purpose of service or notification.**]

3 Actes et Documents 366 (Appendix 073).

Thus, there is little doubt that the drafting history indicates that the methods of the Hague Service Convention were intended to be exclusive.

### e. Interpretation of the Hague Service Convention: The Current Views of the United States and Other Signatories to the Treaty

The view of the original drafters, including the United States, that the Hague Service Convention is "mandatory" and "States must apply it," i.e. "Etats requérants devaient l'appliquer," where a document is transmitted abroad for service, remains the view of the signatories to the Hague Service Convention, including the United States.

The Supreme Court gives "great weight" to "the Executive Branch's interpretation of a treaty" and "considerable weight" to views of the other signatories. *Water Splash* at 281-82. Additionally, in reaching the shared understanding of the parties to a treaty, a court should look to the ""practical construction adopted by the parties."' *Air France* v. *Saks,* at 396 (quoting *Choctaw Nation of Indians* v. *United States*, 318 U.S. 423, 431-432 (1943)).

The views of the Executive Branch of the United States and other signatories, including the practical construction they adopted with regard to the Hague Service Convention, may be readily accessed through the website of the

**H**ague **C**onference on Private International Law – **C**onférence de La **H**aye de droit international privé ("***HCCH***"), HCCH.net. The HCCH is an intergovernmental organization to which the United States has been a member since 1964. It manages a suite of Hague Conventions, including the Hague Service Convention. It hosts plenary sessions to negotiate treaties, such as the Troisième Commission which negotiated the Hague Service Convention, and periodically convenes Special Commissions, in which the United States participates, to review the practical operation of the various conventions, including the Hague Service Convention. *See, generally,* *https://www.hcch.net/en/about* (Last accessed October 21, 2025).

It should be noted that there is no discernible difference between the United States' views and those of other signatories to the Convention as reflected in the writings to be found at HCCH.net. Both the Department of Justice and the Department of State refer inquiries regarding service of process abroad to the HCCH.net website[19]. In *Water Splash*, the United States as *Amicus Curiae* filed a brief that relied heavily on the publications of the HCCH on its website. *See U.S. Supreme Court Docket No, 16-254*, Brief for the United States as Amicus Curiae Supporting Petitioner, pp. 3,15,24, 26-29 (*see* Appendix 124), including the then current and previous editions of the *Practical Handbook* and the Conclusions and

---

[19] See Department of Justice website, https://www.justice.gov/civil/service-requests (Last accessed October 17, 2025); Department of State website, https://www.state.gov/judicial-assistance (Last accessed October 17, 2025). *See* Appendix 148, 153.

Recommendations of Special Commissions. There does not appear to be any guidance from the Executive Branch of the United States offering an independent view on the Hague Service Convention. Additionally, courts, including the Supreme Court and the Seventh Circuit , regularly rely on HCCH publications in interpreting Hague Convention treaties. *See., e.g. Monasky v. Taglieri,* 589 U.S. 68, 71 (2020); *Chafin v. Chafin*, 568 U.S. 165, 180 (2013); *Golan v. Saada,* 596 U.S. 666, 681, n10 (2022); *Garcia v. Pinelo*, 808 F.3d 1158, 1162 (7th Cir. 2015); *Sask. Mutual Insurance Co. v. CE Design, Ltd.*, 865 F.3d 537, 541 (7th Cir. 2017); *Redmond v. Redmond*, 724 F.3d 729, 739 (7th Cir. 2013). In *Water Splash,* the Supreme court relied on HCCH publications, citing *Hague Conference on Private Int'l Law, Practical Handbook on the Operation of the Service Convention* ¶279, p. 91 (4th ed. 2016), *Id.* at 280, and several other publications *including Hague Conference on Private International Law, Conclusions and Recommendations Adopted by the Special Commission on the Practical Operation of the Hague Apostille, Evidence and Service Conventions* ¶55, p. 11 (Oct. 28-Nov. 4, 2003). *Id.*

Based on that, the HCCH and its publications should be viewed as the merged understanding of the United States and other signatories to the Hague Service Convention. To be sure, nothing found at the HCCH, save for text of the Hague Service Convention itself, is binding on this Court, but HCCH.net should be considered the authoritative source for the shared understanding of, and practical construction adopted by, all signatories, including the United States. As such, the publications found there are entitled to both "great" and "considerable" weight.

In preparation for the periodic Special Commissions, the HCCH circulates questionnaires to participating members[20]. After meeting and conferring, the Special Commissions issue Conclusions and Recommendations[21]. Based on those Conclusions and recommendations, the HCCH publishes practical handbooks (the drafts of which are approved by the Special Commissions) which offer comprehensive analysis and reviews of the issues arising under the Hague Convention. *See Practical Handbook on the Operation of the Hague Service Convention*, Foreword p 32 (Fifth Edition 2025)[22], [23].

One such issue considered by the HCCH is whether or not the Hague Service Convention is "exclusive." "Exclusive" as defined by HCCH in its 2006 *Practical Handbook*, means "if under the law of the forum a judicial or extrajudicial document is to be transmitted abroad for service, the Convention applies and it provides the relevant catalogue of possible means of transmission for service abroad." *Practical Handbook on the Operation of the Hague Service Convention*. Kindle Edition,

---

[20] https://www.hcch.net/en/instruments/conventions/publications1/?dtid=33&cid=17 (Last accessed October 17, 2025).

[21] https://www.hcch.net/en/instruments/conventions/specialised-sections/service. (Last accessed October 17, 2025)

[22] Unfortunately, due to Digital Rights Management, the Practical Handbooks cannot be included in the Appendix. However, the *Revised Draft of the 5th edition Practical Handbook on the Operation of the Service Convention- track changes version,* is available at https://assets.hcch.net/docs/37d9b7a9-f29f-4e43-9c8f-963d899631fa.pdf.

[23] The latest edition of the *Practical Handbook* was "designed to support courts" p. 13.

paragraph 44, location 1028 (Third Edition, 2006)**.** As noted in that 2006 Edition, the exclusive character of the Hague Service Convention was then "undisputed" *Id.* and "was never really disputed" *Id.* at paragraph 45, location 1035.

The HCCH publishes an outline of the Convention, the *Outline - HCCH 1965 Service Convention,* which explains that the Convention is "exclusive, which means, if these requirements are met [i.e., a judicial document in a civil or commercial matter where the address of the recipient is known], the transmission channels provided for under the Convention *must* be applied." *See* Motion to Vacate, Exhibit G (Dkt. 60-7), available at https://assets.hcch.net/docs/f4ccc07b-55ed-4ea7-8fb9-8a2b28549e1d.pdf, emphasis supplied (Appendix at 120)**.**

That view continues through the latest edition of the *Practical Handbook*, released in July 2025. That edition describes the exclusive character of the Hague Service Convention as "[i]f, under the relevant law of a Contracting Party, it is determined that a document has to be transmitted abroad for service in another Contracting Party, the convention will apply exclusively (i.e., one of the methods of transmission under the convention must be used.)" *Practical Handbook on the Operation of the Hague Service Convention*, p 32 (Fifth Edition 2025).

### f. The Third Circuit Court of Appeals Found the Hague Service Convention to be Exclusive and Prohibited Service by Email.

In an opinion designated "Not Precedential," the Third Circuit Court of Appeals, in *SEC v. Lahr*, No. 22-2497,  2024 U.S. App. LEXIS 18170 (3d Cir.

July 24, 2024, vacated the district court's order declining to grant a motion to vacate a default judgment as the defendant was not properly served in Switzerland by email under the Hague Service Convention. Following *Shlunk's* admonition that "compliance with the Convention is mandatory in all cases to which it applies," *Schlunk*, 486 U.S. at 705, the *Lahr* court found that "the Convention prescribes the means for service abroad. Thus, for email service to be permitted in Switzerland, it must be authorized by the Convention's terms. Here, (1) the Convention does not expressly provide for service by email, (2) there is no evidence that the United States and Switzerland have consented to email service under Article 11, and (3) email service under Swiss law is permitted only if the served party consents, and there is no evidence that Megas consented. Thus, email service upon [defendant] Megas in Switzerland was not permitted under the Convention." *Id*. at *8-9.

The *Lahr* court declined to consider whether Article 10(a)'s provision for service by "postal channels" encompasses service by electronic means since "Switzerland has objected to Article 10(a), so we need not address whether Article 10(a)'s use of the phrase "postal channel" includes email service." *Id*. at *9 n.17. The issue of Article 10(a) and whether email is a "postal channel" is discussed in the next section.

## V. DESPITE THE EXCLUSIVITY OF THE HAGUE SERVICE CONVENTION, IT MAY ALLOW SERVICE BY EMAIL (BUT NOT IN CHINA).

Article 10 reads "Provided the State of destination does not object, the present Convention shall not interfere with a) the freedom to send judicial documents, by postal channels, directly to persons abroad

China, like Argentina, Germany, Austria, Belgium, and France, has objected to Article 10(a). Thus, "postal channels" are specifically prohibited for service of process on defendants in China. Having been adopted in 1965 (and signed by the U.S. in 1969), the Hague Service Convention is understandably silent on the topic of email, which of course did not exist at the time.

The admittedly "most natural understanding of 'postal channels' applies only to material that is physically delivered by letter carrying authorities." *NBA Properties* 549 F. Supp. 3d at 798. However natural that definition may be, it is far from certain when the "traditional tools" are applied.

The drafting history sheds some light on the definition of "postal." As noted in *Water Splash*, the term "postal" included telegrams; drafters "did not accept the proposal that postal channels be limited to registered mail." *Id.* at 281. *See also 3 Actes et Documents*, p. 90 ("La disposition du N° i semble admettre la notification par télégramme si l'Etat où la notification doit être effectuée ne déclare pas s'y opposer" ["The provision in paragraph 1 appears to permit notification by telegram if the State in which the notification is to be carried out does not declare its opposition] Appendix at 043). Telegrams are as different from the physical

definition in *NBA Properties* as email. Both are encoded at the source, transmitted electronically and decoded at the destination.

But the current views of HCCH signatories, including the United States offer a better understanding of "postal channels." In light of the vast technological changes developed since the Hague Service Convention was drafted in 1965, the HCCH has carefully considered the effect of technology on service of process under the Convention. In July of 2024, a "Special Commission" ("**SC**") on the practical operation of the Convention was convened representing 55 Hague Convention signatories, including the United States and China. The Special Commission made the following recommendation:

> The SC noted that Article 10(a) [i.e. "postal channels"] includes transmission and service by e-mail, insofar as such method is provided by the law of the State of origin and permitted under the law of the State of destination. The SC reiterated that service by e-mail under Article 10(a) must meet the requirements established under Article 1 of the Convention, in particular that the addressee's physical address in the State of destination is known. The SC noted that e-mail domains are not sufficient for locating the person to be served under Article 10(a).

*HCCH 2024 Special Commission Conclusions & Recommendations,* Motion to Vacate, Exhibit D (Dkt. 60-4), available at [6aef5b3a-a02c-408f-8277-8c995d56f255.pdf](6aef5b3a-a02c-408f-8277-8c995d56f255.pdf) (Last accessed October 21, 2025) (Appendix at 143).

The idea that email may be considered a "postal channel" is consistent with the views of the Universal Postal Union ("**UPU**"), of which the United States is a member. The UPU has long considered email to be "postal." The views of the UPU

should be entitled to "great weight" insofar as they reflect the understanding of the Executive Branch of the US, but should also be given "considerable weight" in accordance with *Water Splash.*

More than 30 years ago, the Universal Postal Convention in Seoul in 1994, a meeting of the Universal Postal Union (both the United States and China are members), adopted the following definition of electronic mail, "Electronic mail is a *postal service* which uses telecommunications for transmitting within seconds messages true to the original posted by the sender in either a physical or an electronic form for delivery to the addressee in a physical or electronic form." (emphasis supplied). *Universal Postal Convention (Seoul, 1994), pp. 23-24,* Motion to Vacate, Exhibit E (Dkt. 60-5), Appendix at 165-66. The Universal Postal Union subsequently adopted the "Universal Postal Convention and Final Protocol" in 2004, which also defined "electronic mail" as "a *postal service* involving the electronic transmission of messages." *Decisions of the 2004 Bucharest Congress*, p. 129, Motion to Vacate, Exhibit F (Dkt. 60-6, emphasis supplied, Appendix at 162).

Other explanatory documents from HCCH, which of course reflect the shared views of the United States and China as both are members, also demonstrate that the signatories to the Hague Service Convention view email as a postal channel.

The 5th Edition of the *Practical Handbook on the Operation of the 1965 Service Convention* states the following: "The 2024 meeting of the Special Commission noted that Article 10(a) indeed includes transmission and service by e-

mail, insofar as such a method is (i) provided by the law of the state of origin. And (ii) permitted under the law of the state of destination, Kangol filed a motion *Id*. ¶181, p. 118.

To remove all doubt as to the views of the United States, through the Office of Private International Law, Office of the Legal Adviser, Department of State (the "National Organ" who communicates with the HCCH on the United States' behalf, *see* https://www.hcch.net/en/states/hcch-members/details1/?sid=76, last accessed October 20, 2025), affirmatively stated the following in response to a 2022 HCCH questionnaire[24]:

> 23.3. If no objection has been made, which of the following categories does your State recognise as a "postal channel" under Article 10(a)?
>
> (a)    Regular post.
> (b)    Registered (tracked) post, with receipt.
> (c)    Private courier, such as FedEx.
> (d)    E-mail
>
> 23.4. If no objection has been made, more specifically, would your State consider service by e-mail to be analogous to service by postal channels under Art. 10(a)?
>
> (a)    Yes.

If email falls within the definition of a postal channel within the meaning of Article 10(a), then service was improper, as service through postal channels is subject to the objection of the receiving state, in this case China, which has formally objected to service via Article 10(a). China declared "to oppose the service of

---

[24] https://www.hcch.net/en/publications-and-studies/details4/?pid=9031&dtid=33 (Last accessed October 20, 2025), Appendix at 109) .

documents in the territory of the People's Republic of China by the methods

provided by Article 10 of the Convention"

https://www.hcch.net/en/instruments/conventions/status-

table/notifications/?csid=393&disp=resdn (last accessed October 21, 2025).

## VI. THE HAGUE SERVICE CONVENTION PROHIBITS JUDGMENT UNLESS THE DEFENDANT IS SERVED BY A METHOD PROVIDED FOR BY THE CONVENTION.

Article 15 of the Hague Service Convention limits how the Court may enter

judgments in cases such as the present one. It reads, in relevant part, as follows:

> Where a writ of summons or an equivalent document had to be transmitted abroad for the purpose of service, under the provisions of the present Convention, and the defendant has not appeared, judgment shall not be given until it is established that –
>
> a) the document was served by a method prescribed by the internal law of the State addressed for the service of documents in domestic actions upon persons who are within its territory, or
>
> b) the document was actually delivered to the defendant or to his residence by another method provided for by this Convention,"
>
> The *Practical Handbook*, 5th Edition concurs. A "judge may rule by default... but only if... the document was transmitted by one of the methods provided for in the convention" p. 54.

Even if this Court allows service of process on Hangzhou Chuanyue via

email, it is uncontroverted under the plain text of Article 15 that default may only

be entered where service has been in accordance with a method from the

Convention, which would not include email (either because email is not mentioned

or because it is a postal channel, to which China has objected). *See also Bestway at *2*.

## VII. THE DEFAULT JUDGMENT IS VOID *AB INITIO*

If the Default Judgment was improper under Article 15 of the Hague Service Convention, it should be rendered void *ab initio*. Similarly, since Hangzhou Chuanyue sought relief under Rule 60(b)(4) only, if service was improper under the Hague Service Convention, the Default Judgment is void. "Because a court lacks personal jurisdiction over a party who was not adequately served with process, any judgment against such a party is automatically void and it is a per se abuse of discretion to deny a motion to vacate that judgment." *Peanuts Worldwide LLC v. P'ships & Unincorporated Associations Identified on Schedule "A,"* 347 F.R.D. 316, 322-23 (N.D. Ill. 2024) (Internal citations and quotation marks omitted).

## VIII. FEDERAL RULE OF CIVIL PROCEDURE 69

The District Court denied Hangzhou Chuanyue's motion with respect to Fed. R. Civ. P. 69(a)(1) based on "Defendant's failure to present sufficient argument in its initial brief cannot be remedied through its reply brief." Hangzhou Chuanyue's initial brief stated that "The Default Order is inconsistent with Fed. R. Civ. P. 69(a)(1), in that it purports to order third parties, such as Amazon, to immediately turn over funds to Plaintiff, which is contrary to Illinois post-judgment proceedings. Moreover, Plaintiff made no attempt to comply with Illinois procedures." That argument should not be derided for being brief.

In seeking to collect from Hangzhou Chuanyue, Plaintiff made no attempt to comply with Illinois procedures. In accordance with 735 ILCS 5/2-1402, Ill. Sup. Ct., R 277, Illinois post-judgment procedure is structured around post-judgment supplemental proceedings commenced by citations to discover assets, not self-executing default orders such as the one issued by the District Court. Default Order S. App 008.

## IX. RESTITUTION

Under any of the alternatives outlined above, service of process was invalid, the Default Judgment was improper, or Fed. R. Civ. P. 69 was not adhered to, Hangzhou Chuanyue would be entitled to restitution from Plaintiff of any money wrongly transferred from Moving Defendant to Plaintiff. The power to order restitution "is inherent in every court . . . to undo what it had no authority to do originally." *Nw. Fuel Co. v. Brock*, 139 U.S. 216, 219 (1891). To that end, a court may "direct restitution, so far as practicable, of all property and rights which have been lost by [an] erroneous judgment." *Id.* at 221.

## X. CONCLUSION

Accordingly, Defendant-Appellant Hangzhou Chuanyue Silk Import & Export Co., Ltd respectfully requests this Court find that the District Court erred by denying Hangzhou Chuanyue's motion to vacate or modify its Default Order, and remand to determine if Hangzhou Chuanyue's address is "known" within the meaning of Article 1 of the Hague Service Convention and if so, direct the District Court to find:

A. That the Default Judgment entered on October 2, 2024, is void *ab initio,* since service of process did not comply with the Hague Service Convention, or, in the alternative,

B. That the Default Judgment should be vacated with respect to Defendant No. 14, as it did not comply with Article 15 of the Hague Service Convention; or, in the alternative,

C. That the Default Judgment failed to comply with Fed. R. Civ. P. 69(a)(1) and that Plaintiff failed to comply with Illinois post-judgment collection laws; and

D. That Plaintiff pay restitution to Defendant No. 14, Hangzhou Chuanyue Silk Import & Export Co., Ltd., for any amounts it obtained as a result of the vacated judgment and related orders.

October 22, 2025

Respectfully submitted,

/s/ Wesley E. Johnson

Wesley E. Johnson
Cross-Border Counsel LLP
105 W. Madison Street, Suite 2300
Chicago, Illinois 60602
(312) 752-4828
wjohnson@cbcounselor.com

Counsel for Defendant-Appellant
Hangzhou Chuanyue Silk Import & Export
Co., Ltd.

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(b), FED. R. APP. P. 32(g), and CIR. R. 32(c)**

The undersigned hereby certifies that the foregoing Brief for Plaintiff-Appellee complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(b). The brief was printed using 12-point Century Schoolbook font, with footnotes in 11-point Century Schoolbook font. The word-processing system used to prepare the document, excluding the Table of Contents, Table of Authorities, and Circuit Rule 26.1 Disclosure Statement, calculates that it contains 12, 911 words, including footnotes.

*/s/ Wesley E. Johnson*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on October 22, 2025, an electronic copy of the foregoing was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Wesley E. Johnson*

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the Appendix.

*/s/ Wesley E. Johnson*

No. 25-2205
_____

**UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**
_____

**KANGOL LLC,**

*Appellee-Plaintiff,*

v.

**HANGZHOU CHUANYUE SILK IMPORT & EXPORT CO., LTD.,**

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
District Judge Sharon Johnson Coleman
No. 1:24-cv-01636

**SHORT APPENDIX OF DEFENDANT-APPELLANT HANGZHOU
CHUANYUE SILK IMPORT & EXPORT CO., LTD.**

**Wesley E. Johnson
Cross-Border Counselor LLP
105 W. Madison St, Suite 2300
Chicago, IL 60602
Phone: (312) 752-4828
Email: Wjohnson@cbcounselor.com
Attorney for Defendant-Appellant**

**ORAL ARGUMENT REQUESTED**

I.    Memorandum Opinion and Order of June 13, 2025, Short

      Appendix 001-07

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KANGOL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 24-cv-01636 |
| v. | ) | |
| | ) | |
| THE PARTNERSHIPS AND | ) | |
| UNINCORPORATED ASSOCIATIONS | ) | Judge Sharon Johnson Coleman |
| IDENTIFIED ON SCHEDULE A | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kangol, LLC ("Plaintiff") filed its Complaint, known as a "Schedule A" action, against five foreign defendants for trademark infringement and counterfeiting for selling unauthorized Kangol products. Approximately 12 weeks later, the Court granted Plaintiff's motion for default judgment against all defendants, including Defendant Hangzhou Chuanyue Silk Import & Export Co., Ltd ("Defendant"). Nearly nine months later, Defendant filed a motion to vacate judgment pursuant to Fed. R. Civ. P 60(b)(4) ("Rule 60(b)(4)") or, in the alternative, for failure to comply with Fed. R. Civ. P. 69(a)(1) ("Rule 69(a)(1)"). For the following reasons, the Court denies Defendant's motion to vacate [60].

**BACKGROUND**

Plaintiff manufactures and sells clothing apparel, including headwear, that contains a variety of Plaintiff's kangaroo design trademarks. Plaintiff filed this action on February 27, 2024, against defendants, including Defendant who filed this motion, alleging that they were selling counterfeit products from China, and other foreign jurisdictions, via e-commerce platforms, including Alibaba and AliExpress. The defendants were listed in an accompanying Schedule A, which was filed under

1

seal. Plaintiff amended the Schedule A from 25 defendants to five defendants on March 25, 2024. The amended Schedule A included Defendant.

On March 26, 2024, Plaintiff moved for an ex parte temporary restraining order, which included Plaintiff's request for service of process via email under Fed. R. Civ. P. 4(f)(3) ("Rule 4(f)(3)"), which the Court granted. Plaintiff later moved for default judgment, which this Court granted on May 22, 2024, noting that no defendant appeared or contacted the Court ("Default Judgment Order"). Defendant filed its motion to vacate under Rule 60(b)(4) or, in the alternative, Rule 69(a)(1) on February 25, 2025.

## LEGAL STANDARD

Rule 60(b)(4) provides relief from a final judgment or order if the judgment is void where the court lacks personal jurisdiction over a party. *Philos Tech., Inc. v. Philos & D, Inc.,* 645 F.3d 851, 854 (7th Cir. 2011). If a district court determines that a judgment is void under Rule 60(b)(4), the judge has no discretion and must grant the party appropriate relief. *Philos Tech., Inc.,* 645 F.3d at 855. Courts have found "a *per se* abuse of discretion to deny a Rule 60(b)(4) motion when the trial court has no jurisdiction over the action." *Id.* at 855 (internal citations omitted). There is no time limit, absent exceptional circumstances, for motions filed under Rule 60(b)(4). *Id.* at 857.

## DISCUSSION

Defendant argues it is entitled to relief from default judgment under Rule 60(b)(4) because service of process was invalid under the Hague Service Convention (the "Convention"). Defendant also contends, in the first alternative, that the entry of default judgment did not comply with Article

2

15 of the Convention.  Lastly, in the second alternative, Defendant argues that the Court's Default

Judgment Order should be vacated and modified to comply with Rule 69(a)(1).

### I.    Validity of Service of Process under the Convention

Rule 4(f) allows service on defendants in foreign countries "(1) by any internationally agreed

means of service that is reasonably calculated, such as those authorized by the [] Convention on the

Service Abroad of Judicial and Extrajudicial Documents;" "(2) if there is no internationally agreed

means" "by a method that is reasonably calculated to give notice;" or "(3) by other means not

prohibited by international agreement, as the court orders."  Fed. R. Civ. P. 4(f).

The Court first considers whether service was proper under Rule 4(f)(1).  The Convention

"seeks to simplify, standardize, and generally improve the process of serving documents abroad."

*Water Splash, Inc. v. Menon,* 581 U.S. 271, 273, 137 S.Ct. 1504, 197 L.Ed.2d 826 (2017).  While the

"primary innovation" of the Convention is that it "requires each state to establish a central authority

to receive requests for service of documents from other countries," *Volkswagenwerk Aktiengesellschaft v.*

*Schlunk,* 486 U.S. 694, 698, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988), submitting a request to central

authority is not the only approved method of service.  *Water Splash, Inc.,* 581 U.S. at 275.  The United

States and China are parties to the Convention.

The Convention does not apply where the defendant's address is unknown.  *See Peanuts*

*Worldwide LLC v. Partnerships and Unincorporated Associations Identified on Schedule A,* No. 23 C 2965, 347

F.R.D. 316, 325 (N.D. Ill. June 25, 2024) (Pallmeyer, J.)  To determine whether an address is

"unknown," a plaintiff must show that it made "reasonably diligent efforts to ascertain and verify

defendant's mailing address."  *See Oakley, Inc. v. Partnerships and Unincorporated Associations Identified in*

*Schedule "A",* No. 20-cv-05049, 2021 WL 2894166, at *4 (N.D. Ill. July 9, 2021) (Kness, J.)

Defendant argues that Plaintiff failed to make reasonably diligent efforts to determine

Defendant's mailing address because the address was available online, and accessible to Plaintiff, at

the time the Complaint was filed. Defendant contends that Plaintiff's failure to conduct such efforts renders service improper. Plaintiff argues that it did make reasonably diligent efforts and that it could not verify the accurate address as its efforts resulted in a multitude of different addresses. Based on the different addresses listed, Plaintiff argues that it could not ascertain which, if any, were the correct address.

Even if Plaintiff did not make reasonably diligent efforts, it is not dispositive of the motion. Many Northern District of Illinois courts have found that a defendant was properly served under Rule 4(f)(3) even where a plaintiff failed to conduct reasonable due diligence under the Convention. *See Oakley,* 2021 WL 2894166, at *6; *see also Peanuts,* 347 F.R.D. at 328. Therefore, the real inquiry is whether service was proper under Rule 4(f)(3).

Rule 4(f)(3) allows for service of process "by any other means not prohibited by international agreement." Northern District of Illinois courts have found that no hierarchy exists in attempting service under Rule 4, meaning the Rule does not require service under the Convention (pursuant to Rule 4(f)(1)) if required, prior to seeking a court order for alternative service under Rule 4(f)(3). *See Peanuts,* 347 F.R.D. at 328; *see NBA Properties, Inc. v. P'ships and Unincorporated Ass'ns Identified in Schedule A,* 549 F.Supp.3d 790, 796-797 (N.D. Ill. July 15, 2021) (Kness, J.). In other words, Plaintiff need to attempt service under the explicit terms of the Convention for the Court to authorize service be effected through alternative means, such as email, so long as Plaintiff made "a showing as to why alternative service should be authorized" which was achieved here. *Oakley, Inc.,* 2021 WL 2894166, at *4. Here, the parties dispute whether service by email was proper under Rule 4(f)(3).

The Convention is silent as to whether service by email is permitted or forbidden. *See NBA Props.,* 549 F.Supp.3d at 797. Relevant here, Article 10 of the Convention allows for service through "post channels" and through "judicial officers, officials, or other competent persons" so long as the country in which service is to be effected has not objected to the method. *Id.* at 275-276. Defendant

4

argues that the Court should follow the holding in *Luxottica Group S.p.A. v. P'ships and Unincorporated Ass'ns on Schedule "A"* which found that China's objection to alternative means of process listed in Article 10(a) of the Convention precluded service via email. 391 F.Supp.3d 816, 826-27 (N.D. Ill. 2019) (Gottschall, J.). However, several other courts in this district have found that the term "post channels" in Article 10(a) should not be read to include email as "email does not require physical intrusion on Chinese territory, which is China's express objection to the availability of postal service under the [] Convention." *Hangzhou Chic Intelligent Tech. Co. v. P'ships v. Unincorporated Ass'ns Identified on Schedule A,* No. 20 C 4806, 2021 WL 1222783, at *3 (N.D. Ill. Apr. 1, 2021) (Durkin, J.) (listing cases that reject theory that Article 10(a) includes email service); *see also Peanuts,* 347 F.R.D. at 330; *see also NBA Props.,* 549 F.Supp.3d at 798 (finding "post channels" to apply only to material physically delivered by letter carrying authorities, not email). The Court will follow the suit of other Northern District of Illinois courts, finding that service via email is not prohibited by Article 10(a).

Defendant argues that the Supreme Court's holdings in *Schlunk* and *Water Splash* require a different result, namely that the Convention prohibits all methods of service not mentioned in its text, which would prohibit service via email under Rule 4(f)(3); but this Court does not agree. In *Schlunk,* the Supreme Court found that Articles 15 and 16 prohibit the practice of "notification *au parquet,*" service of process on a foreign actor through the deposit of documents with a designated local official. *Schlunk,* 486 U.S. at 703. In *Water Splash,* the Supreme Court held that the Convention did not prohibit service of process by mail. *Water Splash,* 581 U.S. at 274-284. Clearly, neither *Schlunk* nor *Water Splash* commented on the propriety of service by email under the Convention. Other courts in this district have come to the same conclusion, finding that the Convention's silence on unenumerated methods of service is not an outright prohibition. *See NBA Props.,* 549 F.Supp.3d at 797-98; *see also Peanuts,* 347 F.R.D. at 331; *see also Oakley, Inc.,* 2021 WL 2894166, at *5. The Court, therefore, finds that the

5

Convention does not prohibit email service nor are the prescribed methods of service exclusive. Accordingly, email service under Rule 4(f)(3) was proper.

## II.     Article 15 of the Convention

Defendant contends that Article 15 of the Convention mandates that default may only be entered where service is conducted under either a method of service available for domestic service in China or under the Convention.  Defendant argues that under either process of service, email is not sufficient.  The Court does not agree.

In reaching its conclusion in *Schlunk*, the Supreme Court referenced the elimination of *notification au parquet* in the Convention which was addressed through the Article 15 requirement that "a judgment may not be entered unless a foreign defendant received adequately and timely notice of the suit."  *Schlunk,* 486 U.S. at 703.  Indeed, the main concern in eliminating *notification au parquet* from Article 15 was to prevent default where a defendant did not receive notice of the lawsuit.  *Id.*  ("Yet such methods of service of process are the least likely to provide a defendant with actual notice.")  Article 15 allows a court to enter judgment where "the document was actually delivered to the defendant or to his residence by another method provided for by this Convention, and that… the delivery was effected in sufficient time to enable the defendant to defend."  As mentioned, the Convention does not prohibit email service and the listed methods of service permitted in the Convention are not exclusive.  Indeed, the facts demonstrate that Defendant received timely notice of the lawsuit based on the frequent communications with the parties during the pendency of this matter.  This removes any concern regarding the timeliness of notice Article 15 seeks to prevent. Accordingly, the Court finds that default judgment did not contravene Article 15 of the Convention.

## III.     Rule 69(a)(1)

Lastly, Defendant argues that the Default Judgment Order should be vacated or modified to comply with Rule 69(a)(1).  Defendant contends the Default Judgment Order, mandating third parties,

like Amazon, to turn over funds to Plaintiff, is contrary to Illinois post judgment proceedings and that Plaintiff did not comply with these procedures.

However, as correctly noted by Plaintiff, Defendant does not describe how the Default Judgment Order is contrary to Illinois post judgment proceedings. Nor does Defendant make any attempt to argue which Illinois post judgment proceedings Plaintiff violated and how Plaintiff failed to comply with these procedures. Defendant's failure to present sufficient argument in its initial brief cannot be remedied through its reply brief. *See Aliwoli v. Gilmore,* 127 F.3d 632, 635 (7th Cir. 1997) ("The reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court.") (internal citations omitted). Undeveloped arguments unsupported by legal authority are waived. *Schaefer v. Universal Scaffolding & Equip., LLC,* 839 F.3d 559, 607 (7th Cir. 2016). It is not the Court's duty to go on an expedition to create Defendant's arguments. *See Contilli v. Loc. 705 Int'l Bhd. of Teamsters Pension Fund,* 559 F.3d 720, 724 (7th Cir. 2009) ("Judges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). Accordingly, the Court finds that the Default Judgment Order did not violate Rule 69(a).

**CONCLUSION**

For these reasons, the Court denies Defendant's motion to vacate [60].

**IT IS SO ORDERED.**

Date: 6/13/2025

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge

II.   Amended Final Judgment Order of October 2, 2024, Short

      Appendix 008-13

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS (CHICAGO)**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KANGOL LLC, | ) | CASE NO. 1:24-cv-01636 |
| | ) | |
| Plaintiff, | ) | Judge Sharon Johnson Coleman |
| | ) | |
| -vs- | ) | |
| | ) | |
| THE PARTNERSHIPS AND | ) | |
| UNINCORPORATED ASSOCIATIONS | ) | |
| IDENTIFIED ON SCHEDULE A, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED FINAL JUDGMENT ORDER

This action having been commenced by Plaintiff Kangol LLC against the fully interactive e-commerce stores operating under the Seller Aliases identified in Exhibit A attached hereto, the Plaintiffs having moved for entry of Default and Default Judgment against the Defendants identified in Exhibit A (the "Defaulting Defendants");

Plaintiff having properly completed service of process on the Defaulting Defendants, the combination of providing notice via e-mail, along with any notice that the Defaulting Defendants received from payment processor, being notice reasonably calculated under all circumstances to apprise the Defaulting Defendants of the pendency of the action and affording them the opportunity to answer and present their objections; and

Defaulting Defendants having failed to answer the Amended Complaint or otherwise plead, and the time for answering the Amended Complaint having expired;

THIS COURT HEREBY FINDS that it has personal jurisdiction over the Defaulting Defendants because the Defaulting Defendants directly target their business activities toward consumers in the United States, including Illinois. Specifically, the Defaulting Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using at least the Seller Aliases, offering shipping to the United States, including Illinois, accepting payment in U.S. dollar, and/or from U.S. bank accounts, and having sold products using infringing and counterfeit versions of Plaintiff's federally registered trademarks ("Plaintiff's Trademarks") to residents of Illinois. A list of the Plaintiff's Trademarks is included in the chart below.

| Registration Number | Trademark |
| --- | --- |
| 535,357; 1,011,576; 1,490,292; 3,017,272; 4,153,667; 4,384,997 | KANGOL<br>(standard character word mark) |
| 1,372,671; 4,204,801; 4,384,996 |  |
| 2,235,981; 2,278,532 |  |
| 3,787,973 |  |

This Court further finds that the Defaulting Defendants are liable for willful trademark infringement and counterfeiting under 15 U.S.C. § 1114 and false designation of origin under 15 U.S.C. § 1125(a).

Accordingly, this Court orders that Plaintiff's Motion for Entry of Default and Default Judgment is GRANTED in its entirety, that the Defaulting Defendants are deemed in default and that this Final Judgment is entered against Defaulting Defendant.

The Court further orders that:

1. Defaulting Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert of participation with them be permanently enjoined and restrained from:

    a. using the Plaintiff's Trademarks or any reproductions, counterfeit copies or colorable imitations thereof, in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine Plaintiff's product or not authorized by Plaintiff to be sold in connection with the Plaintiff's Trademarks;

    b. passing off, inducing, or enabling others to sell or pass off any product as a genuine Plaintiff's product or any other product produced by Plaintiff, that is not Plaintiff's, or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under the Plaintiff's Trademarks;

    c. committing any acts calculated to cause consumers to believe that the Defaulting Defendants' products are those sold under the authorization, control, or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

    d. further infringing the Plaintiff's Trademarks and damaging Plaintiff's goodwill and reputation; and

     e.   manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, not authorized by Plaintiff to be sold or offered for sale, and which bear any of Plaintiff's trademarks, including the Plaintiff's Trademarks, or any reproductions, counterfeit copies or colorable imitations thereof.

2. Upon Plaintiff's request, any third party with actual notice of this Order who is providing services for any of the Defaulting Defendants, or in connection with the Defaulting Defendants' Sellar Aliases, including, without limitation, any online marketplace platforms such as eBay Inc. ("eBay"), AliExpress, Alibaba Group Holding Ltd. ("Aibaba"), Amazon.com, Inc. ("Amazon"), ContextLogic Inc. d/b/a/ Wish.com ("Wish"), Walmart Inc. ("Walmart"), Etsy, Inc. ("Etsy"), WhaleCo, Inc. ("Temu"), and DHgate.com ("DHgate") (collectively, the "Third Party Providers") shall within seven (7) calendar days after receipt of such notice, disable and cease displaying any advertisements used by or associated with the Defaulting Defendants in connection with the sale of counterfeit and infringing goods using Plaintiff's Trademarks.

3. Pursuant to 15 U.S.C. § 1117(c)(2), Plaintiff is awarded statutory damages from the Defaulting Defendants in the amount of fifty thousand dollars ($50,000) for willful use of counterfeit Plaintiff's Trademarks in connection with the sale of products through at least the Defaulting Defendants' online marketplaces.

4. Plaintiff may serve this Order on Third Party Providers, including PayPal, Inc. ("PayPal"), eBay, DHgate, Alipay, Alibaba, Ant Financial Services Group ("Ant Financial"), Wish, Walmart, Etsy, Temu, and Amazon Pay, by e-mail delivery on the Third Party Providers.

5. Any Third Party Providers holding funds for the Defaulting Defendants, including PayPal, eBay, DHgate, Alipay, Alibaba, Ant Financial, Wish, Walmart, Etsy, Temu, and Amazon Pay, shall within seven (7) calendar days of receipt of this Order, permanently restrain and enjoin any financial accounts connected to the Defaulting Defendants' Sellar Aliases from transferring or disposing of any funds, up to the above identified statutory damages award, or other of the Defaulting Defendants' assets.

6. All monies, up to the above identified statutory damages award, in the Defaulting Defendants' financial accounts, including monies held by Third Party Providers such as PayPal, eBay, DHgate, Alipay, Alibaba, Ant Financial, Wish, Walmart, Etsy, Temu, and Amazon Pay, are hereby released to Plaintiff as partial payment of the above-identified damages, and Third Party Providers, including PayPal, eBay, DHgate, Alipay, Alibaba, Ant Financial, Wish, Walmart, Etsy, Temu, and Amazon Pay, are ordered to release to Plaintiff the amounts from the Defaulting Defendants' financial accounts within seven (7) calendar days of receipt of this Order.

7. Until Plaintiff has recovered full payment of monies owed to them by the Defaulting Defendant, Plaintiff shall have the ongoing authority to serve this Order on Third Party Providers, including PayPal, eBay, DHgate, Alipay, Alibaba, Ant Financial, Wish, Walmart, Etsy, Temu, and Amazon Pay, in the event that any new financial accounts controlled or operated by the Defaulting Defendants are identified. Upon receipt of this Order, Third Party Providers, including PayPal, eBay, DHgate, Alipay, Alibaba, Ant Financial, Wish, Walmart, Etsy, Temu, and Amazon Pay, shall within seven (7) calendar days:

a. locate all accounts and funds connected to Defaulting Defendants' Sellar Alias, including, but not limited to, any financial accounts connected to any e-mail addresses provided for the Defaulting Defendants by third parties;

b. restrain and enjoin such accounts or funds from transferring or disposing of any money or other of Defaulting Defendants' assets; and

c. release all monies, up to the above identified statutory damages award, restrained in the Defaulting Defendants' financial accounts to Plaintiff as partial payment of the above-identified damages within seven (7) calendar days of receipt of this Order.

8. In the event that Plaintiff identifies any additional online marketplace accounts or financial accounts owned by the Defaulting Defendants, Plaintiff may send notice of any supplemental proceeding to the Defaulting Defendants by e-mail at the e-mail addresses identified or provided for the Defaulting Defendants by third parties.

9. The ten thousand dollar ($10,000) bond posted by Plaintiff, including any interest, minus the registry fee, is hereby released via regular mail to counsel of record for Plaintiff, Todd Tucker of Calfee Halter & Griswold LLP at 1405 East Sixth Street, Cleveland, OH 44114.

This is a Final Judgment.

DATED: 10/2/2024

_____
Sharon Johnson Coleman
United States District Judge

**III.** **Sealed Temporary Restraining Order of March 26, 2024, Short Appendix 014-22**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

<table>
<tr><td>Kangol LLC</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>Case No.: 24-cv-1636</td></tr>
<tr><td>The Partnerships and Unincorporated</td><td>)</td><td></td></tr>
<tr><td>Associations Identified on Schedule A</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendants.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

## SEALED TEMPORARY RESTRAINING ORDER

Plaintiff Kangol LLC ("Kangol") filed an *Ex Parte* Motion for Entry of a Temporary Restraining Order and Other Relief (the "Motion") against the fully interactive, e-commerce stores[1] operating under the seller aliases identified in Amended Schedule A to the Complaint and attached hereto (collectively, "Defendants") and using at least the domain names identified in Schedule A (the "Defendant Domain Names") and the online marketplace accounts identified in Schedule A (the "Online Marketplaces"). After reviewing the Motion and the accompanying record, this Court GRANTS Kangol's Motion as follows.

This Court finds, in the absence of adversarial presentation, that it has personal jurisdiction over Defendants because Defendants directly target their business activities toward consumers in the United States, including Illinois. Specifically, Kangol has provided a basis to conclude that Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more seller aliases, offer shipping to the United

---

[1] The e-commerce store urls are listed on Schedule A hereto.

States, including Illinois, and have sold products using infringing and counterfeit versions of Kangol's federally registered trademarks (the "Kangol Trademarks") to residents of Illinois.

In this case, Kangol has presented screenshot evidence that each Defendant e-commerce store is reaching out to do business with Illinois residents by operating one or more commercial, interactive internet stores through which Illinois residents can and do purchase products using counterfeit versions of the Kangol Trademarks. *See* Docket No. __, which includes screenshot evidence confirming that each Defendant internet store does stand ready, willing and able to ship its counterfeit goods to customers in Illinois bearing infringing and/or counterfeit versions of the Kangol trademarks. A list of the Kangol Trademarks is included in the below chart.

| Registration Number | Trademark |
|---|---|
| 535,357; 1,011,576; 1,490,292; 3,017,272; 4,153,667; 4,384,997 | KANGOL (standard character word mark) |
| 1,372,671; 4,204,801; 4,384,996 |  |
| 2,235,981; 2,278,532 |  |

Short Appendix 015

| 3,787,973 |  |
| --- | --- |

This Court also finds that issuing this Order without notice pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure is appropriate because Kangol has presented specific facts in the Declaration of Sean McCabe in support of the Motion and accompanying evidence clearly showing that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition. Specifically, in the absence of an *ex parte* Order, Defendants could and likely would move any assets from accounts in financial institutions to unknown off-shore accounts. Accordingly, this Court orders that:

1.    Defendants, their officers, agents, servants, employees, attorneys, and all persons acting for, with, by, through, under, or in active concert with them be temporarily enjoined and restrained from:

   a.   using the Kangol Trademarks or any reproductions, counterfeit copies, or colorable imitations in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine Kangol product or not authorized by Kangol to be sold in connection with the Kangol Trademarks;

   b.   passing off, inducing, or enabling others to sell or pass off any product as a genuine Kangol product or any other product produced by Kangol, that is not Kangol's or not produced under the authorization, control, or supervision of Kangol and approved by Kangol for sale under the Kangol Trademarks;

    c.  committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control, or supervision of Kangol, or are sponsored by, approved by, or otherwise connected with Kangol; and

    d.  manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Kangol, nor authorized by Kangol to be sold or offered for sale, and which bear any of Kangol's trademarks, including the Kangol Trademarks, or any reproductions, counterfeit copies, or colorable imitations.

2.    Defendants shall not transfer or dispose of any money or other of Defendants' assets in any of Defendants' financial accounts.

3.    Kangol is authorized to issue expedited written discovery to Defendants, pursuant to Federal Rules of Civil Procedure 33, 34, and 36, related to:

    a.  the identities and locations of Defendants, their officers, agents, servants, employees, attorneys, and any persons acting in active concert or participation with them, including all known contact information and all associated e-mail addresses;

    b.  the nature of Defendants' operations and all associated sales, methods of payment for services, and financial information, including, without limitation, identifying information associated with the Online Marketplaces and Defendants' financial accounts, including Defendants' sales and listing history related to their respective Online Marketplaces; and

    c.  any financial accounts owned or controlled by Defendants, including their officers, agents, servants, employees, attorneys, and any persons acting in active concert or

4

participation with them, including such accounts residing with or under the control of any banks, savings and loan associations, payment processors or other financial institutions, including, without limitation, PayPal, Inc. ("PayPal"), Alipay, ContextLogic Inc. d/b/a Wish.com ("Wish.com"), Alibaba Group Holding Ltd. ("Alibaba"), Ant Financial Services Group ("Ant Financial"), Amazon Pay, or other merchant account providers, payment providers, third party processors, and credit card associations (e.g., MasterCard and VISA).

4.    Upon Kangol's request, any third party with actual notice of this Order who is providing services for any of the Defendants, or in connection with any of Defendants' Online Marketplaces, including, without limitation, any online marketplace platforms such as eBay, Inc., AliExpress, Alibaba, Amazon.com, Inc., Wish.com, and Dhgate (collectively, the "Third Party Providers"), shall, within seven (7) calendar days after receipt of such notice, provide to Kangol expedited discovery, limited to copies of documents and records in such person's or entity's possession or control sufficient to determine:

a.  the identities and locations of Defendants, their officers, agents, servants, employees, attorneys, and any persons acting in active concert or participation with them, including all known contact information and all associated e-mail addresses;

b.  the nature of Defendants' operations and all associated sales, methods of payment for services, and financial information, including, without limitation, identifying information associated with the Online Marketplaces and Defendants' financial accounts, including Defendants' sales and listing history related to their respective Online Marketplaces; and

c.  any financial accounts owned or controlled by Defendants, including their officers,

agents, servants, employees, attorneys, and any persons acting in active concert or participation with them, including such accounts residing with or under the control of any banks, savings and loan associations, payment processors or other financial institutions, including, without limitation, PayPal, Alipay, Wish.com, Alibaba, Ant Financial, Amazon Pay, or other merchant account providers, payment providers, third party processors, and credit card associations (e.g., MasterCard and VISA).

5. Upon Kangol's request, those with notice of this Order, including the Third Party Providers as defined in Paragraph 4, shall within seven (7) calendar days after receipt of such notice, disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the Kangol Trademarks.

7. Any Third Party Providers, including PayPal, Alipay, Alibaba, Ant Financial, Wish.com, and Amazon Pay, shall, within seven (7) calendar days of receipt of this Order:

   a. locate all accounts and funds connected to Defendants' seller aliases, including, but not limited to, any financial accounts connected to the information listed in Schedule A hereto and any e-mail addresses provided for Defendants by third parties; and

   b. restrain and enjoin any such accounts or funds from transferring or disposing of any money or other of Defendants' assets until further order by this Court.

8. Kangol may provide notice of the proceedings in this case to Defendants, including notice of the preliminary injunction hearing, service of process pursuant to Fed. R. Civ. P. 4(f)(3), and any future motions, by electronically publishing a link to the Complaint, this Order, and other relevant documents on a website and by sending an e-mail with a link to said website to the e-mail addresses provided for Defendants by third parties. The Clerk of

the Court is directed to issue a single original summons in the name of "BAR CORPORATION" and all other Defendants identified in the Complaint" that shall apply to all Defendants. The combination of providing notice via electronic publication and e-mail, along with any notice that Defendants receive from payment processors, shall constitute notice reasonably calculated under all circumstances to apprise Defendants of the pendency of the action and afford them the opportunity to present their objections.

9.      Kangol must provide notice to Defendants of any motion for preliminary injunction as required by Rule 65(a)(1).

10.     Schedule A to the Complaint (ECF No. 5), the Declaration of Sean McCabe and exhibits thereto (ECF No. 6), Kangol's Memorandum in support of its Motion for Temporary Restraining Order (ECF No. 11), Amend Schedule A (ECF No. 26), and this Order shall remain sealed until further order by this Court or until the Order expires, whichever occurs earlier.

11.     Within seven (7) calendar days of entry of this Order, Kangol shall deposit with the Court $10,000, either cash or surety bond, as security, which amount has, in the absence of adversarial testing, been deemed adequate for the payment of such damages as any person may be entitled to recover as a result of a wrongful restraint hereunder.

12.     Any Defendants that are subject to this Order may appear and move to dissolve or modify the Order as permitted by and in compliance with the Federal Rules of Civil Procedure and the Northern District of Illinois Local Rules. Any third party impacted by this Order may move for appropriate relief.

13.     This Temporary Restraining Order without notice is entered at 10:00 A.M. on this 26th day of March 2024 and shall remain in effect for fourteen (14) calendar days.

Sharon Johnson Coleman
United States District Judge

8

| Defendant No. | Seller | Seller URL | Product Listing URL(s) |
|---|---|---|---|
| 14 | Hangzhou Chuanyue Silk Imp And Exp Co., Ltd. | https://danasilk.en.alibaba.com/contactinfo.html | alibaba.com/product-detail/_1600242720246.html |
| 17 | Guangzhou Unipin Sportswear Co., Ltd. | https://unipincap.en.alibaba.com/contactinfo.html | alibaba.com/product-detail/_1600593328251.html |
| 18 | Yiwu Zhipai Trade Co., Ltd. | https://zhipai.en.alibaba.com/contactinfo.html | alibaba.com/product-detail/_1600713671370.html |
| 21 | Yiwu Lisa Knitting Raw Materials Firm | https://ywlisa.en.alibaba.com/contactinfo.html | alibaba.com/product-detail/_1600830716548.html |
| 23 | Yiwu Mingqi Trading Co., Ltd. | https://mingqitrade.en.alibaba.com/contactinfo.html | alibaba.com/product-detail/_1600914814503.html |

Short Appendix 022