No. 25-2205

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

## KANGOL LLC,

*Appellee-Plaintiff,*

v.

## HANGZHOU CHUANYUE SILK IMPORT & EXPORT CO., LTD.,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
District Judge Sharon Johnson Coleman
No. 1:24-cv-01636

---

## APPENDIX OF DEFENDANT-APPELLANT HANGZHOU CHUANYUE SILK IMPORT & EXPORT CO., LTD.

**Wesley E. Johnson**
**Cross-Border Counselor LLP**
**105 W. Madison St, Suite 2300**
**Chicago, IL 60602**
**Phone: (312) 752-4828**
**Email: Wjohnson@cbcounselor.com**
**Attorney for Defendant-Appellant**

## ORAL ARGUMENT REQUESTED

# Contents

1965 Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, 20 U.S.T. 361 ..................................... 4

Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, 23 U. S. T. 2555, T. I. A. S. No. 7444 ........................................... 5

1964 Conference de la Haye de Droit International Prive, Actes et Documents de la Dixieme Session (Notification) TOME III (1965) (3 Actes et Documents) (Excerpts) ................................................................................................. 6

2003 Conclusions and Recommendations Adopted by the Special Commission on the Practical Operation of the Hague Apostille, Evidence and Service Conventions . 7

Office of Private International Law, Office of the Legal Adviser, Department of State, Response to Questionaire .................................................................. 8

OUTLINE-HCCH 1965 SERVICE CONVENTION ................................................. 9

U.S. Supreme Court Docket No, 16-254, Brief for the United States as Amicus Curiae Supporting Petitioner .................................................................. 10

HCCH 2024 Special Commission Conclusions & Recommendations ................... 11

U.S. Department of State, Civil Division, Office of International Judicial Assistance – Website ............................................................................... 12

U.S. Department of Justice – Judicial Assistance, Office of the Legal Advisor-Website ................................................................................................. 13

Decisions of the 2004 Bucharest Congress............................................................ 14

Universal Postal Convention (Seoul, 1994).......................................................... 15

**1965 Hague Convention on the Service Abroad of Judicial and**

**Extrajudicial Documents in Civil and Commercial Matters, 20 U.S.T. 361**



**14. CONVENTION ON THE SERVICE ABROAD OF
JUDICIAL AND EXTRAJUDICIAL DOCUMENTS
IN CIVIL OR COMMERCIAL MATTERS[1]**

*(Concluded 15 November 1965)*

The States signatory to the present Convention,
Desiring to create appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time,
Desiring to improve the organisation of mutual judicial assistance for that purpose by simplifying and expediting the procedure,
Have resolved to conclude a Convention to this effect and have agreed upon the following provisions:

Article 1

The present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad.
This Convention shall not apply where the address of the person to be served with the document is not known.

CHAPTER I – JUDICIAL DOCUMENTS

Article 2

Each Contracting State shall designate a Central Authority which will undertake to receive requests for service coming from other Contracting States and to proceed in conformity with the provisions of Articles 3 to 6.
Each State shall organise the Central Authority in conformity with its own law.

Article 3

The authority or judicial officer competent under the law of the State in which the documents originate shall forward to the Central Authority of the State addressed a request conforming to the model annexed to the present Convention, without any requirement of legalisation or other equivalent formality.
The document to be served or a copy thereof shall be annexed to the request. The request and the document shall both be furnished in duplicate.

Article 4

If the Central Authority considers that the request does not comply with the provisions of the present Convention it shall promptly inform the applicant and specify its objections to the request.

---

[1] This Convention, including related materials, is accessible on the website of the Hague Conference on Private International Law (www.hcch.net), under "Conventions" or under the "Service Section". For the full history of the Convention, see Hague Conference on Private International Law, *Actes et documents de la Dixième session (1964)*, Tome III, *Notification* (391 pp.).

Article 5

The Central Authority of the State addressed shall itself serve the document or shall arrange to have it served by an appropriate agency, either –

a)   by a method prescribed by its internal law for the service of documents in domestic actions upon persons who are within its territory, or

b)   by a particular method requested by the applicant, unless such a method is incompatible with the law of the State addressed.

Subject to sub-paragraph *(b)* of the first paragraph of this Article, the document may always be served by delivery to an addressee who accepts it voluntarily.

If the document is to be served under the first paragraph above, the Central Authority may require the document to be written in, or translated into, the official language or one of the official languages of the State addressed.

That part of the request, in the form attached to the present Convention, which contains a summary of the document to be served, shall be served with the document.

Article 6

The Central Authority of the State addressed or any authority which it may have designated for that purpose, shall complete a certificate in the form of the model annexed to the present Convention.

The certificate shall state that the document has been served and shall include the method, the place and the date of service and the person to whom the document was delivered. If the document has not been served, the certificate shall set out the reasons which have prevented service.

The applicant may require that a certificate not completed by a Central Authority or by a judicial authority shall be countersigned by one of these authorities.

The certificate shall be forwarded directly to the applicant.

Article 7

The standard terms in the model annexed to the present Convention shall in all cases be written either in French or in English. They may also be written in the official language, or in one of the official languages, of the State in which the documents originate.

The corresponding blanks shall be completed either in the language of the State addressed or in French or in English.

Article 8

Each Contracting State shall be free to effect service of judicial documents upon persons abroad, without application of any compulsion, directly through its diplomatic or consular agents.

Any State may declare that it is opposed to such service within its territory, unless the document is to be served upon a national of the State in which the documents originate.

Article 9

Each Contracting State shall be free, in addition, to use consular channels to forward documents, for the purpose of service, to those authorities of another Contracting State which are designated by the latter for this purpose.

Each Contracting State may, if exceptional circumstances so require, use diplomatic channels for the same purpose.

Article 10

Provided the State of destination does not object, the present Convention shall not interfere with –

a)   the freedom to send judicial documents, by postal channels, directly to persons abroad,

*b)*   the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,

*c)*   the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

## Article 11

The present Convention shall not prevent two or more Contracting States from agreeing to permit, for the purpose of service of judicial documents, channels of transmission other than those provided for in the preceding Articles and, in particular, direct communication between their respective authorities.

## Article 12

The service of judicial documents coming from a Contracting State shall not give rise to any payment or reimbursement of taxes or costs for the services rendered by the State addressed.

The applicant shall pay or reimburse the costs occasioned by –-

*a)*   the employment of a judicial officer or of a person competent under the law of the State of destination,

*b)*   the use of a particular method of service.

## Article 13

Where a request for service complies with the terms of the present Convention, the State addressed may refuse to comply therewith only if it deems that compliance would infringe its sovereignty or security.

It may not refuse to comply solely on the ground that, under its internal law, it claims exclusive jurisdiction over the subject-matter of the action or that its internal law would not permit the action upon which the application is based.

The Central Authority shall, in case of refusal, promptly inform the applicant and state the reasons for the refusal.

## Article 14

Difficulties which may arise in connection with the transmission of judicial documents for service shall be settled through diplomatic channels.

## Article 15

Where a writ of summons or an equivalent document had to be transmitted abroad for the purpose of service, under the provisions of the present Convention, and the defendant has not appeared, judgment shall not be given until it is established that –

*a)*   the document was served by a method prescribed by the internal law of the State addressed for the service of documents in domestic actions upon persons who are within its territory, or

*b)*   the document was actually delivered to the defendant or to his residence by another method provided for by this Convention,

and that in either of these cases the service or the delivery was effected in sufficient time to enable the defendant to defend.

Each Contracting State shall be free to declare that the judge, notwithstanding the provisions of the first paragraph of this Article, may give judgment even if no certificate of service or delivery has been received, if all the following conditions are fulfilled –

*a)*   the document was transmitted by one of the methods provided for in this Convention,

*b)*   a period of time of not less than six months, considered adequate by the judge in the particular case, has elapsed since the date of the transmission of the document,

*c)*   no certificate of any kind has been received, even though every reasonable effort has been made to obtain it through the competent authorities of the State addressed.

Notwithstanding the provisions of the preceding paragraphs the judge may order, in case of urgency, any provisional or protective measures.


## Article 16

When a writ of summons or an equivalent document had to be transmitted abroad for the purpose of service, under the provisions of the present Convention, and a judgment has been entered against a defendant who has not appeared, the judge shall have the power to relieve the defendant from the effects of the expiration of the time for appeal from the judgment if the following conditions are fulfilled –
a)     the defendant, without any fault on his part, did not have knowledge of the document in sufficient time to defend, or knowledge of the judgment in sufficient time to appeal, and
b)     the defendant has disclosed a *prima facie* defence to the action on the merits.

An application for relief may be filed only within a reasonable time after the defendant has knowledge of the judgment.
Each Contracting State may declare that the application will not be entertained if it is filed after the expiration of a time to be stated in the declaration, but which shall in no case be less than one year following the date of the judgment.
This Article shall not apply to judgments concerning status or capacity of persons.


CHAPTER II – EXTRAJUDICIAL DOCUMENTS


## Article 17

Extrajudicial documents emanating from authorities and judicial officers of a Contracting State may be transmitted for the purpose of service in another Contracting State by the methods and under the provisions of the present Convention.


CHAPTER III – GENERAL CLAUSES


## Article 18

Each Contracting State may designate other authorities in addition to the Central Authority and shall determine the extent of their competence.
The applicant shall, however, in all cases, have the right to address a request directly to the Central Authority.
Federal States shall be free to designate more than one Central Authority.


## Article 19

To the extent that the internal law of a Contracting State permits methods of transmission, other than those provided for in the preceding Articles, of documents coming from abroad, for service within its territory, the present Convention shall not affect such provisions.


## Article 20

The present Convention shall not prevent an agreement between any two or more Contracting States to dispense with –
a)     the necessity for duplicate copies of transmitted documents as required by the second paragraph of Article 3,
b)     the language requirements of the third paragraph of Article 5 and Article 7,
c)     the provisions of the fourth paragraph of Article 5,
d)     the provisions of the second paragraph of Article 12.


## Article 21

**Appendix 008**

Each Contracting State shall, at the time of the deposit of its instrument of ratification or accession, or at a later date, inform the Ministry of Foreign Affairs of the Netherlands of the following –
*a)*      the designation of authorities, pursuant to Articles 2 and 18,
*b)*      the designation of the authority competent to complete the certificate pursuant to Article 6,
*c)*      the designation of the authority competent to receive documents transmitted by consular channels, pursuant to Article 9.

Each Contracting State shall similarly inform the Ministry, where appropriate, of –
*a)*      opposition to the use of methods of transmission pursuant to Articles 8 and 10,
*b)*      declarations pursuant to the second paragraph of Article 15 and the third paragraph of Article 16,
*c)*      all modifications of the above designations, oppositions and declarations.

## Article 22

Where Parties to the present Convention are also Parties to one or both of the Conventions on civil procedure signed at The Hague on 17th July 1905, and on 1st March 1954, this Convention shall replace as between them Articles 1 to 7 of the earlier Conventions.

## Article 23

The present Convention shall not affect the application of Article 23 of the Convention on civil procedure signed at The Hague on 17th July 1905, or of Article 24 of the Convention on civil procedure signed at The Hague on 1st March 1954.
These Articles shall, however, apply only if methods of communication, identical to those provided for in these Conventions, are used.

## Article 24

Supplementary agreements between Parties to the Conventions of 1905 and 1954 shall be considered as equally applicable to the present Convention, unless the Parties have otherwise agreed.

## Article 25

Without prejudice to the provisions of Articles 22 and 24, the present Convention shall not derogate from Conventions containing provisions on the matters governed by this Convention to which the Contracting States are, or shall become, Parties.

## Article 26

The present Convention shall be open for signature by the States represented at the Tenth Session of the Hague Conference on Private International Law.
It shall be ratified, and the instruments of ratification shall be deposited with the Ministry of Foreign Affairs of the Netherlands.

## Article 27

The present Convention shall enter into force on the sixtieth day after the deposit of the third instrument of ratification referred to in the second paragraph of Article 26.
The Convention shall enter into force for each signatory State which ratifies subsequently on the sixtieth day after the deposit of its instrument of ratification.

Article 28

Any State not represented at the Tenth Session of the Hague Conference on Private International Law may accede to the present Convention after it has entered into force in accordance with the first paragraph of Article 27. The instrument of accession shall be deposited with the Ministry of Foreign Affairs of the Netherlands.

The Convention shall enter into force for such a State in the absence of any objection from a State, which has ratified the Convention before such deposit, notified to the Ministry of Foreign Affairs of the Netherlands within a period of six months after the date on which the said Ministry has notified it of such accession.

In the absence of any such objection, the Convention shall enter into force for the acceding State on the first day of the month following the expiration of the last of the periods referred to in the preceding paragraph.

Article 29

Any State may, at the time of signature, ratification or accession, declare that the present Convention shall extend to all the territories for the international relations of which it is responsible, or to one or more of them. Such a declaration shall take effect on the date of entry into force of the Convention for the State concerned.

At any time thereafter, such extensions shall be notified to the Ministry of Foreign Affairs of the Netherlands.

The Convention shall enter into force for the territories mentioned in such an extension on the sixtieth day after the notification referred to in the preceding paragraph.

Article 30

The present Convention shall remain in force for five years from the date of its entry into force in accordance with the first paragraph of Article 27, even for States which have ratified it or acceded to it subsequently.

If there has been no denunciation, it shall be renewed tacitly every five years.

Any denunciation shall be notified to the Ministry of Foreign Affairs of the Netherlands at least six months before the end of the five year period.

It may be limited to certain of the territories to which the Convention applies.

The denunciation shall have effect only as regards the State which has notified it. The Convention shall remain in force for the other Contracting States.

Article 31

The Ministry of Foreign Affairs of the Netherlands shall give notice to the States referred to in Article 26, and to the States which have acceded in accordance with Article 28, of the following –
a)     the signatures and ratifications referred to in Article 26;
b)     the date on which the present Convention enters into force in accordance with the first paragraph of Article 27;
c)     the accessions referred to in Article 28 and the dates on which they take effect;
d)     the extensions referred to in Article 29 and the dates on which they take effect;
e)     the designations, oppositions and declarations referred to in Article 21;
f)     the denunciations referred to in the third paragraph of Article 30.

In witness whereof the undersigned, being duly authorised thereto, have signed the present Convention.

Done at The Hague, on the 15th day of November, 1965, in the English and French languages, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Government of the Netherlands, and of which a certified copy shall be sent, through the diplomatic channel, to each of the States represented at the Tenth Session of the Hague Conference on Private International Law.

**Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, 23 U. S. T. 2555, T. I. A. S. No. 7444**



## 20. CONVENTION ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS[1]

*(Concluded 18 March 1970)*

The States signatory to the present Convention,

Desiring to facilitate the transmission and execution of Letters of Request and to further the accommodation of the different methods which they use for this purpose,

Desiring to improve mutual judicial co-operation in civil or commercial matters,

Have resolved to conclude a Convention to this effect and have agreed upon the following provisions –

CHAPTER I – LETTERS OF REQUEST

### Article 1

In civil or commercial matters a judicial authority of a Contracting State may, in accordance with the provisions of the law of that State, request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act.

A Letter shall not be used to obtain evidence which is not intended for use in judicial proceedings, commenced or contemplated.

The expression "other judicial act" does not cover the service of judicial documents or the issuance of any process by which judgments or orders are executed or enforced, or orders for provisional or protective measures.

### Article 2

A Contracting State shall designate a Central Authority which will undertake to receive Letters of Request coming from a judicial authority of another Contracting State and to transmit them to the authority competent to execute them. Each State shall organise the Central Authority in accordance with its own law.

Letters shall be sent to the Central Authority of the State of execution without being transmitted through any other authority of that State.

### Article 3

A Letter of Request shall specify –

a) the authority requesting its execution and the authority requested to execute it, if known to the requesting authority;

b) the names and addresses of the parties to the proceedings and their representatives, if any;

c) the nature of the proceedings for which the evidence is required, giving all necessary information in regard thereto;

d) the evidence to be obtained or other judicial act to be performed.

---

[1] This Convention, including related materials, is accessible on the website of the Hague Conference on Private International Law (www.hcch.net), under "Conventions" or under the "Evidence Section". For the full history of the Convention, see Hague Conference on Private International Law, *Actes et documents de la Onzième session (1968)*, Tome IV, *Obtention des preuves* (219 pp.).

Where appropriate, the Letter shall specify, *inter alia* –
e)  the names and addresses of the persons to be examined;
f)  the questions to be put to the persons to be examined or a statement of the subject-matter about which they are to be examined;
g)  the documents or other property, real or personal, to be inspected;
h)  any requirement that the evidence is to be given on oath or affirmation, and any special form to be used;
i)  any special method or procedure to be followed under Article 9.

A Letter may also mention any information necessary for the application of Article 11.
No legalisation or other like formality may be required.


## Article 4

A Letter of Request shall be in the language of the authority requested to execute it or be accompanied by a translation into that language.
Nevertheless, a Contracting State shall accept a Letter in either English or French, or a translation into one of these languages, unless it has made the reservation authorised by Article 33.
A Contracting State which has more than one official language and cannot, for reasons of internal law, accept Letters in one of these languages for the whole of its territory, shall, by declaration, specify the language in which the Letter or translation thereof shall be expressed for execution in the specified parts of its territory. In case of failure to comply with this declaration, without justifiable excuse, the costs of translation into the required language shall be borne by the State of origin.
A Contracting State may, by declaration, specify the language or languages other than those referred to in the preceding paragraphs, in which a Letter may be sent to its Central Authority.
Any translation accompanying a Letter shall be certified as correct, either by a diplomatic officer or consular agent or by a sworn translator or by any other person so authorised in either State.


## Article 5

If the Central Authority considers that the request does not comply with the provisions of the present Convention, it shall promptly inform the authority of the State of origin which transmitted the Letter of Request, specifying the objections to the Letter.


## Article 6

If the authority to whom a Letter of Request has been transmitted is not competent to execute it, the Letter shall be sent forthwith to the authority in the same State which is competent to execute it in accordance with the provisions of its own law.


## Article 7

The requesting authority shall, if it so desires, be informed of the time when, and the place where, the proceedings will take place, in order that the parties concerned, and their representatives, if any, may be present. This information shall be sent directly to the parties or their representatives when the authority of the State of origin so requests.


## Article 8

A Contracting State may declare that members of the judicial personnel of the requesting authority of another Contracting State may be present at the execution of a Letter of Request. Prior authorisation by the competent authority designated by the declaring State may be required.


## Article 9

The judicial authority which executes a Letter of Request shall apply its own law as to the methods and procedures to be followed.

However, it will follow a request of the requesting authority that a special method or procedure be followed, unless this is incompatible with the internal law of the State of execution or is impossible of performance by reason of its internal practice and procedure or by reason of practical difficulties.

A Letter of Request shall be executed expeditiously.


## Article 10

In executing a Letter of Request the requested authority shall apply the appropriate measures of compulsion in the instances and to the same extent as are provided by its internal law for the execution of orders issued by the authorities of its own country or of requests made by parties in internal proceedings.


## Article 11

In the execution of a Letter of Request the person concerned may refuse to give evidence in so far as he has a privilege or duty to refuse to give the evidence –
*a)*    under the law of the State of execution; or
*b)*    under the law of the State of origin, and the privilege or duty has been specified in the Letter, or, at the instance of the requested authority, has been otherwise confirmed to that authority by the requesting authority.

A Contracting State may declare that, in addition, it will respect privileges and duties existing under the law of States other than the State of origin and the State of execution, to the extent specified in that declaration.


## Article 12

The execution of a Letter of Request may be refused only to the extent that –
*a)*    in the State of execution the execution of the Letter does not fall within the functions of the judiciary; or
*b)*    the State addressed considers that its sovereignty or security would be prejudiced thereby.

Execution may not be refused solely on the ground that under its internal law the State of execution claims exclusive jurisdiction over the subject-matter of the action or that its internal law would not admit a right of action on it.


## Article 13

The documents establishing the execution of the Letter of Request shall be sent by the requested authority to the requesting authority by the same channel which was used by the latter.

In every instance where the Letter is not executed in whole or in part, the requesting authority shall be informed immediately through the same channel and advised of the reasons.


## Article 14

The execution of the Letter of Request shall not give rise to any reimbursement of taxes or costs of any nature.

Nevertheless, the State of execution has the right to require the State of origin to reimburse the fees paid to experts and interpreters and the costs occasioned by the use of a special procedure requested by the State of origin under Article 9, paragraph 2.

The requested authority whose law obliges the parties themselves to secure evidence, and which is not able itself to execute the Letter, may, after having obtained the consent of the requesting authority, appoint a suitable person to do so. When seeking this consent the requested authority shall indicate the approximate costs which would result from this procedure. If the requesting authority gives its consent it shall reimburse any costs incurred; without such consent the requesting authority shall not be liable for the costs.

## Article 15

In a civil or commercial matter, a diplomatic officer or consular agent of a Contracting State may, in the territory of another Contracting State and within the area where he exercises his functions, take the evidence without compulsion of nationals of a State which he represents in aid of proceedings commenced in the courts of a State which he represents.

A Contracting State may declare that evidence may be taken by a diplomatic officer or consular agent only if permission to that effect is given upon application made by him or on his behalf to the appropriate authority designated by the declaring State.

## Article 16

A diplomatic officer or consular agent of a Contracting State may, in the territory of another Contracting State and within the area where he exercises his functions, also take the evidence, without compulsion, of nationals of the State in which he exercises his functions or of a third State, in aid of proceedings commenced in the courts of a State which he represents, if –

a)    a competent authority designated by the State in which he exercises his functions has given its permission either generally or in the particular case, and

b)    he complies with the conditions which the competent authority has specified in the permission.

A Contracting State may declare that evidence may be taken under this Article without its prior permission.

## Article 17

In a civil or commercial matter, a person duly appointed as a commissioner for the purpose may, without compulsion, take evidence in the territory of a Contracting State in aid of proceedings commenced in the courts of another Contracting State if –

a)    a competent authority designated by the State where the evidence is to be taken has given its permission either generally or in the particular case; and

b)    he complies with the conditions which the competent authority has specified in the permission.

A Contracting State may declare that evidence may be taken under this Article without its prior permission.

## Article 18

A Contracting State may declare that a diplomatic officer, consular agent or commissioner authorised to take evidence under Articles 15, 16 or 17, may apply to the competent authority designated by the declaring State for appropriate assistance to obtain the evidence by compulsion. The declaration may contain such conditions as the declaring State may see fit to impose.

If the authority grants the application it shall apply any measures of compulsion which are appropriate and are prescribed by its law for use in internal proceedings.

## Article 19

The competent authority, in giving the permission referred to in Articles 15, 16 or 17, or in granting the application referred to in Article 18, may lay down such conditions as it deems fit, *inter alia*, as to the time and place of the taking of the evidence. Similarly it may require that it be given reasonable advance notice of the time, date and place of the taking of the evidence; in such a case a representative of the authority shall be entitled to be present at the taking of the evidence.

## Article 20

In the taking of evidence under any Article of this Chapter persons concerned may be legally represented.

## Article 21

Where a diplomatic officer, consular agent or commissioner is authorised under Articles 15, 16 or 17 to take evidence –

a)   he may take all kinds of evidence which are not incompatible with the law of the State where the evidence is taken or contrary to any permission granted pursuant to the above Articles, and shall have power within such limits to administer an oath or take an affirmation;

b)   a request to a person to appear or to give evidence shall, unless the recipient is a national of the State where the action is pending, be drawn up in the language of the place where the evidence is taken or be accompanied by a translation into such language;

c)   the request shall inform the person that he may be legally represented and, in any State that has not filed a declaration under Article 18, shall also inform him that he is not compelled to appear or to give evidence;

d)   the evidence may be taken in the manner provided by the law applicable to the court in which the action is pending provided that such manner is not forbidden by the law of the State where the evidence is taken;

e)   a person requested to give evidence may invoke the privileges and duties to refuse to give the evidence contained in Article 11.

## Article 22

The fact that an attempt to take evidence under the procedure laid down in this Chapter has failed, owing to the refusal of a person to give evidence, shall not prevent an application being subsequently made to take the evidence in accordance with Chapter I.

### CHAPTER III – GENERAL CLAUSES

## Article 23

A Contracting State may at the time of signature, ratification or accession, declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries.

## Article 24

A Contracting State may designate other authorities in addition to the Central Authority and shall determine the extent of their competence. However, Letters of Request may in all cases be sent to the Central Authority.
Federal States shall be free to designate more than one Central Authority.

## Article 25

A Contracting State which has more than one legal system may designate the authorities of one of such systems, which shall have exclusive competence to execute Letters of Request pursuant to this Convention.

## Article 26

A Contracting State, if required to do so because of constitutional limitations, may request the reimbursement by the State of origin of fees and costs, in connection with the execution of Letters of

Request, for the service of process necessary to compel the appearance of a person to give evidence, the costs of attendance of such persons, and the cost of any transcript of the evidence.

Where a State has made a request pursuant to the above paragraph, any other Contracting State may request from that State the reimbursement of similar fees and costs.

## Article 27

The provisions of the present Convention shall not prevent a Contracting State from –
*a)* declaring that Letters of Request may be transmitted to its judicial authorities through channels other than those provided for in Article 2;
*b)* permitting, by internal law or practice, any act provided for in this Convention to be performed upon less restrictive conditions;
*c)* permitting, by internal law or practice, methods of taking evidence other than those provided for in this Convention.

## Article 28

The present Convention shall not prevent an agreement between any two or more Contracting States to derogate from –
*a)* the provisions of Article 2 with respect to methods of transmitting Letters of Request;
*b)* the provisions of Article 4 with respect to the languages which may be used;
*c)* the provisions of Article 8 with respect to the presence of judicial personnel at the execution of Letters;
*d)* the provisions of Article 11 with respect to the privileges and duties of witnesses to refuse to give evidence;
*e)* the provisions of Article 13 with respect to the methods of returning executed Letters to the requesting authority;
*f)* the provisions of Article 14 with respect to fees and costs;
*g)* the provisions of Chapter II.

## Article 29

Between Parties to the present Convention who are also Parties to one or both of the Conventions on Civil Procedure signed at The Hague on the 17th of July 1905 and the 1st of March 1954, this Convention shall replace Articles 8-16 of the earlier Conventions.

## Article 30

The present Convention shall not affect the application of Article 23 of the Convention of 1905, or of Article 24 of the Convention of 1954.

## Article 31

Supplementary Agreements between Parties to the Conventions of 1905 and 1954 shall be considered as equally applicable to the present Convention unless the Parties have otherwise agreed.

## Article 32

Without prejudice to the provisions of Articles 29 and 31, the present Convention shall not derogate from conventions containing provisions on the matters covered by this Convention to which the Contracting States are, or shall become Parties.

## Article 33

A State may, at the time of signature, ratification or accession exclude, in whole or in part, the application of the provisions of paragraph 2 of Article 4 and of Chapter II. No other reservation shall be permitted.
Each Contracting State may at any time withdraw a reservation it has made; the reservation shall cease to have effect on the sixtieth day after notification of the withdrawal.
When a State has made a reservation, any other State affected thereby may apply the same rule against the reserving State.

## Article 34

A State may at any time withdraw or modify a declaration.

## Article 35

A Contracting State shall, at the time of the deposit of its instrument of ratification or accession, or at a later date, inform the Ministry of Foreign Affairs of the Netherlands of the designation of authorities, pursuant to Articles 2, 8, 24 and 25.
A Contracting State shall likewise inform the Ministry, where appropriate, of the following –
*a)*     the designation of the authorities to whom notice must be given, whose permission may be required, and whose assistance may be invoked in the taking of evidence by diplomatic officers and consular agents, pursuant to Articles 15, 16 and 18 respectively;
*b)*     the designation of the authorities whose permission may be required in the taking of evidence by commissioners pursuant to Article 17 and of those who may grant the assistance provided for in Article 18;
*c)*     declarations pursuant to Articles 4, 8, 11, 15, 16, 17, 18, 23 and 27;
*d)*     any withdrawal or modification of the above designations and declarations;
*e)*     the withdrawal of any reservation.

## Article 36

Any difficulties which may arise between Contracting States in connection with the operation of this Convention shall be settled through diplomatic channels.

## Article 37

The present Convention shall be open for signature by the States represented at the Eleventh Session of the Hague Conference on Private International Law.
It shall be ratified, and the instruments of ratification shall be deposited with the Ministry of Foreign Affairs of the Netherlands.

## Article 38

The present Convention shall enter into force on the sixtieth day after the deposit of the third instrument of ratification referred to in the second paragraph of Article 37.
The Convention shall enter into force for each signatory State which ratifies subsequently on the sixtieth day after the deposit of its instrument of ratification.

## Article 39

Any State not represented at the Eleventh Session of the Hague Conference on Private International Law which is a Member of this Conference or of the United Nations or of a specialised agency of that Organisation, or a Party to the Statute of the International Court of Justice may accede to the present Convention after it has entered into force in accordance with the first paragraph of Article 38.
The instrument of accession shall be deposited with the Ministry of Foreign Affairs of the Netherlands.
The Convention shall enter into force for a State acceding to it on the sixtieth day after the deposit of its instrument of accession.

The accession will have effect only as regards the relations between the acceding State and such Contracting States as will have declared their acceptance of the accession. Such declaration shall be deposited at the Ministry of Foreign Affairs of the Netherlands; this Ministry shall forward, through diplomatic channels, a certified copy to each of the Contracting States.

The Convention will enter into force as between the acceding State and the State that has declared its acceptance of the accession on the sixtieth day after the deposit of the declaration of acceptance.


## Article 40

Any State may, at the time of signature, ratification or accession, declare that the present Convention shall extend to all the territories for the international relations of which it is responsible, or to one or more of them. Such a declaration shall take effect on the date of entry into force of the Convention for the State concerned.

At any time thereafter, such extensions shall be notified to the Ministry of Foreign Affairs of the Netherlands.

The Convention shall enter into force for the territories mentioned in such an extension on the sixtieth day after the notification indicated in the preceding paragraph.


## Article 41

The present Convention shall remain in force for five years from the date of its entry into force in accordance with the first paragraph of Article 38, even for States which have ratified it or acceded to it subsequently.

If there has been no denunciation, it shall be renewed tacitly every five years.

Any denunciation shall be notified to the Ministry of Foreign Affairs of the Netherlands at least six months before the end of the five year period.

It may be limited to certain of the territories to which the Convention applies.

The denunciation shall have effect only as regards the State which has notified it. The Convention shall remain in force for the other Contracting States.


## Article 42

The Ministry of Foreign Affairs of the Netherlands shall give notice to the States referred to in Article 37, and to the States which have acceded in accordance with Article 39, of the following –
*a)*     the signatures and ratifications referred to in Article 37;
*b)*     the date on which the present Convention enters into force in accordance with the first paragraph of Article 38;
*c)*     the accessions referred to in Article 39 and the dates on which they take effect;
*d)*     the extensions referred to in Article 40 and the dates on which they take effect;
*e)*     the designations, reservations and declarations referred to in Articles 33 and 35;
*f)*     the denunciations referred to in the third paragraph of Article 41.


In witness whereof the undersigned, being duly authorised thereto, have signed the present Convention.

Done at The Hague, on the 18th day of March, 1970, in the English and French languages, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Government of the Netherlands, and of which a certified copy shall be sent, through the diplomatic channel, to each of the States represented at the Eleventh Session of the Hague Conference on Private International Law.

**1964 Conference de la Haye de Droit International Prive, Actes et Documents de la Dixieme Session (Notification) TOME III (1965) (3 Actes et Documents) (Excerpts)**

# ACTES ET DOCUMENTS
# DE LA DIXIÈME SESSION
# TOME III

CONFÉRENCE DE LA HAYE

DE DROIT INTERNATIONAL PRIVÉ

# ACTES ET DOCUMENTS
## DE LA DIXIÈME SESSION
### 7 AU 28 OCTOBRE 1964

## TOME III
### NOTIFICATION

ÉDITÉS PAR LE BUREAU PERMANENT DE LA CONFÉRENCE
IMPRIMERIE NATIONALE / LA HAYE / 1965

## AVIS AU LECTEUR

Le présent tome contient les procès-verbaux des discussions de la Dixième session de la Conférence de La Haye de droit international privé concernant la Convention relative à la signification et la notification à l'étranger des actes judiciaires et extrajudiciaires en matière civile ou commerciale. Les autres travaux de cette Session figurent dans les autres tomes des Actes et Documents de la Dixième session, dont on trouvera le sommaire à la page suivante.

L'on trouve tout d'abord, dans le présent volume, les documents préliminaires: Mémoire sur la notification des actes judiciaires et extrajudiciaires à l'étranger, établi par M. Georges A. L. Droz, avant-projet de convention établi par la Commission spéciale et rapport de la main de M. V. Taborda Ferreira ainsi que les observations des Gouvernements à leur propos. Suivent les procès-verbaux et les documents de travail de la Troisième commission chargée de la matière à la Dixième session. Le volume est complété par un extrait du procès-verbal de la séance plénière qui a approuvé le projet de convention, par le texte adopté et par le rapport explicatif de M. V. Taborda Ferreira. Ce rapport, sans reprendre dans le détail l'analyse de la convention, la compare à l'avant-projet; il souligne les modifications ainsi que les compléments apportés par la Dixième session à l'avant-projet initial et renvoie pour le reste au rapport y relatif. On trouvera à la fin du volume des tables permettant de retrouver rapidement les discussions sur un point particulier.

Contrairement aux Sessions précédentes, la Dixième session a élaboré pour tous les projets de convention et les décisions des textes français et anglais équivalents. Au cours de la Session un certain nombre de documents ont été publiés dans les deux langues; dans la mesure où cela a été fait les deux versions sont reprises dans les Actes et Documents.

Certaines modifications proposées ou approuvées après la Session par les Délégués intéressés et ayant pour seul but de rendre le texte plus clair ont été apportées aux procès-verbaux. Il va sans dire que l'essence des interventions a été maintenue.

Conformément aux pratiques traditionnelles de la Conférence, le Comité de rédaction n'a pas fait établir le compte rendu de ses réunions. Son travail a résulté dans l'établissement de documents de travail à l'intention de la Commission plénière.

Le présent tome peut être commandé séparément ou avec les autres à l'Imprimerie Nationale des Pays-Bas, Christoffel Plantijnstraat 1, à La Haye, ou par l'intermédiaire des librairies.

Le Secrétaire général de la Conférence,

M. H. van Hoogstraten

Le Président de la Dixième session,

J. Offerhaus

SOMMAIRE DES ACTES ET DOCUMENTS DE LA DIXIÈME SESSION

**TOME PREMIER — SÉANCES PLÉNIÈRES, DIVORCE,
SÉPARATION DE CORPS ET NULLITÉ DU MARIAGE**

Programme de travail de la Dixième session

Etats représentés à la Dixième session et noms de leurs Délégués

Représentants et Observateurs d'organisations intergouvernementales et non gouverne-
mentales

Bureau et Secrétariat de la Dixième session

Composition des Commissions

SÉANCE D'OUVERTURE DE LA DIXIÈME SESSION

PROCÈS-VERBAL DE LA SÉANCE PLÉNIÈRE DES 27 ET 28 OCTOBRE 1964

SÉANCE DE CLÔTURE DE LA DIXIÈME SESSION

ACTE FINAL DE LA DIXIÈME SESSION

DOCUMENTS PRÉLIMINAIRES, PROCÈS-VERBAUX, DOCUMENTS DE TRAVAIL, ETC. relatifs
aux matières suivantes:

    Travaux futurs et méthodes de travail

    Divorce, séparation de corps et nullité du mariage

ANNEXE: Sélection d'articles sur la Conférence et les Conventions de La Haye en général

             Premier supplément à la Bibliographie relative aux Septième et Huitième
sessions

             Bibliographie relative à la Neuvième session

**TOME II — ADOPTION**

DOCUMENTS PRÉLIMINAIRES, PROCÈS-VERBAUX, DOCUMENTS DE TRAVAIL, RAPPORT EXPLI-
CATIF, relatifs à la convention concernant la compétence des autorités, la loi applicable et
la reconnaissance des décisions en matière d'adoption

### TOME III — SIGNIFICATION ET NOTIFICATION
### DES ACTES JUDICIAIRES ET EXTRAJUDICIAIRES A L'ÉTRANGER

DOCUMENTS PRÉLIMINAIRES, PROCÈS-VERBAUX, DOCUMENTS DE TRAVAIL, RAPPORT EXPLI-CATIF, concernant la convention relative à la signification et la notification à l'étranger des actes judiciaires et extrajudiciaires en matière civile ou commerciale

### TOME IV — FOR CONTRACTUEL

DOCUMENTS PRÉLIMINAIRES, PROCÈS-VERBAUX, DOCUMENTS DE TRAVAIL, RAPPORT EXPLI-CATIF, relatifs à la convention sur les accords d'élection de for

## LISTE DES DOCUMENTS PRÉLIMINAIRES [1]

N° 1   *Notification et transmission des actes judiciaires à l'étranger, Questionnaire et*
       *réponses des Organes nationaux (octobre 1963, ronéogr.)*

N° 2   Mémoire sur la notification des actes judiciaires et extrajudiciaires à
       l'étranger, établi par M. GEORGES A. L. DROZ, Secrétaire au Bureau
       Permanent, et Annexe, tableau analytique des réponses des Organes
       nationaux au Questionnaire sur la notification et la transmission des
       actes judiciaires et extrajudiciaires à l'étranger, établi par le Bureau
       Permanent (octobre 1963, 50 p. ronéogr.) . . . . . . . . . . .   *infra* p. 11

N° 3   Avant-projet de convention adopté par la Commission spéciale et
       rapport de M. V. TABORDA FERREIRA (mai 1964, 49 p. impr.) . . .   *infra* p. 63

N° 4   Observations des Gouvernements relatives à l'avant-projet de
       convention adopté par la Commission spéciale et au rapport de M.
       Vasco Taborda Ferreira (juin–octobre 1964, ronéogr.) . . . . . . .   *infra* p. 121

Le document préliminaire N° 1 (titre en italiques) n'a pas été repris dans les *Actes et Documents*. Il peut être obtenu auprès du Bureau Permanent de la Conférence, 66A, Zeestraat, La Haye.

---

[1]  Voir aussi les travaux de la Neuvième session en cette matière, *Actes et Documents de la Neuvième session (1960)*, tome I, p. 164 à 175 et la décision, Acte final de la Neuvième session, B, III, *op. cit.* p. 314.

## RAPPORT DE LA COMMISSION SPÉCIALE PRÉSENTÉ
## PAR M. VASCO TABORDA FERREIRA

### I. INTRODUCTION

Les efforts tendant à une révision du titre I des Conventions de La Haye de 1905 et de 1954 relatives à la procédure civile ont été provoqués par une décision de la Neuvième session.

La matière y avait été présentée par une note du Secrétaire général de la Conférence commentant un mémoire de l'Union internationale des Huissiers de Justice et Officiers judiciaires relatif à la signification d'actes à l'étranger [1].

Après quelques discussions au sein de la Cinquième commission, la décision suivante fut adoptée en séance plénière:

> *La Neuvième session, ayant pris connaissance d'un mémoire présenté par l'Union inter-nationale des Huissiers de Justice et Officiers judiciaires, est consciente de la nécessité d'établir un système assurant la remise effective et rapide des actes judiciaires et extrajudiciaires aux intéressés résidant à l'étranger.*
>
> *Elle prie la Commission d'Etat de charger le Bureau Permanent de procéder à une enquête sur les données du problème, tant dans les pays qui connaissent l'institution des huissiers que dans ceux qui ne la connaissent pas, afin de réunir les éléments nécessaires à une solution des problèmes signalés [2].*

Comme suite à cette décision, le Bureau Permanent a élaboré un questionnaire qu'il a envoyé aux Organes nationaux. Les réponses reçues ont été collectionnées dans un *document préliminaire N° 1* d'octobre 1963. Le Secrétaire rédacteur, M. Georges A. L. Droz, a rédigé un mémoire précis et excellent qui présente en annexe un tableau analytique des réponses des Organes nationaux au questionnaire susmentionné (*document préliminaire N° 2* d'octobre 1963).

La Commission spéciale s'est réunie à La Haye du 4 au 14 février 1964 sous la présidence de M. A. Panchaud, Juge au Tribunal fédéral suisse. Cette Commission a tenu quatorze séances plénières et a nommé un Comité de rédaction qui a siégé plusieurs fois et a mis au point l'avant-projet que nous commentons.

Outre les documents préliminaires précités, la Commission a pris en considération plusieurs Conventions bilatérales sur la matière, notamment les Conventions signées entre le Royaume-Uni d'une part, l'Allemagne et la Belgique et divers Pays membres de la Conférence de l'autre.

Par ailleurs la Commission a profité de la présence d'un Observateur de la Communauté Economique Européenne qui a été en mesure de fournir des renseignements sur les travaux entrepris en la matière à Bruxelles. Elle a largement apprécié l'esprit de coordination et de coopération dont se laissent inspirer ladite Organisation et ses organes.

De plus l'Union internationale des Huissiers de Justice et Officiers Judiciaires avait

---

[1] *Actes et Documents de la Neuvième session (1960)*, tome I, p. 165.
[2] Acte final, B, III, *op. cit.*, tome I, p. 314.

envoyé, en la personne de son Président, un Observateur dont l'expérience pratique des problèmes rendit des services appréciés.

Enfin le Comité de rédaction a encore pu prendre connaissance du projet de *l'International Bar Association*, Congrès d'Edimbourg de 1962, concernant un projet de convention de coopération judiciaire internationale en matière civile et commerciale et de la Convention d'Ottawa de 1957.

## II. OBJET DE LA RÉVISION ENTREPRISE

Dès 1958 un mémoire de l'Union internationale des Huissiers de Justice et Officiers judiciaires attirait l'attention de la Conférence sur le fait que, malgré les progrès obtenus avec les Conventions de 1896, 1905 et 1954, beaucoup de difficultés s'élèvent dans la pratique en ce qui concerne la transmission et la notification des actes judiciaires et extrajudiciaires à des personnes se trouvant à l'étranger.

Ces difficultés ont notamment pour cause:

– Le fait que la technique de transmission n'est plus appropriée aux exigences de la vie moderne;

– Le fait que le système de transmission prévu dans les Conventions de 1905 et de 1954 n'est pas obligatoire.

*a*)  La technique normale de transmission prévue par l'article premier de la Convention relative à la procédure civile [1] de 1954, c'est-à-dire la transmission par *voie consulaire* aux autorités du pays requis (voie consulaire indirecte) est en effet, pour être une amélioration par rapport à la transmission par la voie classique diplomatique, longue et difficile.

Pour l'effectuer, il est nécessaire de recourir à plusieurs autorités. Il faut transmettre l'acte au Ministère des Affaires Etrangères de l'Etat requérant qui doit le faire parvenir à son consul en poste dans le pays où l'acte doit être transmis; ce consul à son tour le fera parvenir à l'autorité du pays requis compétente pour effectuer la notification.

Quant à la *voie diplomatique*, dont l'emploi n'est pas exclu par les Conventions précitées, elle est encore plus compliquée puisque l'acte est envoyé par le Ministère des Affaires Etrangères de l'Etat requérant à son Ambassadeur dans l'Etat requis qui s'adresse au Ministère des Affaires Etrangères de cet Etat lequel doit alors transmettre l'acte par la voie hiérarchique, commençant au Ministère de la Justice, à une autorité compétente pour effectuer la notification. Toute constatation que la remise a été effectuée doit alors suivre la même voie pour rentrer au pays requérant. Il a été signalé que l'utilisation de ces voies consulaires ou diplomatiques pouvait entraîner des délais allant parfois jusqu'à un an.

De tels délais sont regrettables à notre époque et peuvent nuire tant au défendeur, qui peut bien n'être touché qu'après l'écoulement du délai octroyé pour présenter sa défense, qu'au demandeur qui a intérêt à ce que le procès débute et se déroule rapidement, et mène à un résultat à l'abri de toute critique.

*b*)  Le fait que la transmission prévue dans les Conventions de 1905 et de 1954 n'est pas obligatoire ne permet pas d'éviter les effets nuisibles du système de la signification à parquet.

Ce système est employé dans plusieurs pays, notamment en France, aux Pays-Bas, en Grèce et avec certaines variantes en Belgique et en Italie.

---

[1]  Les Conventions relatives à la procédure civile de 1905 et 1954 présentent des textes à peu près identiques, chaque fois que nous nous référerons à une disposition de la Convention de 1954 sans précision particulière, cette référence vaudra pour la Convention de 1905.

De nombreuses critiques ont été faites à cette méthode d'assignation. Quand le défendeur habite à l'étranger, la notification est faite au parquet, même si son domicile à l'étranger est connu. Les délais pour comparaître ou pour exercer les voies de recours partent de ce moment, indépendamment de la durée effective de la transmission de l'acte à l'étranger. On fait donc intervenir une fiction à un moment où elle n'est pas tout à fait nécessaire et on laisse une procédure se poursuivre sans que le défendeur en ait connaissance réelle, ce qui peut nuire aux intérêts fondamentaux de la Justice, basée sur le principe de la contradiction.

La fiction ne doit être admise que dans des cas extrêmes.

Les pays qui n'emploient pas ce mode d'assignation au parquet, comme l'Allemagne, cherchent depuis longtemps une solution qui puisse éviter les inconvénients éventuels de ce système.

Le rapport de la Première commission sur la révision de la Convention relative à la procédure civile de 1896, présenté à la Quatrième session de la Conférence en 1904, disait déjà [1]:

> De vives critiques ont été faites au système dit de la remise au parquet qu'on désire voir disparaître. Le Gouvernement allemand avait estimé qu'il était supprimé par le fait même de la Convention. Comme les vues contraires ont prévalu dans les autres pays, il pense qu'il faut faire un pas en avant.

Aussi la délégation allemande proposait-elle d'insérer dans la Convention un nouvel article dont la partie essentielle peut être formulée de la façon suivante: *les significations à des personnes se trouvant dans un autre Etat contractant ne pourront se faire que par les modes indiqués dans les articles 1, 2, 3 et 6 précédents.*

Mais en 1905 la question n'était pas encore mûre pour qu'on puisse donner satisfaction à la proposition allemande. Cependant la Commission a été unanime à penser qu'il y avait là un problème important à étudier et elle demanda à la Conférence d'exprimer le voeu suivant:

> Il est à désirer que, par suite d'une réforme de la législation intérieure ou en vertu d'une stipulation conventionnelle, les significations à faire à des personnes se trouvant dans un autre Etat contractant ne puissent se faire que par les modes indiqués dans les articles 1, 2, 3, 5 et 6 du projet de convention [2].

L'avant-projet de convention relative à la reconnaissance et à l'exécution des jugements étrangers en matière patrimoniale adopté le 8 mars 1963 par une Commission spéciale de la Conférence [3] a déjà suivi la même orientation, par un refus de reconnaissance ou d'exécution du jugement étranger, le fait que la partie défaillante, sans qu'il y ait eu faute de sa part, n'a pas eu connaissance de l'acte introductif d'instance en temps utile pour pouvoir se défendre (article 5, N° 4).

La question semble être mûre maintenant et notre Commission spéciale a pu établir un avant-projet de convention qui contient deux dispositions visant à rendre obligatoire les voies de la convention: l'une couvre le cas où la notification de l'acte introductif d'instance n'a pas été faite de la façon prévue par la convention, l'autre règle le cas où un jugement par défaut n'est pas arrivé en temps utile à la connaissance du défendeur.

Mais, il a fallu maintenir l'équilibre des intérêts du défendeur et du demandeur et négliger nullement la protection de ce dernier tout en garantissant autant que possible

---

[1] *Actes de la Quatrième session (1904)*, p. 90.

[2] *Actes de la Quatrième session (1904)*, p. 91.

[3] Voir avant-projet de convention adopté par la Commission spéciale sur la reconnaissance et l'exécution des jugements étrangers en matière patrimoniale et rapport de M. Ch. N. Fragistas, document préliminaire N° 4, texte révisé, mai 1964.

que le défendeur a été touché par l'acte introductif d'instance. Nous verrons comment la Commission spéciale a tenté d'obtenir cet équilibre en assurant notamment que l'exigence de notification effective au défendeur ne donne pas lieu à des délais trop longs pour le demandeur.

L'avant-projet présenté rend la technique de transmission et de notification des actes judiciaires et extrajudiciaires plus facile et impose, avec l'établissement d'une «sanction indirecte», que la notification la plus importante, celle de l'acte introductif d'instance, soit faite dans les termes prévus. En outre, dans le cas d'un jugement par défaut, en donnant au juge la possibilité de relever d'une forclusion, on a voulu garantir que le défendeur ait eu connaissance du jugement ou du procès en temps utile pour se défendre.

L'avant-projet apporte donc un progrès considérable au droit existant: d'un côté il rend la notification plus expéditive et de l'autre en rendant obligatoire les voies prévues il assure les intérêts fondamentaux des deux parties, sans retomber dans une protection excessive de l'une d'entre elles.

On a enfin essayé d'obtenir, avec cet avant-projet, un moyen de faciliter la preuve que la notification a été effectuée à l'étranger. Nous pensons que ce but a été atteint par le moyen des attestations incluses dans une formule uniforme.

### III. RAPPORTS ENTRE L'AVANT-PROJET ET LES CONVENTIONS DE 1905 ET DE 1954

Etant donné que la convention projetée a pour but de réviser le titre I des Conventions de 1905 [1] et de 1954, on a soulevé le problème de savoir comment l'on pourra conjuguer la nouvelle convention et les anciennes.

On a indiqué deux solutions:

– La nouvelle convention remplacerait le titre I des Conventions de 1905 et de 1954;
– La nouvelle convention coexisterait avec les Conventions de 1905 et de 1954.

La Commission spéciale est encline à adopter la seconde solution. On a cru en effet avantageux de maintenir l'autonomie des instruments en question.

On peut admettre d'un côté que quelques Etats membres de la Conférence de La Haye qui n'ont pas pu signer ni ratifier la Convention de 1954, pour des raisons qui ne soient pas en relation avec le titre I, puissent donc accepter la présente convention dont la portée est plus étroite. D'un autre côté, on admet que quelques pays, comme le Portugal, qui ont signé et ratifié la Convention de 1905 et n'ont pas ratifié la Convention de 1954, puissent maintenant, indépendamment de la ratification précédente, signer et ratifier la nouvelle convention.

Les deux conventions seront donc indépendantes, mais le titre I des Conventions de 1905 et 1954 ne sera plus en vigueur dans les rapports entre les Etats qui signeront et ratifieront la nouvelle convention. Les Conventions de 1905 et de 1954 continueront toutefois à régler la transmission et la notification des actes judiciaires et extrajudiciaires dans les rapports avec les Etats parties à ces instruments qui ne ratifieraient pas la présente convention.

On peut admettre que dans un Etat A soit en vigueur la Convention de 1954 et la nouvelle convention – la première Convention réglera les relations avec l'Etat B qui n'aurait pas ratifié la nouvelle convention, mais celle-ci régira les relations avec l'Etat C qui aurait ratifié le nouvel instrument.

---

[1] N.B. La Convention de 1905 s'applique toujours aux rapports avec les Parties qui n'ont pas ratifié celle de 1954.

Aucune règle de droit des gens ne s'oppose à cette situation qui d'ailleurs est similaire à celle provoquée par les ratifications successives des Conventions de 1905 et 1954.

A notre avis il serait en tout cas avantageux que la nouvelle convention contienne une formule semblable à celle établie dans l'article 29 de la Convention de 1954.

La Commission n'a pas discuté le point de savoir si la convention projetée devait être ouverte ou fermée. Nous estimons qu'il serait préférable que la convention n'exclue pas la possibilité que les Etats non représentés à la Dixième session puissent un jour y adhérer.

## IV. RAPPORTS ENTRE L'AVANT-PROJET ET LE DROIT INTERNE DES ÉTATS

L'avant-projet a dû, pour atteindre son but, adopter des solutions nécessitant des adaptations du droit interne des Etats. La Commission spéciale a cependant toujours eu soin de réduire le plus possible ces altérations. On a surtout essayé de ne pas introduire des modifications en ce qui concerne le point de départ des délais tel qu'il est établi dans les législations nationales. L'avant-projet oblige les tribunaux de surseoir à statuer, et il les autorise à relever une partie d'une forclusion si certaines conditions ne sont pas réunies.

Nous estimons que l'avant-projet a ainsi atteint un équilibre adéquat, résultat qu'exigeait l'objectif défini sous II.

## V. OBJET ET DOMAINE DE L'AVANT-PROJET (ARTICLE PREMIER)

L'article premier de l'avant-projet fixe l'objet et la portée de la convention. Cette disposition a soulevé un certain nombre de questions qui seront successivement étudiées.

### A. TERMINOLOGIE

*a*) Au cours des débats on s'est demandé si l'on devait employer une expression juridique en définissant l'objet de la convention ou si l'on devait, au contraire, recourir à une expression sans contenu juridique défini.

On a soutenu le premier principe, en affirmant qu'il faudrait adopter l'expression *signification* qui a un contenu juridique bien déterminé, étant donné que l'acte de signification aux destinataires sera toujours un acte d'autorité publique.

La position opposée a été défendue et on a proposé l'emploi de l'expression *remise*, notion plus de fait que de droit, étant donné qu'elle veut simplement exprimer l'idée de la remise de l'acte à la personne intéressée.

La Commission a décidé que la solution la plus convenable serait une solution intermédiaire de compromis. On a observé que l'avant-projet avait pour but deux opérations: la transmission de l'acte de l'Etat requérant à l'Etat requis et la notification à la personne à qui l'acte est destiné.

Il faut bien remarquer que c'est seulement en accomplissant la deuxième opération qu'on pourra obtenir les effets juridiques désirés.

Cette distinction ayant été acceptée, la Commission a pensé que l'on ne devrait pas employer l'expression *signification de l'acte*, étant donné les différences entre les législations nationales en matière de procédure. En France par exemple l'emploi du mot *signification* limiterait sans raison la portée de la convention, étant donné que cette expression, d'après la coutume et la pratique, est réservée à la remise formelle constatée par actes authentiques établis par des officiers ministériels et tombant dans la compétence exclusive de ceux-ci.

Dans d'autres pays, comme l'Espagne ou le Portugal, la traduction du mot *signification*

est difficile étant donné qu'il n'y a pas dans ces langues de terme équivalent. On a ainsi préféré employer le mot *notification*.

*b*) L'emploi de l'expression *actes judiciaires et extrajudiciaires* ne soulève aucune difficulté. Cette expression était déjà employée dans la Convention de 1896 et dans le rapport relatif à la révision de cette Convention, lors de la Conférence de 1904, on peut lire ceci:

> *Les mots actes judiciaires ou extrajudiciaires ont une portée très large; ils ne se réfèrent pas seulement à la juridiction contentieuse mais à la juridiction volontaire ou gracieuse, comme cela avait été indiqué dans les délibérations de 1893. Aucune difficulté ne saurait s'élever à ce sujet* [1].

*c*) On ne pourra pas dire de même en ce qui concerne l'expression *en matière civile ou commerciale*, mots déjà employés dans la Convention de 1905.

L'Expert belge a posé la question de savoir s'il ne serait pas adéquat d'appliquer également la convention à certains actes en matières pénale, administrative ou fiscale. La Commission a décidé de ne pas inclure explicitement ces actes dans la convention.

Les Etats peuvent cependant établir des accords bilatéraux relativement à cette question. On pourrait penser à prévoir dans l'avant-projet une faculté en ce sens.

On ne peut pas, en tout cas, oublier l'interprétation donnée au problème par la Conférence en 1904. A la suite d'une remarque de la délégation italienne qui croyait qu'il ne serait pas raisonnable d'exclure les actes administratifs de la portée de la convention, le rapport s'expliquait ainsi:

> *La Commission pense que les mots* en matière civile ou commerciale *doivent être maintenus pour éviter toute équivoque. Ce n'est pas à dire que les matières administratives soient absolument en dehors de la convention. Il y a lieu de distinguer. Une juridiction administrative peut avoir à connaître de questions de même genre que celles qui se présentent devant les tribunaux civils ordinaires (par exemple procès relatif à l'exécution d'un marché de fournitures entre un particulier et une administration publique); il n'y a pas de raison pour que les significations à faire relativement à des procès de ce genre ne puissent s'effectuer en conformité des dispositions de notre chapitre. Les expressions que l'on veut supprimer sont très larges et ne comprennent pas seulement les affaires qui sont de la compétence des tribunaux civils ou des tribunaux de commerce dans les pays où il y a une juridiction administrative. Autrement il y aurait entre les Etats contractants une inégalité que rien ne justifierait: les significations des actes judiciaires pourraient se faire d'une manière plus large pour les pays qui n'ont pas une juridiction administrative que pour les pays qui en ont une. Du moment où les intérêts privés sont en jeu, la convention s'applique, quelle que soit la nature de la juridiction, parce qu'autrement on entrerait dans le domaine de la législation intérieure* [1].

## B. QUALIFICATIONS

En ce qui concerne le problème de savoir d'après quelle loi doit être faite la qualification de la matière civile ou commerciale de l'acte, on a décidé de ne rien mentionner dans l'avant-projet. Les textes de 1904 et de 1954 n'ont pas soulevé de doute à cet égard. Il ne faudrait donc pas résoudre expressément un problème qui a un aspect plutôt théorique.

L'Etat requérant emploiera sans doute la convention quand il lui faudra transmettre à l'étranger un acte qu'il estime civil ou commercial. L'Etat requis donnera suite à la demande s'il estime qu'elle se trouve couverte par la convention et qu'elle n'est pas contraire à sa souveraineté ou à sa sécurité.

---

[1] *Actes de la Quatrième session (1904)*, p. 84.

Il faudra donc que la demande concerne une matière civile ou commerciale selon la qualification interne des deux Etats intéressés. Nous pensons que le fonctionnement de la convention présuppose que la matière qui fait l'objet de l'acte soit qualifiée par la loi de l'Etat requérant et celle de l'Etat requis comme tombant dans le domaine d'application de la convention.

Pour éviter de trop restreindre le champ d'application de la convention on a demandé l'insertion d'une disposition ayant pour effet de la rendre applicable soit dans le cas où le contenu de l'acte est considéré comme matière civile et commerciale par la loi du pays requérant, soit dans le cas où cette qualification est donnée à l'acte par la loi de l'Etat requis.

Cette solution reviendrait à établir une qualification alternative. Mais il est préférable de ne pas essayer de régler expressément un problème qui est résolu sans difficulté par la pratique, d'autant plus que l'extension et l'élasticité des mots *civile et commerciale* permettent de faire application de la convention aux questions considérées comme administratives selon le rapport précité de 1904.

D'ailleurs le problème n'est pas spécial à notre convention, il se répète partout. Les Commissions spéciales en matière d'exécution des jugements et de compétence générale du for contractuel n'ont pas jugé opportun de lui donner une solution dans les avant-projets qu'elles ont élaborés.

### C. CARACTÈRE OBLIGATOIRE DE LA CONVENTION

A la suite d'une remarque du Secrétaire général, la Commission a largement discuté le point de savoir s'il faudrait fixer, déjà dans l'article premier, le caractère obligatoire de la convention en établissant que les justiciables des Etats membres sont obligés de suivre les voies de transmission conventionnelles, comme le stipulent indirectement les articles 13 et 16 de l'avant-projet.

La Commission s'est aussi demandé si ce devoir de suivre les voies de transmission prévues devrait être général, c'est-à-dire exister chaque fois qu'il y a lieu de faire une notification à l'étranger parce que la personne à notifier se trouve à l'étranger, ou si cette obligation ne devrait être établie que dans certains cas déterminés, par exemple:

– quand la personne à notifier a son domicile à l'étranger, ou
– quand cette personne a sa résidence habituelle à l'étranger.

Il a semblé qu'il serait exagéré d'imposer de suivre les voies de la convention toutes les fois que la personne à laquelle la notification doit être faite se trouverait à l'étranger. Si cette personne maintient des relations étroites avec l'Etat du tribunal saisi, y ayant son domicile ou sa demeure, il ne serait pas raisonnable d'imposer l'obligation de faire la notification selon les termes de l'avant-projet pour la seule raison que la personne se trouve temporairement à l'étranger.

Cette solution ayant été exclue, deux orientations se sont fait jour:

– Selon la première, ce serait à la seule loi interne du tribunal saisi d'indiquer les cas où la notification implique une transmission de l'acte à l'étranger.
– Selon la seconde, la convention devrait imposer elle-même le recours aux voies qu'elle institue dans le cas où le défendeur, n'ayant pas été atteint dans le pays du tribunal saisi, n'avait pas de domicile ou de résidence habituelle dans ce pays.

On a décidé d'abandonner la seconde solution, étant donné les difficultés de rédaction qu'elle entraînerait. Il ne serait pas souhaitable d'employer l'expression *domicile* dont le sens peut différer selon les pays. L'emploi d'autres expressions telles que *résidence habituelle* ou *demeure* soulevait également des problèmes graves étant donné l'imprécision de ces termes.

En outre on a pensé que c'est bien la loi du pays du tribunal saisi qui est compétente pour indiquer les cas où il faudra recourir à la convention, et qu'il serait inopportun de limiter, sous cet aspect, la liberté du juge saisi.

Il est pourtant regrettable, à l'avis du Rapporteur, qu'on n'ait pas indiqué, en définissant la portée de la convention, son caractère obligatoire, étant donné que c'est ce caractère obligatoire qui représente son plus grand progrès et assure son efficacité.

En laissant au juge du tribunal saisi la liberté de fixer, en vertu de sa propre loi interne, quand il doit ou ne doit pas recourir à la convention, on a en effet établi plus une faculté qu'une obligation. Selon le texte actuel le caractère obligatoire de la convention ne dépendra pas de la réunion de certaines conditions objectives ; la convention sera appliquée dans un Etat contractant seulement si la loi de cet Etat le veut bien.

Quoi qu'il en soit on peut dire, avec les réserves expresses que nous avons faites, que la Commission a établi deux sortes d'obligations :

– Pour l'Etat requérant celle d'obliger les justiciables à se servir des voies convention-nelles, lorsque sa loi interne prévoit une notification, ou au moins une transmission de l'acte à l'étranger ;

– Pour l'Etat requis celle de fournir l'entraide judiciaire demandée.

Le Préambule de l'avant-projet définit d'ailleurs cette idée en établissant :

*Les Etats signataires . . .*
*désirant créer les moyens appropriés pour assurer que les actes judiciaires et extrajudiciaires devant être notifiés à des personnes se trouvant à l'étranger ne leur restent pas inconnus,*
*soucieux de mieux organiser à cette fin l'entraide judiciaire mutuelle en simplifiant ses procédures, etc.*

### VI. VOIE PRINCIPALE DE NOTIFICATION. – INSTITUTION D'UNE AUTORITÉ CENTRALE (ARTICLE 2)

L'article 2 de l'avant-projet fixe la technique principale de la convention en prévoyant l'institution dans chaque Etat contractant d'une Autorité centrale chargée 1) de recevoir les demandes aux fins de notification en provenance des autres Etats contractants, 2) de veiller à leur notification au destinataire et 3) enfin de veiller à l'acheminement des attes-tations de notification.

La Commission est arrivée à ce résultat après avoir examiné les techniques prévues dans les Conventions de 1905 et de 1954. Aucune de ces techniques ne donnant complète satisfaction, on s'est tourné vers le nouveau système adopté.

#### A. EXAMEN CRITIQUE DES TECHNIQUES TRADITIONNELLES

*a) Voie normale de notification dans les Conventions de 1905 et de 1954*

L'article premier de ces Conventions aménage les voies consulaires et diplomatiques. On les a décrites dans l'introduction et on a montré qu'elles ne satisfaisaient point aux exigences de célérité en raison des longues filières à suivre pour que l'acte parvienne au

destinataire. Tout cela a paru périmé et injustifiable et l'on a estimé qu'on ne pouvait plus conserver la voie consulaire comme voie normale de notification.

### b) *Voies subsidiaires dans les Conventions de 1905 et de 1954*

L'article 6 de ces Conventions permet l'utilisation, sous certaines conditions, de voies subsidiaires. Le Mémoire du Bureau Permanent [1] avait posé la question de savoir s'il ne serait pas possible de transformer une ou plusieurs de ces voies subsidiaires en technique principale de la nouvelle convention.

Il n'a pas paru à la Commission qu'il était possible de faire l'unanimité sur l'une de ces voies. La discussion a plus particulièrement porté sur le système de la communication directe entre autorités et sur la voie postale.

1. *Communication directe entre autorités.* – Nous donnerons un exemple de ce système prévu par l'article premier, alinéa 4, des Conventions de 1905 et de 1954.

Le Tribunal de première instance de Palerme s'adresserait directement au Tribunal de première instance de Hanovre. Cette procédure a été employée par l'Allemagne dans des Conventions signées avec d'autres Pays membres de la Conférence de La Haye, comme la Belgique, la France, les Pays-Bas et la Suisse.

La simple transmission d'autorité à autorité peut cependant donner lieu à des difficultés. Il suffit de penser à la diversité de l'organisation judiciaire et administrative des Etats membres de la Conférence et aux troubles qui seraient provoqués par l'arrivée de demandes en provenance de l'étranger formulées par des autorités dont l'instance requise peut difficilement apprécier la compétence. Le tout est encore aggravé par la difficulté provoquée par la diversité des langues.

Bref, une simplification exagérée risquait de ne pas pouvoir être réalisée dans la pratique. Les mêmes critiques sont, pour la majeure partie, valables en ce qui concerne les communications directes d'officier ministériel à officier ministériel, et plus concrètement d'huissier à huissier. D'ailleurs seule une minorité d'Etats connaît l'institution des officiers ministériels, donc il serait difficile de généraliser ce procédé dans le cadre de la Conférence.

2. *Voie postale.* – Ce mode de notification, prévu par l'article 6, N° 1 des Conventions existantes, est le mode usuel de notification des actes à l'étranger dans certains pays comme le Portugal.

L'Expert allemand s'est fortement opposé à l'extension de la voie postale dans les rapports internationaux. Ses objections se basaient:

– sur le fait que cette voie peut porter atteinte à la souveraineté des Etats étant donné que la remise du pli postal peut être considérée comme un acte de signification qui serait de la compétence exclusive des autorités du pays requis;

– sur la nécessité de permettre à l'Etat requis d'exercer un contrôle sur les notifications en provenance de l'étranger afin d'éviter qu'elles ne produisent des effets contraires à son ordre public.

On a aussi attaqué la voie postale du point de vue technique, particulièrement en ce qui concerne la façon dont l'acte peut être remis en l'absence du destinataire ou en cas de refus d'acceptation. En outre on a pensé que dans le pays de destination le système de

---

[1] *Mémoire établi par Georges A. L. Droz,* document préliminaire N° 2 d'octobre 1963, p. 11.

notification postale pourrait ne pas fonctionner de la même façon que dans le pays d'expédition. On a enfin soulevé des objections en rapport avec la différence des langues.

Il faut néanmoins admettre que cette technique présente des avantages réels, elle est simple et rapide et son extension a été défendue par plusieurs Experts, notamment celui de la Belgique.

3. *Communication directe par le consul.* – Une autre technique prévue à l'article 6 des Conventions relatives à la procédure civile, la signification directe par les soins des agents diplomatiques ou consulaires, n'a pas pu être retenue comme voie principale.

A son propos on a notamment considéré que les petits pays ont un nombre réduit de consuls à l'étranger, ce qui rend encore plus difficile la tâche de chacun pour effectuer des significations; ces consuls ne disposent d'aucun moyen de contrainte et ils ne peuvent notifier que si le destinataire y consent.

Si tous les systèmes énumérés ne pouvaient donner entière satisfaction à tous, ils n'en comportaient pas moins certains avantages, ce qui fait qu'on les a conservés à titre subsidiaire comme on le verra plus loin *(infra* Nº XIII).

### B. TECHNIQUE ADOPTÉE

Eloigné des divers modes classiques on est arrivé à la conclusion que les formalités employées par chaque pays pour la notification des actes dans l'ordre interne, donneraient satisfaction aux notifications en provenance d'un pays étranger. On s'est accordé pour faire confiance aux dispositions du droit de l'Etat requis.

Cette conclusion ayant été obtenue, il a été décidé la création dans chaque Etat d'une *Autorité centrale* dont les fonctions sont fixées en trois numéros clairs et précis qu'on a énoncés dans l'introduction de ce chapitre.

C'est un grand avantage pour les justiciables de n'avoir à connaître dans chaque Etat contractant étranger qu'une seule adresse, une seule autorité, pour faire effectuer des notifications.

La création de l'Autorité centrale assure en outre le respect du droit de l'Etat requis en permettant un contrôle des notifications en provenance de l'étranger. L'intervention de cette autorité donne plus de sûreté à la transmission qui sera effectuée par son entremise.

La Commission n'a pas voulu imposer à chaque Etat la création de toutes pièces d'une autorité ou d'un organisme. Les Etats contractants pourront attribuer le rôle de l'Autorité centrale à des autorités déjà existantes.

Il est évident que c'est à chaque Etat d'organiser cette Autorité centrale en accord avec ses lois internes. L'article 2 fixe les fonctions de l'Autorité centrale, mais il est aussi évident que son activité pourra être précisée par la loi de l'Etat respectif. C'est cette loi qui déterminera les démarches à faire dans chaque cas concret. On pourra même, par exemple, prescrire à l'Autorité centrale de faire des recherches d'office dans l'hypothèse où le destinataire de l'acte a changé de domicile (voire même en cas de domicile inconnu, *cf. infra* XXII).

Après une longue discussion sur la terminologie on a préféré le mot *Autorité* à celui *d'organe* parce qu'on a cru que l'expression choisie s'accordait mieux au caractère de l'article examiné. On a voulu mettre l'accent sur l'exigence de la sécurité, qui est une des bases du nouveau système. D'ailleurs la tâche de l'Autorité centrale n'est pas limitée à la transmission de l'acte mais peut aussi concerner le contrôle de l'ordre public et on a voulu que ce contrôle soit exercé par une instance officielle.

Mais il n'est pas interdit que l'Autorité centrale, instituée par chaque Etat, puisse déléguer éventuellement sa tâche ou une partie de sa tâche à un organe ou un organisme n'ayant pas le caractère d'une autorité, comme par exemple un groupement officiellement reconnu d'officiers ministériels.

### VII. DEMANDES AUX FINS DE NOTIFICATION (ARTICLE 3)

L'article 3 indique:
– l'entité qui doit faire la demande de notification (expéditeur *infra* A);
– l'entité qui en principe doit recevoir cette demande (Autorité centrale *supra* VI);
– la façon dont cette demande doit être présentée (forme de la demande *infra* B).

#### A. EXPÉDITEUR

Toute *autorité* ou tout *officier ministériel* compétent selon les lois de l'Etat requérant peut faire une demande de notification.

Il faut remarquer que la Commission a entendu inclure dans ces expressions toutes les personnes qui peuvent faire des notifications selon la loi de l'Etat requérant, même si ces personnes ne sont pas des officiers ministériels (par exemple les *solicitors* dans la *Common Law*).

La formule autorité ou officier ministériel *compétents selon les lois de l'Etat requérant* facilite et suggère cette interprétation et a donné satisfaction à l'Expert anglais.

Cette disposition doit cependant être interprétée en relation avec l'article 10, N° 3 de l'avant-projet qui donne la faculté, aux *personnes privées intéressées à une instance judiciaire*, de faire faire des notifications d'actes judiciaires directement par les soins des officiers ministériels, fonctionnaires ou autres personnes compétents de l'Etat de destination.

Il faut donc savoir si les personnes privées intéressées ont la faculté de s'adresser directement à l'Autorité centrale de l'Etat requis. Si on veut l'exclure il faudrait, au moins, le dire dans le rapport final, autrement on pourrait argumenter qu'en donnant aux personnes privées intéressées la faculté de l'article 10, N° 3, il n'y a pas de raison de ne pas accorder à ces personnes la possibilité de s'adresser directement à l'Autorité centrale.

Le Rapporteur reconnaît que cet argument a de la force et il lui semble qu'une solution en ce sens pouvait être acceptée. S'il en est ainsi il faudrait modifier la rédaction de l'article 10.

#### B. FORME DE LA DEMANDE

L'article 3 établit clairement la façon dont la demande de transmission doit être faite.

La demande est envoyée à l'Autorité centrale par la voie la plus directe, qui sera en fait la voie postale sans que d'autres procédés soient exclus. La Commission a pensé qu'avec l'institution de l'Autorité centrale la voie postale ne présentait plus les inconvénients signalés, relatifs à la protection de la souveraineté, au contrôle, au problème des langues et au manque de sûreté dans la transmission.

La Commission a adopté le système des formules uniformes existant dans les Traités bilatéraux entre l'Allemagne et la Grèce, ou la France et la Belgique, etc. D'ailleurs ce système de formule a déjà eu un précédent à La Haye, puisqu'il a été adopté dans la Convention supprimant l'exigence de la légalisation des actes publics étrangers du 5 octobre 1961.

Il va de soi que s'il y a plus d'un défendeur on enverra le nombre d'exemplaires nécessaires pour que l'acte soit communiqué de la façon prévue dans la convention à tous les

défendeurs. Cette question semble être d'ordre pratique et concerne l'application de la convention elle-même plus que son interprétation. Nous reviendrons sur la question des formules en étudiant l'article 8 *(infra* sous XII).

### VIII. REFUS D'ENTRAIDE (ARTICLE 4)

L'article 4 prévoit la seule hypothèse du refus de transmission dans les termes exacts de l'article 4 de la Convention de 1954.

L'expression *atteinte à la souveraineté ou à la sécurité* l'a encore emporté sur l'expression *atteinte à l'ordre public*. La Commission a pensé qu'ainsi on pourrait limiter les cas de refus. L'expression *ordre public* peut être dangereuse parce qu'elle est peu précise et permettrait des refus basés sur un esprit hostile à l'entraide internationale. On a voulu limiter les cas de refus à ceux où la notification peut léser la sécurité interne des Etats ou leur souveraineté. Nous nous demandons en ce qui concerne ce dernier terme si son emploi est encore justifié dans l'état actuel du droit international.

Quand l'Etat requis refuse la transmission pour cette raison, la voie prévue par la convention ne peut pas être suivie. Sur le plan international on pourra seulement avoir recours à des représentations diplomatiques pour essayer de vaincre la résistance de l'Etat requis.

C'est à la loi de l'Etat requérant de résoudre le problème soulevé pour éviter le déni de justice. Dans le cas de refus, d'ailleurs, un moyen de notification existera toujours dans l'ordre interne pour pallier la difficulté. Le tribunal ou l'autorité saisie pourra, dans ces cas, considérer la notification comme effectuée en se basant sur l'article 14 qui fait jouer la diligence du demandeur. En effet dans l'hypothèse prévue le demandeur a été diligent et c'est seulement en raison de circonstances qui ne dépendent pas de lui que la notification n'a pu avoir lieu.

Il serait donc injuste que le juge du tribunal saisi continue à surseoir à la décision.

Il faut reconnaître en tout cas qu'il peut y avoir toujours pour le défendeur des désavantages substantiels s'il n'arrive pas à connaître l'acte en temps utile pour se défendre. Pour éviter cette difficulté, il serait peut-être avantageux que l'Etat requis, même dans ce cas, avertisse le défendeur qu'une action est introduite contre lui à l'étranger. Mais ce point doit rester à l'appréciation des autorités requises: il est extrêmement délicat de solliciter de l'Etat requis quelque action dans un cas où il estime que sa sécurité ou sa souveraineté sont en jeu.

D'un autre côté le demandeur peut aussi dans certains pays subir un désavantage dans des cas pareils étant donné que le délai pour notifier peut être écoulé quand le refus est connu. Cette difficulté doit être résolue selon les règles de l'Etat requérant, et on doit prendre en considération, dans la ligne d'orientation de l'article 14, que le demandeur a employé tous ses efforts pour obtenir la notification. Dans ce cas le juge du tribunal saisi doit accorder une protection spéciale au demandeur.

L'alinéa 2 de l'article 4 établit le devoir pour l'Autorité centrale de faire connaître le refus à l'expéditeur avec indication des raisons respectives. Ainsi on a voulu pallier, dans la mesure du possible, les inconvénients signalés.

### IX. OBJECTIONS A LA DEMANDE (ARTICLE 5)

On peut admettre que l'Etat requis éprouve des difficultés à accomplir ses obligations conventionnelles pour des raisons tenant notamment à quelque erreur ou imperfection de

transmission due à l'expéditeur. On peut aussi penser à des erreurs de traduction, oubli du double, etc. Dans ces cas, l'article 5 impose que l'Autorité centrale en informe l'expéditeur.

Cette disposition n'est peut-être pas indispensable puisqu'elle est implicite dans tout l'esprit de la convention, mais on a cru en tout cas opportun, pour des raisons pratiques, d'établir expressément une telle obligation, pour évidente qu'elle soit.

### X. NOTIFICATION DANS L'ÉTAT REQUIS SELON SA PROPRE LOI (ARTICLE 6)

L'article 6 de l'avant-projet établit la façon dont l'État requis doit procéder à la notification de l'acte qui lui a été transmis selon les modes définis aux articles précédents. Cette disposition équivaut à celle de l'article 2 de la Convention de 1954. La procédure à suivre est celle de l'État requis.

Si cet État est un État fédéral ou à système juridique non unifié, la loi applicable sera celle du territoire où la notification doit être faite.

La notification sera réputée faite à l'égard du destinataire même si, conformément aux lois de l'État requis, on a fait utilisation d'une fiction légale, par exemple si le destinataire n'ayant pas été trouvé à son domicile, l'acte a été remis à une personne de son entourage et que les règles de procédure locales considèrent cela comme une notification régulière.

En cas de changement de domicile ou de domicile inconnu les autorités de l'État requis en informeront l'expéditeur qui fera connaître le fait au juge ou à l'autorité saisie dans l'État requérant qui en tirera les conséquences juridiques définies par ses propres lois.

La Commission ayant en vue l'accélération de la transmission et de la notification des actes à l'étranger a cru convenable d'introduire l'expression *sans retard* à l'alinéa premier de cet article. L'emploi de cette expression souligne l'esprit de la convention.

L'alinéa 2 de l'article 6 prévoit la possibilité pour l'expéditeur de demander l'emploi d'une forme spéciale de notification, si cette forme n'est pas contraire à la loi de l'État requis. Cette disposition s'inspire de l'article 3 de la Convention de 1954.

On a hésité sur l'étendue du devoir de l'État requis d'accomplir une demande de notification en forme spéciale. La formule adoptée indique que la Commission a attribué à l'État requis le devoir de satisfaire à la demande *si sa loi ne s'y oppose pas*. Il n'est donc pas suffisant que la loi de l'État requis *ne connaisse pas* la forme de notification demandée, il faut que cette forme soit incompatible avec sa législation.

Comme exemple de ces notifications spéciales on peut indiquer le cas des notifications effectuées devant un certain nombre de témoins, les notifications à domicile (pour les États qui ignorent ce système, au moins pour l'acte introductif d'instance) et la notification à personne (pour les États qui se contenteraient de la notification à domicile).

### XI. ATTESTATION DE NOTIFICATION (ARTICLE 7)

L'article 7 de l'avant-projet, correspondant à l'article 5 de la Convention de 1954, impose à l'Autorité centrale le devoir d'établir et d'adresser une attestation de notification. Dans le système de l'avant-projet cette attestation sera faite selon une formule, constatant le fait, la forme et la date de la notification; elle sera adressée directement à l'expéditeur de la demande. Les avantages de ce système sont clairs.

D'ailleurs il est permis de croire que les résultats auxquels aboutissent les discussions sur la reconnaissance et l'exécution des jugements à l'étranger, tenues au sein de la Communauté Économique Européenne, contiendront également une disposition prévoyant que

la remise des actes faits dans les formes prévues par la loi de l'Etat requis doit être constatée par un procès-verbal de remise. Ce procès-verbal équivaudrait à notre attestation. Il faut considérer que tandis que les textes actuellement à l'étude dans l'enceinte de cette Organisation prévoient exclusivement la communication directe entre officiers ministériels, notre avant-projet fait, en principe, intervenir l'Autorité centrale.

L'attestation mentionnée ci-dessus est faite par le moyen d'une formule uniforme conforme au modèle annexé à la convention qui a pour but de rendre les procédures plus faciles.

On mentionne dans cette attestation les éléments principaux de la notification: le fait même de la notification, sa forme, sa date.

Il est évident que cette attestation aura pour effet de prouver que la notification a été faite conformément à la loi de l'Etat requis. On notera que par simplification et pour éviter les filières l'attestation est adressée directement à l'expéditeur de la demande sans que l'Autorité centrale de *l'Etat requérant*, qui ne joue pas de rôle dans le système, intervienne.

La Commission a largement discuté le problème de savoir si c'est seulement l'Autorité centrale qui a la possibilité d'établir et d'adresser l'attestation. De bons arguments en ce sens ont été présentés. On a fait valoir les difficultés que provoquerait le renvoi direct de l'attestation à l'expéditeur par les officiers ministériels des petits villages chargés, sur demande de l'Autorité centrale de l'Etat requis, de procéder à la notification. En outre on a dit qu'il serait plus facile de contrôler l'authenticité de l'attestation si elle pouvait seulement provenir de l'Autorité centrale, puisqu'il suffirait de vérifier si son sceau a été apposé.

Les exigences de simplicité et de rapidité ont néanmoins prévalu et il a été décidé que toute autre autorité ou organisme de l'Etat requis, chargé de procéder à la notification, pourra établir et adresser l'attestation. Les autorités ou officiers à qui l'envoi de l'attestation à l'étranger causerait des difficultés sérieuses auront de toute façon la faculté d'invoquer l'intermédiaire de leurs autorités nationales.

L'avant-projet laisse l'Etat requis libre de disposer à son gré et n'exige même pas que l'attestation provienne d'une autorité. Elle peut être émise par un organe ou une personne compétente de l'Etat requis, par exemple un *solicitor* comme le cas pourrait se présenter dans le système anglais.

## XII. FORMULE ET TRADUCTIONS (ARTICLE 8)

### A. FORMULE

Comme nous l'avons déjà mentionné, la Commission a décidé de l'emploi d'une formule uniforme afin de rendre plus facile la transmission internationale des actes. La formule, dont le modèle est annexé à l'avant-projet, comprend deux volets. Toutes les mentions qui figurent sur ces volets sont numérotées ce qui accentue le caractère uniforme.

Sur le premier volet, l'entité demanderesse énonce la demande au recto, l'entité requise répond sur le verso.

Le deuxième volet contient les mentions essentielles de l'acte à notifier, de manière à renseigner sur celui-ci aussi bien l'Autorité centrale que le destinataire. Ces mentions essentielles sont les suivantes:

– Nom, qualité et adresse de la partie demanderesse. Il a paru intéressant que l'on précise en quelle qualité intervenait la partie demanderesse, si elle agissait en personne ou en qualité de tuteur, de représentant d'un héritage indivis, de syndic de faillite, etc.;

– Nom et adresse du destinataire et qualité à laquelle il est pris. Le mot qualité est employé dans le sens qui vient d'être indiqué;

– Nature, objet et éventuellement montant du litige. Cette mention permet au destinataire d'avoir connaissance de la demande et de savoir les raisons sur lesquelles elle se base.

On notera que la formule est rédigée de telle manière qu'elle s'adapte aussi bien aux actes judiciaires qu'aux actes extrajudiciaires.

### B. TRADUCTIONS

L'article 8 a trait essentiellement au problème des langues dans lesquelles la formule doit être rédigée ou remplie.

Les indications imprimées sur la formule sont obligatoirement écrites en langues française et anglaise. La formule pourra donc être aisément employée dans tous les Etats membres de la Conférence, d'autant plus que chaque mention est numérotée. Mais il va de soi que l'Etat requérant qui émet la formule peut également ajouter une traduction dans sa propre langue.

La Commission a largement discuté le problème des traductions à propos de la langue dans laquelle la formule devrait être remplie. Notons tout de suite que le problème perd partiellement de son importance du fait de l'uniformité de la formule, les mentions sont réduites au maximum, elles sont presque toutes des mentions techniques et les spécialistes de la plupart des Etats membres pourront les comprendre sans difficulté.

Finalement l'avant-projet a décidé d'attribuer la charge de la traduction au demandeur et a précisé que les indications à insérer dans les formules devraient être écrites dans la langue de l'Autorité centrale requise. On a pensé que cela représenterait trop d'efforts et de charges pour l'autorité requise si les demandes lui étaient adressées dans des langues différentes de la sienne. Il en serait de même pour leur réponse. Il n'y aurait pas un motif valable pour obliger l'Autorité centrale à faire des traductions pour le compte des demandeurs, même si ces traductions sont très simples. C'est aux demandeurs de formuler leurs demandes de manière à être compris par ceux auxquels elles sont adressées.

Le défendeur, par contre, doit pourvoir lui-même à la traduction intégrale de l'acte s'il l'estime nécessaire pour décider s'il désire se défendre ou non. Ainsi la charge de la traduction est donc partagée de manière équitable.

Etant donné, cependant, la simplicité des points à traduire il a été admis dans la rédaction adoptée que ces mentions puissent également être remplies en langues française ou anglaise. La solution a été placée entre crochets afin de bien montrer qu'il s'agit là d'une simple *proposition* de la Commission spéciale. Ayant en considération les raisons précédemment énoncées nous croyons toutefois qu'il est préférable que les mentions soient de toute façon remplies dans la langue de l'Etat requis.

L'article 3, alinéa 2 de la Convention de 1954 prévoyait que l'acte à notifier pouvait être rédigé soit dans la langue de l'autorité requise soit dans la langue convenue entre deux Etats intéressés, ou au moins traduit dans l'une de ces langues. Nous pensons aussi que pour l'application de la nouvelle convention quelques Etats pourront convenir l'utilisation d'une langue déterminée.

Si l'Etat intéressé a plus d'une langue officielle, comme la Suisse et la Belgique, la traduction semble pouvoir être faite dans l'une des langues de l'Autorité centrale.

### XIII. VOIES SUBSIDIAIRES DE TRANSMISSION (ARTICLES 9 A 12)

Ayant institué et précisé une voie principale de transmission et de notification des actes à destination de l'étranger, la Commission spéciale n'a pas cru pouvoir lui donner un caractère exclusif. En effet d'autres modes de transmission très simples sont déjà employés par certains Etats dans le cadre des Conventions de 1905 et 1954 et l'interdiction d'utiliser ces voies aurait constitué pour ces Etats une régression.

Enfin si la voie consulaire classique, qui avait la première place dans la Convention de 1954, a été remplacée comme voie principale par le système de l'Autorité centrale, il n'a pas semblé possible de l'éliminer complètement, et on l'a conservée comme voie subsidiaire.

#### A. VOIE DIRECTE PAR UN AGENT DIPLOMATIQUE OU CONSULAIRE (article 9)

L'article 9, alinéa premier de l'avant-projet prévoit l'hypothèse énoncée à l'article 6, N° 3 de la Convention de 1954. Le deuxième alinéa reprend l'idée du deuxième alinéa du même article 6.

Les agents diplomatiques ou consulaires de l'Etat requérant pourront, sans recourir aux autorités compétentes de l'Etat requis, faire directement des notifications aux personnes se trouvant sur le territoire de l'Etat d'accueil des agents en question pourvu que cet Etat n'ait pas déclaré s'y opposer.

On emploie dans cet article l'expression *Etat de destination* au lieu *d'Etat requis* parce qu'il n'y a plus de *requête* transmise d'un Etat à l'autre.

L'avant-projet apporte une modification importante par rapport à la Convention de 1954. Tandis que dans cette dernière Convention on disait que la notification ne peut être effectuée que *si l'Etat de destination ne s'y oppose pas*, dans le texte actuel il a été établi que la notification sera toujours effectuée *sauf si l'Etat de destination déclare s'y opposer*.

Bien que dans le cadre de la Convention de 1954 il n'y ait pas d'obligation de déclarer son opposition, on a vu des Etats déposer au Ministère des Affaires Etrangères des Pays-Bas un texte indiquant qu'ils ne veulent pas voir utiliser certains modes de transmission sur leur territoire.

Il a semblé raisonnable d'exiger expressément, dans l'avant-projet, une action positive de l'Etat d'accueil, celui-ci devra *déclarer* par un moyen propre qu'il est opposé à ce mode de notification. On n'a cependant pas fait la lumière sur ce moyen, et il subsiste des doutes sur le point de savoir si un Etat pourra déclarer son opposition par un acte concret d'un organe judiciaire. La Commission n'a pas nettement pris position sur ce point.

Selon nous, on pourrait interpréter l'avant-projet de la manière suivante: un Etat peut manifester son opposition en la déclarant par une loi, une note diplomatique, ou même une décision judiciaire. Cette interprétation qui ne semble pas être exclue n'est pas rassurante et il faudrait l'écarter. Il serait donc utile qu'une disposition des clauses finales apporte des précisions sur ce point.

La suggestion que la déclaration d'opposition puisse seulement être formulée au moment de la signature, de la ratification ou de l'adhésion n'a pas été retenue.

En tout cas les Etats de destination ne pourront pas s'opposer à ce que les agents diplomatiques ou consulaires notifient un acte *sans contrainte* à un *ressortissant* de *l'Etat d'origine*. L'expression contient un sens fixé par la tradition et doit être maintenue.

La notification sans contrainte est la notification volontairement acceptée. Si le destinataire refuse de recevoir l'acte, cette tentative de remise ne peut être considérée comme une notification au sens de la convention.

### B. AUTRES VOIES DIRECTES (article 10)

L'article 10 prévoit l'utilisation subsidiaire d'autres voies directes de transmission. Il a été introduit à l'alinéa premier de cet article la même altération de fond que nous venons d'énoncer concernant le mode d'opposition des Etats à l'emploi de ces voies. Contrairement à l'article 6 de la Convention de 1954 on exige de nouveau une *déclaration*, et nous renvoyons, sur ce point, à ce qui a été dit sous A.

#### a) Voie postale (N° 1)

Le N° 1 de l'article 10 correspond au chiffre 1 de l'article 6 de la Convention de 1954. Toutefois le mot *intéressés*, employé dans cette Convention pour indiquer le destinataire, a été remplacé par le mot *personnes* qui est plus précis dans le contexte.

Dans le N° 1 de l'article 10 on fait référence, en fait, aux *personnes privées*; l'expression englobe les personnes compétentes pour représenter les parties aux fins de notification comme les *solicitors* en droit anglais.

Enfin il faut comprendre que par personnes privées on entend aussi bien les personnes physiques que les personnes morales.

La disposition du N° 1 semble admettre la notification par télégramme si l'Etat où la notification doit être effectuée ne déclare pas s'y opposer.

La Commission n'a pas accepté que la voie postale soit limitée aux envois sous pli recommandé.

Il faut préciser qu'en permettant l'utilisation de la voie postale si l'Etat de destination ne s'y oppose pas, l'avant-projet n'entend pas se prononcer sur la validité d'un tel mode de transmission au regard de la loi du tribunal saisi: pour que la voie postale puisse être utilisée il faut au départ que la loi du tribunal saisi le permette. C'est ainsi que dans le cadre de l'application de la Convention de 1954 les actes belges peuvent être notifiés en France par la voie postale, puisque la loi belge connaît ce mode de notification et que la France ne s'y oppose pas, alors que les actes français ne peuvent pas être notifiés en Belgique par la voie postale bien que la Belgique ne s'y oppose pas, puisque la loi française ne connaît pas ce mode de notification.

#### b) Notification directe par les soins des officiers ministériels, fonctionnaires ou autres personnes compétents de l'Etat de destination (N°ˢ 2 et 3)

Dans l'avant-projet on a développé le N° 2 de l'article 6 de la Convention de 1954. On étudiera séparément les N°ˢ 2 et 3 de l'actuel article qui résultait de ce développement en considération de la personne qui demande la notification.

1. *Notification à la demande d'un officier ministériel, fonctionnaire ou autre personne compétents de l'Etat d'origine.* – Dans cette disposition on a remplacé le mot *intéressés*, employé pour désigner l'expéditeur, par les mots *officiers ministériels, fonctionnaires ou autres personnes compétents de l'Etat d'origine*. On a ainsi maintenu la possibilité de faire faire des notifications directement d'huissier à huissier ou de fonctionnaire à fonctionnaire.

La mention autres *personnes compétentes* a pour but d'attribuer aux *solicitors*, qui au Royaume-Uni ont compétence pour notifier sans pour cela être des officiers ministériels ou des autorités, la possibilité de demander des notifications à l'étranger.

2. *Notification à la demande d'une personne privée intéressée.* – On a cependant pas exclu la possibilité pour les personnes privées intéressées à une instance judiciaire de faire faire directement des notifications.

Le N° 3 de l'article 10 donne en effet faculté aux *personnes privées de faire faire des notifi-cations d'actes judiciaires directement par les soins des officiers ministériels, fonctionnaires ou autres personnes compétents de l'Etat de destination* tels que définis plus haut. La question a été très discutée. Il ne fallait pas exclure cette possibilité étant donné que l'esprit de l'avant-projet est de faciliter et de rendre le plus efficace possible la notification d'un acte judiciaire à l'étranger.

Les modes de notification seront les modes prévus par l'Etat de destination. Il faut noter, comme nous l'avons fait pour la notification postale, qu'une notification de ce genre n'aura dans l'Etat du for de l'instance que les effets prévus par sa loi. Il a paru bien clair à la Commission que le tribunal saisi pourrait ne pas accepter de tenir compte d'un mode de notification qui n'est pas en accord avec son propre droit de procédure.

### C. VOIES DIPLOMATIQUES OU CONSULAIRES INDIRECTES (article 11)

L'article 11 prévoit la possibilité d'utiliser la voie consulaire indirecte, mode de notification principal selon la Convention de 1954. Par voie indirecte on entend que le consul de l'Etat requérant remet l'acte non pas directement au destinataire – cas étudié *supra* sous A – mais à une autorité de l'Etat requis, aux fins de notification. Le même article prévoit dans son alinéa 2 l'utilisation de la voie diplomatique qui était prévue à l'article premier, alinéa 3 de la Convention de 1954.

Etant donné que l'avant-projet établit comme voie principale de notification et de transmission celle de l'Autorité centrale, on a voulu limiter le recours aux voies diploma-tiques et consulaires aux circonstances exceptionnelles. Mais cette opinion n'a pas prévalu en ce qui concerne la voie consulaire.

Etant donné qu'en plus de la voie normale de transmission l'avant-projet prévoit d'autres voies subsidiaires, il serait injustifiable de cantonner la voie consulaire aux circons-tances exceptionnelles. C'est pourquoi on a établi une distinction entre la voie diplo-matique et consulaire.

#### a) *Voie diplomatique*

On a décidé que la voie diplomatique ne serait admise qu'exceptionnellement. En effet, quoiqu'encore employé par certains Etats, le moyen de transmission des actes par voie diplomatique est extrêmement lourd. Il ne sert qu'à augmenter les délais en surchargeant le travail de fonctionnaires qui ne sont pas familiarisés avec le mécanisme judiciaire et à multiplier des filières inopportunes. Admettre trop facilement l'utilisation de la voie diplomatique pourrait risquer d'annuler les progrès déjà obtenus par les Conventions de 1905 et de 1954. On a même songé à supprimer purement et simplement le système dans l'avant-projet.

On a fait valoir que quelques Etats transmettent encore régulièrement leurs actes par voie diplomatique alors que la voie consulaire devrait être employée, ce qui apporte des inconvénients graves dans les services des Ministères des Affaires Etrangères mal outillés pour s'en occuper.

Il a semblé cependant impossible d'interdire le recours à la voie diplomatique qui représente une *ultima ratio* toujours à la disposition des Etats. Aussi l'a-t-on acceptée en la restreignant aux circonstances exceptionnelles.

Mais il est très important de noter que si l'Etat requérant peut bien exceptionnellement utiliser la voie diplomatique pour transmettre ses actes à l'étranger, l'Etat requis ne certainement pas exiger, dans le cadre de l'avant-projet, qu'on lui transmette par la voie

diplomatique les actes à notifier sur son territoire. C'est en cela que l'avant-projet diffère profondément de la Convention de 1954 puisqu'il élimine la faculté prévue à l'article premier, alinéa 3 de cet instrument. En effet on ne conçoit pas qu'un Etat qui s'obligerait, en ratifiant la convention nouvelle, à créer une autorité destinée à centraliser les demandes de notification en provenance de l'étranger déclare aussitôt qu'il entend que les demandes de signification à faire sur son territoire lui soient adressées non pas par l'intermédiaire de l'Autorité centrale qu'il a créée mais par la voie diplomatique!

### b) Voie consulaire

En ce qui concerne la voie consulaire elle-même, quelques Experts ont soutenu, pour en défendre l'emploi, que dans quelques cas elle pourrait être un moyen encore plus simple que la voie principale établie par l'avant-projet.

La voie consulaire n'est plus en soi nécessaire mais il est utile de la laisser à la disposition des Etats. En effet puisque la voie diplomatique classique, la plus compliquée, ne peut pas être complètement exclue, il ne faut pas pousser les Etats à l'utiliser dans des cas où ils seraient prêts à se contenter de la voie consulaire un peu plus simple.

Il serait avisé, étant donné que l'avant-projet institue l'Autorité centrale, que les consuls s'adressent à cette Autorité. Mais on n'a pas cru opportun d'établir dans l'avant-projet une obligation de ce genre parce qu'elle équivaudrait à organiser la voie consulaire, ce qu'on ne veut pas.

Dans l'esprit de l'avant-projet, la voie consulaire doit conserver un caractère subsidiaire et accidentel. On la maintient pour faciliter la transition. Ce sera d'ailleurs la pratique qui décidera de cet aspect. Si la voie principale de l'avant-projet s'avère la plus rapide et la plus efficace, elle sera sans doute adoptée et toutes les autres voies ne seront employées qu'exceptionnellement.

En conclusion nous estimons que le consul devrait en principe s'adresser à l'Autorité centrale de l'Etat requis pour faire procéder à la notification. Tout dépendra cependant des instructions données au consul par ses supérieurs hiérarchiques et du droit du pays requis.

### D. ACCORDS PARTICULIERS ÉTABLIS PAR LES ETATS – COMMUNICATIONS DIRECTES (article 12)

L'article 12 reprend le système prévu au dernier alinéa de l'article premier de la Convention de 1954. Cette disposition admet que les Etats puissent s'entendre pour organiser la communication directe des actes entre leurs autorités respectives. Un acte judiciaire allemand pourra ainsi être directement transmis par le fonctionnaire compétent à l'autorité respective en Suisse.

Cette disposition qui était justifiée dans la Convention de 1954 ne semble pas devoir être maintenue dans notre convention étant donné que l'avant-projet permet déjà que la transmission se fasse entre Etats contractants d'autorités à autorités, ainsi qu'on l'a vu en étudiant le No 2 de l'article 10 de l'avant-projet.

### XIV. CONSÉQUENCES DE LA NON-NOTIFICATION DE L'ACTE INTRODUCTIF D'INSTANCE SELON L'AVANT-PROJET (ARTICLE 13)

L'article 13 est la clef de voûte de l'avant-projet. Il institue une sanction indirecte à l'encontre du demandeur qui n'aurait pas fait, selon les termes de la convention, la notification de l'acte introductif d'instance ou d'un acte équivalent.

### A. PORTÉE DE L'ARTICLE 13

L'avant-projet s'applique à tous les actes judiciaires mais n'institue une sanction qu'à propos de *l'acte introductif d'instance ou d'un acte équivalent*. En employant cette dernière expression on a voulu protéger d'autres actes qui n'étant pas des actes introductifs d'instance ont des effets identiques comme, par exemple, la citation en appel. On ne s'est pas préoccupé des actes judiciaires intermédiaires parce que le défendeur n'a plus besoin d'une protection spéciale, ayant dû par hypothèse être touché à l'origine du procès. C'était son devoir de se tenir au courant du développement du procès et il doit supporter les conséquences de son attitude.

### B. BUT DE L'ARTICLE 13

L'article 13 a pour but d'assurer le respect des droits de la défense en exigeant que tous les efforts soient employés pour que le destinataire soit touché conformément à la loi du pays requis ou selon les autres modes de notification prévus par la convention, et cela en temps utile pour qu'il puisse se défendre.

On a voulu rendre insuffisante la notification faite selon la seule loi du pays du tribunal saisi qui peut ne pas respecter les termes conventionnels. Une signification au parquet en France, doublée d'une transmission diplomatique ou consulaire, ne sera pas suffisante pour satisfaire à la convention tant que Primus, qui a sa résidence habituelle au Portugal, n'est pas touché par l'acte introductif d'instance.

Le problème de savoir à quel moment commencent les délais dans le cas où le droit du tribunal saisi exige une notification dans la forme de sa loi interne suivie d'une notification ou d'une transmission dans la forme conventionnelle doit être résolu par la *lex fori*. Le droit interne de chaque Etat peut considérer que les délais commencent à courir à partir de la signification réalisée d'après la loi interne du pays du tribunal saisi ou que, au contraire, il commence avec la notification effectuée dans les termes de la convention. Dans la première hypothèse, la notification dans les termes de la convention aurait plutôt le caractère d'une communication, quoique essentielle, étant donné que le juge ne peut statuer sans qu'elle ait eu lieu.

On a discuté la possibilité de parvenir à une scission des effets de la notification selon qu'ils sont dans l'intérêt du défendeur ou du demandeur, ainsi que le suggérait le Mémoire[1]. Quoiqu'on ait reconnu que dans certains pays comme l'Allemagne et l'Autriche ce système de scission des effets fonctionne très bien, l'idée a choqué les préjugés dogmatiques de certains pays latins et n'a pas été approfondie.

### C. ANALYSE DE L'ARTICLE 13

*a)* Selon l'alinéa premier la sanction contenue dans cet article n'intervient que lorsque l'acte introductif d'instance ou un acte équivalent a dû être notifié sur le territoire d'un Etat contractant autre que celui du for. C'est à la loi interne de l'Etat requérant de fixer dans quel cas la notification devra être faite dans un autre Etat contractant. Cette conclusion est tirée de l'interprétation que nous avons faite de l'article premier de l'avant-projet (*supra* sous V.C.).

L'avant-projet, en effet, n'établit pas de critères objectifs qui obligent le juge à recourir à son application. S'il se trouve que l'acte aurait dû être notifié sur le territoire d'un Etat

---

[1] Document préliminaire N° 2, p. 11.

contractant, alors le juge aura le devoir de surseoir à statuer si le défendeur ne comparaît pas et s'il n'est pas établi que l'une des conditions prévues à l'article 13 N° 1 ou 2 s'est produite.

*b*) L'article 13 s'applique seulement si le défendeur ne comparaît pas. On a pensé qu'il ne fallait pas alourdir la tâche du juge en exigeant qu'il veille dans tous les cas, et même si le défendeur comparaît, à ce que les conditions prévues dans la convention soient remplies.

*c*) La Commission a discuté le point de savoir si le juge aurait simplement la faculté de surseoir à statuer ou si on lui imposerait cette obligation.

Pour les pays qui connaissent la signification au parquet, l'article 13 représente une concession considérable et une altération substantielle du système de leur loi interne. On peut donc comprendre la proposition de ceux qui voulaient amoindrir la portée de l'article en ne prévoyant qu'une simple faculté pour le juge. En soutenant cette thèse, on faisait valoir par exemple qu'une signification au parquet, combinée avec l'envoi d'une lettre recommandée au défendeur, constituerait un système suffisamment sûr.

Cependant la Commission a décidé opportunément dans un sens opposé. Si l'on avait donné au juge la simple faculté de surseoir, on n'aurait guère progressé parce qu'on n'aurait pas assuré de façon impérative le recours à la convention pour la notification de l'acte introductif d'instance et on serait resté dans la situation juridique actuelle en permettant un emploi injustifié de la fiction dans les notifications, ce qui porte préjudice aux droits de la défense et donc à la Justice elle-même.

Donnons un exemple du changement que peut apporter à certains droits le système de l'avant-projet. Conformément au droit des Pays-Bas, la citation de Primus se trouvant à l'étranger est faite au parquet. Malgré l'écoulement du délai établi dans le droit interne, le juge ne pourra plus statuer sans que Primus ait fait l'objet d'une notification par une des voies de la convention, en temps utile pour pouvoir se défendre. Dans le droit actuel, le tribunal néerlandais devrait statuer, une fois le délai écoulé, sans que l'on se préoccupe de savoir si une notification a bien eu lieu à l'étranger.

*d*) Le N° 1 de l'article 13 établit une des conditions qui obligent le juge à surseoir à statuer: il faut que l'acte ait été notifié selon une procédure *utilisant les formes de la loi de l'Etat requis*. Le cas se présentera lorsqu'on aura utilisé le système de l'Autorité centrale, la voie consulaire ou diplomatique indirecte, ou enfin l'intervention directe d'un officier ministériel du pays requis.

Dans l'hypothèse considérée les formalités de notification sont celles de l'Etat requis. On peut donc admettre que, dans les cas et dans les conditions prévus par la loi de ce pays, la notification soit faite au parquet. De cette façon on continue à admettre la possibilité d'une notification fictive; mais cette fiction est raisonnable parce que le défendeur doit se soumettre aux lois générales de l'Etat où il se trouve. On accepte de considérer que le défendeur a été touché si les moyens prévus pour la notification dans ce pays ont été accomplis. Il faut faire confiance aux législations internes des Etats qui ont tous prévu, dans leur procédure interne, des moyens pour respecter les droits de la défense.

L'attestation prévue à l'article 7 de l'avant-projet servira à établir que cette notification a été effectuée de la manière prévue par les lois de l'Etat requis. Si l'acte est renvoyé avec l'indication que le défendeur n'a pas de domicile connu ou a changé d'adresse, il faut distinguer: quand il s'agit d'un domicile nouveau, inconnu, la convention ne s'applique pas puisqu'elle ne prévoit pas ce cas. En cas de changement d'adresse, ou bien toutes les formalités prévues dans le pays requis ont été accomplies et la notification doit être consi-

dérée comme effectuée, ou bien les formalités n'ont pas été complètement accomplies et dans ce cas la notification ne peut pas être réputée effectuée.

*e*) Le N° 2 de l'article 13 établit, comme autre condition qui oblige le juge à surseoir à statuer, que l'acte n'ait pas été effectivement remis au défendeur ou à sa demeure par un procédé qui, bien que n'utilisant pas les formes de l'Etat requis, soit prévu par la convention.

Dans ce N° 2 on a été plus exigeant que précédemment. Les voies de transmission subsidiaires, comme la voie postale ou l'intervention directe des agents diplomatiques ou consulaires, ne donnent pas autant de garanties au défendeur que l'accomplissement des formalités de l'Etat requis obtenues par l'entremise de l'Autorité centrale. Pour cette raison, quand la transmission est faite par des voies subsidiaires qui ne font pas intervenir les formes de la loi de l'Etat requis, on exige que le défendeur ait été touché en personne ou au moins à sa demeure. On n'a pas cru nécessaire d'exiger que la remise soit faite à personne. On a cru suffisant qu'elle ait été effectuée à demeure, en effet une personne normalement diligente devrait toujours se comporter de façon à avoir connaissance d'une notification faite dans cette circonstance.

*f*) Ces principes ayant été acceptés, la Commission a rejeté une proposition belge selon laquelle, pour que le juge saisi puisse statuer, il serait suffisant que le défendeur *ait été mis à même de pouvoir se défendre.*

Ce système n'est pas très différent de celui qui a été adopté étant donné qu'en dernière analyse la notification à demeure équivaut à mettre une personne raisonnablement diligente à même de se défendre. La solution adoptée est préférable parce qu'elle est plus concrète et donc d'application plus facile. L'expression *mis à même de se défendre* est fluide et vague et créerait dans la pratique toutes sortes de difficultés. D'ailleurs si l'on complète le texte adopté de l'article 13 avec l'article 14 on voit que les intérêts du demandeur sont suffisamment défendus.

*g*) De même, après avoir hésité, la Commission a rejeté la proposition suédoise selon laquelle, pour que la condition prévue au N° 2 soit établie, il suffirait que l'on apporte la preuve de la remise de l'acte selon un moyen prévu par la loi de l'Etat requérant, même s'il n'avait pas été fait utilisation d'une voie de transmission établie par la convention.

On a en effet estimé qu'un tel système risquerait de vider la convention de son contenu étant donné qu'un de ses buts est d'établir une certaine «standardisation» des modes de notification et la protection de leur emploi. Il a semblé qu'il ne fallait pas élargir l'éventail des possibilités offertes pour la notification. Il n'a pas paru raisonnable d'admettre, à côté des voies conventionnelles, déjà assez larges, la possibilité de toucher le défendeur sans aucune formalité, par exemple par une simple lettre du demandeur, même si cela est prévu par la loi de l'Etat requérant. Un minimum de formalités est nécessaire pour maintenir l'équilibre entre les intérêts du défendeur et ceux du demandeur. La notification à un *solicitor*, prévue par le droit anglais ne semble pas être comprise dans le N° 2 que nous avons examiné.

*h*) Le dernier alinéa de l'article 13 établit l'obligation pour le juge de surseoir à statuer s'il trouve, bien que constatant la notification ou la remise prévues aux numéros 1 et 2, que celles-ci n'ont pas eu lieu en temps utile pour que le défendeur puisse se défendre.

On ne pourrait pas admettre, dans l'esprit de l'avant-projet, qu'on donne suite au procès si le défendeur n'a pas pu présenter sa défense du fait que la notification bien que valable, ne lui laissait pas un délai suffisant pour mettre en oeuvre sa défense. C'est au juge

du tribunal saisi d'apprécier en conformité des principes d'une bonne administration de la justice si la notification ou la remise ont été faites en temps utile. Si le défendeur se présente devant le juge en affirmant que l'acte ne lui est pas parvenu en temps utile, le juge devrait être compréhensif et généreux, lui accordant de nouveaux délais ou des délais prolongés. L'appréciation de la preuve présentée requiert, selon nous, une grande souplesse.

## XV. CONSÉQUENCES DE LA DILIGENCE DU DEMANDEUR (ARTICLE 14)

### A. PORTÉE DE L'ARTICLE 14

L'article 14 de l'avant-projet donne aux Etats la faculté d'établir une législation ayant pour but d'atténuer le régime établi à l'article 13. Si aucune attestation de notification n'est reçue dans un délai raisonnable et s'il est confirmé que l'acte a été transmis selon les modes prévus par la convention et que toutes les diligences ont été accomplies aux fins de la notification, les lois internes peuvent accorder au juge la possibilité de statuer malgré les dispositions de l'article 13.

La technique employée par l'article 14 est différente de celle de l'article précédent quoique les deux dispositions soient fondamentalement liées. On a remarqué que le contenu de l'article 14, qui prévoit une présomption en faveur du demandeur diligent, ne traduit pas une doctrine admise par tous les Etats. Pour leur donner satisfaction on a pensé que la disposition de cet article ne devait pas être mise au même niveau que les autres dispositions de la convention.

Tandis que les autres articles s'adressent directement aux autorités et aux justiciables de chaque Etat contractant, l'article 14 attribue une faculté *aux seuls Etats*, qui seront libres d'en user à leur gré par l'entremise d'une législation interne appropriée.

Les dispositions de la loi interne auxquelles l'article 14 fait allusion pourront éventuellement figurer dans la loi qui introduit la convention dans le droit interne.

La Commission a établi un compromis entre les Etats qui, en admettant la signification au parquet, protègent le demandeur et ceux qui font prévaloir les droits de la défense. L'avant-projet garantit essentiellement le droit de la défense, mais permet que les Etats puissent, dans des limites raisonnables, créer une présomption en faveur du demandeur.

L'ensemble du système de l'avant-projet respecte ainsi l'équilibre nécessaire entre les intérêts des parties en cause.

### B. ANALYSE DU SYSTÈME DE L'ARTICLE 14

*a*) Le juge ne pourra utiliser sa faculté de statuer malgré la disposition de l'article 13 que lorsque l'attestation n'a pas été reçue dans un délai raisonnable. Il a donc été établi une condition objective qui limite la portée de la faculté en question.

Qu'entend-on par délai raisonnable? On a beaucoup parlé pendant les discussions de *délais excessifs* pour l'accomplissement de la notification. Cette idée donne le sens qui doit présider à l'interprétation de l'expression *délai raisonnable* dans le cadre de l'article 14.

Pour l'application de l'article 14 il faut encore qu'il soit prouvé que l'acte a été transmis *selon un des modes prévus à la convention*. A cela s'ajoute une dernière condition: il faut que *toutes diligences aient été effectuées aux fins de la notification*. Cette condition est cumulative avec la précédente, comme le prouve la conjonction reliant les deux conditions.

Au cours des débats on a proposé de viser la diligence *du demandeur*. Mais on a reconnu que l'intervention du demandeur est très limitée, il se borne à provoquer une activité dont le processus, la notification elle-même, le concerne mais dont il doit attendre passivement

le résultat. En dehors de l'indication de l'adresse exacte du défendeur, il est difficile d'apercevoir ce que le demandeur pourra faire de plus pour que la notification réussisse. C'est pourquoi on a élargi la notion de diligence et on ne l'a pas restreinte à l'activité du demandeur. La diligence doit être exigée du demandeur et de tous les autorités, officiers ministériels et personnes compétentes, qui interviennent dans la transmission de l'acte et dans sa remise au défendeur.

Pour ces raisons la Commission a décidé d'adopter le texte actuel qui implique que toutes diligences aient été accomplies par tous les intervenants.

On a employé l'expression *toutes diligences* au pluriel au lieu de *toute diligence* au singulier pour bien marquer le *caractère de réitération* impliqué par l'expression. On a ainsi voulu être aussi restrictif que possible pour l'application de l'article 14.

Mais il est évident que cette orientation ne peut pas porter trop loin en sens inverse et amener à exiger du demandeur une diligence plus que raisonnable. On doit toujours avoir pour but, dans cette matière, de maintenir l'équilibre entre les intérêts en présence. La façon dont la disposition est rédigée donne lieu à l'idée que le tribunal pourra officieusement ordonner les démarches nécessaires pourqu'on constate que toutes diligences ont été accomplies.

*b)* On a aussi pensé à introduire à côté des conditions qu'on vient d'étudier une condition subjective qui limiterait l'application de l'article aux seuls cas où il y a eu *faute ou négligence de la part du défendeur*. Comme exemple d'une telle faute on peut citer le cas où Primus ayant reçu notification par voie postale pendant ses vacances ne fait pas suivre son courrier ou ne retire pas le pli postal à la poste après son retour.

La faute ou négligence a déjà été prise en considération pour des cas pareils dans les Conventions de La Haye. L'article 2 N° 2 de la Convention concernant la reconnaissance et l'exécution des décisions en matière d'obligations alimentaires du 15 avril 1958 a tenu compte de cette notion. En effet elle permet de refuser la reconnaissance si c'est *sans faute* de la partie défaillante que celle-ci n'a pas eu connaissance de la procédure ou n'a pu s'y défendre.

L'idée de faute du défendeur a été aussi adoptée dans l'avant-projet de convention sur la reconnaissance et l'exécution des jugements étrangers en matière patrimoniale dont l'article 5 établit:

> *La reconnaissance ou l'exécution de la décision peut néanmoins être refusée dans l'un des cas suivants:*
>
> . . .
>
> *4. En cas de décision par défaut, la partie défaillante, sans qu'il y ait eu faute de sa part, n'a pas eu connaissance de l'acte introductif d'instance en temps utile pour pouvoir se défendre.*

Tout d'abord on a reconnu qu'en principe le défendeur à qui on ne saurait reprocher d'avoir fait une faute devait être protégé par la règle de l'article 13. L'exemple suivant fait ressortir les raisons pour lesquelles on a soutenu cette doctrine: une Portugaise mariée à un Français veut intenter en France, où elle s'est établie, une action en divorce contre son mari qui habite le Portugal. La demande est notifiée au parquet, mais pour une raison ou une autre, les services diplomatiques chargés par le Procureur de la République d'acheminer l'acte ne le remettent pas au défendeur. A ce moment, on pourra certes dire que la femme a fait tout ce qui lui incombait en France, mais néanmoins il serait injuste d'en tirer la conclusion que dans ce pays un jugement par défaut puisse être rendu contre le mari qui ignore tout de la procédure.

Mais la Commission n'a cependant pas estimé possible d'admettre une condition subjective – la faute du défendeur – dans l'article 14, en considérant notamment qu'il serait difficile, pour le demandeur, de l'établir. Un autre argument est qu'on a voulu protéger l'intérêt du demandeur dans les cas où la notification aurait pris du retard pour des raisons étrangères au défendeur lui-même, par exemple à cause de l'inefficacité des organes chargés de la transmission. On a voulu éviter le sursis prolongé si la notification n'a pas été faite dans un délai raisonnable pour quelque raison d'ordre bureaucratique.

*c*)   Avec l'article 14 tel qu'il est rédigé on a, en éliminant quelques cas extrêmes, donné satisfaction aux pays où la signification au parquet est admise, pays qui ont manifesté la meilleure des volontés dans ces négociations. D'un autre côté la disposition en cause n'affaiblit pas d'une façon sérieuse la protection du défendeur. De toute façon il ne faut pas oublier qu'on n'impose pas aux Etats d'accepter les principes de l'article 14 ainsi qu'on l'a mis en exergue.

## XVI. MESURES PROVISOIRES ET CONSERVATOIRES (ARTICLE 15)

L'article 15 exclut l'application des articles 13 et 14 aux mesures provisoires ou conservatoires à décréter en cas d'urgence. Etant donné le caractère urgent de ces procédures on a estimé qu'il ne faudrait pas leur appliquer la sanction prévue à l'article 13 ni, dans le cadre de l'article 14, exiger du demandeur des diligences particulières.

Il faut en tout cas mettre l'accent sur le fait que ces mesures ne sont pas exclues de la convention. Les voies de transmission et de notification prévues leur sont applicables quand il n'y a pas d'urgence qui l'empêche.

Il faut noter que la Commission a été d'avis que la procédure des référés est couverte par l'article 15. Il semble que dans cette hypothèse le magistrat pourra avoir toutes libertés pour la fixation des moyens de notification.

On ne peut pas dire toutefois que, en ce qui concerne les mesures provisoires ou conservatoires, l'avant-projet n'apporte pas de progrès par rapport aux Conventions de 1905 et de 1954, et cela même dans le cas où l'urgence empêche de recourir aux voies de transmission et de notification prévues dans l'avant-projet. En effet, même dans ces cas, on accorde une protection au défendeur, puisque l'article 15 n'exclut pas l'application de l'article 16 visant les jugements par défaut.

Ainsi, en présence d'un jugement par défaut concernant des mesures provisoires ou conservatoires, le juge pourra toujours, en cas de besoin, relever le défendeur de la forclusion dans les termes de l'article 16 que nous allons maintenant étudier.

## XVII. JUGEMENT PAR DÉFAUT (ARTICLE 16)

### A. PORTÉE DE L'ARTICLE 16

L'article 16 de l'avant-projet donne aux juges la faculté d'éviter les inconvénients qui pourraient résulter du manque de notification des jugements par défaut. On a eu pour but de protéger le défendeur lorsque le jugement émane du tribunal d'un pays où les délais de recours ne dépendent pas de la notification effective du jugement.

On n'a pas retenu la solution qui consisterait à prévoir des délais d'opposition plus longs ou à fixer un point de départ de ces délais qui soit particulièrement favorable au défendeur, en tenant compte du moment où il y a eu connaissance du jugement. En effet on a voulu éviter, cette fois encore, une modification trop grande du droit interne des Etats.

On s'est contenté de donner au juge la faculté de relever le défendeur d'une forclusion si certaines conditions sont remplies.

La question de savoir si l'on devrait aussi prévoir quelques dispositions protégeant le défendeur même en cas de jugements contradictoires a été très discutée. La Commission s'est orientée dans le sens négatif considérant que le défendeur ayant eu connaissance du procès entrepris, puisqu'il est contradictoire, pourra avoir toujours connaissance du jugement s'il manifeste une diligence raisonnable.

D'ailleurs, du point de vue technique, les droits de la défense n'exigent pas dans ce cas une protection spéciale. En effet, l'élément d'internationalité ne joue plus un rôle déterminant pour les Etats qui font courir le délai à partir du prononcé du jugement ou à partir de la signification aux mandataires *ad litem* sans que la notification au défendeur lui-même soit nécessaire. Il n'y a pas lieu de prévoir un système international de protection du défendeur alors que les formalités de la procédure, dont notamment les notifications, s'accomplissent dans la sphère juridique d'un seul pays. Dans les législations qui exigent une signification au défendeur lui-même, il serait superflu de demander une sanction supplémentaire, étant donné que ces législations apportent, déjà par rapport aux systèmes précédents, une garantie supplémentaire au défendeur en obligeant à lui signifier l'acte.

Le défendeur a toujours la possibilité d'élire domicile dans le pays du tribunal saisi, domicile où souvent les jugements pourront être valablement signifiés. Il y a là un moyen de protection possible. Mais il n'a pas semblé raisonnable que l'avant-projet établisse 'lobligation d'élire domicile dans le pays du for, comme un Expert l'a proposé. On n'a pas non plus accepté le principe selon lequel, un domicile ayant été élu dans le pays du for, les autorités de ce pays soient obligées d'accepter comme valable une notification faite au domicile élu.

### B. ANALYSE DE L'ARTICLE 16

*a*) L'article 16 dispose: *lorsqu'un jugement a été rendu sans que le défendeur ait comparu* ...

On n'a pas employé l'expression *jugement par défaut* afin d'inclure dans la portée de l'article les jugements *réputés contradictoires* qui existent notamment en droit français et égyptien. C'est ainsi que, selon le droit français, il y a jugement réputé contradictoire lorsque le défendeur, quoique touché en personne par l'acte introductif d'instance, ne comparaît pas. En droit égyptien le jugement est réputé contradictoire si le défendeur après avoir été réassigné et atteint en personne ne comparaît pas. Comme la réassignation est obligatoire, en vertu de ce mécanisme le droit égyptien ne connaît pas les jugements par défaut.

On a pensé que dans l'esprit de l'avant-projet le point à retenir devrait être le fait qu'un jugement a été rendu en l'absence du défendeur, et l'on a ainsi refusé de tenir compte de ces distinctions légales basées sur des fictions.

*b*) L'article 16 se poursuit ainsi ... *et que les voies de recours contre ce jugement ne peuvent plus être exercées* ...

Par voies de recours on entend les voies ordinaires aussi bien qu'extraordinaires: l'appel, l'opposition, le pourvoi en cassation, les demandes en révision, etc.

*c*) Dans le cas d'un jugement auquel s'applique l'article 16 *le juge pourra relever le défendeur de la forclusion s'il est établi* qu'un certain nombre de conditions sont réunies.

L'avant-projet ne change en rien le point de départ ou la durée du délai légal qui peut ainsi courir et s'écouler. Mais le juge en vertu de l'article 16 pourra *relever* le défendeur de la forclusion et admettre ainsi un délai d'opposition ou d'appel extraordinaire si le défendeur le demande dans un délai raisonnable à partir du moment où il a eu connaissance du jugement, ainsi qu'on le verra plus loin.

En employant l'expression *s'il est établi* la Commission a voulu éviter de se prononcer sur le problème de la charge des preuves. On a refusé d'imposer expressément au défendeur la preuve d'un fait négatif. Mais le tribunal ne pourra pas se satisfaire d'une simple vraisemblance, et il faudra prouver de façon claire et précise les faits prévus aux Nos 1, 2 et 3 de l'article 16 constituant autant de conditions cumulatives qu'il convient maintenant d'étudier.

*d)* Le Nº 1 impose l'obligation de vérifier que l'on est effectivement dans le champ d'application de la convention et qu'il s'agissait donc bien d'un acte introductif d'instance qui devait être notifié internationalement.

Nous estimons que la disposition en cause pourrait sans conséquence être supprimée. Il va de soi que l'article 16 sera appliqué uniquement si l'on se trouve dans le domaine de la convention.

On pourrait éventuellement, réunir les Nos 1 et 2 de la manière suivante: *s'il est établi . . . que le défendeur sans qu'il y ait eu faute de sa part n'avait pas eu connaissance de l'acte introductif d'instance ou d'un acte équivalent devant lui être notifié sur le territoire d'un Etat contractant autre que celui du for, en temps utile pour pouvoir se défendre.*

Si l'on veut obtenir un texte plus léger on pourrait employer la formule suivante: *s'il est établi . . . que le défendeur, sans qu'il y ait eu faute de sa part, n'avait pas eu connaissance de l'acte introductif d'instance ou d'un acte équivalent visé par la présente Convention, en temps utile pour pouvoir se défendre.*

D'ailleurs une solution semblable avait été admise par le Comité de rédaction dans le document de travail Nº 6 qui employait l'expression suivante: *acte introductif d'instance ou acte équivalent devant être notifié conformément à la présente Convention.* A la suite des discussions, étant donné que la portée de l'article 16 devait être la même que celle de l'article 13, la Commission a résolu de changer la rédaction et après plusieurs modifications est arrivée à la formule de l'article 16 actuel.

Le texte du Rapporteur va à la rencontre de plusieurs critiques et correspond exactement au but recherché par l'article 16 actuel. Dans cet article on n'a pas voulu exiger que les voies de la convention aient été respectées parce qu'on a désiré accorder une ultime protection au défendeur dans le cadre des jugements par défaut. Avec l'emploi du mot *visé* au lieu de *conformément* on exprime cette idée. L'article 16 s'appliquera dans tous les cas où il s'agit d'une notification internationale, c'est-à-dire d'un acte devant être notifié à l'étranger sur le territoire d'un Etat contractant autre que celui du for même si les voies de la convention n'ont pas été suivies.

*e)* Le Nº 2 de l'article 16 reproduit la formule de l'article 5 de l'avant-projet de convention sur l'exécution des jugements étrangers en matière patrimoniale.

La Commission a tout d'abord été d'opinion que l'article 16 devrait correspondre aux dispositions des articles 13 et 14, mais elle a par la suite abandonné cette orientation en soutenant que l'article 16 ne veut pas sanctionner la non-utilisation des formes de notification conventionnelle, mais plutôt réparer des injustices qui pourraient sembler choquantes au juge du for.

Pour cette raison, on a repris de l'avant-projet sur l'exécution des jugements deux

éléments que notre avant-projet n'avait pas jusqu'alors utilisés: l'idée de *faute du défendeur*, et l'idée de *non-connaissance*.

Avec ces innovations, même si les formalités prévues au N° 1 de l'article 13 sont remplies et même si au cas du N° 2 du même article le défendeur a été touché à sa demeure, il y a possibilité de faire intervenir l'article 16 si le défendeur prouve que, sans faute de sa part, il n'a pas eu connaissance de l'acte introductif d'instance en temps utile pour pouvoir se défendre. L'article 16 est la dernière barrière de protection des intérêts du défendeur. Il faut toutefois préciser que si le défendeur a reçu la notification même par des voies irrégulières, on considère qu'il a eu connaissance du jugement et l'article 16 ne peut être appliqué.

Des objections raisonnables ont été présentées contre la formule acceptée puisqu'on risque de paralyser les effets du jugement. Il peut sembler injuste qu'on donne encore cette dernière possibilité au défendeur, même si la notification a été faite conformément aux formalités du pays requis ou quand, avec l'emploi des autres voies prévues à la convention, l'acte a été effectivement remis au défendeur ou à sa demeure.

Etant donné cependant que nous nous trouvons dans le domaine très strict du jugement par défaut, étant donné aussi qu'il y a toujours la possibilité que les Etats emploient la faculté de l'article 14 qui fait supporter un certain risque au défendeur, étant donné enfin que l'article 16 donne une faculté au juge mais ne l'oblige pas, nous estimons que la solution adoptée est raisonnable et maintient l'équilibre entre les intérêts du défendeur et ceux du demandeur.

D'ailleurs, en exigeant pour l'application de l'article qu'il n'y ait aucune faute du défendeur et en cumulant l'exigence du N° 2 avec le N° 3, on réduit encore les cas où l'article 16 pourra être employé et on amoindrit ainsi les risques de cette disposition.

Le système finalement adopté se trouve en accord avec celui qui anime la Convention sur l'exécution des jugements en matière d'obligations alimentaires et l'avant-projet sur l'exécution des jugements en matière patrimoniale, et une telle harmonie des Conventions de La Haye sur ce point paraît digne d'intérêt.

*f*)  La disposition du N° 3 de l'article 16 est identique à celle du N° 2 mais concerne la connaissance du jugement au lieu de l'acte introductif d'instance.

Si le N° 3 utilisait non pas la formule choisie mais prenait en considération le fait que le *jugement n'a pas été notifié* il faudrait reconnaître que la condition visée serait toujours remplie dans les pays qui ne connaissent pas la notification des jugements. Cette constatation apporte un nouvel argument en faveur de l'introduction de l'idée de connaissance dans le problème en analyse.

*g*)  Le dernier alinéa de l'article 16 stipule, comme nous le savons déjà, que le relevé de la forclusion ne peut être accordé que si la demande est formulée dans un délai raisonnable à partir du moment où le défendeur a eu connaissance du jugement.

L'expression *délai raisonnable* a été choisie de préférence à celle de *bref délai*. La Commission a décidé d'éviter cette dernière expression peu juridique qui peut trouver justification dans le champ des contrats mais qui serait difficilement adaptée à l'utilisation d'un recours très spécial.

Quelques Experts se sont toutefois orientés dans le sens de fixer un délai concret dans la convention. On a voulu éviter cette solution parce qu'un délai fixe pourrait être raisonnable dans un pays et ne pas l'être pour l'autre et pourrait ainsi se trouver selon les circonstances trop long ou trop court. D'ailleurs les inconvénients d'un délai même raisonnablement long ne sont pas grands étant donné que la possibilité de relever de la

forclusion ne suspendra pas l'exécution du jugement. De plus, comme il s'agit d'une faculté, le juge ne l'utilisera pas lorsque le délai dans lequel elle a été demandée lui paraîtra trop long.

On a aussi envisagé de se référer au délai fixé par le droit interne. Le système n'a pas été retenu parce qu'il créerait un enchevêtrement du droit conventionnel et du droit interne. D'ailleurs il peut fort bien ne pas exister de délai du tout dans les droits internes qui ignorent l'institution du relevé de la forclusion.

La Commission s'en est donc tenue à la formule analysée. Le juge pourra évidemment prendre comme délai raisonnable le délai prévu, le cas échéant, par sa propre loi. On peut admettre qu'on fait implicitement référence avec cette expression au droit interne des Etats.

La Commission n'a pas été favorable à la possibilité d'envisager l'extension de l'application de l'article 16 au cas où le défendeur se trouvant dans l'Etat du for au moment de la notification de l'acte introductif d'instance, et n'ayant pas eu connaissance dudit acte quoique celui-ci ait été régulièrement notifié selon les normes internes du for, va s'établir dans un autre Etat contractant avant que le jugement ne soit rendu. La Commission n'a pas voulu donner de solution à ce cas où l'élément international décisif intervient postérieurement à l'acte introductif d'instance.

### XVIII. FRAIS (ARTICLE 17)

#### A. PRINCIPES

L'article 17 reprend dans son alinéa premier le même principe de gratuité qui figurait déjà dans l'article 7, alinéa premier de la Convention de 1954 [1].

Mais l'alinéa 2 établit immédiatement deux cas où l'Etat requis peut néanmoins exiger d'être remboursé par l'Etat requérant, et cela malgré les arguments avancés par l'Expert allemand dans le sens de la suppression pure et simple du remboursement en vue de la simplicité et d'une économie administrative.

*a)* Il s'agit tout d'abord du cas où la notification à effectuer dans l'Etat requis exige l'intervention d'un officier public ou d'une personne compétente: dans ce cas les frais sont plus élevés que lorsque la notification est faite par l'intermédiaire des autorités étatiques ou par voie postale. Il est donc juste que l'expéditeur supporte les frais qu'il a provoqués.

Voici un exemple illustrant le fonctionnement de cette disposition: si une notification est demandée à la Suisse ou au Portugal, où elle doit être faite par l'intermédiaire de fonctionnaires ou par voie postale, aucun remboursement ne sera demandé par ces pays. Si une demande de notification émanant de Suisse ou de Portugal requiert en France l'intervention d'un huissier il y aura lieu à remboursement des frais provoqués par l'intervention de cet officier ministériel. Ces frais devront être supportés par l'expéditeur mais leur paiement est garanti par l'Etat requérant qui, en vertu des dispositions de l'avant-projet, a l'obligation de remboursement.

On ne pourrait pas admettre que les entités requises puissent être obligées à supporter les frais dus par des services qui leur sont demandés au profit d'étrangers, frais qui dans l'ordre interne sont supportés par les particuliers lorsqu'ils veulent les utiliser.

Etant donné que la Commission adopte comme point de départ la Convention de 1954

---

[1] Ce chapitre est nécessairement long, malgré l'importance mineure du problème, parce qu'on a chargé le Rapporteur de développer et concrétiser différentes idées amorcées par la Commission. On espère ainsi faciliter la tâche de la Dixième session.

qui se développe purement sur le plan interétatique, elle n'a pu se libérer de l'idée fonda-
mentale contenue dans cet article selon laquelle les questions de frais devraient être réglés
entre Etats. Cela explique pourquoi il a été décidé que ce sera l'Etat requis lui-même qui
demandera le remboursement des frais à l'Etat requérant. Nous verrons plus loin combien
il est difficile de maintenir ce principe dans le système de l'avant-projet et même de le
conjuguer avec l'alinéa 3 de l'article 17.

*b*) Outre le cas mentionné, le remboursement est encore dû lorsqu'on demande l'emploi
d'une forme spéciale de notification selon l'article 6, alinéa 2. Il s'agit par exemple du cas
où l'on demande une notification à personne ou à domicile dans un pays où un tel type
de notification n'est pas connu. Dans cette hypothèse on demande à l'Etat requis une
activité spéciale qui ne lui est pas habituelle. Il est donc naturel que celui-ci exige un
remboursement pour ce service.

### B. MODE DE REMBOURSEMENT

L'alinéa 3 de l'article 17 s'éloigne, dans une certaine mesure, du principe établi à l'alinéa 2
Cette disposition permet en effet à l'Autorité centrale de l'Etat requis de réclamer le
remboursement à l'expéditeur. On sort donc du plan interétatique.

Au cours des discussions on a fait valoir que le principe de l'alinéa 2 est tout à fait
raisonnable dans le système de la Convention de 1954 où la notification à l'étranger est en
principe effectuée par l'intermédiaire des agents consulaires de l'Etat requérant qui
s'adressent aux autorités compétentes de l'Etat requis. Certains Experts ont justement pensé
que ce principe cadrait mal avec l'avant-projet qui a créé l'Autorité centrale à laquelle les
autorités et officiers ministériels de l'Etat requérant doivent s'adresser et qui permet
également qu'une autorité ou officier ministériel de l'Etat requérant s'adresse directement
aux autorités ou officiers ministériels de l'Etat requis (article 10 N° 2).

Finalement on a maintenu le principe de l'alinéa 2 tout en lui apportant de graves
atteintes en établissant les nouvelles prescriptions du N° 3 qu'on peut ainsi résumer:

– le remboursement est demandé à l'expéditeur par l'Autorité centrale requise;

– l'Autorité centrale requise a la faculté d'exiger une avance pour couvrir les frais soumis
à remboursement si l'expéditeur n'est pas une autorité de l'Etat requérant mais un
officier ministériel ou une personne compétente.

Nous étudierons ces deux prescriptions séparément.

*a*) Donnons tout d'abord un exemple pour voir le fonctionnement du premier principe:
si un tribunal portugais demande une notification qui devra se faire en Belgique par
l'intermédiaire d'un huissier, cet huissier pourra adresser la note de frais à l'Autorité
centrale belge qui en demandera le remboursement à l'expéditeur.

1. Ce principe est assez innovateur et il faut constater qu'il porte atteinte à la souveraineté
de l'Etat requérant au sens traditionnel de cette conception dans la mesure où une
Autorité centrale d'un autre Etat – celle de l'Etat requis – pourra s'adresser directement
à ses autorités. Il faut cependant admettre que les applications du principe traditionnel
de la souveraineté subissent des atténuations et que de nos jours on ne peut établir des
lois internationales limitées par un respect exagéré à une notion en pleine évolution.
    En défense du système de l'alinéa 3 on peut avancer que l'Etat requis s'adresse à
l'expéditeur par l'intermédiaire d'une Autorité spéciale dont les pouvoirs sur le plan

international sont définis par une convention. Il faut reconnaître aussi que le principe établi en permettant à l'Autorité centrale de l'Etat requis de s'adresser directement à l'expéditeur est inspiré par l'orientation générale de l'avant-projet tendant à faciliter les procédures. L'avant-projet ne s'est-il pas donné pour but de rendre les méthodes de transmission plus simples et efficaces, pourquoi maintenir des filières inutiles? On peut cependant estimer que le système établi ne donne pas satisfaction complète au principe de simplification qui est à la base de l'avant-projet.

2.  Il faut cependant remarquer que, si l'autorité qui a effectué la notification retourne l'acte directement à l'expéditeur, il y aura une certaine incongruité à faire passer nécessairement la note de frais par son Autorité centrale. Il semble dans la logique du système établi qu'on devrait admettre que l'entité qui a notifié l'acte puisse demander directement le remboursement de ses frais à l'expéditeur.

   Quoiqu'il en soit le remboursement par un expéditeur autre qu'une autorité pourra soulever des difficultés d'ordre pratique. Ces difficultés sont réelles. Nous inclinons à croire, cependant, que leur solution ne doit pas être envisagée dans une convention qui doit établir des principes généraux mais plutôt dans la réglementation à laquelle elle donne lieu dans chaque Etat.

3.  Ceci étant nous nous demandons s'il ne serait pas plus sage de changer des principes qu'on ne respecte plus et d'établir un système en harmonie avec les nouvelles idées contenues dans l'avant-projet.

   Il faut remarquer en effet que la prescription qui figure à l'alinéa 3 modifie et contredit le principe énoncé à l'alinéa 2 de l'article 17. Si on veut maintenir l'alinéa 3 il faudrait, à notre avis, supprimer toute référence aux Etats contractants dans l'alinéa 2 qui traduit un respect apparent à la conception traditionnelle selon laquelle la convention règle uniquement les rapports entre Etats. Son maintien traduirait simplement un respect formel à des idées sans valeur et cela ne nous semble pas acceptable.

   Le système créé par l'alinéa 3 est un vrai système de droit uniforme. Tout cela n'ira pas, à notre avis, sans créer quelques difficultés lors de la signature et la ratification de la convention dans certains Etats.

b) Pour répondre à quelques-uns des inconvénients résultant du fait que l'Autorité centrale requise peut demander le remboursement des frais à l'expéditeur on a inclus, dans l'alinéa 3, un second principe selon lequel l'Autorité centrale peut exiger une avance pour couvrir les frais soumis à remboursement si l'expéditeur n'est pas une autorité étatique.

1.  Cette disposition ne pourra prévenir que quelques-uns des inconvénients énoncés, et particulièrement ceux qui concernent l'efficacité pratique du système et les difficultés éventuelles d'obtenir le remboursement par un expéditeur qui ne soit pas une autorité.

   Mais même dans le strict domaine de l'efficacité pratique, le concept énoncé n'est pas à notre avis satisfaisant.

   En effet la demande d'avance de frais donnera lieu à des retards difficiles à conjuguer avec le principe de l'entraide judiciaire que l'on veut développer.

2.  Il est aussi un peu choquant que dans la vie internationale, où précisément la courtoisie est traditionnelle, on permette une telle demande anticipée.

3.  Bref, nous estimons que la disposition visée ne résout ni les objections de principe que nous avons soulevées ni les difficultés pratiques. Le système en question accentue le caractère de droit uniforme que prend l'article 17, il n'évite pas la contradiction

entre ses alinéas 2 et 3, il ne satisfait pas à l'objection basée sur l'atteinte à la souveraineté de l'Etat requérant, il risque de compliquer la signature et la ratification de la convention par quelques Etats membres de la Conférence, et finalement porte atteinte au principe de l'entraide judiciaire.

### C. AUTRE SOLUTION ENVISAGÉE PAR LA COMMISSION

Le but qu'on veut atteindre a paru à certains Experts pouvoir être obtenu par une autre voie.

Ce que l'on avait en vue était de faciliter et de rendre plus efficace le remboursement des frais en voulant, de surcroît, respecter le principe que la convention doit régler les relations entre Etats, idée reprise de la Convention de 1954.

Les Conventions entre le Royaume-Uni et quelques Etats membres comme la Belgique et le Portugal montraient un chemin à suivre. Par exemple l'article 7 de la Convention belgo-britannique stipule:

> *Le remboursement est réclamé par l'autorité judiciaire requise à l'autorité consulaire requérante en même temps qu'elle lui fait parvenir l'attestation prévue . . .*

Cette disposition établit le principe du remboursement, dû par l'Etat requérant, par l'intermédiaire du consul compétent.

L'application de la formule à notre avant-projet soulèverait des problèmes. En effet le système de l'avant-projet n'est pas basé sur la voie consulaire qui a pris un rôle simplement subsidiaire. Mais il est évidemment possible d'adapter la disposition à la technique de l'Autorité centrale créée par notre convention.

On pourrait conserver le principe selon lequel l'autorité requise demanderait le remboursement à l'expéditeur, mais en rendant toujours responsable l'Etat requérant *par l'intermédiaire de sa propre Autorité centrale*.

En ce qui concerne la demande de remboursement, il semble que l'intervention de l'Autorité centrale *requise* n'est pas toujours nécessaire. C'est l'entité qui est directement intervenue dans la notification qui est intéressée au remboursement. La filière consistant à l'obliger à passer par son Autorité centrale ne représente dans ce cas aucun avantage.

Il n'en est pas de même en ce qui concerne la concrétisation du remboursement. On peut considérer avantageux que celui-ci puisse être toujours demandé à une entité responsable qui offre des garanties. Cette entité devrait être dans le système de la convention *l'Autorité centrale de l'Etat requérant*, c'est-à-dire l'organe directement institué par cet Etat pour s'occuper de ces matières. Toutefois il ne serait nécessaire de faire intervenir l'Autorité centrale de l'Etat requérant qu'au cas où le remboursement par l'expéditeur deviendrait difficile.

Etant donné que l'avant-projet prévoit la possibilité des relations directes d'autorité à autorité, d'officiers de justice à officiers de justice, il n'y a pas de raison pour ne pas admettre que l'entité requise demande directement le remboursement à l'expéditeur. Mais, même dans ce cas, pour donner satisfaction à l'idée que seul l'Etat peut offrir des garanties suffisantes de remboursement, on pourrait envisager que l'Etat requérant garantisse le remboursement par l'intermédiaire de son organe adéquat, c'est-à-dire sa propre Autorité centrale.

On éviterait de cette façon les difficultés pratiques, le biais employé porterait une atteinte, certaine mais mineure, au principe de l'article 2, et on satisferait au but de simplicité et d'efficacité poursuivi par l'avant-projet.

L'intervention de l'Autorité centrale de l'Etat requérant, même subsidiaire et réservée aux cas où il y a des difficultés de remboursement, maintiendrait le principe de l'alinéa 2 qui attribue la responsabilité du remboursement à l'Etat requérant, puisque l'Autorité centrale est un organe de celui-ci ou, tout au moins, une entité agissant par délégation d'une autorité étatique.

Etant donné que l'avant-projet n'exclut pas la voie consulaire, quoiqu'il ne la conseille pas non plus, il est évident que dans le cas où le consul interviendrait l'entité requise pourrait demander le remboursement à l'autorité consulaire requérante. Dans un tel cas on respecterait aussi le principe de l'alinéa 2 puisque l'agent consulaire est un agent de l'Etat requérant.

Dans la ligne de ces idées on pourrait proposer que le texte suivant remplace l'alinéa 3 de l'article 17:

*Le remboursement est réclamé à l'expéditeur par l'entité qui a engagé les frais, en même temps qu'elle lui fait parvenir l'attestation prévue à l'article 7. Toutefois, si les circonstances l'exigent, le remboursement pourra être réclamé à l'Autorité centrale de l'Etat requérant.*

On ne mentionnerait pas la faculté de recourir au consul quand il est intervenu en transmettant la demande, parce que cette possibilité est évidente. On devrait simplement songer au système normal de l'avant-projet organisé autour de l'Autorité centrale et non à la transmission par la voie consulaire subsidiaire.

La solution figurant dans l'article 17 a été adoptée à la majorité de 4 voix contre 3 et 3 abstentions, trois Experts étant absents. Pour cette raison le Président et le Secrétaire général ont demandé que les deux solutions soient expliquées dans le rapport. Le Président a chargé le Rapporteur de préparer un texte correspondant au système concurrent, c'est ce qui a été fait.

### D. SOLUTION PROPOSÉE PAR LE RAPPORTEUR

Le Rapporteur se permet cependant de suggérer encore une troisième solution.

Cette solution tient compte du fait que le principe du N° 2 de l'article 17, repris de la Convention de 1954, est en effet périmé dans le système de l'avant-projet. Il faut reconnaître que l'avant-projet ne se développe pas sur le plan interétatique dans le sens formel du terme puisqu'il est admis d'une part que l'Autorité centrale s'adresse à des entités d'autres Etats, même si ces entités ne sont pas des autorités, et d'autre part est prévue la communication directe entre autorités ou officiers ministériels des différents Etats.

On peut estimer encore qu'il n'est pas nécessaire de tirer les conséquences ultimes du principe traditionnel de la souveraineté dans la matière qui fait l'objet de notre convention.

Enfin il faut admettre que le règlement de la question des frais est un point d'une importance secondaire et qu'il serait sage de l'abandonner à la réglementation concrète que chaque Etat établira en application de la convention. La vie pratique apportera la solution au problème, d'ailleurs l'état actuel des rapports internationaux prouve qu'il en est ainsi dans d'autres domaines.

Si l'expéditeur est estimé mériter du crédit par l'entité requise, celle-ci donnera suite à la demande sans difficulté ni objection. Si au contraire l'entité requise a des doutes sur ce point elle prendra des dispositions adéquates en demandant éventuellement une avance.

Ceci étant il semble qu'on puisse suggérer une solution très simple consistant à biffer l'alinéa 3 de l'article 17 et à rédiger l'alinéa 2 de la manière suivante:

*Toutefois l'expéditeur devra rembourser les frais qui seraient occasionnés par l'intervention d'un officier ministériel ou d'une personne compétente selon la loi de l'Etat requis ou par l'emploi d'une forme spéciale dans le cas de l'article 6, alinéa 2.*

### XIX. ASSISTANCE JUDICIAIRE GRATUITE (ARTICLE 18)

Le texte de l'article 18 de l'avant-projet avait été présenté par le Comité de rédaction dans la disposition qui avait trait aux frais. La Commission spéciale a cependant cru opportun de séparer les deux dispositions du fait que leur portée est différente quoiqu'elles concernent toutes les deux la question des frais. L'article 17 prévoit le remboursement d'Etat à Etat, alors que l'article 18 concerne l'assistance judiciaire.

On a suggéré la suppression pure et simple de l'article 18 étant donné l'existence de l'article 24 de la Convention de 1954 qui est ainsi conçu:

*Si le bénéfice de l'assistance judiciaire a été accordé à un ressortissant d'un des Etats contractants, les significations quelle qu'en soit la forme, relatives à son procès, et qui seraient à faire dans un autre de ces Etats, ne donneront lieu à aucun remboursement de frais par l'Etat requérant à l'Etat requis.*

Cette suggestion n'a pas été acceptée étant donné que la nouvelle convention pourra être indépendante de la Convention de 1954.

D'ailleurs l'article 24 de la Convention de 1954 ne s'applique qu'aux voies prévues par celle-ci, si bien que l'avant-projet doit, en tout cas, contenir une règle relative à l'assistance judiciaire au sujet de l'intervention de l'Autorité centrale.

Sur la question du fonctionnement de l'assistance judiciaire dans la portée de l'avant-projet, la Commission a pensé qu'il ne faudrait pas entrer dans les détails d'autant plus que le problème est considéré dans son ensemble au Titre IV de la Convention de 1954.

On n'a donc pas tranché la question de savoir si, pour que l'Etat requis accorde l'assistance judiciaire, il faudra ou non doubler la demande initiale dans l'Etat requérant d'une seconde demande adressée dans l'Etat requis. Il nous semble que la décision obtenue dans l'Etat requérant devrait être suffisante.

Nous croyons encore que l'Etat requis ne pourra accorder l'assistance judiciaire que dans la mesure où il la connaît et selon les modes fixés par sa propre législation.

La solution de l'article 18 respecte un progrès social représenté par l'article 24 de la Convention de 1954. Mais la question est considérée ici de façon différente en tenant compte de la technique créée par l'avant-projet.

### XX. DIFFICULTÉS D'APPLICATION (ARTICLE 19)

L'article 19 de l'avant-projet reprend le principe énoncé à l'article premier, alinéa 2 de la Convention de 1954.

Cette Convention établissait comme mode normal de communication la voie consulaire et visait donc *les difficultés qui s'élèveraient à l'occasion de la demande du consul.*

L'avant-projet établit un autre mode principal de transmission des actes tout en admettant des voies subsidiaires parmi lesquelles figure la voie consulaire. L'article 19 a donc une portée beaucoup plus large et concerne toutes les difficultés qui pourraient s'élever dans l'application de la convention.

L'article 19 est l'ultime garantie du système contenu dans l'avant-projet.

**Appendix 060**

## XXI. ACTES EXTRAJUDICIAIRES (ARTICLE 20)

L'article 20 fait application de la convention aux actes extrajudiciaires.

Il a pour but de mettre à la disposition des justiciables et à propos des actes extrajudiciaires, les modes de transmission prévus et particulièrement celui de l'Autorité centrale.

Mais la convention ne pourra être appliquée qu'à la transmission internationale des actes émanant d'autorités, ou officiers ministériels d'un Etat contractant agissant ès-qualité.

Il faut noter que les notaires sont inclus dans la catégorie des officiers publics et ils pourront ainsi demander, le cas échéant, la transmission internationale de leurs actes. Nous pensons par exemple à un cas pratique, celui de la notification par un notaire d'un projet de mariage d'un enfant mineur au père ou à la mère qui refuse de donner son consentement et qui réside à l'étranger.

L'avant-projet ne fait pas de référence au mode de transmission des actes émanant de personnes privées. Il a été décidé que la convention ne devrait pas être appliquée s'il n'y avait pas, à l'origine, un acte d'une entité officielle qui puisse effectuer un tri ou un contrôle. L'avant-projet vise le cas où, sous une forme ou une autre, on demande la coopération des autorités des Etats contractants.

Les actes extrajudiciaires seront donc transmis selon les modes et aux conditions fixés dans l'avant-projet pour les actes judiciaires. La transmission et la notification des actes extrajudiciaires seront régies par toutes les dispositions de l'avant-projet dont le contenu est susceptible de s'appliquer à leur égard.

Notamment l'article 17 relatif aux frais trouvera application. Il est donc évident d'un autre côté que les dispositions des articles 13 et 14 concernant l'acte introductif d'instance et celle de l'article 16 concernant les jugements par défaut ne seront pas susceptibles d'application aux actes extrajudiciaires.

Dans le domaine des actes extrajudiciaires il n'y avait pas de raison de rendre obligatoires les voies de la convention par une sanction même indirecte. Seules comptaient, pour ces actes, la facilité et la rapidité de la transmission.

## XXII. LE PROBLÈME DU DOMICILE INCONNU

### A. ÉNONCÉ DU PROBLÈME

Cette difficulté a occupé la Commission mais elle n'a pas trouvé le temps pour établir une réglementation concrète du problème. C'est pourquoi nous croyons utile d'indiquer dans ce rapport les courants d'opinions et la solution que nous envisageons.

Le problème est de savoir si l'Etat requis devrait prêter son concours pour l'affichage ou la publication d'une notification en provenance de l'étranger, quand il y a des raisons sérieuses de croire que le défendeur se trouve dans le pays requis, sans que l'on sache exactement où.

Le problème préoccupait surtout les Experts de quelques pays, comme la Suisse, qui emploient beaucoup d'ouvriers étrangers. Ces ouvriers se déplacent souvent et lorsqu'une notification doit leur être faite, par exemple pour une action en recherche de paternité, ils retournent dans leur Etat d'origine.

Quelques Experts ont estimé que le problème en question ne pouvait pas être résolu dans l'avant-projet et que la solution devrait être trouvée sur le plan du droit interne. Chaque Etat a une législation particulière pour la notification en cas de domicile inconnu, c'est donc à la loi du tribunal saisi de résoudre le problème.

Cependant dans une phase ultérieure les difficultés résultant de l'aspect international du problème risquent de prendre un caractère plus aigu, particulièrement dans la phase d'exécution du jugement par défaut, étant donné que le défendeur n'a pu être touché, son domicile étant inconnu. Dans cet ordre d'idées on a pensé que le problème ressortissait aux Conventions relatives à la reconnaissance et à l'exécution des jugements. Par exemple, le Nº 4 de l'article 5 de l'avant-projet de convention sur l'exécution envisage le cas.

Nous croyons cependant que la question est celle de déterminer la mesure dans laquelle on peut demander à un Etat requis une aide pour la découverte de l'individu dont le domicile est inconnu quoique l'on suppose qu'il ait des attaches avec l'Etat requis.

On peut admettre que la courtoisie internationale résoudra la difficulté dans la plupart des cas, nous pensons cependant qu'il serait plus avantageux qu'on définisse, dans l'avant-projet, l'entraide que les Etats devraient conventionnellement se donner dans cette hypothèse.

### B. ASPECTS PRATIQUES DU PROBLÈME

Examinons certaines questions concrètes:

*a*) L'Etat requis devra-t-il faire des investigations pour trouver la personne dont le domicile est inconnu?

Il est évident que l'on ne peut pas être très exigeant sous cet aspect, et trop demander à l'Etat requis. On ne pourrait pas, notamment, lui demander de sortir du cadre de sa propre législation.

*b*) L'Etat requis devra-t-il permettre l'affichage dans un lieu où la personne recherchée puisse avoir son attention attirée?

Nous estimons que l'Autorité centrale pourra apporter son aide dans la mesure où les exigences de la loi interne sont respectées.

*c*) L'Etat requis devra-t-il faire procéder à la publication d'annonces pour toucher le défendeur?

Nous penchons encore une fois pour l'affirmative tout au moins en ce qui concerne la publication gratuite dans des journaux officiels ou d'annonces légales.

Selon le système de l'avant-projet on a créé l'Autorité centrale pour organiser l'entraide judiciaire. Nous croyons que ce ne serait pas trop que de lui demander de faire publier des annonces dans le journal officiel du pays.

Nous irons même plus loin, nous croyons que l'on pourrait demander à l'Autorité centrale de l'Etat requis de faire publier des annonces onéreuses dans un journal local à condition que les frais soient remboursés. Si l'on admet cette solution il faudrait ajuster l'article 17 de l'avant-projet relatif aux frais.

*d*) D'un autre côté et étant donné que l'avant-projet prévoit l'utilisation des voies subsidiaires de transmission et de notification des actes judiciaires, il nous semble qu'en cas de domicile inconnu on pourrait permettre qu'on prenne contact directement avec les entités du pays requis si l'expéditeur l'estime utile. Dans ce cas le problème des frais devrait être résolu dans la ligne des principes que nous avons énoncés plus haut.

*e*) Répétons qu'on ne pourra pas demander à l'Etat requis une aide qui ne soit pas en accord avec sa propre loi. Si l'Etat demande l'aide de l'Etat requis en cas de domicile inconnu, celui-ci devra la lui donner dans les termes prévus par sa législation interne.

## C. AVANTAGES DE L'ENTRAIDE

Revenant à la question fondamentale nous estimons que le problème se présente ainsi: le cas du domicile inconnu doit-il être exclusivement résolu dans la portée de la législation du pays du tribunal saisi ou peut-on demander l'aide d'un autre Etat quand le tribunal saisi sait qu'il y a de larges possibilités de trouver le défendeur dans cet Etat?

Nous pensons que le but de l'avant-projet étant d'obtenir autant que possible que le défendeur soit effectivement touché, il serait raisonnable de demander, dans cet esprit, l'entraide internationale.

Ce résultat sera sans doute souhaité par les pays qui sont opposés à la fiction de la notification au parquet, sans pour autant porter préjudice aux Etats qui adoptent ce mode de notification. Cette entraide n'exclut évidemment pas que le tribunal saisi fasse application des règles de son propre droit concernant le problème.

## D. LIMITES DE L'ENTRAIDE

Il va sans dire que dans ce domaine spécial, comme dans les autres, il devra y avoir un certain contrôle de la part de l'Etat requis de nature à sauvegarder son ordre public. Nous croyons cependant, étant donné les limites très strictes de l'ordre public dans la portée de l'avant-projet, qu'on pourrait demander l'entraide judiciaire même pour des notifications en matière de divorce dans un pays qui s'oppose à cette institution si le divorce intéresse des personnes dont la loi personnelle l'admet.

Par contre nous estimons que la sauvegarde de la souveraineté et de la sécurité des Etats permet de résoudre le problème du secret de certains registres administratifs qui sont parfois tenus confidentiels vis-à-vis même des tribunaux internes de ces Etats.

L'avant-projet en créant l'Autorité centrale rend l'exécution de ces idées plus facile puisqu'il détermine l'entité à laquelle on devrait en principe demander l'aide nécessaire, et que celle-ci peut exercer le contrôle désiré.

## E. SOLUTION ENVISAGÉE

Dans la ligne de ce qui vient d'être exposé nous proposerions un texte dont la rédaction pourrait s'inspirer des idées suivantes:

*a*) Si une autorité ou un officier ministériel compétents selon les lois de l'Etat requérant l'estiment utile, ils pourront adresser à l'Autorité centrale de l'Etat requis la demande de mesures de nature à donner connaissance de l'acte introductif d'instance au défendeur à domicile inconnu.

*b*) L'autorité de l'Etat requis devra procéder aux mesures qui lui sont demandées selon les formes connues dans sa propre loi. Bref on donnerait une faculté à l'Autorité du pays requérant et on établirait une obligation à l'égard du pays requis.

L'entraide ainsi demandée n'aurait pas les mêmes conséquences que celles établies pour la transmission de l'acte introductif d'instance à une personne dont le domicile est connu. Dans le cas envisagé il n'y aurait pas lieu d'imposer une sanction, il s'agit seulement d'accorder conventionnellement aux Etats la faculté de demander le concours d'autres Etats contractants pour toucher la personne à domicile inconnu, ce qui correspond au grand principe inscrit dans le préambule de la convention.

Le tribunal saisi doit, dans ce cas, exiger l'accomplissement des règles que sa législation interne établit, mais il pourra en outre utiliser la faculté que la convention lui accorde pour demander que des mesures pour toucher le destinataire soient entreprises dans un autre Etat contractant.

Il nous semble, pour ne pas alourdir le texte à rédiger, qu'il ne faudrait pas faire de référence à la possibilité pour l'Etat requérant de s'adresser à des autorités ou officiers ministériels de l'Etat requis autres que l'Autorité centrale étant donné que cette possibilité est déjà admise par l'article 10 de l'avant-projet.

Il nous paraît aussi qu'on ne devrait pas faire allusion à la possibilité d'intervention de l'ordre public puisque l'idée est impliquée dans l'article 4.

### F. LA SOLUTION ENVISAGÉE DANS LE CONTEXTE DE L'AVANT-PROJET

La disposition en étude pourrait opportunément s'insérer entre les articles 16 et 17 actuels de l'avant-projet.

Etant donné que le nouvel article envisagé ne ferait pas allusion à une *notification* mais à de simples *mesures* à entreprendre par l'Etat requis, il n'y aurait pas de danger que l'on interprète la convention dans le sens que les articles 13, 14 et 16 s'appliquent dans cette hypothèse.

Mais comme le domicile est inconnu, n'y a-t-il pas de risque d'entendre dire qu'on se trouve hors du champ d'application de la convention fixé dans l'article premier qui établit que celle-ci est uniquement applicable dans les cas où il y a lieu de *transmettre ou de notifier un acte . . . à une personne se trouvant à l'étranger?*

Cependant une telle interprétation restrictive ne serait pas justifiée. Si on demande l'entraide judiciaire à un Etat tiers c'est parce qu'il y a de fortes raisons de croire que la personne intéressée se trouve sur son territoire. On retombe alors dans le domaine de l'application de la convention *parce qu'on agit dans la présomption que la personne à notifier se trouve dans l'Etat requis*. Une telle interprétation large de l'article premier, respecte complètement son esprit.

Finalement il ne resterait plus qu'à adapter l'article 17 relatif aux frais, qui d'ailleurs dans la rédaction que nous avons proposée pourrait couvrir le cas.


LISBONNE, AVRIL 1964                                        V. TABORDA FERREIRA

# PROCÈS-VERBAL N° 3

SÉANCE DU LUNDI 12 OCTOBRE 1964

La séance est ouverte à 10 h. sous la présidence de M. Panchaud (Suisse);
Rapporteur: M. Taborda Ferreira (Portugal).

**Le Président** rappelle qu'à la dernière séance il a été discuté des questions générales et de l'article premier de l'avant-projet. En fin de séance, ce texte semblait faire l'objet de l'agrément général avec l'ajoute de la proposition du Délégué suédois désirant y introduire la formule *ou se trouvant à l'étranger*.

Le Président, notant qu'il s'agit là d'une question de rédaction plus que d'une question de fond, suggère qu'elle soit examinée ultérieurement. Il demande s'il reste des questions à formuler au sujet de l'article premier.

**M. Richardson** (Royaume-Uni), dans une première observation, répond au Délégué norvégien, qui se demandait pourquoi cette convention ne s'appliquerait pas à la notification dans tous les cas où la personne se trouve à l'étranger. La rédaction actuelle permet d'envisager le cas de la notification à l'avocat se trouvant à l'étranger, et M. Richardson voudrait, pour cette raison, que soit gardée la rédaction de l'avant-projet. Dans le rapport de M. Taborda Ferreira, il a été fait allusion au danger que le tribunal saisi puisse décider qu'il n'y a pas lieu à notification. Or le préambule de l'avant-projet précise l'objectif de la convention qui est d'assurer la notification des actes aux personnes se trouvant à l'étranger, pour qu'ils ne leur restent pas inconnus.

Dans une seconde observation, M. Richardson pense qu'il est fondamental d'être clair dans l'article premier sur le fait que la convention ne s'applique pas lorsque l'adresse de la personne à qui l'acte est notifié n'est pas connue.

**M. Arnold** (Allemagne) se déclare défavorable dans l'article premier à l'utilisation du mot *transmettre*. Il voudrait que l'on précise en disant soit *dans tous les cas où l'on transmet aux fins de signification ou de notification*, soit *dans tous les cas où il y a lieu de transmettre par l'intermédiaire d'une autorité de l'État requis*.

M. Arnold est en tout cas d'avis qu'il faut restreindre la portée de l'article premier, le cas de l'avocat transmettant un Mémorandum à un avocat étranger, par exemple, n'entre pas dans le cadre de la convention.

**M. Hoyer** (Autriche) propose de supprimer dans l'article premier les mots *à une personne*, car il peut poser des problèmes d'application selon qu'il s'agit d'une personne morale ou non; dans le cas d'une personne morale ou d'une société de commerce, il se peut que le siège se trouve dans le pays du for, tandis que les représentants se trouvent à l'étranger.

**M. Poch y Gutierrez** (Espagne) demande que l'on ne parle pas en même temps de notification et de signification dans la convention. Car ces deux termes se traduisent exactement de la même manière en espagnol.

**Appendix 065**

M. Poch y Gutierrez serait d'accord d'employer le mot *notification* dans le sens qu'il a dans la Convention de 1905, ou bien un autre terme neutre permettant d'éviter dans la traduction espagnole de la convention la répétition du même mot.

**M. Soulard** (Union internationale des Huissiers) signale qu'il a été question de *transmission* pour éviter les mots *signification* et *notification,* mais il faut remarquer que la transmission n'aboutit pas nécessairement à une notification ou à une signification.

Comme M. Arnold, il pense que la transmission concernerait toutes les pièces d'une affaire alors que seule la transmission des actes de procédure intéresse la Commission.

M. Soulard fait en outre remarquer que l'on a gardé dans l'avant-projet les termes *matière civile ou commerciale* utilisés dans les Conventions adoptées jusqu'ici, notamment la Convention sur la procédure civile. Or, il a observé qu'un Délégué dans une séance antérieure a parlé de matières fiscales et sociales. Depuis 1905, en effet, ces matières se sont ajoutées ainsi que d'autres, telle que le droit au travail, par exemple. Il se demande s'il faut classer toutes ces matières nouvelles dans les matières civiles ou s'il est préférable d'employer une expression les englobant toutes, telle que: *Dans toutes les matières, à l'exception de la matière pénale.*

En ce qui concerne le point touchant aux personnes se trouvant à l'étranger, il se rallie à la proposition exprimée vendredi par M. Bellet. L'expression *se trouvant* n'est pas parfaite et l'on peut penser à *domicilié, habitant,* etc. Il vaut mieux s'en tenir à une expression neutre comme *signification à l'étranger.* Quant à savoir quelle loi serait compétente pour déterminer les cas où elle devrait avoir lieu, M. Soulard suggère que ce soit celle de l'Etat requérant.

Au sujet de l'étendue d'application de la convention, M. Soulard suggère une rédaction de ce type:

*La présente Convention est applicable dans tous les cas où il y a lieu de transmettre un acte judiciaire ou extrajudiciaire aux fins de notification ou signification, en toutes matières, à l'exclusion des matières pénales.*

**M. Amram** (Etats-Unis) propose le texte suivant:

*La Convention est applicable dans tous les cas où il y a lieu de transmettre un acte judiciaire ou extrajudiciaire en matière civile ou commerciale aux fins de notification à l'étranger.*

Ce texte laisse toutefois ouverte la question de savoir s'il faut modifier l'expression *en matière civile ou commerciale.*

Il fait remarquer que le texte ainsi présenté soulève deux questions: celle d'une documentation appropriée et celle de l'expression *aux fins de notification à l'étranger.*

**M. Van Reepinghen** (Belgique) informe la Commission de ses préoccupations au sujet de la terminologie de cet article eu égard au projet de réforme judiciaire présenté en ce moment à l'assentiment du Parlement belge. Dans ce projet, qui a reçu l'adhésion de la Commission de la Justice du Sénat, le Gouvernement belge s'est occupé d'établir une différence entre *signification* et *notification.* Dans son optique, la *signification* consiste dans la remise d'une copie de l'acte par exploit d'huissier alors que la *notification* est l'envoi d'un acte de procédure dans les cas et les formes prévus par la loi, à l'exclusion de l'intervention par huissier.

M. Van Reepinghen relève donc que le mot *notification* ne comprend pas en Belgique tout ce que la Conférence veut lui faire dire. La nécessité d'être aussi complet que possible plaide en faveur de l'utilisation des deux termes. Une autre solution serait d'envisager une

forme neutre telle que : *afin de porter cet acte à la connaissance des parties dans les formes prévues par la loi.* Ces formes étant déterminées par la loi du lieu où cette signification sera faite.

**M. Puhan** (Yougoslavie) distingue deux phases. Celle de la transmission, décrite dans l'article premier et celle de la notification ou de la signification, évoquée dans l'article 6 de l'avant-projet. Il estime que le plus important à l'article premier est d'accepter les précédentes propositions hollandaise et française suggérant d'employer les termes *transmettre à l'étranger*. Quant aux propositions suédoise et autrichienne, M. Puhan pense, notamment pour le cas présenté l'autre jour par la Suède, qu'elles supposent une certaine mauvaise foi entre les Etats. Il appuie M. Arnold lorsqu'il dit qu'en parlant de transmission on n'en voit pas les limites juridiques, qui à son avis, sont celles prévues par les lois de l'Etat requérant.

M. Puhan propose le texte suivant :

*La présente Convention est applicable dans tous les cas où, selon la loi de l'Etat requérant, il y a lieu de transmettre aux fins de notification, . . .*

**Le Président**, après une intervention dans le même sens de M. Loeff, demande à ce dernier, si une telle disposition couvrirait la signification à parquet telle qu'elle est connue aux Pays-Bas.

**M. Loeff** (Pays-Bas) affirme qu'il n'y a aucun doute à cet égard.

**M. Loussouarn** (France) rappelle qu'en France existe la distinction opérée par M. Van Reepinghen entre la signification et la notification. Il soutient d'autre part la proposition des Etats-Unis, car il la juge utile de parler de *transmission aux fins de notification ou de signification.*

Le Délégué français propose à son tour un texte pour l'article premier : ·

*La présente Convention est applicable dans tous les cas où il y a lieu, en matière civile ou commerciale, de transmettre aux fins de signification ou de notification un acte judiciaire ou extrajudiciaire.*

**Le Président** déclare que cette proposition correspond à l'idée générale et sera transmise au Comité de rédaction.

**M. Van Reepinghen** (Belgique) marque son accord avec la proposition de M. Loussouarn, mais se demande si elle fait référence à la loi de l'Etat requérant.

**Le Président** estime que la proposition de M. Loussouarn convient pour le cas de la signification à parquet, mais il demande au Délégué français si le parquet en France à l'obligation de transmettre l'acte judiciaire à l'étranger.

**M. Flore** (Italie) pense qu'il pourrait être utile de prévoir pour une meilleure interprétation de la convention, que lorsque la loi du pays requérant n'oblige pas à transmettre à l'étranger, on doive le mentionner. Il pense que la formule actuelle, plus souple, et offrant moins de doute pour le juge, constituerait une règle de droit matériel propre à la convention. Il s'oppose à l'addition préconisée par M. Puhan ; en effet, un renvoi à la loi interne peut s'avérer dangereux parce qu'il permet à celle-ci de déterminer les cas dans lesquels la transmission n'est pas obligatoire.

**Le Secrétaire général** constate que la Commission touche au problème central de la convention : celui de savoir si celle-ci va obliger les Etats qui connaissent la notification à parquet à signifier selon les lois locales. Il complète l'affirmation de M. Loeff sur la question de la notification à parquet : si la loi néerlandaise oblige la transmission de l'acte au Ministère des Affaires Etrangères, il faut reconnaître qu'il n'y a pas d'obligation pour celui-ci de transmettre cet acte au destinataire, même si dans la pratique il en est bien ainsi. Il ne s'agit pas d'une disposition de la loi écrite, mais de l'application de la coutume.

Le Secrétaire général met en exergue les deux buts de la convention : trouver dans la loi de l'Etat requérant les cas de transmission, et obliger les Etats qui connaissent la signification à parquet de transmettre l'acte et d'en faire la notification à l'étranger. La suggestion de M. Loussouarn enlève cette possibilité et il est nécessaire pour la Commission de décider sur ces deux principes.

**M. Arnold** (Allemagne) se rallie entièrement à la proposition de M. Loussouarn et, bien que d'accord avec le Délégué yougoslave désirant que la loi de l'Etat requérant décide des méthodes de notification, il estime qu'on ne peut éviter la référence à la législation du pays requis.

En effet, il peut arriver que selon la législation de l'Etat requérant il soit possible de transmettre à l'étranger sans recourir à l'aide du pays requis ; mais il se peut aussi que celui-ci puisse interdire une telle procédure. Aussi est-il encore préférable de ne rien dire du tout, afin d'éviter de difficiles problèmes de qualification.

En ce qui concerne le cumul des mots *signification et notification*, satisfait par la proposition de M. Van Reepinghen préconisant leur double emploi, il propose à M. Poch y Gutierrez de n'utiliser qu'un seul des deux mots dans la traduction espagnole, comme cela s'est fait pour les conventions précédentes.

**M. Poch y Gutierrez** (Espagne) rétorque que le problème reste entier parce que précédemment il n'a jamais été question que de *signification*. Ajouter le mot notification posera des problèmes aux traducteurs espagnols de la convention.

**Le Président** est d'avis qu'il s'agit plutôt là d'un problème de rédaction et manifeste plus de préoccupation pour le choix à faire entre les expressions *s'il y a lieu* et *loi de l'Etat requérant*.

**M. Puhan** (Yougoslavie) prétend que les mots *s'il y a lieu* n'apportent rien car ils ne forcent pas les Etats à changer le système de la notification à parquet. L'expression est en fait un renvoi à la *lex fori*.

**M. Loussouarn** (France) fait part à la Commission du texte de l'article 69, alinéa 10 du Code de procédure civile français, qui prévoit que seront assignés :

*Ceux qui habitent à l'étranger, au même parquet qui, dans les mêmes conditions, enverra la copie au Ministère des Affaires Etrangères ou à toute autre autorité déterminée par les conventions diplomatiques.*

Cette seconde alternative n'est donc qu'une obligation de transmettre l'acte à l'autorité qui sera désignée par la convention. Le Délégué français affirme que ses hésitations venaient plutôt du fait que si cette obligation de transmettre existe, elle n'existe vraiment que si elle est assortie de sanctions. Or, il faut bien reconnaître que si le parquet ne transmet pas, il

n'y a pas de sanction. Toutefois, il reconnaît que les articles 13, 14 et 16 de l'avant-projet de convention remédient à cela.

Dans le choix des formules *s'il y a lieu* ou *loi de l'Etat requérant*, il ne voit pas en quoi la seconde expression étend le domaine de la convention; au contraire, puisqu'elle laisse à l'écart les cas de notification à parquet. Lorsque M. Puhan dit que l'expression *s'il y a lieu* donne la compétence à la *lex fori*, il lui semble personnellement que *lex fori* et *loi de l'Etat requérant* sont les mêmes puisque c'est dans l'Etat requérant que la décision de transmettre aura été prise par le tribunal.

**Le Secrétaire général** signale que la Commission spéciale a préféré que la convention s'applique dans tous les cas où il y a lieu de transmettre à une personne se trouvant à l'étranger. L'idée directrice est en effet qu'une personne veut signifier un acte à une autre se trouvant à l'étranger. C'est pourquoi la disposition de l'article premier de l'avant-projet lui semble la mieux appropriée.

**M. Loeff** (Pays-Bas) croit que la situation aux Pays-Bas est à peu près identique à celle exposée par M. Loussouarn pour la France. Il y a en fait aux Pays-Bas une réelle obligation du parquet et du Ministère des Affaires Etrangères de transmettre à l'étranger. Quant à la signification au parquet, il est inévitable qu'aux Pays-Bas ce système soit maintenu. A son avis, bien que la transmission à l'étranger ait son importance, la signification au parquet est le moment décisif puisque c'est à ce moment qu'il faut se placer, par exemple, pour le départ des délais.

**Le Président** constatant que de nombreux points de rédaction restent à résoudre, propose de les confier au Comité de rédaction. D'ici là, il lui paraît inutile pour la Commission de prendre des décisions en faveur d'une référence à la *lex fori* non plus que sur le choix entre les mots *notification, signification* ou *transmission*. Il pense que le débat sur l'article premier est assez développé jusqu'à présent et qu'il pourra s'achever lorsque le Comité de rédaction proposera un autre texte.

**Le Rapporteur** ajoute que lorsque la convention aura été acceptée il s'y trouvera une sanction indirecte dans son article 13 qui permet aux juges, dans certains cas, de surseoir à une décision.

**Le Président** estime que la rédaction de l'article 13 pose les mêmes problèmes qu'à l'article premier, en raison de l'emploi des termes *a dû être notifié*, qui sous-entendent l'intervention de la *lex fori* ou de la loi de l'Etat requérant. Il suggère dès lors d'attendre d'être arrivé à l'article 13 de l'avant-projet pour reprendre ce débat. Entre-temps, il propose comme Président du Comité de rédaction M. Loussouarn, Délégué de la France.

CETTE PROPOSITION EST ACCEPTÉE PAR ACCLAMATION.

**M. Droz** (Secrétaire au Bureau Permanent), sur proposition du Président, lit L'ARTICLE 2 de l'avant-projet de la convention:

# RAPPORT EXPLICATIF DE M. V. TABORDA FERREIRA

## I. Introduction

Lors de la Dixième session de la Conférence de La Haye de droit international privé, la Troisième commission a été chargée d'étudier l'avant-projet de convention du 14 février 1964, adopté par la Commission spéciale et concernant une «Convention remplaçant le titre I de la Convention de La Haye du premier mars 1954 relative à la procédure civile».

Sous la présidence de M. Offerhaus, Président de la Dixième session, MM. Panchaud et Amram ont été élus par acclamation respectivement Président et Vice-président de la Troisième commission. Le signataire a été, de son côté, élu Rapporteur.

## II. Objet de la révision; ses buts fondamentaux

Les buts fondamentaux de la révision entreprise sont les suivants:

*a*) Etablir un système qui porte, autant que possible, l'acte notifié ou signifié à la connaissance réelle du destinataire en temps utile pour que le défendeur puisse se défendre.

*b*) Simplifier le mode de transmission de ces actes du pays requérant au pays requis.

*c*) Faciliter la preuve que la signification ou la notification a été effectuée à l'étranger, par le moyen des attestations incluses dans une formule uniforme.

Pour arriver à ces buts on a accepté les principes suivants:

*a*) Imposer comme obligatoires les dispositions de la convention, par la création d'une «sanction indirecte» (art. 15 de la convention).

Quand la transmission de l'acte introductif d'instance ou d'un acte équivalent a dû être faite à l'étranger aux fins de signification ou de notification selon les dispositions de la convention, et si le défendeur ne comparaît pas, le juge est tenu de surseoir à statuer aussi longtemps que certaines conditions ne seront pas réunies.

Cette sanction indirecte a surtout eu pour but de défendre les intérêts du défendeur. Dans la deuxième partie de l'article 15 on a cependant tenu compte des intérêts légitimes du demandeur.

La convention a cherché un équilibre raisonnable entre les intérêts des deux parties et «ceux des Etats directement intéressés aux significations d'actes opérés sur leur territoire»[1].

Dans le même sens, la convention (art. 16) a établi la faculté, pour le juge, de relever le défendeur de la forclusion si certaines conditions sont réunies.

*b*) Etablir le système de *l'Autorité centrale*, comme moyen normal de transmission des actes, cela cependant sans préjudice d'autres modes de transmission.

*c*) Admettre que la notification ou la signification faite au pays requis selon les formes prescrites par la législation de l'Etat requis pour la signification ou la notification des actes dressés dans ce pays, et qui sont destinés aux personnes se trouvant sur son territoire, est

---

[1] P. LAGARDE, La Dixième session de la Conférence de La Haye de droit international privé, *cf. Revue critique de droit international privé*, 1965, p. 256.

une garantie suffisante que l'acte a été notifié ou signifié à la connaissance réelle du destinataire en temps utile pour que le défendeur puisse se défendre.

Ces principes de base, qui étaient contenus dans l'avant-projet de la Commission spéciale, ont été admis par la Troisième commission et constituent le fondement du système proposé. C'est à leur lumière qu'on doit interpréter la *convention relative à la signification et la notification à l'étranger des actes judiciaires et extrajudiciaires en matière civile ou commerciale* issue des travaux de la Troisième commission de la Dixième session de la Conférence.

## III. Rapports entre la convention relative à la signification et la notification et les Conventions de 1905 et de 1954 et d'autres Conventions concernant les mêmes matières

La présente convention remplacera les articles 1 à 7 des Conventions de La Haye sur la procédure civile, de 1905 et 1954, entre les Etats qui l'ont signée et ratifiée, dans la mesure où lesdits Etats sont Parties à l'une ou à l'autre de ces Conventions. Ces Conventions resteront cependant en vigueur pour les pays qui les ont signées et ratifiées et qui ne signent ni ne ratifient la présente convention (art. 22).

La convention maintient également l'article 23 de la Convention relative à la procédure civile, signée à La Haye le 17 juillet 1905, ainsi que l'article 24 de celle signée à La Haye, le premier mars 1954. Ces dispositions concernent l'assistance judiciaire, matière qui n'a pas été visée expressément par la convention. Pour éviter tout malentendu, on a donc statué à l'article 23 que cette matière continuerait à être réglementée par les Conventions de 1905 et 1954, en tenant compte surtout des caractéristiques d'ordre social et de protection des économiquement faibles. Les articles ci-dessus mentionnés des anciennes Conventions ne seront appliqués que si les actes sont transmis par les modes de communication prévus par lesdites Conventions (alinéa 2 de l'article 23).

Si des accords additionnels aux Conventions de 1905 et 1954 ont été conclus par les Etats contractants, ces accords doivent être estimés applicables à la présente convention, sauf si les Etats signataires desdits accords en conviennent autrement (art. 24).

La présente convention ne dérogera pas aux conventions auxquelles les Etats contractants sont ou seront Parties, et qui contiennent des dispositions sur les matières qui y sont réglées (art. 25).

## IV. La convention est ouverte

Il a été décidé que la convention, ouverte à la signature des Etats représentés à la Dixième session (art. 26), pourrait donner lieu à des adhésions de la part de tout autre Etat après son entrée en vigueur. Toutefois chaque Etat Partie à la convention pourra s'opposer à une telle adhésion. Ce droit de veto donné aux Etats contractants se retrouve d'ailleurs dans les clauses finales de toutes les Conventions élaborées à la Dixième session. Etant donné les caractéristiques de la convention, la simplicité et la sûreté de ce système, conforme d'ailleurs à celui des Conventions sur la procédure civile de 1905 et 1954, font que la solution choisie semble la meilleure.

## V. Rapports entre la convention et le droit interne des Etats

La convention a dû, pour atteindre son but, accepter des solutions nécessitant des adaptations du droit interne des Etats. On a cependant voulu réduire au maximum ces altérations.

On a surtout essayé de ne pas introduire de modifications en ce qui concerne le point de départ des délais, tel qu'il est établi dans les législations nationales.

## VI. Structure de la convention

L'article premier établit l'objet et le domaine de la convention. La convention se divise en trois chapitres.

Le chapitre I – Actes judiciaires – couvre les articles 2 à 16 et établit le mécanisme de transmission des actes judiciaires à l'étranger, et de ce que nous avons appelé la «sanction indirecte», c'est-à-dire fondamentalement la protection du défendeur contre des jugements rendus contre lui sans qu'il en ait eu connaissance.

Le chapitre II – Actes extrajudiciaires – est constitué uniquement par l'article 17. Cette disposition applique le système de transmission établi au chapitre I, pour la transmission aux fins de signification ou de notification, aux actes extrajudiciaires émanant des autorités et des officiers ministériels d'un Etat contractant.

Le chapitre III – Dispositions générales – renferme les articles 18 à 31. Il donne quelques facultés aux Etats dans le domaine de la convention: articles 18 à 20; il impose aux Etats le devoir de donner certaines informations au Ministère des Affaires Etrangères des Pays-Bas: article 21; il établit les relations entre la présente convention et les autres Conventions concernant la procédure civile: articles 22 à 25; il dispose que la convention sera une convention ouverte à la signature des Etats représentés à la Dixième session: article 26; il fixe la date de l'entrée en vigueur de la convention: article 27; il donne la faculté d'adhésion sous les conditions précédemment étudiées: article 28; il permet aux Etats d'étendre la convention aux territoires qu'ils représentent sur le plan international: article 29; il établit la durée du traité à partir de la date de son entrée en vigueur conformément aux clauses habituelles des Conventions de La Haye: article 30; il impose au Ministère des Affaires Etrangères des Pays-Bas le devoir de notifier aux Etats contractants certains faits concernant la convention: article 31.

## VII. Objet et domaine de la convention

L'article premier de la convention fixe l'objet et la portée de la convention.

### A. TERMINOLOGIE

*a*) L'avant-projet avait seulement employé les termes *transmettre* et *notifier* dans son article premier.

Devant les objections soulevées, on a décidé de préciser que la convention serait applicable à la transmission aux fins de *signification* ou de *notification*.

Il faut constater que la définition des matières civiles ou commerciales ne doit pas être recherchée selon un critère formel, par exemple d'après le tribunal devant lequel elles sont soulevées, mais d'après le fond même de la question[1].

### B. QUALIFICATIONS

La Troisième commission a décidé de suivre la position de la Commission spéciale et de ne pas établir de règle en ce qui concerne le problème de savoir d'après quelle loi doit être faite la qualification de la matière civile ou commerciale de l'acte.

[1] *Cf.* rapport sur l'avant-projet de convention adopté par la Commission spéciale, *supra* pp. 79 et s.

Le choix de la loi de l'Etat requérant n'a aucunement réuni l'unanimité, et l'intervention, tout au moins partielle, de la loi de l'Etat requis, a été estimée inévitable.

Les Conventions de La Haye ont d'ailleurs toujours évité de se prononcer sur le problème de la qualification.

## C. CARACTÈRE OBLIGATOIRE DE LA CONVENTION

Pour parvenir au texte définitif de la convention la Troisième commission a profondément altéré la rédaction de l'article premier de l'avant-projet.

Il avait été établi dans l'avant-projet que *la convention est applicable dans tous les cas où il y a lieu de transmettre un acte à une personne se trouvant à l'étranger.*

On a aussi introduit le terme *signification* considérant que le mot *notification* ne pouvait pas contenir le sens du mot *signification*, tout au moins en ce qui concerne la terminologie de certains pays comme la Belgique. En effet, la *signification* est la remise d'une copie de l'acte par exploit d'un huissier ou officier ministériel. On a encore voulu affirmer, par l'emploi de deux mots juridiques, que la convention s'applique seulement aux cas où l'on transmet un acte de manière formelle.

La solution d'employer une expression neutre comme *remise* ou *transmission* pour fixer le domaine de la convention a été repoussée. Il a été convenu en effet que la convention visait deux opérations: la transmission de l'acte de l'Etat requérant à l'Etat requis, et sa *signification* ou sa *notification* à la personne à qui l'acte est destiné.

Dans le texte anglais, on a traduit les expressions *signifier* et *notifier* par un seul mot qui les contient: *for service.* Cependant la distinction entre *signification* et *notification* est connue en droit écossais[1].

*b)* L'emploi de l'expression *actes judiciaires et extrajudiciaires* ne soulève aucune difficulté. Elle avait déjà été utilisée dans l'avant-projet.

*c)* L'expression *en matière civile ou commerciale,* déjà utilisée dans la Convention de 1905, soulève quelques difficultés, surtout pour les pays anglo-saxons où elle n'a pas une signification précise[2].

Dans le projet définitif, on a supprimé l'expression *une personne se trouvant à l'étranger.* On a dit que cette expression pourrait donner lieu à une interprétation dangereuse: une personne habitant Paris et se trouvant momentanément aux Pays-Bas se voit l'objet d'une notification; la situation très provisoire de cette personne aux Pays-Bas empêchera le juge néerlandais d'appliquer la convention parce que cette personne ne se trouve pas, au moment de la notification, «à l'étranger».

Certains ont estimé qu'il ne convenait pas d'exclure l'expression *personne se trouvant à l'étranger,* car cette exclusion pouvait donner lieu à des équivoques et permettre que les pays où la notification au parquet est admise continuent à l'employer, même dans les cas où, selon l'esprit de la convention, les dispositions de celle-ci devraient être appliquées.

On a quand même décidé d'exclure l'expression discutée et de s'en tenir à une expression neutre. La convention serait applicable *dans tous les cas où un acte judiciaire ou extrajudiciaire doit être transmis à l'étranger pour y être signifié ou notifié.*

Il faut souligner que l'opinion de la Troisième commission a été que la convention était «obligatoire», et que les Etats requérants devaient l'appliquer dans tous les cas où il leur faudrait «transmettre un acte à l'étranger pour y être signifié ou notifié».

---

[1] GRAVESON, *The Tenth Session of the Hague Conference on Private International Law, The International and Comparative Law Quarterly,* April 1965, p. 539.

[2] *Cf.* par exemple intervention de M. Anton, procès-verbal N° 11, *supra* p. 307.

Cependant, en face de la lettre stricte de la disposition, on peut toujours se poser la question de savoir si, quand un Etat admet que la signification ou la notification d'une personne se trouvant à l'étranger soit faite au parquet, la convention s'applique ou ne s'applique pas.

L'INTERPRÉTATION AUTHENTIQUE DE LA COMMISSION TELLE QU'ELLE RESSORT DES DÉBATS[1], EST DANS LE SENS DE L'APPLICATION DE LA CONVENTION.

Nous dirons donc comme M. Graveson: „*It is to be hoped that those countries which ratify this convention will apply it in the liberal spirit in which it is intended: will apply, in effect, their equivalent of the mischief rule in directing its provisions against the hardship and injustice, which it seeks to relieve*"[2].

«Toutes ces voies de transmission (prévues à la convention) doivent aboutir à ce que l'acte parvienne à son destinataire en temps utile. C'est là une exigence de justice, qui prend tout son relief lorsque l'acte à transmettre est un acte introductif d'instance»[3].

### D. EXCLUSION DE LA CONVENTION DANS LES CAS D'ADRESSE INCONNUE

La deuxième partie de l'article premier exclut de la portée de la convention les cas où l'adresse du destinataire de l'acte n'est pas connue.

De ce chef la convention exclut aussi les cas de domicile inconnu.

## VIII. Voie principale de signification ou de notification — Institution d'une autorité centrale (article 2)

L'article 2 correspond à l'article 2 de l'avant-projet. Il est simple et clair. Les fonctions de l'Autorité centrale sont:

*a)* Recevoir les demandes de signification ou de notification en provenance d'un autre Etat contractant.

*b)* Y donner suite.

L'organisation de cette autorité est de la compétence de l'Etat qui l'a instituée, c'est-à-dire, de l'Etat requis.

Il faut conjuguer cet article avec l'article 18 des *Dispositions générales*.

Le premier alinéa de l'article 18 a été introduit à la demande de la délégation britannique et envisage la possibilité pour un Etat d'établir, alternativement, à côté de l'Autorité centrale, d'autres autorités subsidiaires compétentes pour un certain territoire. On a notamment eu en vue la possibilité d'instituer une autorité subsidiaire compétente pour l'Ecosse.

Dans l'hypothèse où il y aura une Autorité subsidiaire, l'Etat requérant pourra toujours s'adresser ou bien à l'Autorité centrale ou bien à l'Autorité subsidiaire: (alinéa 2 de l'art. 18). Cette disposition n'entraîne donc pas la multiplication des Autorités centrales.

Il va sans dire que chaque fois que la convention fait référence à l'Autorité centrale elle vise également les Autorités subsidiaires, le cas échéant.

---

[1] *Cf.* interventions de M. Bellet, procès-verbal N° 2, *supra* p. 160 et interventions de M. Loeff, procès-verbal N° 3, pp. 167 et 169.

[2] GRAVESON, *op. cit.* p. 539.

[3] LAGARDE, *op. cit.* p. 258.

Le troisième alinéa de l'article 18 a été introduit à la demande de la délégation allemande, et a pour but d'admettre que les Etats Fédéraux établissent une Autorité centrale pour chaque Etat Fédéral. On a souligné que la souveraineté en matière de justice appartenait en Allemagne Fédérale aux différents *Länder*.

Il n'y a pas à revenir sur les avantages de l'institution d'une Autorité centrale, déjà fixés dans le rapport de l'avant-projet[1].

Chaque Etat contractant devra, d'après l'article 21, alinéa 1, lettre *a*) de la convention, notifier au Ministère des Affaires Etrangères des Pays-Bas les autorités désignées comme Autorités centrales au sens des articles 2 et 18 de la convention, soit au moment du dépôt de son instrument de ratification ou d'adhésion, soit ultérieurement.

## IX. Demandes aux fins de signification ou notification (article 3)

Les personnes privées n'ont pas le droit de s'adresser à l'Autorité centrale. Seuls l'autorité ou l'officier ministériel compétents selon les lois de l'Etat d'origine des documents ont cette possibilité. Dans la traduction anglaise, plus précise, on a traduit *Etat d'origine*, par *State in which the documents originate* . . . .

Il est bien entendu que le *solicitor* anglais est inclus dans l'expression *autorité ou officier ministériel compétents*. Il pourra donc s'adresser à l'Autorité centrale de l'Etat requis. En ce qui concerne les avocats il appartient à la *lex magistratus* de préciser s'ils ont la possibilité de s'adresser directement à l'Autorité centrale.

Il est établi dans la rédaction même de l'article 3 que c'est à la loi de l'Etat d'origine de déterminer qui sont les autorités ou officiers ministériels compétents pour s'adresser à l'Autorité centrale d'un autre pays, à l'exclusion des personnes privées.

La forme de la demande est clairement établie à l'article 3. Le texte définitif a, par rapport au texte de l'avant-projet, déclaré expressément que la formule qui contient la demande, aussi bien que les autres pièces annexes, n'a pas besoin de légalisation ni d'autre formalité équivalente.

On a décidé qu'il ne serait pas nécessaire d'exiger l'apposition sur la requête du sceau d'une autorité publique de l'Etat requérant. La signature ou le cachet de l'expéditeur a été estimé suffisant.

On a ainsi respecté quelques-uns des objectifs les plus importants de la convention, c'est-à-dire la simplification et la rapidité. Nous croyons que la convention a de ce fait réalisé un progrès.

La demande doit être conforme à la formule modèle annexée à la convention, mais il n'est pas obligatoire que cette formule soit munie du cachet de l'Autorité centrale de l'Etat requérant; il n'est pas nécessaire non plus que cette formule soit imprimée.

*La demande doit être accompagnée de l'acte judiciaire ou de sa copie, le tout en double exemplaire.* L'exigence du double exemplaire a pour but de faciliter la mission de l'Autorité centrale requise, qui pourra immédiatement faire expédier le double au destinataire, en gardant une copie dans ses archives.

Cependant les délégations se sont montrées hostiles à l'exigence du double exemplaire, en argumentant que ce procédé pourrait entraver la pratique des transmissions. On a donc établi à l'article 20, alinéa *a*) que *la présente convention ne s'oppose pas à ce que des Etats contractants s'entendent pour déroger à cette obligation.*

---

[1] *Supra* pp. 81 et s.

## X. Objections à la demande (article 4)

L'article 4 de la convention correspond à l'article 5 de l'avant-projet. La nouvelle disposition est plus complète que la précédente. Pour éviter des retards, elle exige que l'Autorité centrale requise informe *immédiatement* le requérant si elle estime que les dispositions de la convention n'ont pas été respectées.

D'autre part, le texte conventionnel exige que l'autorité requise précise les griefs articulés à l'encontre de la demande. Le demandeur pourra ainsi corriger plus facilement la faute existante. Il serait dangereux d'admettre que l'autorité requise puisse élever une objection à la signification ou notification des actes sans préciser la raison pour laquelle elle le fait. On évite, avec la rédaction actuelle, l'arbitraire éventuel des autorités requises.

On a encore remplacé le mot *expéditeur* par *requérant* qui semble plus adéquat. L'expression *exigence de la convention* a été remplacée par *disposition de la convention*. Le texte a été de ce fait amélioré.

Finalement, on a donné à la règle une rédaction qui montre clairement qu'elle ne vise pas le cas d'un refus de transmission, mais seulement le complément du dossier de demande.

Pour cette raison, on a décidé de placer le texte correspondant à l'article 4 de l'avant-projet, avant le texte de l'article 5 qui concerne le cas de refus d'entraide.

## XI. Signification ou notification dans l'Etat requis — Traduction (article 5)

L'article 5 correspond à l'article 6 de l'avant-projet.

La nouvelle rédaction a supprimé à l'alinéa premier l'expression *sans retard* contenue dans le texte de l'avant-projet. La suppression de cette expression ne change rien à l'esprit de l'avant-projet, un des buts fondamentaux de la convention étant la rapidité des significations et notifications. Cette suppression a été faite pour des raisons *d'elegantia juris* et de courtoisie envers les Etats contractants et leurs Autorités centrales qui, on le suppose, procèderont aux significations ou notifications au plus tôt. D'ailleurs il n'est pas de la compétence d'une convention internationale de fixer la façon dont les autorités des autres Etats contractants doivent agir.

Il a été établi que la signification ou notification requise doit être faite selon *les formes prescrites par la législation de l'Etat requis* ... On a admis que les garanties données par les Etats requis, concernant la signification et la notification des actes dressés chez eux et destinés aux personnes se trouvant sur leur territoire, devraient être suffisantes pour les Etats étrangers requérants (al. 1, lettre *a*) de l'art. 5).

On a cependant admis que la signification ou la notification pourrait être faite selon la forme particulière demandée par le requérant, pourvu que cette forme ne soit pas incompatible avec la loi de l'Etat requis. Pour qu'un Etat requis refuse une forme particulière de notification qui lui est demandée, il ne suffit pas qu'il ne la connaisse pas. Il faut que cette forme soit incompatible avec ses lois. On a en principe voulu que les Etats requis respectent la volonté des requérants concernant la forme de notification.

Donc, dans le cas où la forme demandée est méconnue de l'Etat requis, celui-ci doit l'employer si elle n'est pas incompatible avec ses lois. L'Autorité centrale requise ne pourra pas s'y opposer pour la simple raison qu'un moyen pareil n'existe pas dans sa législation.

L'expression *forme spéciale*, employée à l'article 6 de l'avant-projet, a été remplacée par *forme particulière* considérée comme plus exacte.

La Troisième commission a encore admis expressément – même si le requérant n'exige pas une forme particulière contrairement à ce qui avait été adopté dans l'avant-projet –

que la signification ou la notification puisse être faite par simple remise au destinataire qui l'accepte volontairement. On a admis ainsi la signification sans contrainte, déjà établie dans l'article 2 de la Convention de 1954. Cette solution n'implique aucun changement dans la loi de procédure interne de chaque Etat.

En ce qui concerne le problème des traductions, c'est l'article 5, al. 3, qui le règle. On donne à l'Autorité centrale requise la possibilité de demander que l'acte, qui doit être signifié ou notifié conformément aux formes prescrites par la législation de son Etat, soit rédigé ou traduit dans la langue ou dans une des langues officielles de son pays. On a pensé qu'il ne faudrait pas rendre la traduction obligatoire.

On a même décidé que, quand la notification doit être faite selon la forme particulière demandée par le requérant ou par simple remise au destinataire qui l'accepte volontairement, il n'y avait pas de raison d'accorder à l'Autorité centrale la faculté de demander la traduction. Cette faculté a seulement été accordée à l'Autorité centrale pour les cas où l'on utilisera les formes normales prévues par la loi de procédure de son pays.

L'article 20 de la convention permet que les Etats contractants s'entendent pour déroger à la faculté attribuée à l'Autorité centrale de demander la traduction de l'acte. La charge de la traduction de l'acte est donc en principe au défendeur.

L'article 5, alinéa 4, établit que *la partie de la demande conforme à la formule modèle annexée à la présente convention, qui contient les éléments essentiels de l'acte, est remise au destinataire.*

Pour bien comprendre la portée de cette disposition il faut dire que l'article 7 établit, dans son alinéa 2, que les blancs concernant les éléments essentiels de l'acte doivent être remplis soit dans la langue de l'Etat requis, soit en français ou en anglais. De cette façon on réduit la lourdeur de la charge de la traduction imposée au défendeur. Le défendeur aura connaissance des éléments essentiels de l'acte dans la langue du pays requis, ou en français ou en anglais. Cette première traduction est à la charge du demandeur.

Si le défendeur estime que les indications de la formule ne sont pas suffisantes pour la défense, il prendra la charge de faire traduire tout le contenu de l'acte.

On a de cette façon établi une division équitable et raisonnable des charges de traduction entre le demandeur et le défendeur. Cette solution facilite les procédures. Elle évite la charge de la traduction quand elle n'est pas indispensable, en prenant cependant les mesures nécessaires pour que le défendeur puisse prendre connaissance de l'essentiel de l'acte qui lui est remis.

En ce qui concerne l'obligation contenue dans l'alinéa 4 de l'article 5, l'article 20 lettre *c)* ne s'oppose pas à ce que les Etats contractants s'entendent pour déroger à cette obligation.

## XII. Attestation de notification (article 6)

L'article 6 de la convention admet, comme l'admettait l'article 7 de l'avant-projet, que l'attestation de la signification ou de la notification soit faite par l'Autorité centrale de l'Etat requis ou par une autre autorité désignée par cet Etat. Il en découle qu'il ne faut pas que la signification ou notification et l'attestation correspondante soient faites par une autorité judiciaire. Les officiers ministériels pourront les établir pourvu que l'Etat requis les en charge.

Cependant, à la demande surtout de la délégation anglaise, on a donné (al. 3 de l'art. 6) aux requérants la possibilité de demander que l'attestation, qui n'est pas établie par l'Autorité centrale ou par une Autorité judiciaire, soit visée par l'une de ces autorités. On n'exige pas une légalisation, qui serait onéreuse et contraire à l'esprit de la convention et de

la Conférence qui a d'ailleurs élaboré en 1960 une *Convention supprimant l'exigence de la légalisation des actes publics étrangers*; on se limite à une simple authentification.

Il faut encore remarquer que les Etats ont, d'après l'alinéa premier, lettre *b*) de l'article 21, l'obligation de faire connaître au Ministère des Affaires Etrangères des Pays-Bas le nom des autorités compétentes pour établir l'attestation, soit au moment du dépôt de leur instrument de ratification ou d'adhésion, soit ultérieurement.

L'attestation doit être conforme à la formule modèle annexée à la convention, ce qui est en accord avec l'esprit de simplification qui a inspiré la Commission. L'attestation décrit l'exécution de la demande, *elle indique la forme, le lieu et la date de l'exécution, aussi bien que la personne à laquelle l'acte a été remis* (al. 2 de l'art. 6).

En comparaison avec l'avant-projet, l'attestation doit, de plus, donner l'indication du lieu de notification et de la personne à qui la remise a été faite. En effet il y a intérêt à savoir qui a reçu la notification. La formule annexée exige qu'on donne l'identité de la personne à laquelle la demande a été remise et en quelle qualité elle a reçu la notification, aussi bien que les liens de parenté, de subordination ou autre existant entre elle et le destinataire de l'acte. Tous ces éléments peuvent avoir le plus grand intérêt dans la suite du procès.

Si la remise ne peut pas être faite, il faut que l'autorité compétente indique les faits qui l'ont empêchée. Ces faits doivent être mentionnés dans la formule d'attestation annexée à la convention.

Pour aboutir à la simplification, l'attestation doit être directement adressée au requérant, indépendamment de l'intervention de n'importe quel intermédiaire dans l'Etat requérant et dans l'Etat requis.

## XIII. Formules et traduction (article 7)

L'article 7 de la convention correspond à l'article 8 de l'avant-projet. Il exige que les mentions imprimées soient écrites soit en français, soit en anglais, sans que l'emploi simultané des deux langues soit obligatoire, contrairement à ce qui semblait résulter de l'article 8 de l'avant-projet.

Pour aboutir à une formule plus précise, on a introduit dans le texte actuel le mot *obligatoirement* concernant l'emploi d'une des deux langues ci-dessus indiquées. L'avant-projet ne mentionne pas l'emploi obligatoire des deux langues, mais ce sens y était implicite. Il n'évoquait pas non plus la faculté d'utiliser la langue de l'Etat d'origine ou une des deux langues citées. Cette faculté était, il nous semble, implicitement incluse dans le texte. On l'a en tout cas introduite expressément dans la convention.

Comme nous l'avons déjà vu dans le commentaire de l'article 6, les blancs correspondant à ces mentions sont remplis soit dans la langue de l'Etat requis, soit en français, soit en anglais. On voit, par l'ordre des langues dans lesquelles les blancs doivent être remplis, que la préférence va à la langue de l'Etat requis. La convention laisse cependant aux Etats requérants la liberté de choisir la langue dans laquelle seront remplis les blancs.

Les formules annexées à la convention ont été largement améliorées par la Troisième commission. On indique dans la demande, en haut de page, l'identité et l'adresse du requérant, l'adresse de l'autorité destinataire. On fait ensuite la demande de remise, conformément à l'article 5 de la convention, en indiquant l'identité et l'adresse du destinataire et la façon dont on veut que la notification ou la signification soit faite, c'est-à-dire selon les formes légales du pays requis, ou selon une forme particulière ou par remise simple.

L'autorité requise est priée de renvoyer au requérant un exemplaire de l'acte et,

éventuellement, de ses annexes, avec l'attestation figurant au verso. Il y a encore une place pour l'énumération des pièces remises. La demande doit être signée ou porter un cachet du requérant.

La formule d'attestation est inscrite au verso de la demande. Nous avons déjà examiné, dans le commentaire de l'article 6, quels sont les renseignements contenus dans l'attestation.

On a soulevé le problème de savoir si l'on ne devrait pas exiger la traduction dans la langue du pays requérant de ces mentions du verso de la demande. Il a été décidé de garder un système commun et d'utiliser les mêmes langues des deux côtés du volet.

Il y a encore une troisième formule pour les *éléments essentiels de l'acte*. Cette formule a déjà été mentionnée lors de l'étude de l'article 5, dernier alinéa. En haut de page, on indique le nom et l'adresse de l'autorité requérante, l'identité des parties. On s'occupe après, successivement, de l'acte judiciaire et de l'acte extrajudiciaire. Concernant l'acte judiciaire, on indique la nature et l'objet de l'acte, la nature et l'objet de l'instance et dans les cas où cela peut avoir de l'intérêt, le montant du litige, la date et le lieu de la comparution, la juridiction qui a rendu la décision, la date de la décision, les délais figurant dans l'acte. En ce qui concerne l'acte extrajudiciaire, on indique la nature et l'objet de l'acte et les délais qui y figurent.

On a cherché, au moyen de ces formules, à concrétiser une des idées centrales de la convention, la simplicité.

## XIV.  Voies subsidiaires de transmission (articles 8 à 11)

Beaucoup de délégations ont été opposées à la multiplicité de voies subsidiaires, en plus du système de transmission décrit ci-dessus.

### A. VOIE DIRECTE PAR UN AGENT DIPLOMATIQUE OU CONSULAIRE (ARTICLE 8)

Cette disposition correspond à l'article 9 de l'avant-projet, d'ailleurs sensiblement modifié. La Troisième commission a reconnu qu'on ne peut pas empêcher les Etats d'utiliser la faculté de faire procéder directement, sans contrainte, par la voie de leurs agents diplomatiques ou consulaires, aux significations ou notifications d'actes judiciaires à leurs propres nationaux se trouvant à l'étranger.

Aucun principe ne peut raisonnablement justifier l'opposition à l'emploi par chaque Etat de la voie consulaire ou diplomatique directe, si l'acte doit être signifié ou notifié à un ressortissant de l'Etat d'origine et si le destinataire de l'acte l'accepte volontairement. Tout se passe, en quelque sorte, sous l'autorité de l'Etat d'origine, dans la mesure où il existe un lien de nature juridique entre les Etats et leurs ressortissants.

Cependant la question se pose autrement si un Etat veut utiliser ses agents diplomatiques pour transmettre un acte à des ressortissants de l'Etat requis. On peut admettre dans cette hypothèse que l'Etat requis veuille protéger la compétence de ses autorités en interdisant aux agents diplomatiques et consulaires d'autres Etats d'effectuer des significations et notifications.

C'est pourquoi l'alinéa 2 de l'article 8 a établi que les Etats contractants peuvent déclarer qu'ils s'opposent à l'usage, sur leur territoire, de la faculté des autres Etats (Etat d'origine) d'utiliser leurs agents diplomatiques ou consulaires aux fins de signification ou notification des actes, sauf si un acte doit être signifié ou notifié à un ressortissant de l'Etat d'origine.

Le problème de la plurinationalité n'a pas été expressément étudié et ne semble pas soulever de difficultés spéciales, parce que l'Etat intéressé à s'opposer le ferait à chaque fois que d'après sa loi la personne à notifier a sa propre nationalité. La nationalité du pays requis aura toujours la préférence.

Dans le cas où un Etat voudra s'opposer dans les termes ci-dessus à la signification ou notification par les agents diplomatiques ou consulaires d'un autre Etat, il doit, selon l'article 21, alinéa 2, lettre *a*), notifier au Ministère des Affaires Etrangères des Pays-Bas cette opposition, soit au moment du dépôt de son instrument de ratification ou d'adhésion, soit ultérieurement. Cette obligation de notification, que l'on retrouve d'ailleurs pour les autres facultés d'opposition, constitue un progrès par rapport aux Conventions de 1905 et 1954. Grâce à ce texte les Etats contractants seront renseignés clairement sur la position de leur partenaire, ce qui n'est pas toujours le cas dans le cadre des Conventions existantes.

Le changement éventuel d'attitude des Etats sur ce point doit être également notifié au Ministère des Affaires Etrangères des Pays-Bas [art. 21, al. 2, lettre *c*)].

### B. VOIES DIPLOMATIQUES OU CONSULAIRES INDIRECTES

L'article 9 de la convention a maintenu, en principe, la doctrine de l'article 11 de l'avant-projet. Mais, afin d'éviter que la voie consulaire indirecte devienne trop complexe, et que les consuls s'adressent directement à n'importe quelle autorité de l'Etat requis, on a décidé que les autorités consulaires de l'Etat d'origine pourront seulement s'adresser aux autorités indiquées à cet effet par un autre Etat contractant. Chaque Etat peut ainsi empêcher que les autorités consulaires s'adressent à d'autres autorités que l'Autorité centrale, en faisant ainsi la seule autorité à laquelle les agents consulaires peuvent s'adresser. On donne, de cette façon, une certaine liberté à l'Etat requis, sans limiter le droit de l'Etat d'origine d'utiliser la voie consulaire pour transmettre les actes judiciaires aux fins de signification ou notification.

L'article 21, alinéa premier, lettre *c*) oblige les Etats contractants à notifier au Ministère des Affaires Etrangères des Pays-Bas, soit au moment du dépôt de leur instrument de ratification ou d'adhésion, soit ultérieurement, la désignation de l'autorité compétente pour recevoir les actes transmis par la voie consulaire. Ils doivent aussi notifier au Ministère des Affaires Etrangères des Pays-Bas toute modification de leur attitude à ce sujet.

La deuxième partie de l'article 9 est identique à la deuxième partie de l'article 11 de l'avant-projet. Il faut souligner que la pensée directrice de la Troisième commission a été de limiter autant que possible l'utilisation de la voie diplomatique jugée trop lourde. On n'a voulu donner en aucune façon à l'Etat requis le droit d'exiger que la demande lui parvienne par la voie diplomatique. Les Etats requérants ont uniquement la faculté de l'utiliser *si les circonstances exceptionnelles l'exigent*.

### C. AUTRES VOIES DIRECTES (ARTICLE 10)

L'article 10 de la convention correspond à l'article 10 de l'avant-projet.

Il n'existe que de petites différences de rédaction entre les deux textes. Les chiffres de l'avant-projet ont été remplacés par des lettres dans le texte de la convention.

A la lettre *b*) on a remplacé l'expression *faire faire* employée dans l'avant-projet par le mot *procéder*. En accord avec les décisions prises sur la terminologie, on a introduit le mot *signification* à côté du mot *notification* employé dans l'avant-projet.

A la lettre *c*) on a supprimé le mot *privées* qui avait été placé entre les mots *personnes* et

*intéressées* dans l'avant-projet. La convention parle donc des *personnes intéressées* et non des *personnes privées intéressées*. La formule actuelle est plus large et correspond mieux à la réalité. Une personne privée ou non, intéressée à une instance judiciaire, pourra faire procéder à des significations ou notifications par les entités compétentes dans l'Etat de destination. Il ne fait pas de doute que cette expression contient les représentants des parties. On a aligné la rédaction sur celle de la lettre *b*).

Selon l'article 21 les Etats contractants qui veulent s'opposer aux voies de transmission prévues à l'article 10, doivent le notifier au Ministère des Affaires Etrangères des Pays-Bas, soit au moment du dépôt de leur instrument de ratification ou d'adhésion, soit ultérieurement. Il en est de même pour toute modification de leur attitude à cet égard.

L'opposition doit donc être, d'après le système conventionnel, un acte positif, clair et déterminé.

## XV.  Accords particuliers établis par les Etats —
### Communications directes (article 11)

L'article 11 de la convention correspond à l'article 12 de l'avant-projet. Le texte actuel établit que la convention ne s'oppose pas à ce que les Etats contractants s'entendent pour admettre *d'autres voies de transmission que celles prévues par les articles qui précèdent et notamment la communication directe entre leurs autorités respectives.*

La rédaction antérieure ne contenait pas de disposition d'ordre général. Elle disait seulement que les Etats pouvaient s'entendre pour la communication directe entre leurs autorités respectives.

Le texte de l'article 11 a pour objet des cas différents de ceux qui font l'objet de l'article 10, lettre *b*). L'article 11 concerne la communication directe d'un tribunal à un autre, ou d'un agent du Ministère public à un autre agent du Ministère public, tandis que l'article 10, lettre *b*) concerne les officiers ministériels, fonctionnaires ou autres personnes compétents.

Cependant, la façon très large dont l'article 10, lettre *b*) est rédigé permettrait, croyons-nous, d'y inclure le cas visé à l'article 11.

L'interprétation extensive de l'article 10 ne représente pas un danger, étant donné la faculté accordée aux Etats de s'opposer aux modes de transmission facultatifs prévus à cet article. Mais l'introduction de l'article 11 amène à interpréter restrictivement l'article 10, lettre *b*), en excluant de sa portée d'application la communication d'actes d'un tribunal à un autre ou d'un agent du Ministère public à un autre agent du Ministère public et, en général, d'une autorité judiciaire à une autre.

La signification de l'article 11 de la convention est différente de la portée de l'article 12 de l'avant-projet. La disposition de la convention permet aux Etats de protéger, par voie d'accord entre deux ou plusieurs Etats, les voies existantes de communication qu'on ne peut pas estimer incluses dans la convention. La communication directe entre leurs autorités respectives est donnée comme simple exemple.

Il faut donc conclure que la communication directe entre autorités judiciaires ne pourra pas être effectuée sans que des accords entre deux ou plusieurs Etats l'aient prévue.

La délégation autrichienne a proposé que l'article parle clairement de la communication directe entre les autorités judiciaires ou entre les autorités *supérieures* de justice des différents Etats membres. Cette proposition a été écartée.

Le texte de l'article 11, que nous n'estimons pas très heureux, a son origine dans le dernier alinéa de l'article premier de la Convention de 1954, la Troisième commission n'ayant pas pu se libérer de son influence.

## XVI. Frais (article 12)

L'article 12 correspond à l'article 17 de l'avant-projet.

Le principe établi par cet article est celui de la gratuité, quand les significations ou notifications sont faites par les services de l'Etat requis, ce qui semble logique et raisonnable. Ce principe avait déjà été adopté par l'avant-projet.

Le remboursement a lieu uniquement quand *il existe l'intervention d'un officier ministériel ou d'une personne compétente selon la loi de l'Etat requis*, ou quand l'expéditeur exige *l'emploi d'une forme particulière*, d'accord avec l'article 6.

Ces principes sont également clairs et raisonnables. Sans doute est-ce à l'expéditeur de supporter les frais provenant de l'intervention d'un officier ministériel, ou d'une autre personne compétente, pour une activité qu'il provoque et qui est exécutée pour la satisfaction de son intérêt. Il en va de même pour la forme particulière.

La convention établit seulement le principe selon lequel le requérant est tenu de *payer ou rembourser*, sans définir comment les notes de frais doivent lui parvenir. Nous croyons que cette solution est sage, parce qu'une convention internationale ne doit pas réglementer en détail toutes les questions. Nous ajouterons en tout cas que, normalement, les personnes qui ont engagé des frais pourront s'adresser directement au requérant. Les Autorités centrales pourraient intervenir seulement quand des difficultés surviennent à cet égard, ce qui d'ailleurs, doit être peu fréquent.

Outre les autorités de l'Etat requérant, seuls les officiers ministériels ou autres personnes compétentes peuvent s'adresser à l'Autorité centrale de l'Etat requis. Ces entités offrent des garanties suffisantes pour le règlement des frais engagés en conséquence de leur demande, d'autant plus qu'elles sont soumises à l'autorité du Ministère de la Justice.

Si, cependant, dans la pratique, quelque difficulté de ce genre surgit, l'Autorité centrale requise pourra sans doute en donner connaissance à l'Autorité centrale requérante à toutes fins utiles.

## XVII. Refus d'entraide (article 13)

L'alinéa premier de l'article 13 correspond à l'alinéa premier de l'article 4 de l'avant-projet. L'article 13 a voulu restreindre au maximum les cas de refus d'entraide.

L'exécution de la demande peut être refusée uniquement en cas d'offense à l'ordre public portant atteinte à la souveraineté ou à la sécurité de l'Etat.

On a voulu limiter l'ordre public par l'emploi des mots *souveraineté* et *sécurité*. Ces mots sont imprécis mais ils sont susceptibles de répondre au but poursuivi. L'expression *souveraineté* serait équivalente à *ordre public international*.

D'autre part la convention a précisé que le refus peut seulement avoir lieu quand *l'exécution* de la demande pourrait de l'avis de l'Etat requis, porter atteinte à sa *souveraineté* et à sa *sécurité*. De l'introduction du mot *exécution* dans l'article en question, il résulte que, d'après la convention, la demande, comme telle, ne pourra jamais porter atteinte à la souveraineté et à la sécurité, même si, par exemple, elle concerne une institution méconnue par l'Etat requis ou à laquelle il s'oppose. La demande pourra seulement être refusée si du fait de *l'exécution*, résulte une atteinte à la *souveraineté* ou à la *sécurité* parce que, par exemple, cette exécution porterait atteinte au lien de nationalité existant entre les Etats et leurs ressortissants.

L'alinéa 2 de l'article 13 doit être considéré comme interprétatif de l'alinéa premier et renforce l'interprétation très stricte que nous venons de donner.

L'alinéa premier serait, à notre avis, suffisant pour décider dans le sens qu'il ne serait pas légitime de refuser l'exécution de la demande dans les cas envisagés à l'alinéa 2. On a voulu cependant être sûr de cette interprétation et on a donc décidé de préciser que:

*a)* L'exécution ne peut pas être refusée pour le seul motif que la loi de l'Etat requis revendique la compétence judiciaire exclusive dans l'affaire en cause.

*b)* On ne connaît pas de voie de droit répondant à l'objet de la demande.

L'exécution de la demande ne préjuge pas la reconnaissance de l'exécution ultérieure. Le pays requis pourra, malgré l'exécution de la demande d'assignation, ne pas reconnaître et exécuter la décision rendue par les tribunaux du pays requérant à la suite de cette assignation. Tel fut l'avis de la Troisième commission, mais on n'a pas estimé nécessaire d'établir une disposition expresse à ce sujet.

L'alinéa 3 de l'article 13 correspond à l'alinéa 2 de l'article 4. On a remplacé le mot *expéditeur* par *requérant* et on a fait de petites modifications rédactionnelles. Son but est évident: tenir le requérant au courant de l'impossibilité de la signification ou notification, en lui donnant ainsi la possibilité de prendre les mesures adéquates à l'obtention de ses *desiderata*.

## XVIII.  Difficultés d'application (article 14)

L'article 14 correspond à l'article 19 de l'avant-projet, quelques changements, surtout d'ordre rédactionnel, y ayant été introduits.

La modification la plus importante a été celle de limiter expressément l'intervention de la voie diplomatique aux difficultés concernant la transmission des actes judiciaires. La formule assez générale de l'avant-projet a été limitée à cet égard par la référence expresse aux actes judiciaires. On a considéré qu'il ne serait pas raisonnable d'encombrer la voie diplomatique dans les cas où des difficultés surgiraient à propos des actes extrajudiciaires.

On a supprimé le mot *toutes* avant *difficultés* parce qu'il était inutile et on a adapté la rédaction à la rédaction des autres articles.

## XIX.  Conséquences de la non-signification ou notification de l'acte introductif d'instance selon la convention (article 15)

L'article 15 correspond aux articles 13, 14 et 15 de l'avant-projet.

L'alinéa premier de l'article 15 correspond à l'alinéa premier de l'article 13 de l'avant-projet et tient compte des modifications rédactionnelles introduites à l'article premier, concernant le champ d'application de la convention, notamment les différences de terminologie.

Les lettres *a)* et *b)* correspondent aux chiffres 1 et 2 de l'article 13 de l'avant-projet.

La lettre *a)* a tenu compte des modifications introduites par l'article 5, lettre *a)* de la convention à l'article 6 de l'avant-projet. La rédaction actuelle a gagné en précision et en élégance. Elle établit sans équivoque que les modes de signification employés par les Etats requis doivent être ceux prévus pour les significations *intérieures*, c'est-à-dire pour les significations normales, *ordinaires*, qui visent des personnes se trouvant dans la sphère de la juridiction territoriale respective.

L'alinéa premier, dernière phrase, de l'article 15 correspond à la dernière phrase de l'article 13 de l'avant-projet. Cette disposition veut assurer que le défendeur soit effectivement touché en temps utile pour pouvoir se défendre. Elle se contente de la remise simple du résumé de l'acte à celui-ci.

Il a été établi par la Troisième commission, lors de l'examen d'une proposition néerlandaise, que si les conditions citées ci-dessus n'étaient remplies, on pourrait, pour éviter de surseoir, remettre l'affaire à une session ultérieure en accordant au demandeur un délai nouveau dans lequel il pourra informer le défendeur du procès intenté contre lui.

L'article 15 protège clairement le défendeur contre l'exécution de jugements rendus contre lui à l'étranger sans qu'il ait eu connaissance.

Le juge du tribunal saisi ne devra pas rendre son jugement sans être sûr que le défendeur a fait l'objet d'une signification ou d'une notification ou que l'acte lui a été remis en temps utile pour se défendre. «C'est là une exigence de justice, qui prend tout son relief lorsque l'acte à transmettre est un acte introductif d'instance[1]».

Le deuxième alinéa de l'article 15 correspond à l'article 14 de l'avant-projet. Cette disposition a été introduite surtout à cause des interventions de la délégation française, d'abord à la Commission spéciale et ensuite à la Troisième commission de la Dixième session de la Conférence. Elle représente une protection des droits du demandeur et provient des raisons profondes qui ont imposé, en France et dans d'autres pays, la pratique de notification au parquet dans le cas où le défendeur est à l'étranger. C'est là un contrepoids des concessions très importantes accordées par les Etats attachés à ce système.

Il faut souligner que cette deuxième partie de l'article 15 n'établit pas un commandement obligatoire. Elle donne seulement aux Etats une faculté: celle de déclarer que leurs juges peuvent statuer quoique les conditions de la première partie ne soient pas remplies. Malgré la caractéristique simplement facultative de cette disposition, on exige, pour que cette faculté puisse être appliquée, que soient réunies des conditions qui ont en vue de garantir l'intérêt légitime du défendeur d'être touché en temps utile pour pouvoir se défendre. La disposition devrait être appliquée très rarement, seulement dans les cas où le défendeur se dérobe à la signification et à la simple remise. Dans ces cas de mauvaise foi du défendeur elle peut être utile.

L'avant-projet, dans son article 14, attribuait à chaque Etat contractant la faculté de prévoir dans sa législation interne les cas où ils utilisent cette faculté. La convention impose aux Etats de faire une déclaration précisant que le juge pourrait statuer bien qu'aucune attestation n'ait été reçue dans un délai raisonnable, si certaines conditions sont réunies. Cette déclaration, selon l'article 21, doit être notifiée au Ministère des Affaires Etrangères des Pays-Bas, soit au moment du dépôt de l'instrument de ratification ou d'adhésion, soit ultérieurement. On donne ainsi l'assurance à tous les Etats que chacun d'eux pourra connaître exactement les conditions d'application de la convention par les autres Etats contractants.

La lettre c) de l'alinéa 2 de l'article 21, que nous avons trouvée plusieurs fois, exige que cette déclaration soit mise à jour en cas de modification.

Le système de la convention que nous venons d'examiner permet à chaque Etat d'utiliser la faculté prévue à l'article 15, alinéa 2, sans besoin de statuer dans sa législation interne. Il lui suffit de faire une déclaration dans ce sens.

D'autres modifications ont été introduites dans le texte de la deuxième partie de l'article 15 par rapport au texte correspondant de l'avant-projet (article 14).

---

[1] LAGARDE, *op. cit.*, *loc. cit.*, p. 258.

En ce qui concerne les conditions nécessaires à l'utilisation de la faculté prévue, la convention est plus précise et exigeante que l'avant-projet. L'avant-projet se limitait à imposer que l'acte fût transmis selon un des modes prévus et que toutes les démarches aient été accomplies aux fins de notification.

Par contre trois conditions sont maintenant exigées:

La lettre *a*) précise que l'acte a dû être transmis selon un des modes prévus par la convention.

La lettre *b*) établit un délai entre l'envoi de l'acte et la possibilité de statuer. Ce délai est en principe laissé à l'appréciation du juge. Cependant pour éviter des abus, et toujours pour garantir la remise effective de l'acte, on impose, obligatoirement, que ce délai ne pourra jamais être inférieur à six mois. L'appréciation du juge, en fixant le délai, est donc limitée par le terme minimum de six mois; il pourra être supérieur mais pas inférieur.

On a ainsi évité l'expression *délai raisonnable*, tenue pour trop vague, sans avoir établi par ailleurs un système trop rigide.

La lettre *c*) établit qu'avant de statuer toutes les démarches utiles doivent être faites par le tribunal saisi auprès des autorités compétentes de l'Etat requis, pour l'obtention d'une attestation.

Cette disposition constitue plutôt un voeu étant donné qu'un texte international ne peut pas, en principe, fixer la façon dont les tribunaux de chaque Etat contractant doivent agir. Malgré son caractère, il est utile comme élément d'interprétation de la convention et met au clair l'esprit de celle-ci en accentuant le souci de garantir les droits de la défense, jusqu'à la limite raisonnable.

L'alinéa 3 de l'article 15 correspond à l'article 15 de l'avant-projet et permet que, malgré le non-accomplissement des conditions établies dans la première partie, le juge ordonne, en cas d'urgence, toutes les mesures provisoires ou conservatoires, comme il est de justice.

## XX.  Jugement par défaut (article 16)

L'article 16 de la convention correspond à l'article 16 de l'avant-projet. Il est la dernière défense du défendeur non touché. Si, malgré ce que dispose l'article 15, le tribunal rend, dans le domaine de la convention, une décision contre un défendeur non touché, le juge peut relever ce défendeur de la forclusion résultant de l'expiration des délais de recours. C'est-à-dire qu'en étudiant l'affaire du défendeur, le juge peut, dans le cas envisagé, accorder à celui-ci une extension des délais de recours. Il n'y a chose jugée qu'après écoulement du délai supplémentaire éventuellement accordé.

L'article 16 limite la faculté de relever la forclusion aux cas où la signification ou la notification de l'acte introductif d'instance, ou d'un acte équivalent, doit être faite selon les dispositions de la convention. L'avant-projet établissait également cette connexion.

L'emploi de l'expression *si les conditions suivantes sont réunies*, veut écarter toute décision concernant la charge de la preuve des conditions indiquées dans les alinéas *a*) et *b*). La Troisième commission n'a pas voulu prendre position en cette matière.

Il nous faut examiner les deux conditions qui permettent au juge de proroger les délais de forclusion. La première est qu'il n'existe pas de faute de la part du défendeur, que le fait qu'il n'ait pas eu connaissance de l'acte introductif d'instance ou d'un acte équivalent, en temps utile pour pouvoir se défendre, et de la décision pour exercer un recours, ne soit pas de sa faute.

La convention a réuni en une seule les conditions établies aux chiffres 2 et 3 de l'avant-projet.

L'avant-projet visait séparément la non-connaissance de l'acte introductif d'instance et la non-connaissance de la décision pour exercer le recours. Mais les deux conditions peuvent être rassemblées, dans la mesure où elles représentent le fait que le défendeur n'a pas eu connaissance de la procédure en temps utile pour pouvoir exercer les voies de recours[1].

La deuxième condition a été introduite à la demande de la délégation britannique. En principe, le juge n'accordera pas la prolongation des délais s'il n'y a pas une apparence de droit de la part du défendeur. Le fait que les moyens du défendeur ne soient pas *prima facie* dénués de tout fondement exclut la possibilité d'appliquer la forclusion aux cas où l'utilisation du principe ne pourrait pas changer les résultats obtenus, la chose jugée acquise.

L'alinéa 2 de l'article 16 établit que la demande tendant à relever de la forclusion est irrecevable *si elle n'est pas formulée dans un délai raisonnable, dès le moment où le défendeur a eu connaissance de la décision*. Cette disposition correspond au dernier alinéa de l'article 16 de l'avant-projet. On a maintenu dans le texte actuel la notion de délai raisonnable, qui est évidemment imprécise. Le juge doit, dans chaque cas, décider si la demande a été présentée dans un délai raisonnable. Il doit aussi fixer quand le défendeur a eu connaissance de la décision. Pour respecter la sécurité juridique on ne pouvait pas admettre que la demande de relevé de forclusion soit présentée n'importe quand. On a pensé, d'autre part, qu'étant donné les différences existant dans chaque pays, il était très difficile d'établir un délai général fixe. Cela aurait d'ailleurs été contraire à l'esprit de la convention qui veut, autant que possible, éviter d'intervenir dans la loi interne des Etats contractants, et se transformer en une loi uniforme.

La solution adoptée à l'alinéa 2 avait l'inconvénient de l'imprécision. On a donc cherché à corriger cet inconvénient à l'alinéa 3: les Etats pourront fixer ce délai s'ils ne veulent pas laisser sa fixation à l'arbitre du juge. Ils n'ont même pas besoin pour cela de modifier leur loi interne. Il leur suffit de déclarer que la demande de relevé de forclusion est irrecevable si elle est formulée après l'expiration d'un certain délai. Ce délai doit être précisé dans les termes de l'article 21, dont nous connaissons déjà le mécanisme.

La convention ne fixe pas le point de départ de ce délai qui sera, selon les législations, ou bien le jugement, ou sa notification. L'imprécision qui en découle est corrigée par le fait que la convention établit la limite minimum d'un an pour ce délai. Le point de départ de ce délai minimum, qu'on voulait précis et fixe, sera celui du prononcé de la décision. Seule cette solution pouvait être adoptée, étant donné que dans certains pays, comme la Grande-Bretagne, les jugements ne sont pas notifiés.

Ce délai-limite d'un an établit l'équilibre essentiel entre la protection du défendeur et les exigences de la sécurité.

Le dernier alinéa de l'article 16 a été introduit à la demande de la délégation danoise. Etant donné le caractère particulier des décisions concernant l'état des personnes, la Troisième commission a estimé que, dans ce domaine, les exigences de la sécurité l'emportent. On a décidé qu'il ne devrait pas y avoir d'incertitude dans le domaine des décisions de divorce ou d'annulation de mariage. On a ainsi évité de remettre «en question des mariages célébrés après un jugement de divorce rendu par défaut[2]».

---

[1] Graveson, *op. cit.*, p. 540.
[2] Lagarde, *op. cit.*, p. 259.

## XXI.  Actes extrajudiciaires (article 17)

L'article 17 correspond à l'article 20 de l'avant-projet.

La doctrine des deux articles coïncide. Les modifications introduites à l'article 17 de l'avant-projet sont celles qui découlent des changements terminologiques adoptés par la Commission. Les observations faites à leur égard dans le rapport de l'avant-projet sont donc valables[1].

On ne mentionne pas les notaires dans le texte parce que la formule de l'avant-projet suffisait pour les cas où le notaire est un officier ministériel. Par contre, dans les cas où le notaire n'est pas considéré par son Etat comme un officier ministériel, on a été d'avis que ses actes ne pourront pas être pris en considération pour les effets de la convention.

## XXII.  Liberté pour les Etats d'établir des formes de signification ou de notification non prévues dans la convention (article 19)

Cet article a été inséré à la demande de la délégation américaine. Il permet expressément que, à côté des formes normales de signification ou de notification des actes provenant de l'étranger, prescrites par sa législation pour la signification ou la notification des actes dressés sur son territoire et destinés aux personnes s'y trouvant (art. 5), chaque Etat établisse des formes spéciales de signification et de notification si la signification doit se faire sur son territoire.

La convention n'empêche pas non plus que les Etats contractants permettent l'utilisation des formes de transmission de documents provenant de l'étranger non prévues dans la convention ou dans leur loi interne.

## XXIII.  Assistance judiciaire gratuite (article 23)

L'assistance judiciaire a été l'objet de l'article 23 de l'avant-projet. Des difficultés ont été soulevées à l'égard de cet article. On a fini par accepter de le retirer surtout à la demande des délégations anglo-saxonnes.

Il a été souligné que l'effet de l'assistance gratuite devrait être uniquement effectif sur le territoire de l'Etat qui l'accorde et ne devrait pas engager les autres Etats. Si l'assistance judiciaire a été accordée par l'Etat expéditeur, on n'a pas estimé raisonnable d'établir que la gratuité devrait s'étendre à l'Etat où la signification ou la notification doit être faite. Les dépenses entraînées par la notification à l'étranger devraient être couvertes par l'Etat de l'expéditeur, qui avait accordé l'assistance judiciaire.

Il arrive encore que certains Etats, comme l'Irlande, ne connaissent pas l'institution de l'assistance judiciaire gratuite. Aux Etats-Unis l'assistance judiciaire est réservée à la compétence des Etats fédérés et parfois aux grandes villes.

L'article 23 de notre convention sauvegarde cependant l'article 23 de la Convention de 1905, correspondant à l'article 24 de la Convention de 1954, concernant l'assistance judiciaire. Il souligne cependant que les dispositions mentionnées ne sont applicables que s'il est fait usage de modes de communication identiques à ceux prévus par lesdites Conventions.

La disposition citée sur l'assistance judiciaire n'est donc pas appliquée à l'assignation ou notification faites avec l'intervention de l'Autorité centrale.

---

[1] Voir *supra* p. 108.

## XXIV. Clauses finales

Les articles 26 à 31 constituent les clauses finales, uniformes pour les trois Conventions élaborées par la Dixième session. Elles ont été adoptées sans discussion au cours de la séance plénière et ne donnent pas lieu, dans le contexte de la convention étudiée, à un commentaire particulier.

LISBONNE, FÉVRIER 1966             V. TABORDA FERREIRA

**2003 Conclusions and Recommendations Adopted by the Special Commission on the Practical Operation of the Hague Apostille, Evidence and Service Conventions**



Octobre / Novembre 2003
October / November 2003

**CONCLUSIONS ET RECOMMANDATIONS ADOPTEES PAR LA COMMISSION SPECIALE SUR LE
FONCTIONNEMENT PRATIQUE DES CONVENTIONS
APOSTILLE, OBTENTION DES PREUVES ET NOTIFICATION**

*(28 octobre au 4 novembre 2003)*

\* \* \*

**CONCLUSIONS AND RECOMMENDATIONS ADOPTED BY THE SPECIAL COMMISSION ON THE
PRACTICAL OPERATION OF THE HAGUE
APOSTILLE, EVIDENCE AND SERVICE CONVENTIONS**

*(28 October to 4 November 2003)*

Permanent Bureau | *Bureau Permanent*
6, Scheveningseweg   2517 KT The Hague | *La Haye*   The Netherlands | *Pays-Bas*
telephone | *téléphone* +31 (0)70 363 3303   fax | *télécopieur* +31 (0)70 360 4867
e-mail | *courriel* secretariat@hcch.net   website | *site internet* http://www.hcch.net

**CONCLUSIONS ET RECOMMANDATIONS ADOPTEES PAR LA COMMISSION SPECIALE SUR LE FONCTIONNEMENT PRATIQUE DES CONVENTIONS APOSTILLE, OBTENTION DES PREUVES ET NOTIFICATION**

*(28 octobre au 4 novembre 2003)*

\* \* \*

**CONCLUSIONS AND RECOMMANDATIONS ADOPTED BY THE SPECIAL COMMISSION ON THE PRACTICAL OPERATION OF THE HAGUE APOSTILLE, EVIDENCE AND SERVICE CONVENTIONS**

*(28 October to 4 November 2003)*

**Conclusions and Recommendations
of the Special Commission on the practical operation
of The Hague Apostille, Evidence and Service Conventions**
*(28 October to 4 November 2003)*

1.  A Special Commission met in The Hague from 28 October to 4 November 2003 to review the practical operation of the Hague Conventions of *5 October 1961 Abolishing the Requirement of Legalisation for Foreign Public Documents*, of *15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, and of *18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters*. The Special Commission, which was attended by 116 delegates representing 57 Member States, States party to one or more Convention under review, and observers, unanimously approved the following conclusions and recommendations:

## I.    GENERAL COMMENTS

2.  The Special Commission (SC) noted and emphasised the *continued importance* of the Hague Apostille, Evidence and Service Conventions.

3.  In light of the value of the continued monitoring of the Conventions' practical operation, the need to promote uniform interpretation, foster mutual confidence and enhance the mutual benefits for States party to the Convention to exchange their respective experiences in operating the Conventions, as well as to promote the benefits of the Conventions to non-party States, the SC recommended to have *more frequent meetings* to review the practical operation of the Apostille, Evidence and Service Conventions. The Special Commission recommended that review meetings on the practical operation of these three Conventions be held *every five years*, subject to the availability of the additional resources needed. Also, consideration should be given to the possibility of reviewing the practical operation of the *Hague Convention of 25 October 1980 on International Access to Justice*.

4.  The SC emphasised that the Apostille, Evidence and Service Conventions operate in an environment which is subject to important *technical developments*. Although this evolution could not be foreseen at the time of the adoption of the three Conventions, the SC underlined that modern technologies are an integral part of today's society and their usage a matter of fact. In this respect, the SC noted that the spirit and letter of the Conventions do not constitute an obstacle to the usage of modern technology and that their application and operation can be further improved by relying on such technologies. The Workshop held prior to the SC (*i.e.*, on 27 October 2003) clearly revealed the means, possibilities and advantages of using modern technologies in subject matters falling within the scope of the Conventions[1].

---

[1]   The Workshop was structured around the following presentations: MR THOMAS GOTTWALD & MR PETER FRANK (Federal Ministry of Justice, Austria): *eJustice – Datahighway to Austrian Courts – Electronic Legal Communication (ELC) – Transmission of Legal Documents*; MS JULIE NIND (Ministry of Justice, New Zealand): *Taking evidence by video link across Tasman*; MS DORY MCKENZIE & MR JAMES MASON (Foreign and Commonwealth Office, United Kingdom): *The issuance of Apostilles by the Foreign and Commonwealth Office*; MR OZIE STALLWORTH & MR KEVIN MENDELSON (National Notary Association, United States of America): *enjoa – The Electronic Notary Journal of Official Acts*.

## II.   APOSTILLE CONVENTION

*General considerations*

5.  Examination of practice under the Apostille Convention confirmed its *very wide use and effectiveness*, as well as the absence of any major practical obstacle. Against this background, the SC recommended strongly that States party to the Convention should continue to *promote* it to other States. In particular, Member States of the Conference which are not already party to the Convention are encouraged to consider actively becoming party to the Convention.

6.  The SC also stressed the *usefulness of linking the application of the Hague Adoption Convention of 1993 to the Apostille Convention*. In light of the high number of public documents included in a typical adoption procedure, the SC recommended that States that are party to the Adoption Convention but not to the Apostille Convention consider actively becoming party to the latter.

7.  The SC emphasised that the *use of information technology (IT) could have a positive impact on the operation of the Convention*, in particular through lowering costs and increasing the efficiency of the creation and registration of Apostilles.

8.  The SC noted the difficulties some States face with the recognition of Apostilles issued in States with numerous competent authorities (difficulties in identifying and verifying the competence of individual issuing authorities; differences in Apostilles issued within the same State). With a view to further promoting knowledge about the practical operation of the Convention, the SC recommended that States party send all *relevant information to the Permanent Bureau to be publicised on the Hague Conference's website, and that particular consideration to a FAQ-section be given.*

9.  Furthermore, the SC recommended that a *Handbook* on the practical operation of the Convention be prepared by the Permanent Bureau, subject to adequate resources being available for the purpose.

*Scope of the Convention*

10. With regard to *commercial and customs documents*, which are excluded from the scope of the Convention, the SC noted that despite some isolated concerns there were no developments that would justify the need to reconsider this exclusion. The SC suggested that the matter be further explored in the Handbook (see recommendation 9 above).

11. Regarding the application of an Apostille on a *certified copy* of a public document, the SC concluded that Article 1 of the Convention applies. Individual States, however, may decline to issue an Apostille to the certified copy of a document on the grounds of public policy.

*Competent Authorities*

12. In addition to the obligation mentioned in Article 6 (of the Convention), the SC recommended that States party make available to the Permanent Bureau a list of *all* competent authorities to issue Apostilles, including their full contact details (postal address, telephone and fax numbers, e-mail). The SC noted the importance of keeping this information updated.

13. The SC underlined the importance of the *principle that an Apostille that has been established according to the requirements of the Convention in the State of issuance must be accepted and produce its effects in any State of production*. With a view to further facilitating free circulation of Apostilles, the SC recalled the importance of the *Model certificate* annexed to the Convention. The SC recommended that Apostilles issued by competent authorities should conform as closely as possible to this model. However, variations in the form of an Apostille among issuing authorities should not be a basis for rejection as long as the Apostille is clearly identifiable as an Apostille issued under the Convention. *The SC firmly rejects, as contrary to the Convention, isolated practices among States party that require Apostilles to be legalised.*

14. The SC took note of some reports of *successful use of electronically or non-manually reproduced signatures of issuing authorities* and that the use of such signatures has not led to an increased incidence of fraud. At the same time, it was noted that most States party remained reticent towards the use of such signatures. The SC recommended the advantages of increased automation, but stressed the importance of applying appropriate anti-fraud measures to the production of automated signatures.

15. The SC agreed that it was important to maintain *mutual confidence* where electronically or non-manually reproduced signatures are used. In this respect, the SC underlined the important role that the *register* – which up to now has not often been called upon to verify the relevant information contained in a specific Apostille – could play in resolving any doubt in relation to an Apostille. The SC noted that maintenance of electronic registers could facilitate the process of verification.

16. The SC noted the *variety of means for affixing Apostilles* to the public document. These means may include rubber stamp, glue, (multi-coloured) ribbons, wax seals, impressed seals, self-adhesive stickers, etc.; as to an allonge, these means may include glue, grommets, staples, etc. The SC noted that all these means are acceptable under the Convention, and that, therefore, these variations cannot be a basis for the rejection of Apostilles.

17. As regards Apostilles to be issued for a *multi-page document*, the SC recommended that the Apostille be affixed to the signature page(s) of the document. When using an allonge, the Apostille may be affixed to the front or the back of the document.

18. The SC stressed that Apostilles may *not be refused in a State of production on the grounds that they do not comply with that State's national formalities and modes of issuance*. The only relevant consideration in this respect is that referred to in paragraph 13 above.

*Language*

19. The SC concluded that Article 4 of the Convention permitted the *use of more than one language* in the Apostille and that this might well assist in the circulation of documents. In the light of examples given by delegations it was clear that it was possible to create a form of Apostille with a number of languages and yet retain conformity with the model of the Apostille provided in the Convention. The SC recommended that States party give information on this to the PB for inclusion on the Hague Conference's website.

Costs

20. The SC recalled that the fees charged in connection with the issuing of the Apostille should be *reasonable*, particularly for situations like cross-border adoptions and maintenance procedures. One way of dealing with this could be to charge a single fee for a cluster of related documents rather than an individual fee for each document in a particular case.

*Retention of records in a Register*

21. As regards the issue of the retention and disposal of records in a register or card index established under Article 7, the SC did not suggest a minimum period during which records in a register should be kept. It concluded that it was a matter for each State party to develop *objective criteria* in this respect. The SC agreed that holding of information in electronic form would assist this process by making it easier to store and retrieve records.

*Effects of an Apostille*

22. The SC recalled that under the Convention, the effect of an Apostille is to "certify the authenticity of the signature, the capacity in which the person signing the document has acted and, where appropriate, the identity of the seal or stamp which it bears" (Art. 3). In particular, the *effect of an Apostille does not extend to the content of the public document* to which it is attached.

*Use of IT in issuing Apostilles*

23. The SC identified the following four stages in the issuing of an Apostille in respect of which the application of IT might be considered and thought that there was no reason in principle – as far as the use of IT proves to be cost-efficient – why IT should not be applied:

   1. maintenance of a secure electronic database of signatures for the purpose of verifying the signatures appearing on public documents for which an Apostille is requested;
   2. use of word-processing technology to complete the information to appear on the Apostille;
   3. use of electronically reproduced signatures of the issuing authority to be inserted through secure electronic means and printed on the Apostille;
   4. maintenance of an electronic register.

*E-Apostille?*

24. The SC recommended that States party and the PB should work towards the development of techniques for the generation of electronic Apostilles taking into account *inter alia* the UNCITRAL model laws on electronic commerce and on electronic signatures, both being based on the principles of non-discrimination and functional equivalence.

*Multi-unit States and Regional Economic Integration Organisations (REIOs)*

25. The SC took note of the position of one Member State that the existence of a Multi-unit State clause might assist that State to accede to the Convention, but there was insufficient priority for this to be the subject of a protocol on its own; if there were to be a Protocol on other issues, then such a clause might be considered.

26. The SC accepted that, at this point, there was no need to consider the application of the Convention to documents issued by REIOs.

## III.  EVIDENCE CONVENTION

*General considerations*

27. The SC recalled the importance of the Evidence Convention as a *bridge between common law and civil law* procedures relating to the taking of evidence in civil and commercial litigation.

28. With a view to overcoming some of the differences that have arisen among States party in interpreting the Convention, in particular the scope of a possible reservation under Article 23, the SC carefully reviewed some of the principles and practices relating to the Convention.

*Reservations under Article 23*

29. The SC recognised that the terms of Article 23, which permits a Contracting State to "declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents", are a continued source of misunderstandings. Having regard to the history of the provision, the SC agreed that Article 23 was intended to permit States to ensure that a request for the production of documents must be *sufficiently substantiated* so as to avoid requests whereby one party merely seeks to find out what documents may generally be in the possession of the other party to the proceeding. The SC noted that the wording of the particularised declaration submitted by the UK (*i.e.,* the proponent of the provision) reflected this purpose more adequately than the wording of Article 23. The UK declaration reads as follows:

> "In accordance with Article 23 Her Majesty's Government declare that the United Kingdom will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents. Her Majesty's Government further declare that Her Majesty's Government understand "Letters of Request issued for the purpose of obtaining pre-trial discovery of documents" for the purposes of the foregoing Declaration as including any Letter of Request which requires a person:
>
> a.   to state what documents relevant to the proceedings to which the Letter of Request relates are, or have been, in his possession, custody or power; or
> b.   to produce any documents other than particular documents specified in the Letter of Request as being documents appearing to the requested court to be, or to be likely to be, in his possession, custody or power."

30. Equally, the SC noted that Article 16 of the *Additional Protocol of 1984 to the Inter-American Convention on the Taking of Evidence Abroad* also more adequately reflects the concern of the proponents of Article 23 of the Evidence Convention. Article 16 of the Additional Protocol reads as follows:

> "The States Parties to this Protocol shall process a letter rogatory that requests the exhibition and copying of documents if it meets the following requirements:
>
> a.   The proceeding has been initiated;
> b.   The documents are reasonably identified by date, contents, or other appropriate information, and
> c.   The letter rogatory specifies those facts and circumstances causing the requesting party reasonably to believe that the requested documents are or were in the possession, control, or custody of, or are known to the person from whom the documents are requested.

The person from whom documents are requested may, where appropriate, deny that he has possession, control, or custody of the requested documents, or may object to the exhibition and copying of the documents, in accordance with the rules of the Convention.

At the time of signing, ratifying or acceding to this Protocol a State may declare that it will process the letters rogatory to which this article applies only if they identify the relationship between the evidence or information requested and the pending proceeding."[2]

31. The SC noted that in some instances where States have made a general, non-particularised declaration under Article 23, they may have mistakenly believed that they are only objecting to evidence requests submitted prior to the *opening of a proceeding in the State of origin*. In fact, "pre-trial discovery" means evidence requests submitted after the filing of a claim but before the final hearing on the merits.

32. Compounding the misunderstandings that may have prompted Contracting States to make a general declaration under Article 23 denying the "pre-trial discovery of documents", the SC noted that in some cases the judicial authorities of a State of origin have concluded that no requests for the production of documents were permitted under the Convention in a State having made such a general declaration. This may result in the State of origin applying its own domestic law for the taking of evidence against foreign parties.

33. The SC took note of the fact that following the discussion of the same issue during the SC meeting in 1989, some States revised their declaration under Article 23 to reflect the more particularised terms on the UK declaration. At the same time, another State party informed the SC about changes in its internal law to further limit the scope of pre-trial discovery, including by increasing the control of judges over discovery proceedings.

34. Against this background, the SC recommended that States which have made a general, non-particularised declaration under Article 23 *revisit their declaration* by considering an amendment adopting terms such as those contained in the UK declaration or in Article 16 of the Inter-American Protocol. In this connection, the SC further recommended the production of a new edition of the *practical Handbook* on the operation of the Convention.

*Scope of Article 23*

35. The SC noted that Article 23 expressly refers to "documents" and that the scope of the provision should not be extended to oral testimony.

*Article 1(2)*

36. The SC recommended that States party submit information to the Permanent Bureau as to how Article 1(2) was interpreted and, in particular, what national judicial proceedings would be regarded as "contemplated" for purposes of this provision.

*Mandatory and / or Exclusive character of the Convention*

37. The SC noted that there were still differing views among States party as to the obligatory and/or exclusive character of the Convention.

---

[2]  Reference was also made to the treatment of pretrial discovery of documents under Art. 9 of the *Inter-American Convention of 1975 on the Taking of Evidence Abroad*.

Arbitration

38. The SC noted that in some instances, and in accordance with the internal law of some States, the Convention has been made available for use in arbitration proceedings. The SC stressed that a request for the taking of evidence under the Convention would have to be presented by the relevant judicial authority of the State where the arbitration proceedings take place.

*Time issues*

39. The SC recommended that requests for evidence be presented as soon as practically possible so as to provide sufficient time for their execution in the State addressed.

40. The SC also urged States party to communicate to their Central Authorities and to the authorities receiving letters of request, the importance of expeditious execution of the requests.

41. With a view to avoiding unnecessary delays where a letter of request is deficient, the SC recommended that Central Authorities or executing authorities encourage the requesting authority to reformulate and resubmit its letter of request. In cases where the request appears to be partially deficient, the executing authorities should, wherever appropriate, execute the portion of a letter that is not deficient rather than to reject the entire request.

*Modern technologies*

42. The SC expressed general support for the use of modern technologies to further facilitate the efficient operation of the Convention. The SC noted that there seems to be no legal obstacle to the usage of modern technologies under the Convention. However, the use of some techniques may be subject to different legal requirements in different States (*e.g.*, obtaining the consent of all parties involved in the execution). In this respect, the SC recommended that States party make relevant information on legal requirements relating to specific techniques available to the Permanent Bureau

43. The SC stressed where a special method or procedure is requested for the taking of evidence (Art. 9(2)), the *exception* for methods that are "incompatible with the internal law of the State of execution or […] impossible of performance by reason of its internal practice and procedure or by reason of practical difficulties" should be interpreted narrowly to permit, to the greatest possible extent, the use of modern information technology.

44. The SC stressed that early informal contact among appropriate authorities to coordinate the presentation and execution of Letters of request might be facilitated by the use of modern information technology such as e-mail.

*Multi-unit States and Regional Economic Integration Organisations (REIOs)*

45. The SC took note of the position of one Member State that the existence of a Multi-unit State clause might assist that State to accede to the Convention, but there was insufficient priority for this to be the subject of a protocol on its own; if there were to be a Protocol on other issues, then such a clause might be considered.

46. The SC accepted that, at this point, there was no need to consider the application of the Convention in relation to REIOs.

## IV. SERVICE CONVENTION

*Forwarding Authorities*

47. The SC recalled that it is for the law of the requesting State to determine the competence of the forwarding authorities (Art. 3). Furthermore, the SC took note of information provided by number of experts about the position of forwarding authorities and concluded that most practical problems have been solved.

48. The SC invited all States party to provide information on the forwarding authorities and their competences to the Permanent Bureau for posting on the Conference's website. The SC also accepted a suggestion that such information be included on the Standard Form for a Request for Service[3].

49. The SC recommended that in any question of doubt as to the competence of the forwarding authority, rather than rejecting the request, the authorities in the State requested should seek to confirm that competence by either consulting the Conference's website or by making expeditious informal inquiries of the forwarding authorities, including by way of e-mail.

*Designation of Central Authorities*

50. The SC reaffirmed the requirement on States party to the Service Convention to designate a Central Authority under Article 2 and noted the serious difficulties which can arise in operating the Convention if such a designation is not made known to the depositary at the time of the deposit of the instrument of ratification or accession. The SC urged all States party which have not yet done so to designate, as soon as possible, a Central Authority. If delays may not be avoided in the designation of the Central Authority(ies), the SC urged that such States give full information to the Permanent Bureau about the arrangements provided to facilitate the functioning of the Convention pending such designation.

51. The SC requested all States party to provide to the Permanent Bureau complete contact information (postal address, telephone and fax numbers, e-mail and website addresses) for their Central Authorities, particularly for States that have designated more than one Central Authority or other authorities under Article 18. The SC noted the importance of regularly updating of this information on the Conference's website.

*Functioning of the Central Authorities*

52. The SC reaffirmed that it is for a State party to determine its own model for the organisation of the Central Authority functions. In particular, the SC noted that the terms of the Convention do not preclude a Central Authority from contracting activities under the Convention to a private entity, while retaining its status as Central Authority and ultimate responsibility for its obligations under the Convention[4].

53. The SC reaffirmed that according to Article 12(1), a State party shall not charge for its services rendered under the Convention. Nevertheless, under Article 12(2), an applicant shall pay or reimburse the costs occasioned by the employment of a judicial officer or other competent person. The SC urged States to ensure that any such costs reflect actual expenses and be kept at a reasonable level[5].

---

[3]  The Russian Federation did not support this recommendation and reserved its position.
[4]  The Russian Federation did not support this recommendation and reserved its position.
[5]  The Russian Federation did not support this recommendation and reserved its position.

54. The SC invited States party to make available to the Permanent Bureau all relevant information relating to costs, the availability and modalities of service by delivery under Article 5(2), as well as information relating to the alternative modes of transmission under the Convention, for posting on the Conference's website.

*Alternative channels of transmission*

55. The SC reaffirmed its clear understanding that the term "send" in Article 10(a) is to be understood as meaning "service" through postal channels.

56. The SC considered the increasing use of private courier services for the expeditious transmission of documents in a variety of business settings and heard reports that such couriers have been used to serve process under Article 10(a) of the Convention. In light of that, the SC concluded that for the purposes of Article 10(a) the use of a private courier was the equivalent of the postal channel.

57. The SC noted the further clarification submitted by the Japanese delegation on its position regarding Article 10(a):

> "Japan has not declared that it objects to the sending of judicial documents, by postal channels, directly to addressees in Japan. As the representative of Japan made clear at the Special Commission of April 1989 on the practical operation of the Service and Evidence Conventions, Japan does not consider that the use of postal channels for sending judicial documents to persons in Japan constitutes an infringement of its sovereign power.
> Nevertheless, as the representative also indicated, the absence of a formal objection does not imply that the sending of judicial documents by postal channels to addressees in Japan is always considered valid service in Japan. In fact, sending documents by such a method would not be deemed valid service in Japan in circumstances where the rights of the addressee were not respected."

58. The SC noted that the UK confirmed its position expressed at the Special Commission meeting of 1989, indicating its preference for the use of direct service through English solicitors on residents of England and Wales.

*Use of IT*

59. The SC stressed that the operation of the Convention was to be considered in light of a business environment in which use of modern technology was now all pervasive, and that the electronic transmission of judicial communications is a growing part of that environment. In this light, conclusions could be reached as follows:

60. The Convention does not on its terms prevent or prescribe the use of modern technologies to assist in further improving its operation.

61. The Convention does not on its terms deal with internal procedures but there is a link between domestic law systems and the functioning of the Convention.

62. It can be concluded, however, that the transmission of documents internationally for the purposes of the Convention can and should be undertaken by IT-Business methods including e-mail; this is already happening and the SC recommends that States party to the Convention explore all ways in which they can use modern technology for this purpose.

**Appendix 100**

63. In this light, the SC identified a variety of steps for which the use of electronic means may be immediately explored: communication between a requesting party and a forwarding authority, communication between a forwarding authority and a Central Authority of a requested State, and retransmission of the certificate of execution by the designated authority.

64. The SC also recognised that in many domestic legal systems the relevant legal procedures and technological conditions did not allow for service by electronic means, although in certain systems the use of e-mail and fax was permitted in certain circumstances, particularly where approved by judicial authority in advance or agreed by the parties. Nevertheless, the SC recognised that given the pace of technological developments, existing problems might well be overcome so as to enable service by these methods to become more widely used. States party to the Convention are therefore encouraged to explore ways in which such innovations can be achieved.

*Translation requirements*

65. The SC recognised that no translation is required, under the Convention, for transmission under alternative channels provided by the Convention; the SC noted, however, that in isolated cases such translation requirements are imposed by a State's internal law.

66. The SC noted that the vast majority of States party do not require a translation for service by way of informal delivery (Art. 5(2)).

67. As to the translation requirement for service under Article 5(1), the SC also noted the importance of respecting the various requirements provided in the national laws of States party.

68. The SC invited the States party to make available to the Permanent Bureau all relevant information (incl. any declaration) regarding the extent of any translation requirement for execution of requests under Article 5. The SC also invited States party to provide information as to the consequences under their domestic law when acting as requesting State of a refusal of an addressee to accept service under the Convention.

*Scope of application*

69. As to the meaning of the terms "civil or commercial matters", the SC urged for a broad interpretation of these terms and reaffirmed the following conclusions adopted in 1989:

   a.  The Commission considered it desirable that the words "civil or commercial matters" should be interpreted in an *autonomous* manner, without reference exclusively either to the law of the requesting State or to the law of the requested State, or to both laws cumulatively.
   b.  In the "grey area" between private and public law, the historical evolution would suggest the possibility of a more *liberal interpretation* of these words. In particular, it was accepted that matters such as bankruptcy, insurance and employment might fall within the scope of this concept.

70. In addition, the SC took note of the fact that while in some States tax issues were considered as falling within the scope of the Convention, in others this was not the case.

71. The SC also noted that in some States party, the Convention had been applied in proceedings relating to the recovery of proceeds of crime.

**Appendix 101**

72. Finally, the SC cautioned that the meaning of "civil and commercial" appearing in other instruments should not be relied on for interpretation without considering the object and purpose of such other instruments.

*Mandatory and/or exclusive character of the Convention*

73. Recalling the conclusions and recommendations of 1989, the SC confirmed the prevailing view that the Convention was of a non-mandatory, but exclusive character as described in more detail in the provisional version of the new edition of the Practical Handbook, without prejudice to international law on the interpretation of treaties.

74. The SC recalled the purpose and fundamental importance of Article 15(2), which is designed to ensure actual notice to a defender in sufficient time to organise his or her defence.

*Double-date*

75. The SC considered and rejected a proposal that States party adopt a recommendation to implement a system of double-date, according to which the interests of the plaintiff (*e.g.*, limitation periods) and those of the defendant (*e.g.*, time to file his or her defence) have to be protected by assigning different dates. The SC took note that many legal systems have effective means to protect the interests of the plaintiff without having to rely on the actual date of service.

*Exclusion of the application of the Convention between the parties*

76. The SC took note of the practice reported in one State party to the Convention whereby contractual arrangements were entered into and upheld in the courts of that State which excluded the application of the Convention for service of documents as regards parties to such contracts, including parties outside that State.

77. Several experts commented to the effect that this would not be allowed in their States and be considered as contrary to their internal law. Some experts indicated, however, that a judgment rendered pursuant to service in accordance with any such contractual arrangements would not necessarily be refused execution.

*Exequatur*

78. The SC recalled that the Convention does not address the issue of recognition and enforcement of judgments. In addition, experts reaffirmed the need for the Convention to operate so as to sustain the procedural rights of the defender. In particular, the SC recalled again the principle that the defender should be given actual notice in sufficient time to allow him or her to organise a defence. This was significant notably where in the State addressed consideration was given to the validity of service.

*Reservations and reciprocity*

79. The SC noted that States party do not assert reciprocity against other States party that have made declarations under Articles 8 and 10.

*Regional Economic Integration Organisations (REIOs)*

80. The SC accepted that, at this point, there was no need to consider the application of the Convention in relation to REIOs.

**Appendix 102**

Future Work: Form and Handbook

81. The SC accepted that future work on the forms be undertaken by the PB in conjunction with a representative group of experts to be designated by the Secretary General, in particular with a view to assessing the necessity of amending the forms and to develop guidelines for completing those forms.

82. The SC welcomed the draft version of the new edition of the Practical Handbook prepared by the Permanent Bureau. The SC invited the Permanent Bureau to finalise the new edition, taking into account the conclusions and recommendations adopted by the SC and emphasised the desirability of maintaining and enhancing the practical utility of the Handbook in conjunction with the information provided on the Conference's website.

The Hague / 20 November 2003

**Office of Private International Law, Office of the Legal Adviser, Department of State, Response to Questionaire**

# Questionnaire relating to the *Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters* (Service Convention)

| Responding State: | United States of America |
|---|---|

## I.  General Feedback

1.  How does your State rate the general operation of the Service Convention?

    (b)   Good.

2.  How does your State rate the useability of the HCCH Practical Handbook on the Operation of the Service Convention?

    (b)   Good.

3.  Does your State's Central Authority have a manual or electronic case management register or system that is used to track incoming requests under the Service Convention?

    (a)   Yes – electronic for incoming only.

4.  If your State's Central Authority has oversight for all outgoing requests, please indicate if there is a system used to track the progress of these.

    (d)   Other.
         *"The U.S. Central Authority does not have oversight for outgoing requests."*

## II.  Scope of the Convention

5.  In the previous five years*, has your State experienced any difficulties in interpreting the scope of the Service Convention?

    *If your State has become a Party to the Convention during the previous five years, responses to this questionnaire should reflect the period of time, commencing from when the Convention entered into force in your State.

    (d)   No.

### A.   Extrajudicial documents

6.  Is the concept of "extrajudicial documents" (Art. 17) defined in the internal law of your State?

    (b)   No.

7.  What types of extrajudicial documents are **transmitted** under the Service Convention by your State?

    *"Most incoming requests are only for judicial documents; however, some of the requests for service of extrajudicial documents that have been transmitted are from attorneys, usually in connection with litigation or in anticipation or litigation, notices from foreign government agencies, or settlement demands from prosecutor's offices."*

# III.   Operation of the Convention

Requesting State refers to the State from which a request for service is, or will be, issued.
Requested State refers to the State to which a request for service is, or will be, addressed.

8.   As the **requested State**, does your State provide assistance to locate a person to be served under the Service Convention?
*(The Special Commission, at its 2014 meeting, encouraged Contracting Parties to provide such assistance consistent with their legal and structural capabilities, when able to do so, see C&R No 23.)*

   (a)   Yes.
   *"The U.S. Central Authority delegated the ministerial act of service on private individuals and companies pursuant to the Convention to ABC Legal Services, a process server. All incoming requests for service under the Convention for private individuals and companies are transmitted to and executed by ABC Legal Services. ABC Legal will attempt to resolve issues with incomplete or incorrect addresses by finding the closest possible match to the address provided in the request. If, in the course of attempts to serve, it is discovered that the subject or entity can no longer be found at the requested address, ABC Legal provides a complimentary investigation to locate the subject. ABC Legal's investigation department can use a name, previous address, and/or date of birth to conduct a search to find a new or updated address. If a valid new address is identified, ABC Legal will confirm with the foreign applicant whether a new attempt at service should be made for an additional fee."*

9.   As the **requesting State**, how would your State transmit a document for service upon another State, a State official, or a State-owned company?

   (b)   The Service Convention would apply, through:
       (i)    Main channel of transmission (Art. 5);
       (iv)   Indirect diplomatic channel (Art. 9(2));
       (v)    Postal channel (Art. 10(a));

10.  As the **requested State**, how is a request for service on your State, State official or State-owned company executed?

   *"Requests for service on the United States Government, which includes its officials (when named in an official capacity), departments, agencies, or instrumentalities, can be transmitted to the U.S. Central Authority under Article 5 of the Hague Service Convention or through diplomatic channels under customary international law. If the request for service complies with the requirements of the Hague Service Convention (if serving pursuant to the Convention) and customary international law requirements, service is executed by serving the appropriate United States Government office. While the United States does not object to Article 10 service by postal channels for private individuals or companies, service on the United States Government cannot be effected through Article 10. For more information, please see: https://www.justice.gov/civil/service-requests."*

11.  Does your State serve judicial and extrajudicial documents in the same way?

   (a)   Yes.

## A.   Main Channel of Transmission (Art. 5)

12.  In your State, what are the authorities or who are the persons competent to forward a request for service to a foreign Central Authority?

   (a)   Courts / Tribunals.
   (b)   Prosecutors.
   (e)   Process servers.

2

**Appendix 106**

(g)    Other.
       *"The persons and entities within the United States competent to transmit service requests abroad pursuant to Article 5 of the Convention include any court official, any attorney, or any other person or entity authorized by the rules of the court. See Rule 4 of the Federal Rules of Civil Procedure."*

13.    Do outgoing requests for service have to be transmitted through your State's Central Authority?

       (b)    No.

14.    As the **requested State**, when no particular method is requested by the applicant, what is the primary / default method of service? (Art. 5(1)(a))

       (b)    Personal service.

15.    In the previous five years*, as the **requested State**, has your State **received** a request with a particular method of service requested by the applicant? (Art. 5(1)(b))

       *If your State has become a Party to the Convention during the previous five years, responses to this questionnaire should reflect the period of time, commencing from when the Convention entered into force in your State.

       (a)    Yes.

15.1. If yes, what method of service was requested?

       (a)    Personal service.
       (b)    By post.

15.2. If yes, was the requested method of service able to be executed?

       (a)    Yes.

16.    In the previous five years*, as the **requesting State**, has your State's forwarding authorities requested a particular method of service? (Art. 5(1)(b))

       *If your State has become a Party to the Convention during the previous five years, responses to this questionnaire should reflect the period of time, commencing from when the Convention entered into force in your State.

       (c)    Unknown.

16.1. If yes, what particular method of service was requested?

       N/A

16.2. If yes, was the requested method of service able to be executed?

       N/A

16.3.  If yes, were there costs associated with this method of service?

       N/A

**Appendix 107**

## B.    Alternative Channels of Transmission (Arts 8, 9 & 10)

State of origin refers to the State in which proceedings are commenced and where the document to be served originates.
State of destination refers to the State where service is, or will be, effected.

### 1.    Model Form

Use of the Model Form is mandatory for the main channel of transmission. The Special Commission, at its 2009 meeting, urged State Parties to widely encourage the use of the part of the Model Form containing the "Summary", accompanied by the "Warning" (see C&R No 31).

17.    As the **State of origin**, does your State use the "Warning" and "Summary" sections of the Model Form when transmitting a request through alternative channels?

    (d)    Unknown.

18.    As the **State of destination**, does your State use the "Certificate" section of the Model Form when informing whether documents have been served (in response to a request received through alternative channels)?

    (d)    Unknown.

### 2.    Diplomatic and Consular Agents (Art. 8)

19.    In the previous five years*, have the diplomatic or consular agents of your State directly effected service of judicial or extrajudicial documents upon a person abroad? (Art. 8(1))

    *If your State has become a Party to the Convention during the previous five years, responses to this questionnaire should reflect the period of time, commencing from when the Convention entered into force in your State.

    (b)    No.

20.    In the previous five years*, has service by diplomatic or consular agents of your State been rejected by the addressee? (Art. 8(1))

    *If your State has become a Party to the Convention during the previous five years, responses to this questionnaire should reflect the period of time, commencing from when the Convention entered into force in your State.

    (c)    Unknown.

### 3.    Diplomatic and Consular Channels (Art. 9)

21.    In the previous five years*, has your State used consular channels to forward documents? (Art. 9(1))

    *If your State has become a Party to the Convention during the previous five years, responses to this questionnaire should reflect the period of time, commencing from when the Convention entered into force in your State.

    (b)    No.

**Appendix 108**

22.   In the previous five years*, under exceptional circumstances, has your State used diplomatic channels to forward documents? (Art. 9(2))

*If your State has become a Party to the Convention during the previous five years, responses to this questionnaire should reflect the period of time, commencing from when the Convention entered into force in your State.

(a)   Yes.
      *"Requests for service through diplomatic channels, traditionally under customary international law, have been transmitted for service on a foreign state. The process for outgoing requests for service on a foreign state is governed by 28 U.S.C. § 1608(a)."*

### 4.   Postal Channel (Art. 10(a))

23.   Has your State (as the **State of destination**) objected to service under Article 10(a)?

(b)   No.

23.1. If an objection has been made under Article 10(a), does your State continue to use postal channels for service as the State of origin, despite the objection?

N/A

23.2. If no objection has been made, does your State, as the **State of destination**, accept the use of postal channels for service from other States of origin that have made an objection under Article 10(a)?

(a)   Yes.

23.3. If no objection has been made, which of the following categories does your State recognise as a "postal channel" under Article 10(a)?

(a)   Regular post.
(b)   Registered (tracked) post, with receipt.
(c)   Private courier, such as FedEx.
(d)   E-mail

23.4. If no objection has been made, more specifically, would your State consider service by e-mail to be analogous to service by postal channels under Art. 10(a)?

(a)   Yes.

23.5. If no objection has been made, does your State require the documents served to be translated into one of your State's official languages?

(b)   No.

### 5.   Judicial Officers, Officials or other Competent Persons (Art. 10(b))

24.   Has your State objected to service under Article 10(b)?

(b)   No.

**Appendix 109**

24.1. If no objection has been made, which of the following categories does your State recognise as a "judicial officer, official or other competent person" under Article 10(b), either for sending or receiving?

(a)     Attorney or solicitor.
(d)     Court official.
(g)     Process server.
(h)     Other.
        *"See Rule 4 of the Federal Rules of Civil Procedure or applicable U.S. state civil procedure rules for the competent parties in the United States who can effect service."*

24.2. If no objection has been made, how does this channel of transmission operate in practice?

*"The United States has no objection to the informal delivery of such documents by members of diplomatic or consular missions in the United States, through the mail, or by private persons, if that would be effective under applicable law, provided no compulsion is used. See Rule 4 of the Federal Rules of Civil Procedure or applicable U.S. state civil procedure rules for the competent parties in the United States who can effect service and how service is effected."*

24.3. If no objection has been made, are there costs associated with this channel of transmission?

(a)     Yes.
        *"Private process servers charge a fee per request for service."*

### 6.     Person Interested in a Judicial Proceeding (Art. 10(c))

25.     Has your State objected to service under Article 10(c)?

(b)     No.

25.1. If no, which of the following categories does your State recognise as "any person interested in a judicial proceeding" under Article 10(c), either for sending or receiving?

(a)     Attorney or solicitor.
(b)     Bailiff.
(c)     *Huissier.*
(d)     Court official.
(e)     Notary.
(g)     Other.
        *"See Rule 4 of the Federal Rules of Civil Procedure or applicable U.S. state civil procedure rules for the competent parties in the United States who can effect service."*

25.2. If no, how does this channel of transmission operate in practice?

*"The United States has no objection to the informal delivery of such documents by members of diplomatic or consular missions in the United States, through the mail, or by private persons, if that would be effective under applicable law, provided no compulsion is used. See Rule 4 of the Federal Rules of Civil Procedure or applicable U.S. state civil procedure rules for the competent parties in the United States who can effect service and how service is effected."*

25.3. If no, are there costs associated with this channel of transmission?

(a)     Yes.
        *"Private process servers charge a fee per request for service."*

**Appendix 110**

### C.    Refusal to Execute Request (Art. 13)

26.    In the previous five years\*, has your State refused a request for service on grounds of infringing "sovereignty or security"?

   \*If your State has become a Party to the Convention during the previous five years, responses to this questionnaire should reflect the period of time, commencing from when the Convention entered into force in your State.

   (a)    Yes.
   "In the past five years, the U.S. Central Authority has refused to execute 43 requests for service on the grounds of that the request infringed on the "sovereignty or security" of the United States. Common grounds for asserting an Article 13 rejection include, but are not limited to, garnishment of sovereign funds, claims relating to wartime activities, attachment of sovereign assets, and no record of service of the underlying proceeding when seeking to serve or enforce a default judgment. There are no U.S. court decisions to attach as U.S. courts do not review incoming service requests to make a determination of whether a request should be refused on the basis of Article 13."

27.    In the previous five years\*, has a request from your State been refused on grounds of infringing "sovereignty or security"?

   \*If your State has become a Party to the Convention during the previous five years, responses to this questionnaire should reflect the period of time, commencing from when the Convention entered into force in your State.

   (c)    Unknown.


## IV.    Use of Information Technology

In 2019, the PB circulated a questionnaire on the use of information technology in relation to the operation of the Service Convention. That survey was concluded prior to the COVID-19 pandemic. The questions below seek information from Contracting Parties on the use of technology and in light of the pandemic.

28.    Has your State taken any steps (including through legislation) to enable or increase the use of technology to facilitate the operation of the Service Convention, including in response to the COVID-19 pandemic?

   (a)    Yes.
   *"ABC Legal Services, the U.S. Central Authority's designated process server for all incoming Convention requests for private individuals and companies, uses an online database and platform. The platform allows requesting authorities to upload their requests for service online, make the necessary payment, receive status and progress updates, communicate with staff, and obtain their proof of service. ABC Legal also accepts requests by email. The entire process of transmission of requests to ABC Legal, correspondence, and the transmission of the proof of service can now be done electronically."*

29.    Do the forwarding authorities of your State transmit requests under the Service Convention electronically?

   (a)    Yes.

**Appendix 111**

29.1. If yes, what methods of transmission do the forwarding authorities of your State use?

    (a)    E-mail (regular).
    (b)    E-mail (secured / encrypted).

30.    Does your State's Central Authority accept requests under the Service Convention transmitted electronically in circumstances where **only** an electronic copy is provided (and where a paper copy is not subsequently provided)?

    (a)    Yes.

30.1. If yes, what methods of transmission does your State accept?

    (a)    E-mail (regular).
    (b)    E-mail (secured / encrypted).
    (d)    Electronic transmission via online platform administered by a private service provider.

30.2. If no, please provide further information about why this is not yet possible.

    N/A

31.    Does your State permit execution of service via electronic means?

    (g)    Other.
    *"See Rule 4 of the Federal Rules of Civil Procedure or applicable U.S. state civil procedure rules for the competent parties in the United States who can effect service and how service is effected. Service by electronic means may be allowed but typically only if the parties consent to service by email or a U.S. court grants permission in domestic litigation to serve by email. Service by email is not a form of service currently utilized by the U.S. Central Authority (and ABC Legal) under the Convention."*

31.1. If no, what are your State's reasons for refusing to execute the requests for service to be performed by using information technology?

    N/A

32.    What challenges, if any, has your State faced regarding the use of information technology under the Service Convention?

    (h)    Other.
    *"Incoming requests for service under the Convention are too voluminous; too many documents are sent, making electronic transmission impossible."*

33.    In your State's opinion, what further work could the PB do on the use of information technology under the Service Convention?

    (b)    Development of a Guide to Good Practice.
    (c)    Other.
    *"Further clarification from countries whether they allow service by email. Promoting the use of electronic means to transmit service requests and proofs of service."*

34.    In addition to the Service Convention, is your State a Party to any bilateral, regional, or multilateral agreements that provide rules for the service of documents abroad?

    (a)    Yes.

**Appendix 112**

*For Parties that answered "yes" to Q34 above:*

34.1. Do any of these agreements provide for the use of electronic means (*e.g.*, e-mail) to transmit or execute requests for service?

    (b)    No.

# V.    2023 Meeting of the Special Commission & Monitoring

35.    What are the three key topics or practical issues related to the Service Convention that your State would like discussed at the 2023 meeting of the Special Commission?

    1.    *"Service by email and whether an Article 10(a) objection to service by postal channels is analogous to objecting to service by email. How service pursuant to Article 5(c) works in practice and promoting a better understanding of Article 5(c) among contracting states."*
    2.    *"Adherence to technical Convention requirements and country-specific requirements for making a proper Convention request. What documents for service should be transmitted abroad with the goal of reducing voluminous requests for service which hinder or prohibit being able to transmit the request electronically."*
    3.    *"Providing contact information for foreign applicants; completing and updating Practical Information pages for contracting states. Educating courts on the significance of certificates rejecting a service request."*

35.1. Please indicate whether the information provided in Q35 above may be published.

    (a)    Yes.

36.    Does your State have any suggestions that could assist in the promotion, implementation, or operation of the Service Convention?

    (a)    Yes.
    *"-Encouraging contracting states to adopt electronic transmission of requests for service and electronic transmission of the certificate/proof of service.*
    *-Encouraging countries to complete and update their Practical Information pages. Switching the Practical Information pages to a portal that allows Central Authorities to directly update and edit their information.*
    *- Workshops or seminars where contracting states can exchange lessons learned and best practices; trainings for contracting states who have recently joined the Convention.*
    *-Quarterly meetings by video-link for Central Authorities to network and discuss current issues with the operability of the Convention.*
    *-An email distribution list for Central Authorities so updates and developments can be easily and quickly shared among contracting states."*

36.1. If the answer to Q36 above is "yes", please indicate whether the information provided may be published.

    (a)    Yes.

**Appendix 113**

37.    The PB is in the process of revising the Service Handbook. Are there any specific topics, suggestions for presentation or formatting, or any other proposals you recommend for inclusion?

   (a)    Yes.
          *"-Drawing a distinction between service of process (judicial and extrajudicial documents) and service of a subpoena or a request for evidence. Further discussion is needed whether the Hague Service Convention is or is not an appropriate vehicle for service of a subpoena.*
          *-A specific section asking contracting states which alternative service means are permissible, such as service by email or publication.*
          *-Which contracting states permit service through the Hague Service Convention Article 5 for service on a foreign state.*
          *-Better explanations of how Articles 8, 9, and 10 operate in practice and how they are implemented by various contracting states.*
          *-Further discussion of "civil or commercial" and what matters are considered to be outside the scope of the Convention and how the definition of "civil or commercial" may have changed over time.*
          *-What contracting states provide assistance with finding and/or confirming addresses. What is the process for contracting states who can provide assistance with finding and/or confirming an address.*
          *-The distinction between transmitting a service request to a Central Authority and effecting service upon a defendant. The Central Authority may not be treated as an agent of the defendant on whom the document is to be served, especially when serving a foreign state."*

37.1.  If the answer to Q37 above is "yes", please indicate whether the information provided may be published.

   (a)    Yes.

**Appendix 114**

# DATA & STATISTICS FOR CONTRACTING PARTIES

## I. Statistics under Main Channel of Transmission (Art. 5)

### A. Incoming Requests

1. How many incoming requests for service did your State receive under the main channel of transmission (Art. 5) in each of the following years?

| | |
|---|---|
| 2017 | 7182 |
| 2018 | 7857 |
| 2019 | 8046 |
| 2020 | 5835 |
| 2021 | 8272 |
| 2022 | 7323 |
| Unknown – *please explain.*<br>- | |

2. Which three States made the most requests?

| Requesting State | Number |
|---|---|
| France | 11929 |
| Germany | 7662 |
| Vietnam | 4027 |

3. If possible, please provide a breakdown of how long (in months) it took to execute incoming requests.

| | < 1 | 1-3 | 3-6 | 6-12 | > 12 |
|---|---|---|---|---|---|
| 2017 | x | | | | |
| 2018 | x | | | | |
| 2019 | x | | | | |
| 2020 | x | | | | |
| 2021 | x | | | | |
| 2022<br>(if data<br>available) | x | | | | |
| Unknown – *please explain.*<br>- | | | | | |

**Appendix 115**

4.    How many of these incoming requests for service did your State receive via **electronic transmission** in each of the following years?

| 2017 | 0 |
|------|---|
| 2018 | 2 |
| 2019 | 1 |
| 2020 | 886 |
| 2021 | 952 |
| 2022 | 1086 |
| Unknown – *please explain*. - | |

5.    How many incoming requests for service did your State **execute for service** via electronic means in each of the following years?

This is regardless of whether a paper copy of the documents was subsequently provided.

| 2017 | 0 |
|------|---|
| 2018 | 0 |
| 2019 | 0 |
| 2020 | 0 |
| 2021 | 0 |
| 2022 | 0 |
| Unknown – *please explain*. - | |

6.    Are execution times for electronically transmitted requests for service generally faster than those transmitted by post?

(a)    Yes, significantly faster.

**Appendix 116**

### B.    Outgoing Requests

7.    How many outgoing requests for service did your State make under the main channel of transmission (Art. 5) in each of the following years?

| 2017 | - |
|------|---|
| 2018 | - |
| 2019 | - |
| 2020 | - |
| 2021 | - |
| 2022 | - |
| Unknown – *please explain.* "*The U.S. Central Authority does not have oversight for outgoing requests.*" | |

8.    Which three States were the subject of the most requests?

      N/A

9.    How many outgoing requests for service did your State make via electronic transmission under the main channel of transmission (Art. 5) in each of the following years?

| 2017 | - |
|------|---|
| 2018 | - |
| 2019 | - |
| 2020 | - |
| 2021 | - |
| 2022 | - |
| Unknown – *please explain.* "*The U.S. Central Authority does not have oversight for outgoing requests.*" | |

## II.    Statistics under Alternative Channels of Transmission

10.    Does your State have statistics on incoming requests under alternative channels of transmission?

       (a)    Yes, Article 8.
       (b)    Yes, Article 9.
       (c)    Yes, Article 10(a).
       (d)    Yes, Article 10(b).
       (e)    Yes, Article 10(c).
       (x)    No, none of the above.

13

**Appendix 117**

10.1. If yes, how many (total) incoming requests for service did your State receive under the alternative channels of transmission in each of the following years?

N/A

## III.  Refusals (Art. 13)

11.   If applicable, please indicate how many incoming requests for service your State refused to comply with between 2017 and 2022?

*"43 incoming requests. Of the 43 requests, 28 requests were submitted in relation to unique cases, the remaining refusals were issued in relation to previous cases."*

12.   If applicable, please indicate how many outgoing requests for service transmitted by your State were refused between 2017 and 2022?

*"Unknown. The U.S. Central Authority does not have oversight for outgoing requests."*

**Appendix 118**

# CASE LAW, ADDITIONAL INFORMATION & SUPPORTING DOCUMENTS

## I.     Case Law

Please list all your State's judicial decisions that have considered the Service Convention since 2014 and provide a link to, or upload the decisions (in PDF format only).

*1 file uploaded.*

## II.    Additional Documents

Please provide links to and / or any additional information or documentation to support your response (in PDF format only). This may include:

⇒ resources for the general public or guidelines for Central or other Authorities' staff;
⇒ implementation legislations, recent legislative developments; or
⇒ books, articles, or other published work.

*1 file uploaded.*

# PUBLICATION OF RESPONSES

Please confirm whether your responses to this questionnaire can be published on the HCCH website.

(a)     Yes.

**OUTLINE-HCCH 1965 SERVICE CONVENTION**



# Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters

Service is an essential part of any legal proceeding, but one that can be costly and time-consuming in cross-border cases. The Service Convention seeks to simplify this process, establishing a uniform framework designed to facilitate and streamline the channels of transmission for judicial or extrajudicial documents to be served abroad.

The Convention provides for one main channel of transmission between Contracting Parties, while preserving flexibility to use alternative channels. The Convention deals primarily with the transmission of documents; it does not address or comprise substantive rules relating to the actual service of process.

There are, however, two channels of transmission provided for by the Convention where the transmission process includes service of process upon the ultimate addressee: the direct diplomatic or consular channels and the postal channel. For all other channels of transmission under the Convention an additional step, not governed by the Convention, is required to complete service on the ultimate addressee.

## Principal features of the Convention

### Scope of the Convention

The Convention applies where: (i) a judicial or extrajudicial document is (ii) to be transmitted for service from one Contracting Party to another, (iii) the address of the person to be served is known, and (iv) the document to be served relates to a civil or commercial matter (Art. 1). The Convention is exclusive, which means, if these requirements are met, the transmission channels provided for under the Convention must be applied. In relation to the requirement of transmission to another Contracting Party, it is important to note that it remains for the law of the forum to determine whether transmission abroad is necessary.

### Main channel of transmission

The main channel of transmission under the Convention is where an authority or judicial officer competent in one Contracting Party transmits a request for service to the Central Authority of the Contracting Party in which service is to be effected (Art. 5). The request must conform to the Model Form annexed to the Convention.

The Central Authority of the requested Contracting Party shall, under its own law, serve the document or arrange for its service by a competent authority (Art. 5). However, the applicant (*i.e.* the forwarding authority in the requesting Contracting Party) may request that a particular method or procedure be used, to the extent that it is not incompatible with the law of the requested Contracting Party.

Finally, the authority executing the request must complete the certificate as annexed to the Convention, stating that service was effected, or if not, the reasons that prevented service (Art. 6).

*Alternative channels of transmission*

The Convention preserves the freedom of Contracting Parties to use alternative channels of transmission, including through:

- diplomatic or consular channels (Arts 8 and 9);
- postal channels (Art. 10(a));
- direct communication between judicial officers, officials or other competent persons (Art. 10(b)); and
- direct communication between an interested party and judicial officers, officials or other competent persons (Art. 10(c)).

There is no hierarchy of the channels of transmission, and transmission through one of the alternative channels does not lead to service of lesser quality. A Contracting Party may object to the use of these alternative channels (Art. 10). This information is available on the status table on the Service Section of the HCCH website.

*Protection of the defendant*

Regardless of the channel of transmission used, the Convention protects defendants from a default judgment. A default judgment shall not be given unless it is established that service was effective under the Convention (Art. 15). If judgment has already been given, a defendant may apply for relief (Art. 16).

## Role of authorities

The Convention provides for a system of Central Authorities in all Contracting Parties. A Central Authority's main role is to receive requests for service of documents, either serving the documents or arranging for them to be served. The Convention also provides for the designation of additional authorities and leaves Contracting Parties free to determine the extent of their competence.

## The use of technology

The technology-neutral language of the Convention allows Contracting Parties to use modern technology in the transmission and execution of requests. In practice, this is generally subject to the law of the requested Contracting Party.

## Additional resources

The Service Section of the HCCH website contains the latest information about the Service Convention. This includes:

- Text of the Convention
- Status table of Contracting Parties
- List of Central Authorities and practical information by Contracting Party
- Explanatory Report on the Service Convention
- Practical Handbook on the Operation of the Service Convention
- Mandatory Model Form for Requests

**Appendix 122**

**U.S. Supreme Court Docket No, 16-254, Brief for the United States as Amicus Curiae Supporting Petitioner**

# In the Supreme Court of the United States

WATER SPLASH, INC., PETITIONER

*v.*

TARA MENON

*ON WRIT OF CERTIORARI
TO THE COURT OF APPEALS OF TEXAS,
FOURTEENTH DISTRICT*

**BRIEF FOR THE UNITED STATES
AS AMICUS CURIAE SUPPORTING PETITIONER**

NOEL J. FRANCISCO
  *Acting Solicitor General
  Counsel of Record*
JOYCE R. BRANDA
  *Acting Assistant Attorney
  General*
EDWIN S. KNEEDLER
  *Deputy Solicitor General*
JEANNE E. DAVIDSON
KATERINA V. OSSENOVA
DOUGLAS N. LETTER
SHARON SWINGLE
  *Attorneys*

RICHARD C. VISEK
  *Acting Legal Adviser
  Department of State
  Washington, D.C. 20520*

  *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

## QUESTION PRESENTED

The Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (Hague Service Convention), *done* Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163, authorizes transmission of judicial and extrajudicial documents for service of process from one contracting state to another contracting state. The question presented is whether Article 10(a) of the Hague Service Convention authorizes service of process by mail.

(I)

## TABLE OF CONTENTS

Page

Interest of the United States.................................................... 1
Treaty provisions involved........................................................ 2
Statement ................................................................................ 2
Summary of argument .............................................................. 7
Argument:
    Article 10(a) of the Hague Service Convention permits
    service of process by postal channels .................................. 9
        A.  The text, context, and history of the Hague
            Service Convention show that Article 10(a),
            like the rest of the Convention, pertains to
            service of process ....................................................... 10
        B.  The Executive Branch has consistently
            interpreted Article 10(a) to permit service of
            process by postal channels....................................... 17
        C.  Other parties to the Convention agree that
            Article 10(a) permits service by postal
            channels .................................................................... 20
        D.  Policy concerns do not support the lower court's
            reading of Article 10(a)........................................... 27
Conclusion ............................................................................... 30
Appendix — Treaty provisions................................................ 1a

## TABLE OF AUTHORITIES

Cases:

    *Abbott* v. *Abbott*, 560 U.S. 1 (2010)................................ 17, 20
    *Air France* v. *Saks*, 470 U.S. 392 (1985)....................... 10, 14
    *Bankston* v. *Toyota Motor Corp.*, 889 F.2d 172
      (8th Cir. 1989)................................................................ 9, 18
    *Brockmeyer* v. *May*, 383 F.3d 798 (9th Cir. 2004) ....... 10, 24
    Case C-412/97, *ED Srl* v. *Italo Fenocchio*,
      1999 E.C.R. I-3874........................................................... 23

(III)

IV

Cases—Continued:                                                    Page

Efeteia [Efet.] [court of appeals] 3299/2000, p. 165
(Greece).................................................................................. 23

*Lozano* v. *Montoya Alvarez*, 134 S. Ct. 1224 (2014) .......... 20

*Medellin* v. *Texas*, 552 U.S. 491 (2008) ............................... 19

*Noirhomme* v. *Walklate*, [1992] 1 Lloyd's Rep. 427
(Q.B.) (Eng.)......................................................................... 23

*Nuovo Pignone, SpA* v. *STORMAN ASIA M/V*,
310 F.3d 374 (5th Cir. 2002)................................... 6, 9, 27, 28

*Purcaru* v. *Seliverstova*, [2015] O.J. No. 5615
(Can. Ont. Sup. Ct. J.) (QL)............................................... 23

*Société Nationale Industrielle Aérospatiale* v.
*United States District Court*, 482 U.S. 522 (1987) .......... 10

*Sumitomi Shoji Am., Inc.* v. *Avagliano*, 457 U.S. 176
(1982)..................................................................................... 17

*Tucker (a Bankrupt), In re*, [1987] 1 W.L.R. 928
(Ch.) (Eng.), rev'd on other grounds, [1990] 1 Ch.
148 (C.A.) (Eng.) ................................................................. 23

*Volkswagenwerk Aktiengesellschaft* v. *Schlunk*,
486 U.S. 694 (1988)............................................. 7, 10, 12, 13

*Wang* v. *Lin* (2016), 132 O.R. 3d 48 (Can. Ont. Sup.
Ct. J.)..................................................................................... 22

*Wilson* v. *Servier Can. Inc.*, [2003] O.J. No. 157
(Can. Ont. Sup. Ct. J.) (QL)............................................... 23

*Zivotofsky* v. *Clinton*, 132 S. Ct. 1421 (2012)..................... 10

Treaties, statutes and rules:

Convention on the Service Abroad of Judicial and
Extrajudicial Documents in Civil or Commercial
Matters, *done* Nov. 15, 1965, 20 U.S.T. 361,
658 U.N.T.S. 163:
    Pmbl., 20 U.S.T. 362, 658 U.N.T.S. 165......... 2, 11, 30, 1a
    Art. 1, 20 U.S.T. 362, 658 U.N.T.S. 165......... 3, 11, 12, 1a

Treaties, statutes and rules—Continued:                    Page

Art. 2, 20 U.S.T. 362, 658 U.N.T.S. 165, 167 ............ 2, 1a

Arts. 2-6, 20 U.S.T. 362-363, 658 U.N.T.S. 165,
167, 169 .......................................................................... 3

Art. 4, 20 U.S.T. 362, 658 U.N.T.S. 167 ........................... 3

Art. 5, 20 U.S.T. 362, 658 U.N.T.S. 167 .................... 3, 12

Art. 6, 20 U.S.T. 363, 658 U.N.T.S. 169 ........................... 3

Art. 8, 20 U.S.T. 363, 658 U.N.T.S.
169 ..................................................... 3, 4, 12, 13, 14, 2a

Art. 9, 20 U.S.T. 363, 658 U.N.T.S. 169 ............... 3, 12, 2a

Art. 10, 20 U.S.T. 363, 658 U.N.T.S. 169,
171 ................................................................. *passim*, 2a

Art. 10(a), 20 U.S.T. 363, 658 U.N.T.S. 168 ........... 15, 16

Art. 10(a), 20 U.S.T. 363, 658 U.N.T.S. 169 .... *passim*, 2a

Art. 10(b), 20 U.S.T. 363, 658 U.N.T.S. 168 .................. 15

Art. 10(b), 20 U.S.T. 363, 658 U.N.T.S. 169 ........... 11, 3a

Art. 10(c), 20 U.S.T. 363, 658 U.N.T.S. 170 .................. 15

Art. 10(c), 20 U.S.T. 363, 658 U.N.T.S. 171 ............ 11, 3a

Art. 11, 20 U.S.T. 363, 658 U.N.T.S. 171 ................. 12, 3a

Art. 13, 20 U.S.T. 364, 658 U.N.T.S. 171 ....................... 12

Art. 14, 20 U.S.T. 364, 658 U.N.T.S. 171 ................... 1, 13

Art. 15, 20 U.S.T. 364, 658 U.N.T.S. 171, 173 ........... 9, 3a

Art. 15, 20 U.S.T. 364, 658 U.N.T.S. 173 ................. 29, 4a

Art. 19, 20 U.S.T. 365, 658 U.N.T.S. 175 ................. 13, 5a

Art. 21, 20 U.S.T. 365, 658 U.N.T.S. 177 ......... *passim*, 6a

Art. 22, 20 U.S.T. 366, 658 U.N.T.S. 177 ....................... 16

20 U.S.T. 367, 658 U.N.T.S. 181 ..................................... 15

Convention Relating to Civil Procedure, *done* Mar. 1,
1954, 286 U.N.T.S. 265 ..................................................... 14

Statute of the Hague Conference on Private Interna-
tional Law, art. 7, *formulated* Oct. 9-31, 1951, 15
U.S.T. 2230, 220 U.N.T.S. 127 .......................................... 24

Statutes and rules—Continued:                                          Page

   The Foreign Sovereign Immunities Act of 1976,
      28 U.S.C. 1602 *et seq*............................................................ 19
      28 U.S.C. 1608(a) ................................................................. 19
      28 U.S.C. 1608(a)(1)-(4)...................................................... 19
   Fed. R. Civ. P. 4(j)(1) ............................................................ 19
   Tex. R. Civ. P. 108a(1)(d) ....................................................... 5

Miscellaneous:

   Philip W. Amram, *The Proposed International
      Convention on the Service of Documents Abroad*,
      51 A.B.A. J. (1965) ............................................................. 16
   Code of Civil Procedure, c. C-25.01, art. 494 (Can.),
      *LégisQuébec*, http://legisquebec.gouv.qc.ca/en/pdf/
      cs/C-25.01.pdf (last updated Dec. 1, 2016)........................ 10
   *Conclusions and Recommendations Adopted by
      the Special Commission on the Practical
      Operation of the Hague Apostille, Evidence and
      Service Conventions* (Oct./Nov. 2003), https://
      assets.hcch.net/upload/wop/lse_concl_e.pdf ............. 26, 28
   3 Conférence de la Haye de Droit International
      Privé, *Actes et Documents de la Dixième Session*
      (1965) ................................................................................. 12
   *Convention on the Service Abroad of Judicial and
      Extrajudicial Documents in Civil or Commercial
      Matters: Message from the President of the United
      States*, S. Exec. C, 90th Cong., 1st Sess. (1967).............. 17
   Dutch Gov't, *Treaty Database: Convention on the
      Service Abroad of Judicial and Extrajudicial
      Documents in Civil or Commercial Matters:
      Parties with Reservations, Declarations and
      Objections*, https://treatydatabase.overheid.nl/
      en/Verdrag/Details/004235_b (last visited
      Jan. 24, 2017) ......................................................... 20, 21, 22

Miscellaneous—Continued:                                        Page

Hague Conference on Private Int'l Law:

*Authorities: Convention of 15 November 1965
on the Service Abroad of Judicial and Extra-
judicial Documents in Civil or Commercial
Matters*, https://www.hcch.net/en/instruments
/conventions/authorities1/?cid=17 (last visited
Jan. 24, 2017)........................................................ 28, 29

*Practical Handbook on the Operation of the
Hague Convention of 15 November 1965
on the Service Abroad of Judicial and
Extrajudicial Documents in Civil or
Commercial Matters* (2d ed. 1992) ......................... 26

*Practical Handbook on the Operation of the
Hague Convention of 15 November 1965
on the Service Abroad of Judicial and
Extrajudicial Documents in Civil or
Commercial Matters* (3d ed. 2006) .................... 26, 27

*Practical Handbook on the Operation of the
Service Convention* (4th ed.
2016).................................................3, 15, 24, 27, 28, 29

*Status Table: Convention of 15 November
1965 on the Service Abroad of Judicial and
Extrajudicial Documents in Civil or
Commercial Matters*, https://www.hcch.net/
en/instruments/conventions/status-table/
?cid=17 (last visited Jan. 24, 2017)........................... 2

Maurice Kay et al., *Blackstone's Civil Practice 2013*
(13th ed. 2012) ........................................................... 23

2 Marian Nash (Leich), *Cumulative Digest of United
States Practice in International Law 1981–1988*
(1994).......................................................................... 18

David McClean, *International Co-operation in Civil
and Criminal Matters* (3d ed. 2012)................................ 24

Miscellaneous—Continued:                      Page

*Report on the Work of the Special Commission of April 1989 on the Operation of the Hague Conventions of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters and of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters* (Apr. 1989), https://assets. hcch.net/upload/scrpt89e_20.pdf ................................. 25, 26

*Report on the Work of the Special Commission on the Operation of the Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters* (21-25 November 1977), 17 I.L.M. 319 (1978) ........................................................................... 24, 25

1 Bruno A. Ristau, *International Judicial Assistance:  Civil and Commercial* (2000) .............................................................. 2, 14, 15, 16, 28

S. Exec. Rep. No. 6, 90th Cong., 1st Sess. (1967) ......... 16, 18

U.S. Dep't of Justice, Office of Int'l Judicial Assistance, *Service of Process on the United States Government* (Nov. 4, 2016), https://www.justice. gov/civil/page/file/914441/download ................................. 19

U.S. Dep't of State, Bureau of Consular Affairs, *Legal Considerations:  International Judicial Assistance:  Service of Process*, https://travel. state.gov/content/travel/en/legal-considerations/ judicial/service-of-process.html (last visited Jan. 24, 2017) ...................................................................... 19

*United States Department of State Opinion Regarding the Bankston Case and Service by Mail to Japan under the Hague Service Convention,* 30 I.L.M. 260 (1991) ...................................................... 18, 19

**HCCH 2024 Special Commission Conclusions & Recommendations**





# Conclusions & Recommendations (C&R)

The Special Commission (SC) on the practical operation of the *Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters* (Service Convention), the *Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters* (Evidence Convention), and the *Convention of 25 October 1980 on International Access to Justice* (Access to Justice Convention) met from 2 to 5 July 2024. The meeting was attended by 260 delegates and other experts, in person and online, representing 55 HCCH Members, two non-Member Contracting Parties, one Observer State, seven Observer intergovernmental organisations and 13 Observer international non-governmental organisations, as well as by members of the Permanent Bureau (PB).[1]

The SC celebrated its meeting as the first official meeting of the HCCH with Spanish as an additional official language.

The SC adopted the following C&R:

## I.    Service, Evidence, and Access to Justice Conventions

### 1.    Implementation, operation and general information

1    The SC reaffirmed the importance of effective cross-border judicial and administrative cooperation. In this regard, the SC emphasised the continued importance of the Service, Evidence, and Access to Justice Conventions (Conventions).

2    The SC noted with great satisfaction that since its last meeting in 2014, a number of States have become Party to the Conventions. The SC welcomed the accession of Andorra, Azerbaijan, Brazil, Costa Rica, Dominican Republic, El Salvador, Georgia, Kazakhstan, Marshall Islands, Nicaragua, Paraguay, Philippines, Singapore, and Tunisia, and Viet Nam to one or more of these Conventions.

3    Noting the need to promote the benefits of the Conventions to non-Contracting Parties, the SC encouraged States that are currently not Party to the Conventions to join them. States interested in joining the Conventions are encouraged to contact the PB in advance with a view to facilitating effective preparation, including in relation to possible declarations and reservations.

4    The SC noted the value of monitoring the Conventions' practical operation through its meetings. The SC acknowledged the benefits in enabling Contracting Parties to exchange their respective experiences in operating the Conventions to promote uniform interpretation and to foster mutual confidence in the application of these Conventions.

---

[1]    The following Members of the HCCH were represented: Albania, Argentina, Australia, Austria, Belgium, Brazil, Bulgaria, Canada, China (People's Republic of), Costa Rica, Croatia, Czech Republic, Dominican Republic, El Salvador, Estonia, European Union, Finland, France, Georgia, Germany, Hungary, India, Ireland, Israel, Italy, Japan, Kazakhstan, Latvia, Lithuania, Malta, Mexico, Morocco, Netherlands, Nicaragua, Norway, Paraguay, Philippines, Poland, Portugal, Republic of Korea, Romania, Russian Federation, Serbia, Singapore, Slovakia, Slovenia, Spain, Sweden, Switzerland, Türkiye, Ukraine, United Kingdom, United States of America, Venezuela and Viet Nam; in addition to the following non-Member Contracting Parties: Colombia and Seychelles, the following non-Member State: Indonesia; the following intergovernmental organisations: CIEC (*Commission internationale de l'état civil*), Council of Europe, OECS (Organisation of Eastern Caribbean States), OIC (Organisation of Islamic Co-operation), The World Bank, UNCITRAL (United Nations Commission on International Trade Law) and WIPO (World Intellectual Property Organization); and the following international non-governmental organisations: ABLI (Asian Business Law Institute), AIPPI (*Association Internationale pour la Protection de la Propriété Industrielle*), ASADIP (American Association of Private International Law), CCBE (Council of Bars and Law Societies of Europe), EAPIL (European Association of Private International Law), EGPIL (European Group for Private International Law), ELI (European Law Institute), EUBF (European Bailiffs' Foundation), IAFL (International Academy of Family Lawyers), IBA (International Bar Association), IIL (Institute of International Law), ITechLaw (International Technology Law Association) and UIHJ (*Union internationale des huissiers de justice*).

5    The SC recommended having more frequent meetings to review the practical operation of the Conventions, including holding its next meeting in five to six years, subject to available resources. When deciding on the date of the meeting, the Council on General Affairs and Policy (CGAP) may wish to take into account any substantive revisions to the Service and Evidence Handbooks, new or ongoing issues in the practical operation of the Conventions, the work of any potential Experts' Group, and other developments in the use of information technology (IT) in the context of cross-border civil procedure.

6    The SC recalled the requirement for Contracting Parties to designate Central Authorities for these Conventions, and to inform the depositary (the Ministry of Foreign Affairs of the Kingdom of the Netherlands) of these designations. The SC called on Contracting Parties that have not done so to fulfil this requirement as quickly as possible. [*See C&R No 3 of the 2014 SC*]

7    The SC encouraged Contracting Parties to publicise these C&R among users of the Conventions, including judicial authorities, judicial officers, practitioners, and Central Authorities. [*See C&R No 2 of the 2014 SC*]

8    The SC noted that the Sections on the Service, Evidence, and Access to Justice Conventions on the HCCH website were helpful sources of information relating to the practical operation of the respective Conventions, and encouraged Contracting Parties to publicise them.

9    The SC encouraged Contracting Parties to the Service and Evidence Conventions to complete the Country Profiles,[2] in particular the contact details for Central Authorities and other authorities designated under the Conventions, and to continue to update information in a timely manner.

## 2.    Communication and use of IT

10   The SC reiterated the importance of effective communication among Contracting Parties. To that end, the SC encouraged relevant authorities to communicate with each other using IT methods, taking into account data security and privacy considerations. The SC agreed that Contracting Parties should include specific transmission and communication requirements in their respective Country Profiles to ensure that these issues are taken into account by other Contracting Parties.

11   With regard to facilitating communication and cooperation among Central Authorities, the SC recommended that the PB prepare for each Convention an internal list of e-mail addresses of and for Central Authorities. The SC noted the importance of keeping these lists up to date.

12   The SC urged the relevant authorities forwarding a request under the Conventions to provide sufficient contact information including e-mail addresses in their requests to facilitate communication between authorities, given the importance of expeditious execution of the requests.

13   The SC emphasised that the Conventions operate in an environment which is subject to important technological developments, which have been further stimulated by the COVID-19 pandemic. Although the evolutionary use of IT could not be foreseen at the time of the adoption of the Conventions, the SC reiterated that IT is an integral part of today's society and its usage is a matter of fact. In this respect, the SC recalled that the spirit and letter of the Conventions do not constitute an obstacle to the usage of IT, and that the application and operation of the Conventions can be further improved by relying on such technology. [*See C&R No 4 of the 2003 SC, C&R No 3 of the 2009 SC*]

14   The SC encouraged Contracting Parties, where possible, to implement electronic case registers or management systems to track or record requests.

---

[2]   Once finalised and approved by CGAP, these Country Profiles will be made available on the relevant Sections of the HCCH website.

## II. Evidence Convention

### 1. Implementation and general information

15   The SC recalled the importance of the Evidence Convention as a bridge between common law and civil law procedures relating to the taking of evidence in civil and commercial litigation. [*See C&R No 34(a) of the 1989 SC, C&R No 27 of the 2003 SC*]

16   The SC recalled that, pursuant to Article 39(4), the Evidence Convention only applies between an acceding State and an existing Contracting Party if the accession is accepted by that existing Contracting Party. The SC urged all Contracting Parties to consider each accession with a view to its acceptance. [*See C&R No 8 of the 2014 SC*]

17   With a view to enhancing the operation of the Convention, the SC encouraged Contracting Parties that have made a Chapter II reservation to review and revisit their reservation.

18   The SC noted the benefits of the taking of evidence by Commissioners under Article 17, especially in terms of the speedy execution of requests.

### 2. Nature of the Convention

19   The SC noted that there are still differing views among Contracting Parties as to the mandatory or non-mandatory character of the Evidence Convention. The SC also noted that these differences, however, have not been an obstacle to the effective operation of the Convention. Having regard to the objectives of the Evidence Convention, the SC encouraged that in all Contracting Parties, whatever their views as to its mandatory application, priority should be given to the procedures offered by the Convention when evidence located abroad is being sought. [*See C&R No 34(b) and (c) of the 1989 SC, C&R No 37 of the 2003 SC, C&R No 53 of the 2009 SC*]

### 3. Article 1(2)

20   The SC noted the practice of Contracting Parties that the expression "contemplated" in Article 1(2) includes proceedings for the taking of evidence before the main proceedings have been instituted, and where there is a danger that evidence may be lost. [*See C&R No 47 of the 2009 SC*]

21   The SC recommended that the word "commenced" should be given a uniform interpretation across Articles 1(2), 15(1) and 16(1). [*See C&R No 48 of the 2009 SC*]

### 4. Central Authorities and their functions

22   The SC reiterated that the practical operation of the Evidence Convention would be further improved by more timely execution of Letters of Request. The SC encouraged better communication between Central Authorities and between requesting authorities and the relevant Central Authority at all stages of the execution of a Letter of Request. Any informal communication may be carried out by any appropriate means, including e-mail, while taking into account data security and privacy considerations. [*See C&R No 44 of the 2009 SC, C&R No 9 of the 2014 SC*]

23   The SC noted that many Central Authorities provide informal assistance to requesting authorities to ensure that a Letter of Request conforms to the requirements of the requested State. The SC encouraged this practice. [*See C&R No 45 of the 2009 SC*]

24   The SC encouraged Contracting Parties to:

   a.   promptly acknowledge the receipt of Letters of Request;
   b.   promptly respond to enquiries about the status of execution; and
   c.   communicate an indication of steps to be taken for execution. [*See C&R No 10 of the 2014 SC*]

25   The SC welcomed the use of electronic tools that allow the status of requests to be checked online, noting the importance of taking into account data security and privacy considerations. [*See C&R No 11 of the 2014 SC*]

## 5.    Transmission of and responses to Letters of Request

26    The SC noted that many Contracting Parties are able to transmit and receive Letters of Request electronically. The SC encouraged Contracting Parties to transmit and receive Letters of Request in electronic form where it is possible to do so. [See *C&R No 49 of the 2009 SC, C&R No 39 of the 2014 SC*]

27    The SC noted and encouraged the practice of many Contracting Parties accepting Letters of Request that have been sent by private courier. [See *C&R No 49 of the 2009 SC*]

28    The SC welcomed the practice whereby, in response to a Letter of Request, evidence is, where appropriate, returned by electronic means, taking into account data security and privacy considerations.

29    The SC recommended that Letters of Request be sent to the competent Central Authorities and in this regard, the requesting authority check this information in the Country Profile of Contracting Parties.

## 6.    Use of the recommended Model Form

30    The SC strongly recommended that the Model Form developed by the SC in 1978 and revised in 1985 be used. Recognising that this Form is not mandatory, the SC nonetheless considered that regular use of the Model Form would further enhance the practical operation of the Convention. [See *C&R No 54 of the 2009 SC*]

31    The SC noted that many Central Authorities prefer Letters of Request to be issued using the Model Form filled in electronically, and that the *Guidelines for Completing the Model Form*, developed by the PB, is a useful reference tool for completing the Model Form. [See *C&R No 12 of the 2014 SC*]

32    The SC encouraged Contracting Parties to use electronic versions of the Model Form and noted that digital or electronic signatures on requests can generally be accepted, especially if they are transmitted from a competent forwarding Authority and, where applicable, can be easily verified.

33    The SC also encouraged Contracting Parties to share in their Country Profiles whether they have adopted measures (or will adopt measures) to support the acceptance of digital or electronic signatures on requests.

34    The SC noted that some trilingual Model Forms have been prepared by the PB and invited Contracting Parties which have not yet submitted copies of the Model Form in their languages to the PB to do so soon so that the PB can prepare the respective trilingual Model Forms and make them available on the website of the HCCH.

## 7.    Expeditious execution of the requests

35    The SC recalled that Article 9(3) requires that "[a] Letter of Request shall be executed expeditiously" and encouraged Contracting Parties to take measures to improve the effective operation of the Convention. [See *C&R No 43 of the 2009 SC*]

36    The SC recommended that requests for evidence be presented as soon as practically possible so as to provide sufficient time for their execution in the requested State. [See *C&R No 39 of the 2003 SC*]

37    With a view to avoiding unnecessary delays where a Letter of Request is deficient, the SC recommended that Central Authorities or executing authorities encourage the requesting authority to reformulate and resubmit its Letter of Request. In cases where the request appears to be partially deficient, the executing authorities should, wherever appropriate, execute the portion of a letter that is not deficient rather than to reject the entire request. [See *C&R No 41 of the 2003 SC*]

## 8.    Translations

38    The SC noted the importance of providing an accurate and complete set of translations for the expeditious execution of Letters of Request and encouraged Contracting Parties to comply with the translation requirements as set out in Article 4 of the Convention, in order to avoid delays in the

execution of Letters of Request. The SC encouraged Contracting Parties to provide this information (including any declaration) and any specific requirements in their Country Profiles.

## 9. Costs for execution and reimbursement

39 The SC noted that Article 14(2) of the Evidence Convention confers a right to require the reimbursement of "fees paid to experts and interpreters" and the "costs occasioned by the use of a special procedure" requested under Article 9(2). The SC concluded that Article 14(2) does not provide for the requested State to require advance payment of costs. [*See C&R No 13 of the 2014 SC*]

40 The SC concluded that a requested State may require reimbursement of fees paid and / or costs occasioned pursuant to Articles 9(2) and 14(2) even if the evidence is no longer sought (*e.g.,* where the requesting Authority withdraws the Letter of Request). [*See C&R No 14 of the 2014 SC*]

41 The SC acknowledged that electronic payment facilitates reimbursement and encouraged Central Authorities to include this information in their Country Profiles and to keep this information up to date. [*See C&R No 15 of the 2014 SC*]

## 10. Judicial authorities and other authorities under Article 1

42 The SC noted that for the taking of evidence, requesting authorities not only include courts and judges but also other persons (such as notaries) insofar as these persons may perform, in certain Contracting Parties, functions of judicial authorities. Information on those other persons and the extent of their competence should be made available in the Country Profiles.

43 The SC noted that in some instances, and in accordance with the internal law of relevant Contracting Parties, the Convention has been made available for use in arbitration proceedings. The SC stressed that a request for the taking of evidence under the Convention would have to be presented by the relevant judicial authority of the Contracting Party where the arbitration proceedings take place. [*See C&R No 38 of the 2003 SC*]

## 11. Types of evidence and its use

44 The term "evidence" covers information stored in digital form (electronic evidence), which may include e-mail messages, digital images, and entries in electronic registers. The SC recommended that requests for electronically stored information should be treated in the same manner as requests for hard copy documents. [*See C&R 50 of the 2009 SC*]

45 The SC noted that the term "evidence" should be given a uniform meaning in each Chapter of the Convention and interpreted in an autonomous manner. The SC further recommended that the term "evidence" should be interpreted liberally. [*See 1978 SC, Part 1, para 2(A)*]

## 12. Use of IT (taking evidence by video-link)

46 The SC recalled that there is no legal obstacle to the usage of IT under the Convention. However, the use of some techniques may be subject to different legal requirements in different Contracting Parties (*e.g.,* obtaining the consent of all parties involved in the execution). [*See C&R No 42 of the 2003 SC*]

47 The SC reaffirmed that where a special method or procedure is requested for the taking of evidence (Art. 9(2)), the exception for methods that are "incompatible with the internal law of the State of execution or [...] impossible of performance by reason of its internal practice and procedure or by reason of practical difficulties" should be interpreted narrowly to permit, to the greatest possible extent, the use of IT. [*See C&R No 43 of the 2003 SC*]

48 The SC noted that the use of video-link and similar technologies to assist the taking of evidence abroad is consistent with the current framework of the Convention. In particular, the SC noted that:

   a. The Convention permits parties and their representatives to be present (Art. 7), and does not preclude judicial personnel of the requesting authority from being present (Art. 8), by video-link at the execution of the Letter of Request by the requested State, to the same extent as these persons could be physically present.

b. The Convention permits a video-link to be used to assist in the execution of a Letter of Request where the law of the requested State permits such use (Art. 9(1)).

c. A video-link may be used to assist in the execution of a Letter of Request in accordance with Article 9(2).

d. The Convention permits a video-link to be used to assist in the taking of evidence by a diplomatic official, consular agent or Commissioner, provided that the practice is not forbidden by the Contracting Party in which the evidence is to be taken, and provided that the relevant permission has been granted (Arts 15-17 and 21).

e. The SC encouraged Contracting Parties to exchange information about their experience with the use of video-link and other IT to assist with the taking of evidence abroad. [*See C&R Nos 55 and 57 of the 2009 SC*]

49    The SC noted that the Country Profiles will provide a useful source of information for any parties or officials seeking to use video-link in connection with the taking of evidence in another Contracting Party, and that Contracting Parties should provide information about video-link in their Country Profiles and keep this information up to date. The SC also encouraged Contracting Parties to promote the existence of these Country Profiles nationally and recommended that they be consulted prior to the making of a request involving video-link.

50    The SC recalled that Article 17 allows a member of the judicial personnel of the court of origin (or other duly appointed person) who is located in one Contracting Party, to examine a person located in another Contracting Party by video-link. [*See C&R No 20 of the 2014 SC*]

51    The SC acknowledged the different views regarding the use of video-link to take evidence directly under Chapter I, despite the benefits that it can bring. The SC encouraged Contracting Parties which permit the direct taking of evidence by video-link under Chapter I to provide more information to the PB about how this occurs in practice so that examples can be summarised and included in the Evidence Handbook and, if required, further information can be developed to inform Contracting Parties on this issue.

## 13.  Grounds for refusal

### Article 12

52    The SC recalled the exhaustive nature of the grounds for refusal set out in Article 12(1). [*See C&R No 16 of the 2014 SC*]

### Article 23

53    The SC noted that the terms of Article 23 continue to be a source of misunderstanding. The SC recalled that Article 23 is intended to ensure that a request for the production of documents must be sufficiently substantiated, so as to avoid requests whereby one party merely seeks to find out what documents may generally be in the possession of the other party to the proceeding. [*See C&R No 29 of the 2003 SC*]

54    The SC recalled that the wording of the declaration submitted by the United Kingdom reflects the purpose of Article 23 more adequately than the wording of the provision itself. Against this background, the SC recommended that Contracting Parties which have made a general, non-qualified declaration under Article 23 revisit their declaration, taking into account terms such as those contained in the United Kingdom declaration or in Article 16 of the *Additional Protocol of 1984 to the Inter-American Convention on the Taking of Evidence Abroad*. The SC recommended that Contracting Parties refrain from applying Article 23 to refuse the execution of Letters of Request for the production of documents that are specified in the request, or otherwise reasonably identified.

55    The SC noted that Article 23 expressly refers to "documents" and that the scope of the provision should not be extended to oral testimony. [*See C&R No 35 of the 2003 SC*]

56    The SC noted that Article 23 only applies to Chapter I. However, when considering a request for prior permission under Chapter II, the Convention does not preclude a requested authority from making its permission conditional on requiring an appropriate level of specificity.

57   The SC further recalled the following C&R of previous meetings: C&R Nos 29-34 of the 2003 SC; C&R Nos 51 and 52 of the 2009 SC; and C&R Nos 18 and 19 of the 2014 SC.

### 14. Relationship of the Convention with other instruments (including bilateral, multilateral)

58   Recalling the relationship of the Convention with other instruments, the SC recommended greater elaboration in the Evidence Handbook on such relationship, including with regional and bilateral instruments, and the situation where the States involved are not Party to the Convention. The SC encouraged Contracting Parties to provide information about all other instruments that would apply in parallel with the Evidence Convention in their Country Profiles.

## III.   Access to Justice Convention

### 1. Operation and application

59   The SC noted that the existence and implementation of similar instruments related to access to justice at regional or bilateral level should not deter States in their consideration of ratifying or acceding to the Convention which is an important component of an efficient system of international legal cooperation. [See C&R No 60 of the 2009 SC]

60   Notwithstanding other approaches in bilateral or regional instruments, the SC considered, in light of the Explanatory Report and the prevailing view in comparative law, that the wording of Article 1 does not accommodate the inclusion of legal persons within its scope of application. [See C&R No 61 of the 2009 SC]

61   The SC was of the view that the word "presence" in Article 2 is to be interpreted in a literal way. [See C&R No 62 of the 2009 SC]

62   The formulation of Article 14 leaves some uncertainty with regard to who is exempt from giving security for costs. Nevertheless, the SC was of the view that nationals of a Contracting Party who are habitually resident in the State where the proceedings are brought fall within the scope of application of this provision. [See C&R No 63 of the 2009 SC]

63   When examining an application for legal aid, the competent authorities of the requested State are invited to take into account the economic situation of the applicant in their State of residence. In this context, the competent authorities of the requesting State may for example transmit any document useful for assessing the economic situation in the State of residence or confirm if the applicant meets the criteria for legal aid in their State of residence.

### 2. Implementation tools

64   Recognising the continuing importance and increasing use of the Access to Justice Convention, the SC recalled the usefulness of multilingual forms and further translations of the Convention, with a view to encouraging further accessions. [See C&R No 64 of the 2009 SC, C&R No 22 of the 2014 SC]

## IV.   Service Convention

### 1. Implementation and general information

65   The SC recalled that one of the fundamental purposes of the Service Convention is to ensure that judicial and extrajudicial documents are brought to the notice of the addressee in sufficient time. [See C&R No 6 of the 2009 SC]

### 2. Nature of the Convention (non-mandatory but exclusive character of the Convention)

66   The SC confirmed the view that the Service Convention is of a non-mandatory but exclusive character, without prejudice to international law on the interpretation of treaties. The SC further noted with great satisfaction that the non-mandatory but exclusive character of the Service Convention has not caused any difficulties in the past 10 years. [See C&R No 73 of the 2003 SC, C&R No 12 of the 2009 SC]

### 3. Application of the Convention

67 The SC noted that the absence of a specific rule on the date of service has not caused any major problems in practice. [*See C&R No 36 of the 2009 SC*]

68 The SC noted that various States recognise many kinds of extrajudicial documents. The SC invited Contracting Parties to encourage Central Authorities and, where applicable, forwarding authorities to communicate when problems of interpretation arise. [*See C&R No 15 of the 2009 SC*]

69 The SC noted that no particular challenges arise in respect of the use of the Convention for the service of documents relating to class actions. The SC noted that the Convention is applicable to a request for service upon a defendant in a class action. The SC noted that, in the general case, the Convention does not apply to the sending of information regarding the constitution of a possible class (including notices sent abroad encouraging possible claimants to opt in or opt out of a particular class). [*See C&R No 17 of the 2009 SC*]

### 4. Central Authorities (designation and organisation)

70 The SC reaffirmed that it is for a Contracting Party to determine its own model for the organisation of the Central Authority functions. In particular, the SC noted that the terms of the Convention do not preclude a Central Authority from contracting activities under the Convention to a private entity, while retaining its status as Central Authority and ultimate responsibility for its obligations under the Convention. [*See C&R No 52 of the 2003 SC*]

### 5. Use of IT (service by digital means – the Service Convention)

71 Recalling the importance of taking into account data security and privacy considerations, the SC reiterated that the operation of the Convention is to be considered in light of a business environment which relies on IT, and that the electronic transmission of judicial communications is a growing part of that environment and its use should be encouraged. [*See C&R No 59 of the 2003 SC*]

72 The SC recognised that the Convention does not on its terms deal with internal procedures but there is a link between domestic legal systems and the functioning of the Convention. [*See C&R No 61 of the 2003 SC*]

73 The SC also recognised that in some domestic legal systems the relevant legal procedures and technological conditions do not allow for service by electronic means, although in certain systems the use of e-mail and online platforms is permitted in certain circumstances, particularly where approved by the judicial authority in advance or there is prior consent by the addressee. [*See C&R No 64 of the 2003 SC*]

74 The SC noted that, subject to the domestic law of the requested State, requests for service transmitted under the main channel of transmission (the Central Authority) may be executed by electronic means under Article 5. The SC also noted developments in the use of IT under the alternative channels of Article 10. [*See C&R No 37 of the 2014 SC*]

75 The SC invited the PB to continue to monitor developments in this area and encouraged Contracting Parties to reflect such developments in their Country Profiles. [*See C&R No 38 of the 2014 SC*]

### 6. Assistance in locating the addressee

76 Recognising that there is no obligation to provide assistance in locating an addressee to be served under the Service Convention, the SC acknowledged that some Contracting Parties have employed a variety of practices to assist, as a requested State, in circumstances when the address is incomplete or incorrect. Some have even reported assistance when the address is unknown. The SC encouraged Contracting Parties to provide such assistance consistent with their legal and structural capabilities, when able to do so. The SC also encouraged Contracting Parties to indicate in their Country Profiles whether they would provide such assistance and information about different possibilities to locate the addressee. [*See C&R No 23 of the 2014 SC*]

77    When providing assistance in locating an addressee, an authority may become aware of potential risks to the health, safety or liberty of that addressee. In such cases, the SC suggested that the authority should take necessary precautions.

## 7.    Use of the Model Form

78    The SC strongly reaffirmed that the use of the Model Form is mandatory (Art. 3(1)), and encouraged relevant authorities in Contracting Parties to use it with the "Summary" and "Warning". The SC also encouraged the use of the "Summary" and "Warning" of the Model Form where one of the alternative channels of transmission is used. The SC noted that many trilingual Model Forms have been prepared by the PB and invited Contracting Parties which have not yet submitted copies of the Model Form in their languages to the PB to do so soon so that the PB can prepare the respective trilingual Model Forms and make them available on the website of the HCCH. [*See C&R Nos 29 and 31 of the 2009 SC, C&R No 27 of the 2014 SC*]

79    The SC noted the usefulness of the *Guidelines for Completing the Model Form* (Guidelines) developed by the PB and welcomed the minor updates to the Guidelines. The SC invited the Working Group on the Service Handbook to continue refining the Guidelines, with a view to having them approved by CGAP. Once approved, the Guidelines would be inserted at Annex 6 of the Service Handbook and be made available on the website of the HCCH. The SC encouraged Contracting Parties to circulate and publish the updated Guidelines.

80    The SC recalled that under Article 7(2) of the Convention, the fields of the Model Form are to be completed in English, French, or in (one of) the official language(s) of the requested State. As long as the Model Form is completed in English or French, the request may not be rejected solely on the basis of the Model Form not being in the official language of the requested State. [*See C&R No 32 of the 2009 SC*]

81    The SC strongly recalled Article 3(1), according to which there is no requirement for a completed Model Form to be legalised, or be made subject to any equivalent formality such as an Apostille. [*See C&R No 34 of the 2009 SC*]

82    The SC noted that the effect of a Certificate certifying the execution of a request constitutes authoritative confirmation that service has been effected in conformity with the law of the requested State, and creates at least a rebuttable presumption that service was properly performed. The probative value of the Certificate in the requesting State remains subject to that State's law. Notice of a rejection is also authoritative confirmation that service was not effected. [*See C&R No 33 of the 2009 SC*]

83    The SC stressed that a properly completed Certificate should be returned to the applicant (*i.e.,* the forwarding authority). [*See C&R No 26 of the 2014 SC*]

84    The SC encouraged Contracting Parties to use electronic versions of the Model Form and noted that digital or electronic signatures on requests can generally be accepted, especially if they are transmitted from a competent forwarding Authority and where applicable can be easily verified.

85    The SC also encouraged Contracting Parties to share in their Country Profiles whether they have adopted measures (or will adopt measures) to support the acceptance of digital or electronic signatures on requests.

## 8.    Forwarding authorities

86    The SC recalled that it is for the law of the requesting State to determine the competence of the forwarding authorities (Art. 3). [*See C&R No 47 of the 2003 SC*]

87    The SC also accepted the suggestion that such information be included on the Model Form. [*See C&R No 48 of the 2003 SC*]

88    The SC recommended that in any question of doubt as to the competence of the forwarding authority, rather than rejecting the request, the authorities in the State requested should seek to confirm that competence by either consulting the HCCH website or by making expeditious informal enquiries of the forwarding authorities, including by way of e-mail. [*See C&R No 49 of the 2003 SC*]

## 9. Language and translation requirements

89     Regarding the translation requirement for service under Article 5(1), the SC noted the importance of respecting the various requirements provided in the domestic laws of Contracting Parties. [*See C&R No 67 of the 2003 SC*]

90     The SC noted the practice of some Contracting Parties which do not require translations in certain cases, for example where the addressee is shown to understand the language in which the documents to be served are written. The importance of a properly completed Form, in particular the Summary, is stressed in this regard. [*See C&R No 26 of the 2009 SC*]

91     The SC recalled that no translation of the documents to be served is required for informal delivery. [*See C&R No 66 of the 2003 SC, C&R No 28 of the 2014 SC*]

92     The SC recognised that no translation is required, under the Convention, for transmission under alternative channels provided by the Convention; the SC noted, however, that in isolated cases such translation requirements are imposed by a State's domestic law. [*See C&R No 65 of the 2003 SC*]

93     The SC noted the importance of providing an accurate and complete set of translations for the expeditious execution of requests for service and encouraged Contracting Parties to comply with translation requirements as set out in Article 5 of the Convention, in order to avoid delays in the execution of requests for service. The SC encouraged Contracting Parties to provide this information and any specific requirements in their Country Profiles.

## 10. Prompt execution of requests

94     The SC welcomed the practice reported by some Contracting Parties whereby requests for service are executed in less than three months.

95     Aiming at further enhancing cross-border judicial cooperation among Contracting Parties, the SC recommended:

   a.   A request for execution of service should be executed without undue delay, and Contracting Parties are encouraged to take measures to further improve the effective operation of the Convention.

   b.   If a forwarding authority has not received any acknowledgement of receipt of the request for service from the requested State within 30 calendar days following the sending of the request, it is encouraged to contact the Central Authority in the requested State to enquire about the status of the request. Such enquiry should be answered within a reasonable time.

   c.   Where the request for service cannot be executed as a result of inadequate information or document(s) forwarded, the Central Authority of the requested State is encouraged to contact, as promptly as possible, the forwarding authority in order to secure the missing information or document(s).

   d.   Whenever the Central Authority of the requested State is considering, under Article 4, whether the request complies with the provisions of the Convention, it is encouraged to take that decision within 30 calendar days of receipt of the request.

   e.   If at any time during the execution of the request for service, an obstacle arises which may significantly delay or even prevent execution of the request, the Central Authority of the requested State is encouraged to communicate with the forwarding authority as promptly as possible.

   f.   If the forwarding authority has not received a Certificate confirming service or non-service from the relevant authority of the requested State within a reasonable time after sending the request, it is encouraged to contact the Central Authority of the requested State to enquire about the status of the execution of the request and the enquiry should be answered within a reasonable time.

   g.   The Central Authority of the requested State is encouraged to take all reasonable and appropriate steps to execute the request until such time as the forwarding authority advises that service is no longer required.

10

h.     The forwarding authority is also encouraged to specify in the request a time after which service is no longer required or inform the relevant authority of the requested State at any time that service is no longer required. [*See C&R No 23 of the 2009 SC*]

96     The SC welcomed the practice reported by certain Contracting Parties whereby Central Authorities promptly respond to enquiries about the status of execution and encouraged all Contracting Parties to embrace this practice where possible. [*See C&R No 30 of the 2014 SC*]

97     The SC encouraged Contracting Parties to provide an average time of execution in their Country Profiles, where possible.

## 11.    Costs for service and reimbursement

98     The SC reaffirmed that according to Article 12(1), a Contracting Party shall not charge for its services rendered under the Convention. Nevertheless, under Article 12(2), an applicant shall pay or reimburse the costs occasioned by the employment of a judicial officer or other competent person. The SC urged Contracting Parties to ensure that any such costs reflect actual expenses and are kept at a reasonable level. [*See C&R No 53 of the 2003 SC*]

99     The SC recalled that Article 5(1)(b) allows for the applicant to request a particular method of service that is not incompatible with the law of the requested State. Where the requested method is prescribed by the domestic law of the requested State and ordinarily used in that State for the execution of requests, the requested State is encouraged not to charge for the execution of the request, without prejudice to Article 12(2)(a). [*See C&R No 20 of the 2009 SC*]

100    In response to concerns voiced by some Contracting Parties about difficulties with payments for costs incurred for service, the SC noted that payment methods regarding the Evidence Convention are equally applicable to payments under the Service Convention. [*See C&R No 32 of the 2014 SC*]

## 12.    Grounds for refusal

101    The SC recalled the exhaustive nature of the grounds for refusal set out in Article 13(1) of the Service Convention and stressed the importance of providing notice of the refusal when the execution of the request is refused. [*See C&R No 35 of the 2014 SC*]

## 13.    Alternative channels of transmission

102    The SC stressed that Article 8 of the Convention provides for the direct service of documents by consuls and diplomatic officials, while Article 9(1) provides for the transmission of documents from one Contracting Party to the authorities of another Contracting Party designated by the latter for this purpose.

103    The SC reinforced that Article 9(2) only applies in exceptional circumstances.

104    The SC reaffirmed its clear understanding that the term "send" in Article 10(a) is to be understood as meaning "service" through postal channels. [*See C&R No 55 of the 2003 SC*]

105    The SC noted that Article 10(a) includes transmission and service by e-mail, insofar as such method is provided by the law of the State of origin and permitted under the law of the State of destination. The SC reiterated that service by e-mail under Article 10(a) must meet the requirements established under Article 1 of the Convention, in particular that the addressee's physical address in the State of destination is known. The SC noted that e-mail domains are not sufficient for locating the person to be served under Article 10(a).

106    The SC reiterated that Contracting Parties may impose other requirements and safeguards regarding the use of e-mail under Article 10(a) and encouraged Contracting Parties to indicate any such requirements in their Country Profiles.

107    The SC noted that a Contracting Party, rather than filing a blanket opposition to the use of postal channels under Article 10(a), is allowed to make a qualified declaration stating the conditions in which that Contracting Party accepts incoming transmissions, such as requiring registered mail with acknowledgment of receipt. The SC noted that several qualified declarations, with different conditions, have been made or revised in the past 10 years. [*See C&R No 28 of the 2009 SC*]

108    The SC noted the practical importance of the methods of service provided by the Convention under Article 10(b) and 10(c), in particular in relation to the prompt and effective execution of requests. The SC encouraged Contracting Parties to review and revisit their oppositions to the use of these methods.

109    The SC recommended that persons forwarding requests for service under Article 10(b) or 10(c) enquire with authorities in the State of destination, before sending a request for service in order to properly identify to whom the request should be sent. [*See C&R No 33 of the 2014 SC*]

## 14.   Relationship of the Convention with other instruments

110    Recalling the relationship of the Convention with other instruments, the SC recommended greater elaboration in the Service Handbook on such relationship, including with regional and bilateral instruments. The SC encouraged Contracting Parties to provide information about all other instruments that would apply in parallel with the Service Convention in their Country Profiles.

## 15.   Contractual waivers and the Convention

111    The SC took note of a case reported by one Contracting Party in which the court found that the parties' agreement to use alternative means of notification constituted a waiver of formal service of process under the applicable law. The SC recalled the Convention's non-mandatory, but exclusive, character, according to which the Convention will only apply if the domestic law of the forum determines that there is occasion to transmit a document for service abroad; if so, one of the available channels under the Convention must be used. The SC also stressed the potentially negative impact of such contractual agreements, namely, in relation to the protection of defendants under Articles 15 and 16 of the Convention, and the recognition and enforcement of judgments in the Contracting Party. The SC further questioned the effect of privately negotiated agreements in light of Contracting Parties' declarations and reservations.

## 16.   Service on foreign States and State officials

112    The SC noted the different practices in serving foreign States, State officials and State-owned companies. The SC encouraged further discussions at the Working Group on the Service Convention and recommended to reflect such discussions in the Service Handbook. The SC also recommended that Contracting Parties provide information on the service on foreign States and State officials in their Country Profiles.

113    While the absence of a specific rule on the date of service has not been noted to cause major problems in practice with respect to litigation between private parties, the SC recognised the importance of complying with any applicable customary international law requirements when serving sovereign parties under the Convention.

114    The SC also confirmed that receipt by the Central Authority of a Contracting Party does not constitute effective service on that State or its officials. The SC noted that service on diplomatic missions is not permitted.

## 17.   Relationship between the Service and Evidence Conventions

115    The SC noted that cases have arisen concerning the relationship between the Service and Evidence Conventions. [*See C&R No 40 of the 2009 SC*]

116    The SC recommended that the Service Handbook elaborate on the relationship between the two Conventions, by incorporating the relevant text contained in the Evidence Handbook and reflecting the discussions on particular matters such as subpoenas at the subsequent meeting of the Working Group on the Service Handbook. The SC recommended that the requesting authority choose carefully which Convention to make the request under to avoid rejection of the request.

## 18.   Articles 15 and 16

117    The SC recalled the purpose and fundamental importance of Articles 15 and 16, which are designed to balance the interest of all parties. The SC reaffirmed the need for the Convention to operate so as to sustain the procedural rights of the parties, and encouraged Contracting Parties

to consider making declarations to Articles 15(2) and 16(3) with a view to achieving the full operation of the Convention. [*See C&R No 74 of the 2003 SC*]

118    The SC recalled the principle that the defendant should be given actual notice in sufficient time to allow them to prepare a defence. This was significant notably where in the State addressed consideration was given to the validity of service. [*See C&R No 78 of the 2003 SC*]

119    The SC noted, with reference to Article 15(2)(c), that the receipt of a Certificate that no service could be effected is not an obstacle to the giving of a judgment in accordance with the domestic law of the requesting State when such State has made the relevant declaration. [*See C&R No 35 of the 2009 SC*]

120    The SC recognised that the types of relief against a default judgment contemplated in Article 16 (including appeal and other forms of redress) are a matter for domestic law. [*See C&R No 34 of the 2014 SC*]

121    The SC recalled that the Convention does not address the issue of recognition and enforcement of judgments. [*See C&R No 78 of the 2003 SC*]

## V.    "Civil or commercial matters" under the Service and Evidence Conventions

122    The SC recalled its former C&R on the term "civil or commercial matters" and recommended that this term be interpreted in a broad, liberal and autonomous manner, without reference exclusively to either the law of the requesting State (or State of origin), or to the law of the requested State (or State of execution), or to both laws cumulatively. The term should be interpreted consistently across both the Service and Evidence Conventions. [*See C&R No 26 of the 1989 SC, C&R No 69 of the 2003 SC, C&R No 13 of the 2009 SC, C&R No 40 of the 2014 SC*]

123    The SC also recalled that when interpreting the phrase "civil or commercial matters", one should focus on the nature of the cause of action and keep in mind that the Conventions do not expressly exclude any particular subject matter from the scope of "civil or commercial matters". The SC invited Contracting Parties to encourage their Central Authority to communicate, by using IT, with the forwarding authority when problems of interpretation arise. It recommended that Contracting Parties encourage forwarding authorities to include in their requests some information about the nature of the cause of action, in particular where a request may give rise to doubts as to whether it falls within the scope of the Conventions. [*See C&R No 14 of the 2009 SC*]

124    The SC cautioned that the meaning of "civil and commercial" appearing in other instruments should not be relied on for interpretation without considering the object and purpose of such other instruments. [*See C&R No 72 of the 2003 SC*]

125    The SC noted that some Contracting Parties do not regard as "civil or commercial matters" claims in relation to acts of States in the exercise of State authority.

126    The SC recommended that rather than Contracting Parties developing a list-based approach to identify the scope of "civil or commercial matters", Contracting Parties consider requests on a case-by-case basis, with the aim of providing the broadest possible cross-border judicial cooperation.

## VI.    Good practices

127    The SC noted the value and usefulness of a document outlining good practices for the operation of the Conventions (Good Practices document). The SC noted the importance of ensuring the consistency of this document with the Handbooks and the 2024 SC C&R. In this connection, the SC recommended the Working Groups on the Handbooks to continue the work carried out on the Good Practices document, with a view to submitting it to CGAP for approval.

## VII.    Standardisation of data and statistics

128    Taking into account Conclusion & Decision No 59 of CGAP 2024, the SC noted the usefulness of standardising the collection of data and statistics in assessing the effective operation of the Conventions. The SC also recommended that the PB develop questions to be retained as standard inclusions across future questionnaires with a view to facilitating discussions at future SC meetings and to assist authorities in planning to report statistical data.

129    Recognising the different legal and technical frameworks among Contracting Parties and the resourcing for Central Authorities and other authorities under the Conventions, the questions should relate to data that is easily identifiable and readily available to the Central Authorities.

## VIII.    Handbooks

130    The SC welcomed the updated Service and Evidence Handbooks, prepared by the PB and considered by the Working Groups. The SC acknowledged the importance and usefulness of these Handbooks. [See *C&R No 5 of the 2014 SC*]

131    The SC approved, in-principle, the fifth edition of the Handbooks, while noting that further amendments will be made, including incorporating the discussions at the SC meeting and relevant C&R, in cooperation with the Working Groups. The SC recommended to CGAP to approve the Handbooks.

132    Taking into account the available resources and with a view to publishing the Handbooks efficiently, the SC recommended to proceed with the finalisation of the Service Handbook first and to have it approved by the Members through a written procedure ahead of the 2025 CGAP meeting. The Evidence Handbook will be submitted to CGAP for approval at its 2025 meeting.

133    Once published, the SC encouraged Contracting Parties to promote the use of the Handbooks. Contracting Parties are also encouraged to arrange for the translations of the Handbooks into their languages. [See *C&R No 9 of the 2009 SC*, *C&R No 7 of the 2014 SC*]

## IX.    Country Profiles

134    The SC welcomed the draft Country Profiles for the Service and Evidence Conventions prepared by the PB and considered by the Working Groups, and agreed that the Country Profiles will provide a useful source of information for any parties or officials seeking to make a request to another Contracting Party for the service of documents or the taking of evidence abroad, and that Contracting Parties should undertake efforts to promote the existence of these Country Profiles domestically and recommended that they be consulted prior to the making of a request.

135    The SC noted that further amendments would be made to the questions in the draft Country Profiles, including incorporating the discussions at the SC meeting and relevant C&R, in co-operation with the Working Groups. The SC recommended that once the Country Profiles are finalised, they be submitted to CGAP for approval.

## X.    Future work

### 1.    Meetings

136    The SC recommended informal online meetings for Central Authorities to exchange experiences. The first meeting would be organised by the PB, subject to available resources, following the publication of the Handbooks and the release of the Country Profiles for the Service and Evidence Conventions.

137    The SC encouraged Contracting Parties to meet online to further discuss and exchange experiences to develop a deeper understanding of the use of IT and to develop further guidance for e-transmission and associated matters. These discussions will be supported by, or conducted under the auspices of, the PB. Such meetings will be held by way of online workshops for Central Authorities and other users of the Service and Evidence Conventions.

### 2.    Model Forms under Chapter II of the Evidence Convention

138    The SC welcomed the development of Model Forms for the taking of evidence under Chapter II and invited the Working Group on the Evidence Handbook to continue the development of the Model Forms. The final versions of the Model Forms for Chapter II will be submitted to CGAP for approval.

**U.S. Department of State, Civil Division, Office of International Judicial Assistance – Website**

An official website of the United States Government    Here's how you know

FEDERAL GOVERNMENT SHUTDOWN

Due to the Democrat-led shutdown, website updates will be limited until full operations resume.

Students

Travelers

Passports

Visas


**U.S. DEPARTMENT *of* STATE**

**Judicial Assistance**

**Home** > **Office of Private International Law** > Judicial Assistance

# Judicial Assistance

OFFICE OF THE LEGAL ADVISER

# Private International Law Conventions to Which the United States Is a Party

**Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents (Apostille Convention) (1961)**

The Apostille Convention simplifies the process of authenticating public documents by providing for a single Apostille certificate attached to the document being presented.  Further information about Authentications and Apostilles are located on the State Department Travel.state.gov website here.

**Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (1965)**

The Service Convention gives litigants located in one contracting State a reliable and efficient means of serving documents on parties living, operating, or based on the territory of another contracting State through designated Central Authorities.  Contracting parties may also permit alternative methods of service under the Convention.  More information about Service Requests can be found at the U.S. Department of Justice, Office of International Judicial Assistance website.

**Hague Convention on the Taking of Evidence Abroad in Civil or Commerci** Cookie Settings

The Evidence Convention provides for the transmission of letters of request (letters rogatory) from one contracting State (where the evidence is sought) to another contracting State (where the evidence is located). Contracting parties may also permit alternative methods of taking evidence under the Convention. More information about Evidence Requests can be found at the U.S. Department of Justice, Office of International Judicial Assistance website.

**Inter-American Convention on Letters Rogatory (1975)**

**Additional Protocol to the Inter-American Convention on Letters Rogatory (1979)**

The Organization of American States (OAS) concluded a Convention and Additional Protocol on letters rogatory applicable to civil and commercial matters. The United States recognizes a treaty relationship limited to requests for service of process with States parties to both the Convention and Additional Protocol. This framework allows for the direct transmission of requests between designated Central Authorities.

# Other Private International Law Conventions

**Inter-American Convention on the Taking of Evidence Abroad (1975)**

The OAS concluded a convention on the taking of evidence abroad, which establishes a system of Central Authorities but does not otherwise mandate procedures that differ much from the traditional letters rogatory process. The Convention envisions that requests for evidence shall be executed in accordance with the laws and procedural rules of the State of destination. While it does not preclude the taking of evidence by consular officers if permitted under another Convention or accepted practices, it does not independently provide for the practice. This was remedied somewhat by the conclusion of the Additional Protocol in 1984, linked to below.

**Hague Convention on International Access to Justice (1980)**

The Access to Justice Convention provides that nationals or habitual residents of a Contracting Party to the Convention have access to justice within all the Contracting Parties to the Convention on a non-discriminatory basis. It provides for non-discrimination with respect to legal aid, including the provision of legal advice, security for costs, copies of entries and decisions, and physical detention and safe-conduct. Its purpose is not to harmonize domestic laws but to ensure that the mere status as an alien or the absence of residence or domicile in a Contracting Party are not grounds for discrimination with regard to access to justice.

**Additional Protocol to the Inter-American Convention on the Taking of Evidence (1984)**

# Resources

## Legalization of Foreign Documents (Apostille)

**Apostille Section of the Hague Conference on Private International Law**

**U.S. Department of State, Bureau of Consular Affairs**

## Evidence

**Evidence Section of the Hague Conference on Private International Law**

**U.S. Department of Justice**

## Service

**Service Section of the Hague Conference on Private International Law**

**U.S. Department of Justice**

---

TAGS     International Law, Treaties, and Agreements

---

Contact Us

America 250



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

**U.S. Department of Justice – Judicial Assistance, Office of the Legal Advisor- Website**


# Service Requests

Español

I. *Inbound Service Requests*

OIJA serves as the Central Authority pursuant to the Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, T.I.A.S. No. 6638, 20 U.S.T. 361 ("HCCH 1965 Service Convention"), the Inter-American Convention on Letters Rogatory, S. Treaty Doc. No. 27, 98th Cong., 2d Sess. (1984), and the Additional Protocol to the Inter-American Convention on Letters Rogatory, S. Treaty Doc. No.98-27, 58 Fed. Reg. 31,132 (1988) ("Inter-American Convention"). OIJA also handles service requests in civil and commercial matters received from non-Convention States through diplomatic channels.

   A. *Service on Private Litigants and Companies*

Service requests directed at private individuals or companies located in the United States are executed through a private contractor.  Accordingly, these service requests and service-related inquiries should be sent directly to OIJA's contractor, ABC Legal Services, at <u>1099 Stewart St., Suite 700, Seattle, WA  98101 USA</u>.. For service requests sent pursuant to the HCCH 1965 Service Convention or letters rogatory through diplomatic channels, the documents need to be accompanied by a $95 USD processing fee, payable to ABC Legal. There is no fee for service requests pursuant to the Inter-American Convention or requests for the United States Government.

   B. *Service on the United States Government*

Requests for service on the United States Government, which includes its departments, agencies, or instrumentalities, should be sent directly to OIJA. There is no fee for service requests designated for the United States Government. Requests for service on the United States Government should be mailed to OIJA at <u>U.S. Central Authority, U.S. Department of Justice, P.O. Box 14360, Washington, DC 20044 USA</u>. Please refer to the OIJA Guidance on Service on the U.S. Government below for detailed information (see section below).

II. Outbound *Service Requests*

Because the HCCH 1965 Service Convention does not require outbound service requests to be sent by the Requesting State's Central Authority, *OIJA plays no role with regard to service requests involving persons or parties located abroad in private litigation matters*. United States litigants seeking to serve a judicial or extrajudicial documents in a foreign country bear the sole responsibility for making the necessary

arrangements and, consequently, should research the rules and laws governing service in the foreign country in which service is to be made. Please refer to the OIJA Guidance on Service Abroad in U.S. Litigation for more information (see link below). Additional information can be found on the websites for the U.S. Department of State and the HCCH 1965 Service Convention. Litigants should bear in mind that many civil law countries regard service as a judicial function and the failure to adhere to the laws of a foreign country may render a United States judgment unenforceable in that country.

Conversely, the Inter-American Convention requires that all service requests come from the Requesting State's Central Authority. For that reason, outbound service requests made pursuant to the Inter-American Convention must come from OIJA, by way of its contractor ABC Legal. ABC Legal charges no fee to send service requests pursuant to the Inter-American Convention. United States litigants, however, must complete and submit to ABC Legal all required forms and obtain the official seal of the United States domestic court. Instructions on requesting service pursuant to the Inter-American Convention can also be found in the OIJA Guidance on Service Abroad in U.S. Litigation (see link below).

Questions can be directed to OIJA at [OIJA@usdoj.gov](mailto:OIJA@usdoj.gov). Our mailing address can be found under Contact Us.

Links:

### HCCH 1965 Service Convention

[HCCH 1965 Service Convention Specialized Section](#)

[HCCH 1965 Service Convention](#)

[HCCH 1965 Service Convention Central Authorities](#)

[HCCH 1965 Service Convention Mandatory Form](#)

### Inter-American Convention

[Inter-American Convention](#)

[Additional Protocol to the Inter-American Convention](#)

[Inter-American Convention Mandatory Form](#)

### U.S. Department of State Guidance

[U.S. Department of State: Service of Process](#)

[U.S. Department of State: Country Information](#)

### OIJA Service Guidance on the U.S. Government

[OIJA Guidance on Service on the U.S. Government (HSC) (English)](#)

[OIJA Guía de notificación de actos procesales al gobierno de los Estados Unidos (HSC) (Spanish)](#)

[OIJA Guida della notifica di atti e documenti giudiziali al Governo degli Stati Uniti dAmerica (HSC) (Italian)](#)

[OIJA Birleşik Devletler Hükümetine Yapılacak Tebligatlara İlişkin Rehber (HSC) (Turkish)](#)

Guide d'OIJA de la Signification out Notification d'actes judiciaires au Gouvernement des États–Unis d'Amérique (French).

Citação Intimação e Notificação de Documentos Judiciais junto ao Governo dos Estados Unidos (HSC) (Portuguese).

OIJA Guidance on Service on the U.S. Government (IAC) (English).

OIJA Guia de notificación de actos procesales al gobierno de los Estados Unidos (IAC) (Spanish).

Citação Intimação e Notificação de Documentos Judiciais junto ao Governo dos Estados Unidos (IAC) (Portuguese).

**OIJA Service Guidance**

OIJA Guidance on Attorneys as Competent Forwarding Authorities under the Hague Service Convention

OIJA Guidance on Service Abroad in U.S. Litigation (English).

OIJA Guia de notificación en el extranjero para litigación en los EE.UU. (Spanish)

ABC Legal

*Updated September 17, 2025*



U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue NW
Washington DC 20530-0001

Civil.Feedback@usdoj.gov

Phone: 202-514-2000

**Decisions of the 2004 Bucharest Congress**



Universal Postal Union

# Decisions of the 2004 Bucharest Congress

Final text of the Acts signed in Bucharest
Decisions other than those amending the Acts

Berne 2005
International Bureau of the Universal Postal Union

The present volume should be quoted under the following reference:

Decisions of the 2004 Bucharest Congress

**Note concerning the use of bold type in the Decisions of the 2004 Bucharest Congress**

Bold type appearing in the texts of the Constitution, the Seventh Additional Protocol, the General Regulations and the Rules of Procedure of Congresses indicates amendments with respect to the Acts adopted by the 1999 Beijing Congress.
Bold type appearing in the texts of the Universal Postal Convention and its Final Protocol and in the Postal Payment Services Agreement indicates amendments with respect to the texts of the 1999 Beijing Convention and Agreement as recast by the Council of Administration (Congrès–Doc 25.Add 1 and Congrès–Doc 30.Add 1.Corr 1).

# Contents

|  | Page |
|---|---|
| Contents ................................................................................................ | 3 |
| List of abbreviations and acronyms used in the Decisions of the 2004 Bucharest Congress.............................................................................................. | 5 |
| Constitution of the Universal Postal Union......................................................... | 9 |
| Seventh Additional Protocol to the Constitution of the Universal Postal Union ............... | 27 |
| Declarations made on signature of the Acts ....................................................... | 65 |
| General Regulations of the Universal Postal Union[1] .......................................... | 75 |
| Rules of Procedure of Congresses[2] ................................................................ | 101 |
| Universal Postal Convention ........................................................................... | 117 |
| Final Protocol ............................................................................................ | 147 |
| Postal Payment Services Agreement ................................................................. | 157 |
| Decisions of the 2004 Bucharest Congress other than those amending the Acts (resolutions, decisions, recommendations and formal opinions) ...................................... | 203 |

[1] The Constitution of the Universal Postal Union, as signed at Vienna and amended by the 1969 Tokyo, 1974 Lausanne, 1984 Hamburg, 1989 Washington, 1994 Seoul, 1999 Beijing and 2004 Bucharest Additional Protocols, is reproduced in this volume for information purposes, but does not form part of the Acts signed at Bucharest. Only the Seventh Additional Protocol, which is reproduced separately in this volume, was signed by the plenipotentiaries of the 2004 Bucharest Congress.
[2] The Rules of Procedure of Congresses no longer form part of the Acts signed at Congress.

**4.2**    international reply coupons, which shall be exchangeable in any member country. The sale of international reply coupons is, however, optional**;**

**4.3**    **advice of delivery for registered and recorded delivery letter-post items, parcels and insured items. All postal administrations shall admit incoming advices of delivery. The provision of an outward advice of delivery service is, however, optional.**

**5**    The description of these services and their charges are set out in the Regulations.

**6**    Where the service features below are subject to special charges in the domestic service, postal administrations shall be authorized to collect the same charges for international items, under the conditions described in the Regulations:

**6.1**    delivery for small packets weighing over 500 grammes;

**6.2**    letter-post items posted after the latest time of posting;

**6.3**    items posted outside normal counter opening hours;

**6.4**    collection at sender's address;

**6.5**    withdrawal of a letter-post item outside normal counter opening hours;

**6.6**    poste restante;

**6.7**    storage for letter-post items weighing over 500 grammes, and for parcels;

**6.8**    delivery of parcels, in response to the advice of arrival;

**6.9**    cover against risks of force majeure.

Article **14**
Electronic mail, EMS, **integrated logistics** and new services

1    Postal administrations may agree with each other to participate in the following services, which are described in the Regulations.

1.1    electronic mail, which is a postal service involving the electronic transmission of messages;

1.2    EMS, which is **a** postal **express** service **for documents and merchandise, and shall wherever possible be** the quickest postal service by physical means. **Postal administrations may provide this service on the basis of the EMS Standard Multilateral Agreement or by bilateral agreement;**

**1.3**    **integrated logistics, which is a service that responds fully to customers' logistical requirements and includes the phases before and after the physical transmission of goods and documents;**

**1.4**    **the electronic postmark, which provides evidentiary proof of an electronic event, in a given form, at a given time, and involving one or more parties.**

2    Postal administrations may by mutual consent create a new service not expressly provided for in the Acts of the Union. Charges for a new service shall be laid down by each administration concerned, having regard to the expenses of operating the service.

**Universal Postal Convention (Seoul, 1994)**

Case: 1:24-cv-01636 Document #: 60-5 Filed: 02/25/25 Page 2 of 45 PageID #:1115



WIKISOURCE

WIKISOURCE

# Universal Postal Convention (Seoul, 1994)

**UNIVERSAL POSTAL CONVENTION**

The undersigned, plenipotentiaries of the Governments of the member countries of the Union, having regard to article 22, paragraph 3, of the Constitution of the Universal Postal Union concluded at Vienna on 10 July 1964, have by common consent and subject to article 25, paragraph 4, of the Constitution drawn up in this Convention the rules applicable in common throughout the international postal service and the provisions concerning the letter-post services.

# PART I. RULES APPLICABLE IN COMMON THROUGHOUT THE INTERNATIONAL POSTAL SERVICE

SOLE CHAPTER

GENERAL PROVISIONS

Article 1

Freedom of transit

1 The principle of the freedom of transit is set forth in article 1 of the Constitution. It shall carry with it the obligation for each postal administration to forward always by the quickest routes and the most secure means which it uses for its own items, closed mails and à découvert letter-post items which are passed to it by another administration.

**Appendix 164**

Case: 1:24-cv-01636 Document #: 60-5 Filed: 02/25/25 Page 24 of 45 PageID #:1137

3.1 that the damage appeared to be due to a case of force majeure;

3.2 that the item had been detained, confiscated or destroyed by the competent authority because of its contents or seized under the legislation of the country of destination.

4 The administration of origin or destination, as the case may be, shall be authorized to indemnify the rightful claimant in cases where the inquiry form is not properly completed and has to be returned for additional information, thereby causing the time limit set in 3 to be exceeded.

Article 38

Possible recovery of the indemnity from the sender or the addressee

1 If, after payment of the indemnity, a registered item or an insured item or part of the contents previously considered as lost is found, the sender or the addressee, as the case may be, shall be advised that the item is being held at his disposal for a period of three months on repayment of the amount of the indemnity paid. At the same time he shall be asked to whom the item is to be delivered. In the event of refusal or failure to reply within the prescribed period, the same approach shall be made to the addressee or the sender as the case may be.

2 If the sender and the addressee refuse to take delivery of the item, it shall become the property of the administration or, where appropriate, administrations which bore the loss.

3 In the case of subsequent discovery of an insured item the contents of which are found to be of less value than the amount of the indemnity paid, the sender shall repay the amount of this indemnity against return of the item, without prejudice to the consequences of fraudulent insurance.

CHAPTER 6

ELECTRONIC MAIL

Article 39

General provisions

1 Administrations may agree with each other to participate in electronic mail services.

Appendix 165

2/23/25, 5:43 PM
Case: 1:24-cv-01636 Document #: 60-5 Filed: 02/25/25 Page: 25 of 45 PageID #:1138
Universal Postal Convention (Seoul, 1994) - Wikisource, the free online library

2 Electronic mail is a postal service which uses telecommunications for transmitting within seconds messages true to the original posted by the sender in either a physical or an electronic form for delivery to the addressee in a physical or electronic form. In the case of physical delivery, the information is generally transmitted by electronic means for the longest possible part of the way and reproduced in physical form as near as possible to the addressee. Physical messages are delivered in an envelope to the addressee as a letter-post item.

3 The tariffs applicable to electronic mail are fixed by administrations, taking costs and market requirements into account.

Article 40

Facsimile-based services

1 The bureaufax range of services permits the transmission of texts and illustrations true to the original by facsimile.

Article 41

Text-based services

1 The range of text-based services permits the transmission of texts and illustrations produced by means of data-processing equipment (PC, mainframe computer).

# PART III. PROVISIONS CONCERNING THE LETTER POST: RELATIONS BETWEEN POSTAL ADMINISTRATIONS

CHAPTER 1

TREATMENT OF LETTER-POST ITEMS

Article 42

Appendix 166