No. 25-2205

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| KANGOL LLC, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | ) |
| HANGZHOU CHUANYUE SILK | ) |
| IMPORT & EXPORT CO., LTD., | ) |
| | ) |
| Defendants-Appellant. | ) |

Appeal from the United States District Court
for the Northern District of Illinois
No. 24 CV 01636, Sharon Johnson Coleman, *Judge*

## MOTION FOR LEAVE TO FILE BRIEF AS *AMICI CURIAE* IN SUPPORT OF APPELLEE AND AFFIRMANCE

Amy C. Ziegler
Justin R. Gaudio
Greer, Burns & Crain, Ltd.
200 W Madison Street, Suite 2100
Chicago, IL, 60606

*Counsel for Amici Curiae*
*Strategic Alliance For Fair Ecommerce, NFP,*
*Chrome Hearts LLC, Crye Precision LLC, Costa Del Mar, Inc.,*
*Deckers Outdoor Corporation, Eye Safety Systems, Inc.,*
*Harley-Davidson Motor Company, Inc., Luxottica Group S.P.A.,*
*Mob Entertainment, Inc., Oakley, Inc., Pit Viper LLC,*
*and Swarovski Aktiengesellschaft*

## MOTION FOR LEAVE TO FILE BRIEF AS *AMICI CURIAE*

The Strategic Alliance for Fair Ecommerce, NFP ("SAFE"); Chrome Hearts LLC; Crye Precision LLC; Costa Del Mar, Inc.; Deckers Outdoor Corporation; Eye Safety Systems, Inc.; Harley-Davidson Motor Company, Inc.; Luxottica Group S.p.A; Mob Entertainment, Inc.; Oakley, Inc.; Pit Viper LLC; and Swarovski Aktiengesellschaft (collectively, "Rights Owners") (SAFE and Rights Owners together, "Amici") respectfully move under Federal Rule of Appellate Procedure 29(a) for leave to file a brief as amici curiae in support of Appellee in this case.

Appellant and Appellee consent to this Motion.

## IDENTITY AND INTEREST OF AMICI

SAFE is a bar association comprised of a dedicated coalition committed to advancing the protection of intellectual property rights in e-commerce. SAFE brings together legal practitioners to develop and promote best practices for litigation involving offshore infringers that unfairly violate intellectual property rights over the Internet. Its mission is to address the unique challenges of online intellectual property disputes, ensuring fair, efficient, and effective outcomes in an ever-evolving e-commerce landscape. The coalition advances thought leadership and collaboration among stakeholders to protect brand innovation and consumers. By enforcing intellectual property rights online, brands aim to protect consumers from deceptive practices, support legitimate sellers who adhere to legal standards, and foster a transparent and trustworthy online shopping environment.

Chrome Hearts LLC is an American luxury brand that has been designing, manufacturing, and selling artistically styled leather goods, apparel, jewelry, accessories, home goods, and furniture since 1989.

Crye Precision LLC designs, develops, and manufactures equipment, clothing, and accessories for military and law enforcement personnel, as well as branded gear for the public, and has become a highly recognizable American brand for tactical gear.

Costa Del Mar, Inc. is in the business of producing, manufacturing and distributing premium, luxury and sports eyewear products, apparel, and other accessories.

Deckers Outdoor Corporation is well-known throughout the United States and elsewhere as a source of high-quality footwear, apparel, and other products sold under Deckers' UGG, HOKA, and Teva brands.

Eye Safety Systems, Inc. is one of the world's largest suppliers of military, law enforcement, and firefighting protective eyewear.

Harley-Davidson Motor Company, Inc. is a world-famous manufacturer of motorcycles and a wide variety of other products including apparel, and assorted accessories..

Luxottica Group S.p.A. is in the business of producing, manufacturing and distributing premium, luxury and sports eyewear products under its RAY-BAN and other well-known brands.

Mob Entertainment, Inc. is a digital entertainment company that creates and distributes high quality animated content across multiple platforms, including the famous video game Poppy Playtime.

Oakley, Inc. is an internationally recognized manufacturer, distributor and retailer of eyewear, apparel, footwear, outerwear, jackets, accessories and other merchandise.

Pit Viper LLC ("Pit Viper") is an iconic American brand that designs, manufactures, and sells stylish performance gear, eyewear, sunglasses, apparel, and accessories.

Swarovski Aktiengesellschaft is a famous designer, manufacturer and distributor of crystals, jewelry and other fine, luxury products.

Rights Owners each own federally registered trademarks, which they use to identify and distinguish their respective products in the American market. Rights Owners expend substantial resources in marketing and protecting their respective brands, trademarks, and associated goodwill. Rights Owners face significant counterfeiting of their respective trademarks by anonymous off-shore e-commerce sellers who unfairly compete in the market. The proliferation of rampant online counterfeiting has resulted in consumer confusion, reputational harm, loss of goodwill, loss of sales of genuine products, and loss of market share.

Online marketplaces, however, remain unwilling or unable to implement consequential and effective anti-infringement measures that deter and prevent continued counterfeiting on their platforms. As a result, Rights Owners have been

forced to seek refuge in United States federal courts, since there is currently no other way to obtain meaningful relief. Rights Owners and courts resort to electronic means of service to reliably and effectively reach off-shore e-commerce sellers, because these sellers rely on electronic communications to operate their online stores, and it is extremely difficult and impractical to locate and determine the true identities of these sellers. Even in cases where Rights Owners are able to verify the identity of a seller, traditional means of service do not provide the speed necessary to make enforcement effective. Without a reliable, traceable, and fast method of service, like e-mail, further prosecution of the case will usually be fruitless, since the seller will disappear into cyberspace. As such, it is crucial for this Court to affirm that Rule 4(f)(3) authorizes courts to order electronic service of process.

Amici have no financial or personal interest in the outcome of this appeal.[1]

## ARGUMENT

The Court should grant Amici leave to file their brief as *amici curiae*. The brief is desirable and the matters addressed in the brief are relevant to the issues raised by Appellant. FED. R. APP. P. 29(a)(3)(B). Amici's brief is not duplicative of the principal briefs filed in this matter, but instead draws on Amici's unique and decades of experience combating international counterfeiting, including counterfeiting by e-commerce store operators.

---

[1] No party's counsel authored the brief, in whole or part, and no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief. No person—other than the Amici or their counsel—contributed money that was intended to fund preparing or submitting the brief.

Amici's brief examines the variety of harms that foreign counterfeiters pose to U.S. interests and explains the damaging effects that international counterfeiting has had on U.S. commerce, and the rights of trademark owners like the Rights Owners. Amici further explain how the counterfeiting industry operates on a global level, including the tactics counterfeiters utilize to deceive consumers and avoid detection by brand owners and law enforcement. These tactics are constantly evolving, making it difficult, if not impossible, for affected brand owners to seek recourse aside from initiating legal action against foreign counterfeiters.

Finally, Amici explain why electronic service of process is a necessary mechanism to combat this problem. It is crucial for district courts to continue to have the authority and discretion to permit service of process on counterfeit sellers by alternative means as provided under Federal Rule of Civil Procedure 4(f)(3). Under current law, the burden of monitoring and taking action against online counterfeiters, including filing lawsuits in United States federal courts, falls on brand owners. If the District Court's June 13, 2025, Memorandum Opinion and Order is reversed, trademark owners like Rights Owners would find their ability to seek recourse from foreign counterfeiters significantly hindered. If rights owners cannot serve offshore e-commerce sellers through alternative means, those sellers could and would easily avoid service and continue to violate U.S. law without consequence. As such, Amici respectfully request the opportunity to inform the Court of these issues.

## CONCLUSION

For the foregoing reasons, Amici respectfully request leave to file the *amici curiae* brief in support of Appellee.

Dated this 29th day of December 2025.

Respectfully submitted,

/s/ Justin R. Gaudio
Amy C. Ziegler
Justin R. Gaudio
Greer, Burns & Crain, Ltd.
200 W Madison Street, Suite 2100
Chicago, IL, 60606
312.360.0080 / 312.360.9315
(facsimile)
aziegler@gbc.law
jgaudio@gbc.law

*Counsel for Amici Curiae
Strategic Alliance For Fair
Ecommerce, NFP, Chrome Hearts
LLC, Crye Precision LLC, Costa Del
Mar, Inc., Deckers Outdoor
Corporation, Eye Safety Systems, Inc.,
Harley-Davidson Motor Company,
Inc., Luxottica Group S.P.A., Mob
Entertainment, Inc., Oakley, Inc., Pit
Viper LLC, and Swarovski
Aktiengesellschaft*

# CERTIFICATE OF SERVICE

The undersigned certifies that on **December 29, 2025**, an electronic copy of the foregoing **Motion for Leave to file Brief as Amici Curiae** was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

By: /s/ Justin R. Gaudio

No. 25-2205

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| KANGOL LLC, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | ) |
| HANGZHOU CHUANYUE SILK | ) |
| IMPORT & EXPORT CO., LTD., | ) |
| | ) |
| Defendants-Appellant. | ) |

Appeal from the United States District Court
for the Northern District of Illinois
No. 24 CV 01636, Sharon Johnson Coleman, *Judge*

**BRIEF OF *AMICI CURIAE*
STRATEGIC ALLIANCE FOR FAIR ECOMMERCE, NFP,
CHROME HEARTS LLC, CRYE PRECISION LLC, COSTA DEL MAR, INC.,
DECKERS OUTDOOR CORPORATION, EYE SAFETY SYSTEMS, INC.,
HARLEY-DAVIDSON MOTOR COMPANY, INC., LUXOTTICA GROUP S.P.A.,
MOB ENTERTAINMENT, INC., OAKLEY, INC., PIT VIPER LLC,
AND SWAROVSKI AKTIENGESELLSCHAFT
IN SUPPORT OF APPELLEE AND AFFIRMANCE**

Amy C. Ziegler
Justin R. Gaudio
Greer, Burns & Crain, Ltd.
200 W Madison Street, Suite 2100
Chicago, IL, 60606

*Counsel for Amici Curiae*
*Strategic Alliance For Fair Ecommerce, NFP,*
*Chrome Hearts LLC, Crye Precision LLC, Costa Del Mar, Inc.,*
*Deckers Outdoor Corporation, Eye Safety Systems, Inc.,*
*Harley-Davidson Motor Company, Inc., Luxottica Group S.P.A.,*
*Mob Entertainment, Inc., Oakley, Inc., Pit Viper LLC,*
*and Swarovski Aktiengesellschaf*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2205

Short Caption: Kangol LLC v. Hangzhou Chuanyue Silk Import & Export Co., Ltd.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 See attached Exhibit A

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Greer, Burns & Crain Ltd.

(3) If the party, amicus or intervenor is a corporation:

i)      Identify all its parent corporations, if any; and

 See attached Exhibit A

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

 See attached Exhibit A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

Attorney's Signature: /s/ Justin R. Gaudio          Date: 12/29/2025

Attorney's Printed Name:  Justin R. Gaudio

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑ **No** ☐

Address:  200 West Madison Street, Suite 2100, Chicago, IL, 60606

Phone Number: (312) 987-2922          Fax Number:  (312) 360-9315

E-Mail Address: jgaudio@gbc.law

rev. 12/19 AK

# Exhibit A

## Name of Every Party Represented by Attorney Justin R. Gaudio

1. Richard K. Wagner

2. Strategic Alliance for Fair Ecommerce, NFP

3. Chrome Hearts LLC

4. Crye Precision LLC

5. Costa Del Mar, Inc.

6. Deckers Outdoor Corporation

7. Eye Safety Systems, Inc.

8. Harley-Davidson Motor Company, Inc.

9. Luxottica Group S.p.A.

10. Mob Entertainment, Inc.

11. Oakley, Inc.

12. Pit Viper LLC

13. Swarovski Aktiengesellschaft

<u>**Disclosure Statement**</u>

Pursuant to Fed. R. App. P. 26.1 and Cir. R. 26.1, the undersigned counsel provides the following statements:

1. Richard K. Wagner is an individual. As such, Fed. R. App. P. 26.1 and Cir. R. 26.1 do not apply, and no disclosure statement is required on his behalf.

2. Strategic Alliance for Fair Ecommerce, NFP, is an Illinois non-for-profit corporation with no parent company and no publicly held corporation owning 10% or more of its stock.

3. Chrome Hearts LLC is a limited liability company. As such, Fed. R. App. P. 26.1 and Cir. R. 26.1 do not apply, and no disclosure statement is provided on its behalf.

4. Crye Precision LLC is a limited liability company. As such, Fed. R. App. P. 26.1 and Cir. R. 26.1 do not apply, and no disclosure statement is provided on its behalf.

5. Costa Del Mar, Inc. is a wholly-owned subsidiary of Luxottica Group S.p.A and Essilor International, which in turn are also wholly owned subsidiaries of EssilorLuxottica, a French corporation. EssilorLuxottica is listed on the Euronext Paris market and is included in the Euro Stoxx 50 and CAC 40 indices.

6. Deckers Outdoor Corporation ("Deckers") is a publicly traded corporation with no parent company. The following entities own 10% or more of Deckers'

stock: Fidelity Management & Research Co. LLC, Vanguard Fiduciary Trust Co., and BlackRock Advisors LLC.

7. Eye Safety Systems, Inc. ("ESS") is a subsidiary of Oakley, Inc., which is an indirect, wholly-owned subsidiary of Luxottica Group S.p.A and Essilor International, which in turn are also wholly owned subsidiaries of EssilorLuxottica, a French corporation. EssilorLuxottica is listed on the Euronext Paris market and is included in the Euro Stoxx 50 and CAC 40 indices. ESS further discloses that no publicly held corporation owns 10% or more of its stock.

8. Harley-Davidson Motor Company, Inc. ("HDMC") discloses that its parent company is Harley-Davidson, Inc., a publicly traded company. HDMC further discloses that Vanguard Fiduciary Trust Co. owns 10% or more of Harley-Davidson, Inc.'s stock.

9. Luxottica Group S.p.A. ("Luxottica") is a wholly-owned subsidiary of EssilorLuxottica. EssilorLuxottica is listed on the Euronext Paris market and is included in the Euro Stoxx 50 and CAC 40 indices. Luxottica further discloses that no publicly held corporation owns 10% or more of its stock.

10. Mob Entertainment, Inc. has no parent company and there is no publicly held corporation owning 10% or more of its stock.

11. Oakley, Inc. is a wholly-owned subsidiary of Luxottica Group S.p.A and Essilor International, which in turn are also wholly owned subsidiaries of EssilorLuxottica, a French corporation. EssilorLuxottica is listed on the

Euronext Paris market and is included in the Euro Stoxx 50 and CAC 40 indices. Oakley further discloses that no publicly held corporation owns 10% or more of its stock.

12. Pit Viper LLC is a limited liability company. As such, Fed. R. App. P. 26.1 and Cir. R. 26.1 do not apply, and no disclosure statement is provided on its behalf.

13. Swarovski Aktiengesellschaft discloses that it has no parent company and there is no publicly held corporation owning 10% or more of its stock.

Dated: December 29, 2025

Respectfully submitted,

/s/ Justin R. Gaudio
Amy C. Ziegler
Justin R. Gaudio
Greer, Burns & Crain, Ltd.
200 W Madison Street, Suite 2100
Chicago, Illinois 60606
312.360.0080
312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law

*Counsel for Amici Curiae*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2205

Short Caption: Kangol LLC v. Hangzhou Chuanyue Silk Import & Export Co., Ltd.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
  See attached Exhibit A

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
  Greer, Burns & Crain Ltd.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

      See attached Exhibit A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      See attached Exhibit A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

  N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

  N/A

---

Attorney's Signature: /s/ Amy C. Ziegler    Date: 12/29/2025

Attorney's Printed Name: Amy C. Ziegler

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address: 200 West Madison Street, Suite 2100, Chicago, IL, 60606

Phone Number: (312) 987-2926    Fax Number: (312) 360-9315

E-Mail Address: aziegler@gbc.law

rev. 12/19 AK

# Exhibit A

## **Name of Every Party Represented by Attorney Amy C. Ziegler**

1. Richard K. Wagner

2. Strategic Alliance for Fair Ecommerce, NFP

3. Chrome Hearts LLC

4. Crye Precision LLC

5. Costa Del Mar, Inc.

6. Deckers Outdoor Corporation

7. Eye Safety Systems, Inc.

8. Harley-Davidson Motor Company, Inc.

9. Luxottica Group S.p.A.

10. Mob Entertainment, Inc.

11. Oakley, Inc.

12. Pit Viper LLC

13. Swarovski Aktiengesellschaft

## Disclosure Statement

Pursuant to Fed. R. App. P. 26.1 and Cir. R. 26.1, the undersigned counsel provides the following statements:

1. Richard K. Wagner is an individual. As such, Fed. R. App. P. 26.1 and Cir. R. 26.1 do not apply, and no disclosure statement is required on his behalf.

2. Strategic Alliance for Fair Ecommerce, NFP, is an Illinois non-for-profit corporation with no parent company and no publicly held corporation owning 10% or more of its stock.

3. Chrome Hearts LLC is a limited liability company. As such, Fed. R. App. P. 26.1 and Cir. R. 26.1 do not apply, and no disclosure statement is provided on its behalf.

4. Crye Precision LLC is a limited liability company. As such, Fed. R. App. P. 26.1 and Cir. R. 26.1 do not apply, and no disclosure statement is provided on its behalf.

5. Costa Del Mar, Inc. is a wholly-owned subsidiary of Luxottica Group S.p.A and Essilor International, which in turn are also wholly owned subsidiaries of EssilorLuxottica, a French corporation. EssilorLuxottica is listed on the Euronext Paris market and is included in the Euro Stoxx 50 and CAC 40 indices.

6. Deckers Outdoor Corporation ("Deckers") is a publicly traded corporation with no parent company. The following entities own 10% or more of Deckers'

stock: Fidelity Management & Research Co. LLC, Vanguard Fiduciary Trust Co., and BlackRock Advisors LLC.

7. Eye Safety Systems, Inc. ("ESS") is a subsidiary of Oakley, Inc., which is an indirect, wholly-owned subsidiary of Luxottica Group S.p.A and Essilor International, which in turn are also wholly owned subsidiaries of EssilorLuxottica, a French corporation. EssilorLuxottica is listed on the Euronext Paris market and is included in the Euro Stoxx 50 and CAC 40 indices. ESS further discloses that no publicly held corporation owns 10% or more of its stock.

8. Harley-Davidson Motor Company, Inc. ("HDMC") discloses that its parent company is Harley-Davidson, Inc., a publicly traded company. HDMC further discloses that Vanguard Fiduciary Trust Co. owns 10% or more of Harley-Davidson, Inc.'s stock.

9. Luxottica Group S.p.A. ("Luxottica") is a wholly-owned subsidiary of EssilorLuxottica. EssilorLuxottica is listed on the Euronext Paris market and is included in the Euro Stoxx 50 and CAC 40 indices. Luxottica further discloses that no publicly held corporation owns 10% or more of its stock.

10. Mob Entertainment, Inc. has no parent company and there is no publicly held corporation owning 10% or more of its stock.

11. Oakley, Inc. is a wholly-owned subsidiary of Luxottica Group S.p.A and Essilor International, which in turn are also wholly owned subsidiaries of EssilorLuxottica, a French corporation. EssilorLuxottica is listed on the

3

Euronext Paris market and is included in the Euro Stoxx 50 and CAC 40 indices.  Oakley further discloses that no publicly held corporation owns 10% or more of its stock.

12. Pit Viper LLC is a limited liability company. As such, Fed. R. App. P. 26.1 and Cir. R. 26.1 do not apply, and no disclosure statement is provided on its behalf.

13. Swarovski Aktiengesellschaft discloses that it has no parent company and there is no publicly held corporation owning 10% or more of its stock.

Dated: December 29, 2025

Respectfully submitted,

/s/ Amy C. Ziegler
Amy C. Ziegler
Justin R. Gaudio
Greer, Burns & Crain, Ltd.
200 W Madison Street, Suite 2100
Chicago, Illinois 60606
312.360.0080
312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................i

TABLE OF AUTHORITIES ........................................................................ii

STATEMENT OF INTEREST OF AMICI CURIAE ...............................................1

SUMMARY OF THE ARGUMENT .................................................................3

ARGUMENT ..........................................................................................4

    I.    **The Offshore Counterfeiting Industry** ........................................4

        A.    Transitioning From Brick-And-Mortar to the Internet ................................4

        B.    The Global Trade and Significant Harms of E-commerce Sales of Infringing and Counterfeit Goods ................................................................5

    II.    **Electronic Service Is Vital To Combat Unique Nature Of Offshore E-Commerce Counterfeiters** ................................................................8

        A.    The Unique and Inherently Deceptive Nature of Counterfeiting .................8

        B.    Rights Owners Must Protect Their Marks ................................................9

        C.    The Necessity of Electronic Service of Process .......................................11

CONCLUSION .....................................................................................12

# TABLE OF AUTHORITIES

## Cases

*Beijing iQIYI Sci. & Tech. Co. v. iTalk Glob. Communs., Inc.*, 2019 U.S. Dist. LEXIS 216697, at *11-18 (W.D. Tex. Dec. 17, 2019) .......................................................... 10

*Bose Corp. v. P'ships, et al.*, 334 F.R.D. 511, 516 (N.D. Ill. 2020) ............................... 5

*Cisco Sys. v. Shenzhen Usource Tech. Co.*, 2020 U.S. Dist. LEXIS 158008, at *24 (N.D. Cal. Aug. 10, 2020) ....................................................................................... 10

*Dyson Tech. Ltd. v. David 7 Store*, 132 F.4th 526, 528 (7th Cir. 2025) ....................... 4

*Gen. Elec. Co. v. Speicher*, 877 F.2d 531, 534 (7th Cir. 1989) ..................................... 8

*Gorenstein Enters. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989) ...... 9

*Gucci Am., Inc. v. Huoqing*, 2011 U.S. Dist. LEXIS 783, at *51 (N.D. Cal. Jan. 3, 2011) ...................................................................................................................... 10

*Hard Rock Cafe Licensing Corp. v. Concession Servs.*, 955 F.2d 1143, 1150 (7th Cir. 1992) ........................................................................................................................ 9

*In re Vuitton Et Fils S.A.*, 606 F.2d 1, 1-2 (2d Cir. 1979) ............................................. 4

*Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 588 (7th Cir. 1989) ....................................... 4

Mem. Order at 1, *Levi Strauss & Co. v. Zhejiang Weidu Garment Co., Ltd., et al.*, No. 16-cv-07824 (N.D. Ill. Nov. 17, 2016), ECF No. 52 ........................................... 10

*Mestek, Inc. v. Shenzhen Mestek Elecs. Co., Ltd.*, 2025 U.S. Dist. LEXIS 207903, at *6 (D. Mass. Oct. 22, 2025) ................................................................................... 10

*Microsoft Corp. v. Rechanik*, 249 Fed. App'x. 476, 479 (7th Cir. 2007) ...................... 8

*NBA Props. v. HANWJH*, 46 F.4th 614, 617 (7th Cir. 2022) ....................................... 4

*Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 106-110 (2d Cir. 2010) ........................... 9

## Rules

Rule 4(f)(3) ........................................................................................................................ 2

## Other Authorities

*About Online Counterfeiting*, INT'L ANTICOUNTERFEITING COAL.,
https://iacc.org/online-initiatives/about (last accessed Dec. 29, 2025)……….…...4, 5

Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*,
40 NW. J. INT'L L. & BUS. 157 (2020).......................................................... 7, 9, 10, 11

*Counterfeit Goods: A Danger to Public Safety*, U.S. IMMIGR. & CUSTOMS ENF'T.,
https://www.ice.gov/features/dangers-counterfeit-items (last updated Aug. 19,
2025)…….7

DEP'T. OF HOMELAND SEC., *Combating Trafficking in Counterfeit and Pirated Goods;
Report to the President of the United States* (Jan. 24, 2020),
www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-
goods-report_01.pdf ..................................................................................... 5, 9, 10

Eli Clemens, *How Chinese Online Marketplaces Fuel Counterfeits*, INFO. TECH. &
INNOVATION FOUND. (August 2025), https://www2.itif.org/2025-chinese-
counterfeits.pdf....................................................................................................11

Elizabeth Banegas, *Schedule "A" Cases. Not Sad at All*, 65 IDEA: L. REV. FRANKLIN
PIERCE CTR. FOR INTELL. PROP. 107 (2024) ............................................................ 8

*Impact of COVID Pandemic on eCommerce*, U.S. DEP'T OF COM., INT'L TRADE
ADMIN, https://www.trade.gov/impact-covid-pandemic-ecommerce (last accessed
Oct. 8,
2025)……………………………………………………………….……………………
6

*Intellectual Property Rights Seizure Statistics*, U.S. CUSTOMS & BORDER PROT., Pub.
No. 3964-0125 (2024), https://www.cbp.gov/sites/default/files/2025-
01/IntellectualPropertyRightsSeizureStatisticsFiscalYear2024%20FINAL.pdf
(last modified Jan. 16,
2025)………………………………………………………….…6, 7

Jay Kennedy, et al., *The Sociotechnical Evolution of Product Counterfeiting: How
Social Media, Social Networks, And Social Commerce Are "E-Socializing" Product
Counterfeiting*, MICH. ST. UNIV. CTR. FOR ANTI-COUNTERFEITING & PROD. PROT.
(2021) ...................................................................................................................... 4

Kari Kammel & Jessica Boeve, *Beyond the Brick-and-Mortar Paradigm: The Legal and Procedural Foundations of Schedule A Litigation in Combating Online Counterfeiting as Distinct from Traditional Trademark Enforcement* (2025). Accepted for publication in FORDHAM INTELL. PROP. MEDIA & ENT. L.J., Volume XXXVI, https://ssrn.com/abstract=5508098 ............................................................ 9

Mayumi Brewster, *Annual Retail Trade Survey Shows Impact of Online Shopping on Retail Sales During COVID-19 Pandemic*, U.S. CENSUS BUREAU (Apr. 27, 2022), https://www.census.gov/library/stories/2022/04/ecommerce-sales-surged-during-pandemic.html…..………………………………………..………...…………… .5

Press Release, *Global Trade in Fake Goods Reached USD 467 Billion, Posing Risks to Consumer Safety and Compromising Intellectual Property*, ORG. ECON. COOPERATION & DEV. (May 7, 2025), https://www.oecd.org/en/about/news/press-releases/2025/05/global-trade-in-fake-goods-reached-USD-467-billion-posing-risks-to-consumer-safety-and-compromising-intellectual-property.html......................................................................................................
.....6, 10

Saleem Alhabash et al., *Global Anti-Counterfeiting Consumer Survey 2023: A 17 Country Study* MICH. ST. UNIV. CTR. FOR ANTI-COUNTERFEITING & PROD. PROT. (2023), https://a-capp.msu.edu/wp-content/uploads/2024/10/GlobalConsumerSurvey2023_PublicFinal.pdf ............. 7, 8

*Quarterly Retail E-Commerce Sales 4th Quarter,* U.S. DEP'T. OF COM., 1 CB 25-26 (Feb. 19, 2025), https://www2.census.gov/retail/releases/historical/ecomm/24q4.pdf.........................
...5, 6

Strategic Alliance for Fair Ecommerce, NFP ("SAFE") is a bar association comprised of a dedicated coalition committed to advancing the protection of intellectual property rights in e-commerce. SAFE brings together legal practitioners to develop and promote best practices for litigation involving off-shore infringers that unfairly violate intellectual property rights over the Internet. Its mission is to address the unique challenges of online intellectual property disputes, ensuring fair, efficient, and effective outcomes in an ever-evolving e-commerce landscape.

Chrome Hearts LLC, Crye Precision LLC, Costa Del Mar, Inc., Deckers Outdoor Corporation, Eye Safety Systems, Inc., Harley-Davidson Motor Company, Inc., Luxottica Group S.p.A., Mob Entertainment, Inc., Oakley, Inc., Pit Viper LLC, and Swarovski Aktiengesellschaft (collectively, "Rights Owners") are businesses associated with some of the biggest and most well-known brand names in America. Rights Owners expend substantial resources promoting and protecting their respective federally registered trademarks. Rights Owners are victims of rampant trademark counterfeiting committed by anonymous off-shore e-commerce sellers on online marketplaces, primarily operating out of China. Because other brand protection measures have historically failed, Rights Owners have resorted to seeking relief in U.S. federal courts to protect their valuable trademark rights. Having the ability to complete service of process by electronic means, in cases like

1

this one, is vital to these efforts and protecting U.S. consumers from being deceived into purchasing counterfeit products online.

The outcome of this case affects intellectual property owners' ability to enforce their rights against anonymous foreign e-commerce defendants. SAFE and Rights Owners (together, "Amici") provide this brief to address the harms of counterfeiting committed by anonymous off-shore e-commerce stores on online marketplaces. Amici further explain why it is necessary for Courts and intellectual property owners to continue to have the ability to complete service of process electronically pursuant to Rule 4(f)(3).

Amici have no financial or personal interest in the outcome of this appeal. No party's counsel authored the brief, in whole or part, and no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief. No person—other than the Amici or their counsel—contributed money that was intended to fund preparing or submitting the brief.

## SUMMARY OF THE ARGUMENT

Amici support Appellee's brief. As discussed below, counterfeiters use a variety of common tactics to conceal their identities, the full scope and interworking of their counterfeiting operation, and to avoid being shut down. Rights holders should be permitted to use alternative service so that counterfeiters are not able to easily avoid service and continue to violate U.S. law without consequence.

**ARGUMENT**

**I.     The Offshore Counterfeiting Industry**

**A.     Transitioning From Brick-And-Mortar to the Internet**

This Circuit has long recognized that "the sale of counterfeit merchandise has become endemic—perhaps pandemic." *Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 588 (7th Cir. 1989) (citing S.Rep. No. 526, 98th Cong., 2d Sess. 11 (1982)).  Historically, "[c]ommercial trade centers and physical retail establishments made counterfeiting an 'in-person' business as consumers traveled to markets and shops to purchase physical goods."  Jay Kennedy, et al., *The Sociotechnical Evolution of Product Counterfeiting: How Social Media, Social Networks, And Social Commerce Are "E-Socializing" Product Counterfeiting*, MICH. ST. UNIV. CTR. FOR ANTI-COUNTERFEITING & PROD. PROT. (2021), https://a-capp.msu.edu/article/the-sociotechnical-evolution-of-product-counterfeiting-how-social-media-social-networks-and-social-commerce-are-e-socializing-product-counterfeiting/; *see also In re Vuitton Et Fils S.A.*, 606 F.2d 1, 1-2 (2d Cir. 1979).

Today, however, the advent and ubiquity of the Internet have incentivized counterfeiters to move their operations online, leading to unprecedented infringement by offshore e-commerce sellers.  *See, e.g., NBA Props. v. HANWJH*, 46 F.4th 614, 617 (7th Cir. 2022); *Dyson Tech. Ltd. v. David 7 Store*, 132 F.4th 526, 528 (7th Cir. 2025).  *See also About Online Counterfeiting*, INT'L ANTICOUNTERFEITING COAL., https://iacc.org/online-initiatives/about ("Once only seen in flea markets and

4

sidewalk stalls, counterfeit products are now prevalent in the virtual world.") (last accessed Dec. 29, 2025).

"[E]-commerce platforms, third-party marketplaces, and their supporting intermediaries have ... served as powerful stimulants for the trafficking of counterfeit and pirated goods." DEP'T. OF HOMELAND SEC., *Combating Trafficking in Counterfeit and Pirated Goods; Report to the President of the United States*, at 20 (Jan. 24, 2020) ("DHS Report").[1] In addition to the "the anonymity and mass reach afforded by the [I]nternet," *Bose Corp. v. P'ships, et al.*, 334 F.R.D. 511, 516 (N.D. Ill. 2020), offshore counterfeiters have flocked online because "e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, [and] transactions are convenient[.]" DHS Report, at 10.

**B.     The Global Trade and Significant Harms of E-commerce Sales of Infringing and Counterfeit Goods**

The United States Census Bureau began tracking e-commerce sales data in 1998, when it became clear online shopping was an "irreversible force." Mayumi Brewster, *Annual Retail Trade Survey Shows Impact of Online Shopping on Retail Sales During COVID-19 Pandemic*, U.S. CENSUS BUREAU (Apr. 27, 2022).[2] That year, e-commerce sales totaled $5 billion in the U.S. *Id.* In 2024, e-commerce sales rose to an estimated $1.1926 trillion in the U.S., with continued growth expected year-over-year. *Quarterly Retail E-Commerce Sales 4th Quarter,* U.S. DEP'T. OF

---

[1]www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf.
[2]https://www.census.gov/library/stories/2022/04/ecommerce-sales-surged-during-pandemic.html.

COM., 1 CB 25-26 (Feb. 19, 2025).[3] This trend is not uniquely American; the International Trade Administration reported that e-commerce accounted for approximately 20% of total global retail sales from 2021 to 2024, with its share continuing to increase each year. *Impact of COVID Pandemic on eCommerce*, U.S. DEP'T OF COM., INT'L TRADE ADMIN.[4]

As the sales of legitimate products have increased online, sales of knockoffs, counterfeits, and other infringing products followed in lockstep. At last count, global trade in counterfeit and pirated goods was worth an estimated $467 billion—accounting for a staggering 2.3% of all imports, according to the Organization for Economic Cooperation and Development (the "OECD"). Press Release, *Global Trade in Fake Goods Reached USD 467 Billion, Posing Risks to Consumer Safety and Compromising Intellectual Property*, ORG. ECON. COOPERATION & DEV. (May 7, 2025)[5] ("OECD Press Release"). Additionally, United States Customs and Border Protection ("CBP") reported that from 2020 to 2024 the number of goods seized for violating intellectual property rights had doubled. *Intellectual Property Rights Seizure Statistics*, U.S. CUSTOMS & BORDER PROT., Pub. No. 3964-0125 (2024)[6]. CBP seized over 32 million goods for violating intellectual property rights in 2024 alone, worth the total manufacturer's suggested retail price of $5.4 billion. *Id.* While this

---

[3] https://www2.census.gov/retail/releases/historical/ecomm/24q4.pdf.

[4] https://www.trade.gov/impact-covid-pandemic-ecommerce (last accessed Oct. 8, 2025).

[5] https://www.oecd.org/en/about/news/press-releases/2025/05/global-trade-in-fake-goods-reached-USD-467-billion-posing-risks-to-consumer-safety-and-compromising-intellectual-property.html.

[6] https://www.cbp.gov/sites/default/files/2025-01/IntellectualPropertyRightsSeizureStatisticsFiscalYear2024%20FINAL.pdf (last modified Jan. 16, 2025).

number is staggering, actual figures are likely higher since counterfeit products are often distributed via a high volume of small packages, as opposed to being sent to a distributor via large shipping containers. The shift to small packages makes it harder for authorities like CBP to detect counterfeit shipments, resulting in proportionally fewer counterfeit goods being intercepted and seized. Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 171 (2020).

Consumers purchasing infringing or counterfeit goods are also at risk of both physical and financial harm. For example, in 2019, local and federal agencies shut down a counterfeit jewelry operation in Los Angeles and determined that the seized jewelry, valued at about $15 million, contained levels of lead and cadmium as high as 200,000 parts per million (ppm), more than twice the acceptable level of 90 ppm per U.S. safety standards. *Counterfeit Goods: A Danger to Public Safety*, U.S. IMMIGR. & CUSTOMS ENF'T.[7] In 2023, Michigan State University's Center for Anti-Counterfeiting and Product Protection published a consumer survey study finding that 27% of American survey respondents lost money from counterfeit purchases, 22% suffered personal injury from counterfeit purchases, 19% suffered other negative health effects, and 19% had their personal information compromised from counterfeit purchases. Saleem Alhabash et al., *Global Anti-Counterfeiting Consumer Survey 2023: A 17 Country Study* 42 MICH. ST. UNIV. CTR. FOR ANTI-COUNTERFEITING & PROD. PROT. at 42 (2023), https://a-capp.msu.edu/wp-

---

[7] https://www.ice.gov/features/dangers-counterfeit-items (last updated Aug. 19, 2025).

content/uploads/2024/10/GlobalConsumerSurvey2023_PublicFinal.pdf.  That study

also reported that 71% of American survey respondents reported that they

knowingly or unknowingly purchased a counterfeit product online.  *Id.* at 27.

In addition to consumer harm, sales of counterfeit products account for

billions in economic losses, resulting in tens of thousands of lost jobs for legitimate

businesses and broader economic losses, including lost tax revenue.  As found by

DHS, "[l]egitimate companies, and particularly small businesses, report devastating

impacts due to the abundance of competing online counterfeits and pirated goods."

DHS Report at 19.  "American enterprises have little recourse aside from initiating

legal action against a particular vendor."  *Id.*  These illicit sales result in billions of

dollars in lost tax revenue.  Elizabeth Banegas, *Schedule "A" Cases. Not Sad at All*,

65 IDEA: L. REV. FRANKLIN PIERCE CTR. INTELL. PROP. 107, 116 (2024).

## II.     Electronic Service Is Vital To Combat Unique Nature Of Offshore E-Commerce Counterfeiters

### A.     The Unique and Inherently Deceptive Nature of Counterfeiting

Trademark counterfeiting is an inherently deceptive form of intellectual

property infringement.  *See Gen. Elec. Co. v. Speicher*, 877 F.2d 531, 534 (7th Cir.

1989); *see also Microsoft Corp. v. Rechanik*, 249 Fed. App'x. 476, 479 (7th Cir. 2007).

Trademark counterfeiting is "an outlier within traditional intellectual property

disputes and enforcement."  Kari Kammel & Jessica Boeve, *Beyond the Brick-and-*

*Mortar Paradigm: The Legal and Procedural Foundations of Schedule A Litigation*

*in Combating Online Counterfeiting as Distinct from Traditional Trademark*

*Enforcement*, at 5-9 (2025). Accepted for publication in FORDHAM INTELL. PROP.

MEDIA & ENT. L.J., Volume XXXVI.[8]  Congress enacted "specific provisions within the Lanham Act that address counterfeiting, an entire federal criminal statute (The Trademark Counterfeiting Act)[,] and there are both civil and criminal remedies in each of the fifty states that specifically address counterfeiting[.]" *Id.* at 5.  However, none of these statutes could have accounted for the rise of counterfeiting via the Internet by offshore e-commerce sellers operating through third-party online marketplaces like Alibaba.  *See id.*  Accordingly, both Courts and rights owners require all available tools at their disposal to combat this problem.

## B.  Rights Owners Must Protect Their Marks

Rights owners have an affirmative duty to actively police their marks. *Gorenstein Enters. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989).  By contrast, online marketplaces generally have no affirmative duty to police the third-party sellers peddling counterfeit goods on their platform.  *See Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 106-110 (2d Cir. 2010); *cf. Hard Rock Cafe Licensing Corp. v. Concession Servs.*, 955 F.2d 1143, 1150 (7th Cir. 1992*).*  As a result, the burden of policing sellers operating through online marketplaces falls on rights owners.

Offshore e-commerce store owners present unique hurdles to rights owners because they frequently operate anonymously, often under fake identities, and often using multiple accounts or profiles.  Chow, *supra*, at 186; *see also* DHS Report, at 22.  *See, e.g., Mestek, Inc. v. Shenzhen Mestek Elecs. Co., Ltd.*, 2025 U.S. Dist. LEXIS 207903, at *6 (D. Mass. Oct. 22, 2025); Mem. Order, *Levi Strauss & Co. v.*

---

[8] Available at SSRN: https://ssrn.com/abstract=5508098.

*Zhejiang Weidu Garment Co., Ltd., et al.*, No. 16-cv-07824, Dkt. No. 52 at 1-2 (N.D. Ill. Nov. 17, 2016).  On e-commerce platforms like Alibaba, Chow, *supra,* at 186, "little identifying information is necessary [for a counterfeiter] to begin selling" and "[s]ignificantly enhanced vetting of third-party sellers" is necessary.  DHS Report at 11, 35-36.  Counterfeiters also hedge against the risk of being caught by preemptively establishing multiple virtual storefronts.  This "[r]apid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked." *Id.* at 11.

These challenges are compounded by the fact that most of these sellers are located outside of the U.S., face no repercussions for trafficking in counterfeit goods, and have no incentive to stop.  As reported by the OECD, China remains the primary source of counterfeit goods. OECD Press Release, *supra.*  There are few mechanisms to hold counterfeiters accountable when they operate out of countries like China where intellectual property violations are not strictly enforced.  China is also an inadequate forum to resolve U.S. trademark claims.  *Beijing iQIYI Sci. & Tech. Co. v. iTalk Glob. Communs., Inc.*, 2019 U.S. Dist. LEXIS 216697, at \*11-18 (W.D. Tex. Dec. 17, 2019).  Counterfeiters operating from China do so with impunity because an American judgment is unlikely to be enforced in China.  *See Gucci Am., Inc. v. Huoqing*, 2011 U.S. Dist. LEXIS 783, at \*51 (N.D. Cal. Jan. 3, 2011); *see also Cisco Sys. v. Shenzhen Usource Tech. Co.*, 2020 U.S. Dist. LEXIS 158008, at \*24 (N.D. Cal. Aug. 10, 2020).

Many China-based e-commerce platforms, like Alibaba, help facilitate sales of counterfeit products to U.S. consumers. *See* Eli Clemens, *How Chinese Online Marketplaces Fuel Counterfeits*, INFO. TECH. & INNOVATION FOUND. (August 2025)[9]; *see also* Chow, *supra*, at 172-183, 186 (describing Alibaba's counterfeiting problem, its refusal to comply with Chinese law and conduct proper seller verification, and the improbability that circumstances will change). In fact, based on Exhibits filed by other Alibaba sellers in court filings, Alibaba has informed counterfeiters on their platforms that they will not comply with U.S. judgments against Alibaba sellers. *See* Ex. 1 to Decl. of Tina You, *Fox Head, Inc. v. The P'ships, et al.*, No. 24-cv-05812, Dkt No. 55-1 (N.D. Ill. June 30, 2025). Given the foregoing challenges, enforcing trademark rights against offshore e-commerce sellers requires providing rights owners with more flexibility, not more restrictions.

### C.   The Necessity of Electronic Service of Process

Counterfeit sellers routinely obscure their true identities and locations by operating online storefronts that lack legitimate contact information, making it difficult for rightsholders, consumers, and law enforcement to identify or locate them. As a result, traditional methods of service of process are often ineffective and predictably lead to substantial delays, compounding the irreparable harm suffered by trademark owners and consumers. Based on Amici's experience, email has proven to be the most reliable and effective means of contacting and serving offshore e-commerce sellers. Restricting a district court's discretion to authorize

---

[9] https://www2.itif.org/2025-chinese-counterfeits.pdf.

alternative service of process would invite counterfeiters to evade service altogether, allowing them to continue violating U.S. law with impunity.  Affirming the district court's decision to permit alternative service of process, by contrast, preserves critical enforcement mechanisms for rightsholders and protects U.S. consumers.

## <u>CONCLUSION</u>

For the foregoing reasons, Amici respectfully requests that the Court affirm the District Court's decision.

Dated this 29th day of December 2025.

Respectfully submitted,

<u>/s/ Justin R. Gaudio</u>
Amy C. Ziegler
Justin R. Gaudio
Greer, Burns & Crain, Ltd.
200 W Madison Street, Suite 2100
Chicago, IL, 60606
312.360.0080 / 312.360.9315
(facsimile)
aziegler@gbc.law
jgaudio@gbc.law

*Counsel for Amici Curiae*
*Strategic Alliance For Fair*
*Ecommerce, NFP, Chrome Hearts*
*LLC, Crye Precision LLC, Costa Del*
*Mar, Inc., Deckers Outdoor*
*Corporation, Eye Safety Systems, Inc.,*
*Harley-Davidson Motor Company,*
*Inc., Luxottica Group S.P.A., Mob*
*Entertainment, Inc., Oakley, Inc., Pit*
*Viper LLC, and Swarovski*
*Aktiengesellschaft*

<u>**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE- STYLE REQUIREMENTS**</u>

The undersigned certifies on **December 29, 2025**, that

1. This document complies with the type-volume limit of Seventh Circuit Rule 29 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 2007 words.

2. This document complies with Fed. R. App. P. 27(d)(1)(E) because it complies with the typeface and the type-style requirements of Seventh Circuit Rule 32(b) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 Version 2505 in 12-point and Century Schoolbook Font, with footnotes in 11-point.

Dated this 29th day of December 2025.

Respectfully submitted,

<u>/s/ Justin R. Gaudio</u>
Amy C. Ziegler
Justin R. Gaudio
Greer, Burns & Crain, Ltd.
200 W Madison Street, Suite 2100
Chicago, IL, 60606
312.360.0080 / 312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law

*Counsel for Amici Curiae Strategic Alliance For Fair Ecommerce, NFP, Chrome Hearts LLC, Crye Precision LLC, Costa Del Mar, Inc., Deckers Outdoor Corporation, Eye Safety Systems, Inc., Harley-Davidson Motor Company, Inc., Luxottica Group S.P.A., Mob Entertainment, Inc., Oakley, Inc., Pit Viper LLC, and Swarovski Aktiengesellschaft*

## CERTIFICATE OF SERVICE

The undersigned certifies that on **December 29, 2025**, an electronic copy of the foregoing was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

By: /s/ Justin R. Gaudio